# 26-263-cv

# United States Court of Appeals
### *for the*
# Second Circuit

CORY EPPS,

*Plaintiff-Appellee,*

v.

CITY OF BUFFALO, DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA, MARK R. COSTANTINO,
Executor of the Estate of Anthony Costantino,

*Defendants-Appellants,*

DETECTIVE JOHN BOHEN, DETECTIVE REGINALD MINOR, DETECTIVE
ROBERT CHELLA, DETECTIVE RANIERO MASECCHIA, DETECTIVE
CHARLES ARONICA, CHIEF JOSEPH RIGA,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## APPENDIX
## Volume 1 of 13 (Pages A-1 to A-245)

HUGH M. RUSS III
CHEYENNE N. FREELY
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

DAVID J. PANZARELLA
HODGSON RUSS LLP
1800 Bausch & Lomb Place
Rochester, New York 14604
(585) 454-0700

*Attorneys for Defendants-Appellants*

CP COUNSEL PRESS   (800) 4-APPEAL • (390342)

i

# TABLE OF CONTENTS

**Page**

District Court Docket Sheet ....................................... A-1

Complaint, dated February 28, 2019 ......................... A-17

Answer by Defendants, dated May 1, 2019 ............... A-44

Notice of Motion, by Defendants, for Summary
Judgment, dated October 7, 2022 .......................... A-66

Declaration of Peter A. Sahasrabudhe, for
Defendants, in Support of Motion, dated
October 7, 2022 ...................................................... A-68

    Exhibit 1 to Sahasrabudhe Declaration -
    Complaint, dated February 28, 2019,
    with Civil Cover Sheet ........................................... A-75

    Exhibit 2 to Sahasrabudhe Declaration -
    Answer by Defendants, dated May 1, 2019,
    with Certificate of Service ..................................... A-104

    Exhibit 3 to Sahasrabudhe Declaration -
    Deposition Testimony of John Bohen, dated
    January 19, 2021 ..................................................... A-127

    Exhibit 4 to Sahasrabudhe Declaration -
    Deposition Testimony of Reginald Minor, dated
    March 29, 2021 ....................................................... A-246

    Exhibit 5 to Sahasrabudhe Declaration -
    Deposition Testimony of Mark Stambach, dated
    June 18, 2021 ......................................................... A-328

    Exhibit 6 to Sahasrabudhe Declaration -
    Deposition Testimony of James F. Giardina,
    dated January 21, 2021 ........................................... A-420

ii

|  | Page |
|---|---|
| Exhibit 7 to Sahasrabudhe Declaration - Deposition Testimony of Anthony Costantino, dated February 12, 2021 | A-538 |
| Exhibit 8 to Sahasrabudhe Declaration - Deposition Testimony of Wymiko Anderson, dated August 11, 2021 | A-677 |
| Exhibit 9 to Sahasrabudhe Declaration - Deposition Testimony of Jacqueline Bradley, dated October 29, 2021 | A-736 |
| Exhibit 10 to Sahasrabudhe Declaration - Deposition Testimony of Jacqueline M. Bradley, dated August 4, 1997 | A-778 |
| Exhibit 11 to Sahasrabudhe Declaration - Trial Testimony of Jacqueline Bradley | A-792 |
| Exhibit 12 to Sahasrabudhe Declaration - Trial Testimony of Wymiko Anderson | A-848 |
| Exhibit 13 to Sahasrabudhe Declaration - Trial Testimony of Mark R. Stambach | A-931 |
| Exhibit 14 to Sahasrabudhe Declaration - Trial Testimony of James Giardina | A-946 |
| Exhibit 15 to Sahasrabudhe Declaration - Trial Testimony of Anthony Costantino | A-964 |
| Exhibit 16 to Sahasrabudhe Declaration - Transcript of Hearing before the Honorable Joseph P. McCarthy, dated December 9, 1997 | A-981 |
| Exhibit 17 to Sahasrabudhe Declaration - Affidavit of Patricia I. Carrington, sworn to August 28, 2000 | A-1061 |

**iii**

**Page**

Exhibit 18 to Sahasrabudhe Declaration -
Affidavit of Wymiko Anderson, sworn to
April 29, 2000...................................................... A-1063

Exhibit 19 to Sahasrabudhe Declaration -
Affidavit of Anthony Costantino, sworn to
August 30, 2000.................................................... A-1067

Exhibit 20 to Sahasrabudhe Declaration -
Affidavit of Mark Stambach, sworn to
August 30, 2000.................................................... A-1069

Exhibit 21 to Sahasrabudhe Declaration -
Affidavit of James Giardina, sworn to
August 30, 2000.................................................... A-1071

Exhibit 23 to Sahasrabudhe Declaration -
Affidavit of Patricia I. Carrington, sworn to
July 16, 1997........................................................ A-1073

Exhibit 24 to Sahasrabudhe Declaration -
Order of the Honorable Timothy J. Drury, dated
July 29, 1997........................................................ A-1076

Exhibit 25 to Sahasrabudhe Declaration -
Memorandum and Order of the Honorable Joseph
P. McCarthy, dated March 2, 2001.......................... A-1078

Exhibit 26 to Sahasrabudhe Declaration -
Memorandum and Order of the Honorable Joseph
P. McCarthy, dated September 13, 2001................. A-1086

Exhibit 27 to Sahasrabudhe Declaration -
Memorandum and Order of the Honorable Joseph
P. McCarthy, dated January 27, 1998..................... A-1091

Exhibit 28 to Sahasrabudhe Declaration -
Photograph Array, with Identification Affidavit of
Jacqueline Bradley, sworn to July 6, 1997............. A-1095

**iv**

**Page**

Exhibit 29 to Sahasrabudhe Declaration - Photograph Array by John Bohen .......................... A-1098

Exhibit 30 to Sahasrabudhe Declaration - Photograph Array by Juan Morales ....................... A-1100

Exhibit 31 to Sahasrabudhe Declaration - Indictment ............................................. A-1105

Exhibit 32 to Sahasrabudhe Declaration - Affidavit of Wymiko Anderson, sworn April 17, 1998 ....................................... A-1107

Exhibit 33 to Sahasrabudhe Declaration - Anonymous Letter, dated April 27, 1998 ............... A-1109

Exhibit 34 to Sahasrabudhe Declaration - Statement of Cory L. Epps, sworn to July 9, 1997 ............................................. A-1111

Exhibit 35 to Sahasrabudhe Declaration - Police Reports ......................................... A-1114

Exhibit 36 to Sahasrabudhe Declaration - Affidavit of Witness 1, sworn to November 11, 2014 (Filed Under Seal) .................................. A-1119

Exhibit 37 to Sahasrabudhe Declaration - Deposition Testimony of Witness 1 (Filed Under Seal) .................................. A-1120

Exhibit 38 to Sahasrabudhe Declaration - Deposition Testimony of Joseph Riga, dated May 5, 2021 ......................................... A-1121

Exhibit 39 to Sahasrabudhe Declaration - Order of the Honorable James F. Bargnesi, dated December 1, 2017 .................................. A-1216

v

**Page**

Exhibit 40 to Sahasrabudhe Declaration - Excerpt from Statement of Facts Filed in Connection with Epps's Criminal Proceedings ..... A-1218

Statement of Undisputed Material Facts by Defendants, dated October 7, 2022......................... A-1220

Memorandum of Law, by Defendants, in Support of Motion, dated October 7, 2022 .............................. A-1233

Letter from Peter Sahasrabudhe to the Honorable Leslie G. Foschio, dated November 10, 2022 ....... A-1272

Declaration of Rob Rickner, for Plaintiff, in Opposition to Motion, dated December 22, 2022................................. A-1273

Exhibit A to Rickner Declaration - Trial Transcript, dated April 22, 1998..................... A-1277

Exhibit B to Rickner Declaration - Deposition Testimony of Raniero Masecchia, dated February 17, 2021 ........................................ A-1645

Exhibit C to Rickner Declaration - Deposition Testimony of Robert Chella, dated January 25, 2021 ..................................................... A-1754

Exhibit D to Rickner Declaration - Channel 7 News Article, "Cory Epps is not the killer – so who is?" by Charlie Specht, dated December 1, 2017................................................. A-1878

Exhibit E to Rickner Declaration - Trial Transcript, dated December 9, 1997 ............. A-1888

Exhibit F to Rickner Declaration - Defendants' Discovery Demands, dated August 20, 1997..................................................... A-1969

vi

**Page**

Exhibit G to Rickner Declaration -
P73 Murder Investigation Forms from Murder of
Tomika Means......................................................... A-1984

Exhibit H to Rickner Declaration -
Composite Sketch Created with Help of
Jacqueline Bradley.................................................. A-1986

Exhibit I to Rickner Declaration -
Sentencing Transcript in *People v. Epps*,
Indictment #97-1542............................................... A-1987

Exhibit J to Rickner Declaration -
Buffalo Police Department Intra-Departmental
Correspondence, dated July 7, 1997 ...................... A-2020

Exhibit K to Rickner Declaration -
Handwritten Note from Tomika Means
Investigatory File, dated July 6, 1997.................... A-2021

Exhibit L to Rickner Declaration -
Photo Arrays Shown to Jacqueline Bradley
Indicating Witness #5 as Assailant ....................... A-2022

Exhibit M to Rickner Declaration -
Affidavit of Jacqueline Bradley, dated
July 6, 1997............................................................ A-2024

Exhibit N to Rickner Declaration -
Deposition Testimony of Charles Aronica, dated
March 30, 2021 ...................................................... A-2025

Exhibit O to Rickner Declaration -
Buffalo Police Department Intra-Departmental
Correspondence, dated June 24, 1997 ................... A-2071

Exhibit P to Rickner Declaration -
Buffalo Police Department Intra-Departmental
Correspondence, dated July 31, 1997.................... A-2072

vii

**Page**

Exhibit Q to Rickner Declaration -
Expert Testimony of Margaret Bull Kovera, PhD,
dated September 7, 2022........................................ A-2073

Exhibit R to Rickner Declaration -
Expert Report by Margaret Bull Kovera, PhD,
dated December 20, 2021 ...................................... A-2239

Exhibit S to Rickner Declaration -
Mug Shot of Cory Epps, taken May 18, 1997, at
the Buffalo Police Department .............................. A-2259

Exhibit T to Rickner Declaration -
Anonymous Letter, dated April 27, 1998............... A-2260

Exhibit U to Rickner Declaration -
50-h Deposition Testimony of Cory Epps, dated
May 24, 2018 ........................................................ A-2262

Exhibit V to Rickner Declaration -
Declaration of David Cotter, Esq., dated
December 19, 2022................................................ A-2346

Exhibit W to Rickner Declaration -
Affidavit of Jacqueline Bradley, dated
April 20, 2000....................................................... A-2348

Exhibit X to Rickner Declaration -
Hearing Transcript Held before the Honorable
Joseph P. McCarthy, dated May 15, 2001.............. A-2349

Exhibit Y to Rickner Declaration -
Affidavit of Mark Stambach, sworn to
August 30, 2000.................................................... A-2524

Exhibit Z to Rickner Declaration -
Supplemental Affidavit of Theresa M. Guenther,
sworn to June 15, 2002 ......................................... A-2526

viii

**Page**

Exhibit AA to Rickner Declaration - Affidavit of Lawrence M. Schwegler, dated August 30, 2000...................................................... A-2530

Exhibit BB to Rickner Declaration - Affidavit of Reginald Minor, sworn August 31, 2000...................................................... A-2532

Exhibit CC to Rickner Declaration - Affidavit of Anthony Constatino, sworn to August 30, 2000...................................................... A-2533

Exhibit DD to Rickner Declaration - Affidavit of Robert Chella, sworn to August 31, 2000...................................................... A-2535

Exhibit EE to Rickner Declaration - Affidavit of James Giardina, dated August 30, 2000...................................................... A-2537

Exhibit FF to Rickner Declaration - Exhibits to Raniero Masecchia Deposition Testimony................................................ A-2539

Exhibit GG to Rickner Declaration - Memorandum and Order of the Honorable Joseph P. McCarthy, dated September 13, 2001................. A-2874

Exhibit HH to Rickner Declaration - Affidavit of Wymiko Anderson, dated April 29, 2000........................................................ A-2879

Memorandum of Law by Plaintiff in Opposition to Motion, dated December 22, 2022 ........................ A-2881

46.1 Counter-Statement of Facts, by Plaintiff, dated December 22, 2022................................................. A-2921

ix

**Page**

Reply Declaration of Peter A. Sahasrabudhe, for
    Defendants, in Further Support of Motion, dated
    January 27, 2023 ..................................................... A-2950

Exhibit 41 to Sahasrabudhe Declaration -
    Memorandum and Order of the Honorable Joseph
    McCarthy, dated March 2, 2001 ........................... A-2952

Annexed to Sahasrabudhe Declaration -
    Affidavit of Patricia I. Carrington, sworn to
    January 26, 2023 ..................................................... A-2960

Reply Memorandum of Law in Further Support of
    Defendants' Motion, dated January 27, 2023 ........ A-2963

Report and Recommendation of the Honorable
    Leslie G. Foschia, United States Magistrate
    Judge, dated May 11, 2023 .................................... A-2978

Amended Report and Recommendation of the
    Honorable Leslie G. Foschia, United States
    Magistrate Judge, dated May 23, 2023 .................. A-3041

Memorandum in Support of Objection to Magistrate
    Judge Foschio's Report and Recommendation by
    Defendants, dated June 22, 2023 ........................... A-3104

Objections to the Magistrate Judge's Report and
    Recommendations by Plaintiff, dated
    June 28, 2023 ......................................................... A-3112

Memorandum in Response to Plaintiff's Objections
    to Judge Foschio's Report and Recommendation
    by Defendants, dated July 26, 2023 ...................... A-3146

Further Objections to the Magistrate Judge's Report
    and Recommendations by Plaintiff, dated
    August 28, 2023 ..................................................... A-3183

x

**Page**

Letter from Glenn A. Garber to the Honorable
   Judge Lawrence J. Vilardo, dated
   April 28, 2025 ........................................................ A-3203

Letter from Peter Sahasrabudhe to the Honorable
   Judge Lawrence J. Vilardo, dated
   April 29, 2025 ........................................................ A-3204

Transcript of Oral Argument before the Honorable
   Lawrence J. Vilardo, dated April 28, 2025 ............ A-3206

Decision and Order of the Honorable Lawrence J.
   Vilardo, dated January 16, 2026 ............................ A-3253

Notice of Interlocutory Appeal by Defendants,
   dated February 5, 2026 .......................................... A-3279

A-1

**Query      Reports      Utilities      Help      Log Out**

APPEAL,MEDIATION

# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Buffalo)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00281-LJV-LGF

| | |
|---|---|
| Epps v. City of Buffalo et al | Date Filed: 03/01/2019 |
| Assigned to: Hon. Lawrence J. Vilardo | Jury Demand: Both |
| Referred to: Hon. Leslie G. Foschio | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**Cory Epps**                                    represented by    **Alexander Daniel Garber**
Glenn A. Garber P.C
233 Broadway
Suite 2370
New York, NY 10279
212-965-9370
Fax: 212-965-9375
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Glenn Andrew Garber**
Glenn A. Garber P.C
233 Broadway
Suite 2370
New York, NY 10279
212-965-9370
Fax: 212-965-9375
Email: ggarber@glenngarber.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Howard Rickner**
Rickner PLLC
14 Wall Street
Suite 4C
New York, NY 10005
212-300-6506
Fax: 888-390-5401
Email: rob@rmcivilrights.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Buffalo**                              represented by    **Hugh M. Russ , III**
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street
Suite 100
Buffalo, NY 14202
(716) 856-4000
Fax: 716-849-0349
Email: hruss@hodgsonruss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
Hodgson Russ, LLP
The Guaranty Building
140 Pearl Street

A-2

Suite 100
Buffalo, NY 14202
716-848-1609
Email: cfreely@hodgsonruss.com
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
Buffalo Public Schools
65 Niagara Square
Room 713 City Hall
Buffalo, NY 14202
716-816-3922
Email: cpoole@lglaw.com
*TERMINATED: 10/07/2022*

**David M. Lee**
Corporation Counsel
The City of Buffalo
1100 City Hall
65 Niagara Square
Buffalo, NY 14202
716-851-9691
Fax: 716-851-4105
Email: dlee@city-buffalo.com
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
City of Buffalo Law Department
Suite 1112 City Hall
Buffalo, NY 14202
716 851-4317
Fax: 716 851-4105
Email: mhuggins@city-buffalo.com
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street
Suite 100
Buffalo, NY 14202
716-848-1508
Email: psahasra@hodgsonruss.com
*TERMINATED: 04/22/2026*

**Defendant**

**Detective John Bohan**                    represented by   **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

A-3

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Detective Reginald Minor**                    represented by **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Detective Mark Stambach**                    represented by **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Detective James Giardina**                    represented by **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**

A-4

(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Mark R. Constantino**                    represented by   **Hugh M. Russ , III**
*Executor of the Estate of Anthony Constantino*            (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Detective Robert Chella**                represented by   **Hugh M. Russ , III**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

A-5

**Defendant**

**Detective Raniero Massechia**                    represented by   **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Detective Charles Aronica**                      represented by   **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

**Defendant**

**Chief Joseph Riga**                              represented by   **Hugh M. Russ , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher R. Poole**
(See above for address)
*TERMINATED: 10/07/2022*

**David M. Lee**

A-6

(See above for address)
*ATTORNEY TO BE NOTICED*

**Maeve Eileen Huggins**
(See above for address)
*TERMINATED: 09/09/2021*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/22/2026*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/01/2019 | 1 | COMPLAINT against Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach $ 400 receipt number 0209-3376733, filed by Cory Epps. (Attachments: # 1 Civil Cover Sheet)(Rickner, Robert) (Entered: 03/01/2019) |
| 03/04/2019 |  | Case Assigned to Hon. Lawrence J. Vilardo. Notification to Chambers of on-line civil case opening. (NRE) (Entered: 03/04/2019) |
| 03/04/2019 |  | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO-85) is available for download at http://www.uscourts.gov/services-forms/forms. (NRE) (Entered: 03/04/2019) |
| 03/04/2019 |  | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative-dispute-resolution(NRE) (Entered: 03/04/2019) |
| 03/04/2019 |  | Remark: Original summons not submitted. (NRE) (Entered: 03/04/2019) |
| 04/03/2019 | 2 | CONTINUATION OF EXHIBITS to 1 Complaint, Remark *Request for Summons All Defendants*. (Attachments: # 1 Summons)(Rickner, Robert) (Entered: 04/03/2019) |
| 04/04/2019 | 3 | Summons Issued as to Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (NRE) (Entered: 04/04/2019) |
| 05/01/2019 | 4 | ANSWER to 1 Complaint, by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Attachments: # 1 Certificate of Service)(Huggins, Maeve) (Entered: 05/01/2019) |
| 05/02/2019 | 5 | TEXT REFERRAL ORDER (DISPOSITIVE) - Hon. H. Kenneth Schroeder Jr., United States Magistrate Judge, is hereby designated to act in this case as follows: Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), all pre-trial matters in this case are referred to the above-named United States Magistrate Judge, including but not limited to: (1) conduct of a scheduling conference and entry of a scheduling order pursuant to Fed. R. Civ. P. 16, (2) hearing and disposition of all non-dispositive motions or applications, (3) supervision of discovery, and (4) supervision of all procedural matters involving the aforementioned or involving the preparation of the case or any matter therein for consideration by the District Judge. The Magistrate Judge shall also hear and report upon dispositive motions for the consideration of the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). All motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge. The parties are encouraged to consider the provisions of 28 U.S.C. § 636(c) governing consent to either partial or complete disposition of the case, including trial if necessary, by the Magistrate Judge. Consent forms are available from the office of the Magistrate Judge or the office of the Clerk of Court. IT IS SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 5/2/2019. (CMD) (Entered: 05/02/2019) |
| 05/02/2019 | 6 | ORDER regarding issuance of Case Management Order. Signed by Hon. H. Kenneth Schroeder Jr. on 5/2/19. (Attachments: # 1 Case Management Order Form, # 2 Consent Memorandum, # 3 Consent Form)(LMG) (Entered: 05/02/2019) |
| 05/02/2019 |  | ADR Plan electronically forwarded to attorneys. The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative-dispute-resolution.(NRE) (Entered: 05/02/2019) |
| 05/07/2019 | 7 | NOTICE of Appearance by Glenn Andrew Garber on behalf of Cory Epps (Garber, Glenn) (Entered: 05/07/2019) |
| 06/05/2019 | 8 | DISCOVERY PLAN by Cory Epps.(Garber, Glenn) (Entered: 06/05/2019) |
| 06/06/2019 | 9 | CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Stipulation of Selection of Mediator due by 8/2/2019; Motions to Join Parties/Amend Pleadings due by 9/11/2019; First Mediation Session due by 10/11/2019; Plaintiff Expert Witness ID due by 1/13/2020; Defendant Expert Witness ID due by 2/6/2020; Discovery completed by 3/6/2020; Dispositive Motions due by 4/20/2020; Mediation To End by 5/15/2020. Signed by Hon. H. Kenneth Schroeder Jr. on 6/6/19. (LMG) (Entered: 06/06/2019) |

A-7

| 08/06/2019 | 10 | TEXT ORDER re 9 Scheduling Order. Upon the parties' letter request, the deadline to pick a mediator is hereby extended to 8/16/2019. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 8/06/2019. (HKG) (Entered: 08/06/2019) |
|---|---|---|
| 08/20/2019 | 11 | Letter filed by Cory Epps as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach *Regarding The Parties Inability to Agree on a Mediator*. (Rickner, Robert) (Entered: 08/20/2019) |
| 09/03/2019 | 12 | ORDER DESIGNATING MEDIATOR Richard J. Evans, Esq. in response to letter 11 Letter filed by Cory Epps. Signed by Hon. H. Kenneth Schroeder Jr. on 9/03/2019. (HKG)<br><br>-CLERK TO FOLLOW UP- (Entered: 09/03/2019) |
| 09/18/2019 | 13 | Letter filed by Cory Epps as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach *re. requesting an extension of time for the first mediation session*. (Garber, Glenn) (Entered: 09/18/2019) |
| 09/20/2019 | 14 | TEXT ORDER extending deadline for initial mediation to 10/17/2019. Issued by Hon. H. Kenneth Schroeder Jr. on 9/20/2019. (KER) (Entered: 09/20/2019) |
| 10/17/2019 | 15 | Mediation Certification by Richard J. Evans. Not settled, mediation complete.(AGW) (Entered: 10/17/2019) |
| 11/15/2019 | 16 | MOTION to Adjourn Discovery and Dispositive Motion Deadlines , MOTION for Extension of Time to Complete Discovery by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Attachments: # 1 Declaration, # 2 Certificate of Service)(Huggins, Maeve) (Entered: 11/15/2019) |
| 11/18/2019 | 17 | TEXT ORDER granting 16 Motion for Extension of Case Management Order as follows: Fact depositions completed by 3/5/2020; Plaintiff's Expert Witness Disclosure by 4/13/2020; Defendants' Expert Witness Disclosure by 5/6/2020; Expert Depositions completed by 6/8/2020; Dispositive Motions due by 7/20/2020. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 11/18/2019. (KER) (Entered: 11/18/2019) |
| 03/03/2020 | 18 | Second MOTION for Extension of Time to Complete Discovery by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Attachments: # 1 Declaration, # 2 Certificate of Service)(Huggins, Maeve) (Entered: 03/03/2020) |
| 03/04/2020 | | E-Filing Notification: Incorrect case number on pleadings, caption correct RE 18 Second MOTION for Extension of Time to Complete Discovery. No Action required. (TF) (Entered: 03/04/2020) |
| 03/04/2020 | 19 | TEXT ORDER granting 18 Motion for Extension of Time to Complete Discovery: Fact depositions to be completed by 6/5/2020; plaintiff's expert witnesses disclosed by 7/13/2020; defendants' expert witnesses disclosed by 8/6/2020; expert depositions completed by 9/8/2020; and dispositive motions filed by 10/20/2020. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 3/4/2020. (KER) (Entered: 03/04/2020) |
| 05/11/2020 | 20 | Letter filed by James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach . (Huggins, Maeve) (Entered: 05/11/2020) |
| 05/12/2020 | | E-Filing Notification: 20 Letter. This document contains a request for relief and should be filed as a motion. ACTION REQUIRED: Re-file document using the motion event. (TF) (Entered: 05/12/2020) |
| 05/12/2020 | 21 | MOTION for Extension of Time to Complete Discovery by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Huggins, Maeve) (Entered: 05/12/2020) |
| 05/21/2020 | 22 | TEXT ORDER granting in part and denying in part 21 Motion for Extension of Time to Complete Discovery and extending Case Management Order as follows: fact depositions to be completed by 8/28/2020; plaintiff's expert disclosure due by 9/14/2020; defendants' expert disclosure due by 10/18/2020; expert depositions completed by 12/18/2020; Dispositive motions due by 1/29/2021. The parties are encouraged to consider alternatives to in person depositions in light of current circumstances. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 5/21/2020. (KER) (Entered: 05/21/2020) |
| 08/27/2020 | 23 | Consent MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 08/27/2020) |
| 09/03/2020 | 24 | TEXT ORDER granting 23 Motion for Extension of Time to Complete Discovery: Fact Depositions to be completed by 11/27/2020; Plaintiff's expert witness disclosure by 12/18/2020; Defendants' expert witness disclosure by 1/15/2021; Expert depositions completed by 3/19/2021; All Discovery completed by 4/2/2021; Dispositive motions due by 4/30/2021. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 9/3/2020. (KER) (Entered: 09/03/2020) |
| 11/27/2020 | 25 | Joint MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 11/27/2020) |

A-8

| 11/30/2020 | 26 | TEXT ORDER granting 25 Motion for Extension of Time to Complete Discovery: Fact depositions shall be completed by 2/5/2021; Plaintiff's expert witness disclosure due by 2/19/2021; Defendants' expert witness disclosure due by 3/19/2021; Expert depositions completed by 4/30/2021; All discovery complete by 5/21/2021; Dispositive Motions due by 6/25/2021. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 11/30/2020. (KER) (Entered: 11/30/2020) |
| --- | --- | --- |
| 01/28/2021 | 27 | Joint MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 01/28/2021) |
| 01/29/2021 | 28 | TEXT ORDER granting 27 Motion for Extension of Time to Complete Discovery: Fact Depositions to be completed by 4/9/2021; Plaintiff's Expert Disclosure due by 4/23/2021; Defendants' Expert Disclosure due by 5/28/2021; Expert Depositions completed by 7/9/2021; Dispositive Motions due by 9/10/2021. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 1/29/2020. (KER) (Entered: 01/29/2021) |
| 03/31/2021 | 29 | Consent MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 03/31/2021) |
| 03/31/2021 | 30 | TEXT ORDER granting 29 Motion for Extension of Time to Complete Discovery: Fact Depositions to be completed by 5/21/2021; Plaintiff's Expert Disclosure by 6/4/2021; Defendants' Expert Disclosure by 7/9/2021; Expert Depositions completed by 8/20/2021 & Dispositive Motions due by 8/28/2021. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 3/31/2021. (KER) (Entered: 03/31/2021) |
| 05/20/2021 | 31 | Consent MOTION for Extension of Time to Complete Discovery *and Request to So Ordered Subpoena* by Cory Epps. (Attachments: # 1 Exhibit Subpoena We Ask Be So Ordered)(Rickner, Robert) (Entered: 05/20/2021) |
| 05/25/2021 | 32 | TEXT ORDER granting 31 Motion for Extension of Time to Complete Discovery: Fact Depositions to be completed by 7/2/2021; Plaintiff's expert witness disclosure due by 7/16/2021; Defendants' expert disclosure due by 8/20/2021; expert depositions completed by 10/1/2021; and dispositive motions due by 10/11/2021. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 5/25/2021. (KER) (Entered: 05/25/2021) |
| 07/02/2021 | 33 | Consent MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 07/02/2021) |
| 07/05/2021 | 34 | TEXT ORDER granting 33 Motion for Extension of Time to Complete Discovery: Fact Depositions to be completed by 8/17/2021; Plaintiff's Expert Witness Disclosure by 8/27/2021; Defendants' Expert Witness Disclosure by 10/1/2021; Expert Depositions completed by 11/12/2021; Dispositive Motions due by 11/22/2021. SO ORDERED. Issued by Hon. H. Kenneth Schroeder Jr. on 7/5/2021. (KER) (Entered: 07/05/2021) |
| 07/06/2021 | 35 | NOTICE of Appearance by Hugh M. Russ, III on behalf of All Defendants (Russ, Hugh) (Entered: 07/06/2021) |
| 07/06/2021 | 36 | NOTICE of Appearance by Peter A. Sahasrabudhe on behalf of All Defendants (Sahasrabudhe, Peter) (Entered: 07/06/2021) |
| 08/04/2021 | 37 | MOTION to Compel *Subpoena for the Testimony of J. Bradley* by Cory Epps. (Attachments: # 1 Declaration Declaration in Support of Rickner, # 2 Exhibit A - Subpoena, # 3 Exhibit B - Affidavit of Service, # 4 Exhibit C - Letter to Witness, # 5 Memorandum in Support)(Rickner, Robert) (Entered: 08/04/2021) |
| 08/10/2021 | 38 | AFFIDAVIT of Service for Motion Enforce Subpoena served on Jacqueline Bradley on 8/10/2021, filed by Cory Epps. (Rickner, Robert) (Entered: 08/10/2021) |
| 08/16/2021 | 39 | Consent MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 08/16/2021) |
| 08/18/2021 | 40 | TEXT ORDER: Due to a conflict, I hereby recuse myself from this case. SO ORDERED. Issued by the Hon. H. Kenneth Schroeder Jr. on 8/18/2021. (LMG)<br><br>-CLERK TO FOLLOW UP- (Entered: 08/18/2021) |
| 08/18/2021 | 41 | TEXT REFERRAL ORDER (DISPOSITIVE) - Hon. Leslie G. Foschio, United States Magistrate Judge, is hereby designated to act in this case as follows: Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), all pre-trial matters in this case are referred to the above-named United States Magistrate Judge, including but not limited to: (1) conduct of a scheduling conference and entry of a scheduling order pursuant to Fed. R. Civ. P. 16, (2) hearing and disposition of all non-dispositive motions or applications, (3) supervision of discovery, and (4) supervision of all procedural matters involving the aforementioned or involving the preparation of the case or any matter therein for consideration by the District Judge. The Magistrate Judge shall also hear and report upon dispositive motions for the consideration of the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). All motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge. The parties are encouraged to consider the provisions of 28 U.S.C. § 636(c) governing consent to either partial or complete disposition of the case, including trial if necessary, by the Magistrate Judge. Consent forms are available from the office of the Magistrate Judge or the office of the Clerk of Court. IT IS SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 8/18/2021. (CMD) (Entered: 08/18/2021) |

A-9

| | | |
|---|---|---|
| 08/25/2021 | 42 | TEXT ORDER granting 39 Motion for Extension of Time to Complete Discovery. SCHEDULING ORDER: Fact Depositions to be completed by 9/17/2021; Plaintiff's Expert Witness Disclosure by 10/8/2021; Defendants' Expert Witness Disclosure by 11/12/2021; Expert Depositions completed by 12/24/2021; Dispositive Motions due by 1/21/2022. Issued by Hon. Leslie G. Foschio on 8/25/2021. (SDW) (Entered: 08/25/2021) |
| 08/25/2021 | 43 | ORDER re 37 MOTION to Compel *Subpoena for the Testimony of J. Bradley* filed by Cory Epps. Responses due by 9/9/2021. Replies due by 9/14/2021. Oral Argument set for 9/16/2021 02:30 PM before Hon. Leslie G. Foschio. The Clerk of Court shall serve a copy of this Order upon Respondent, Jacqueline Bradley, at 65 Savona Street, Apt. #3, Buffalo, New York, 14210. Signed by Hon. Leslie G. Foschio on 8/25/2021. (SDW) (Entered: 08/25/2021) |
| 08/25/2021 | | Remark. Copy of Order filed 8/25/2021 (Dkt. 43) mailed to Respondent, Jacqueline Bradley, at 65 Savona Street, Apt. #3, Buffalo, New York, 14210. (SDW) (Entered: 08/25/2021) |
| 09/08/2021 | 44 | NOTICE of Withdrawal of Attorney: Maeve E Huggins no longer appearing for Defendant City of Buffalo.<br><br>**CLERK TO FOLLOW UP.**<br><br>(Attachments: # 1 Certificate of Service)(Poole, Christopher) (Entered: 09/08/2021) |
| 09/08/2021 | 45 | NOTICE of Appearance by Christopher R. Poole on behalf of All Defendants (Attachments: # 1 Certificate of Service) (Poole, Christopher) (Entered: 09/08/2021) |
| 09/16/2021 | 46 | Consent MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 09/16/2021) |
| 09/16/2021 | 47 | Minute Entry for proceedings held before Hon. Leslie G. Foschio: Oral Argument re: Plaintiff's motion for contempt held on 9/16/2021. Court noted on the record the non-appearance by non-party Jacqueline Bradley. Court to issue an order to show cause to be served upon Bradley by USMS. Parties also requested extension of time to complete discovery; court directed to file letter motion. Appearances via teleconference: Pltf:Glenn Garber, Esq., Robert Rickner, Esq. / Dft: Hugh Russ, Esq. (Court Reporter AT&T Teleconference Service and FTR.) (SDW) (Entered: 09/17/2021) |
| 09/16/2021 | 48 | ORDER TO SHOW CAUSE. Show Cause Response due by 9/24/2021. Plaintiff's reply due 9/29/2021. Show Cause Hearing set for 10/5/2021 02:00 PM in US Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Hon. Leslie G. Foschio. A copy of this Order to Show Cause shall be personally served upon Bradley by the U.S. Marshal's Service in accordance with Fed.R.Civ.P. 4.1(a) with proof of service in accordance with Fed.R.Civ.P. 4(l). Signed by Hon. Leslie G. Foschio on 9/16/2021. (SDW) (Entered: 09/17/2021) |
| 09/17/2021 | 49 | TEXT ORDER granting 46 Motion for Extension of Time to Complete Discovery :<br><br>Fact Depositions to be completed by 10/29/2021; Plaintiff's expert witness disclosure due by 11/19/2021; Defendants' expert disclosure due by 1/3/2022; expert depositions completed by 2/4/2022; and dispositive motions due by 3/4/2022. Issued by Hon. Leslie G. Foschio on 9/17/2021. (SDW) (Entered: 09/17/2021) |
| 09/23/2021 | 50 | MOTION for Extension of Time to File *Motion to Extend Dates in Order to Show Cause and Update re Witness* by Cory Epps.(Rickner, Robert) (Entered: 09/23/2021) |
| 09/24/2021 | 51 | TEXT ORDER granting 50 Motion for Extension of Time to File responses to Order to Show Cause.<br><br>Show Cause Response due by 10/8/2021. Plaintiff's reply due 10/13/2021. Show Cause Hearing set for 10/19/2021 02:00 PM in US Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Hon. Leslie G. Foschio.<br><br>A copy of this Text Order shall be provided to Respondent by United States Postal Service, 1st class mail. Issued by Hon. Leslie G. Foschio on 9/24/2021. (SDW) (Entered: 09/24/2021) |
| 09/24/2021 | | Remark. Copy of Text Order filed 9/24/2021 51 mailed to Respondent at 65 Savona Street, Apt. #3, Buffalo, New York, 14210 (SDW) (Entered: 09/24/2021) |
| 09/24/2021 | | Set Deadlines/Hearings: Show Cause Response due by 10/8/2021. Replies due by 10/13/2021. Show Cause Hearing set for 10/19/2021 02:00 PM before Hon. Leslie G. Foschio. (SDW) (Entered: 09/24/2021) |
| 10/14/2021 | 52 | TEXT ORDER. Show Cause Hearing set for 10/28/2021 02:00 PM in US Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Hon. Leslie G. Foschio, adjourned from 10/19/2021 at court's request. Issued by Hon. Leslie G. Foschio on 10/14/2021. (SDW) (Entered: 10/14/2021) |
| 10/14/2021 | | Remark. Copy of Text Order filed 10/14/2021 52 mailed to Respondent at 65 Savona Street, Apt. #3, Buffalo, New York, 14210. (SDW) (Entered: 10/14/2021) |
| 10/28/2021 | 53 | Minute Entry for proceedings held before Hon. Leslie G. Foschio: Show Cause Hearing held on 10/28/2021. The subpoenaed witness appeared and agreed to cooperate in a deposition to be conducted by Plaintiff on 10/29/2021 commencing at 11:00 a.m. to be arranged by Plaintiff's counsel. US Deputy Marshal served witness with the order to show cause. Witness provided Plaintiff's counsel with her correct contact information. The court expressed its appreciation to the witness for her cooperation and also their appreciation to the US Marshal Service for facilitating |

A-10

| | | |
|---|---|---|
| | | communication with the witness. Appearances: Pltf: Robert Rickner, Esq. / Dft: Hugh Russ, Esq., Peter Sahasrabudhe, Esq. (Court Reporter FTR Gold.) (SDW) (Entered: 10/29/2021) |
| 10/30/2021 | 54 | Letter filed by Cory Epps as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach *Informing Court the Bradley Deposition is Complete*. (Rickner, Robert) (Entered: 10/30/2021) |
| 11/02/2021 | 55 | Return of Service re Order to Show Cause (CGJ) (Entered: 11/02/2021) |
| 11/09/2021 | 56 | Consent MOTION for Extension of Time to Complete Discovery - *Expert Discovery* by Cory Epps.(Rickner, Robert) (Entered: 11/09/2021) |
| 11/10/2021 | 57 | TEXT ORDER granting 56 Motion for Extension of Time to Complete Discovery. SCHEDULING ORDER. Plaintiff's expert witness disclosure due by 12/20/2021; Defendants' expert disclosure due by 2/3/2022; expert depositions completed by 3/4/2022; and dispositive motions due by 4/4/2022. Signed by Hon. Leslie G. Foschio on 11/10/2021. (SDW) (Entered: 11/10/2021) |
| 12/20/2021 | 58 | Consent MOTION for Extension of Time to Complete Discovery by Cory Epps.(Rickner, Robert) (Entered: 12/20/2021) |
| 12/21/2021 | 59 | SCHEDULING ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Plaintiff Expert Witness ID due by 2/21/2022. Defendant Expert Witness ID due by 4/4/2022. Dispositive Motions due by 6/6/2022. Mediation To End by 7/6/2022.. Signed by Hon. Leslie G. Foschio on 12/21/2021. (SDW) (Entered: 12/21/2021) |
| 02/21/2022 | 60 | Consent MOTION for Extension of Time to Complete Discovery *for Experts* by Cory Epps.(Rickner, Robert) (Entered: 02/21/2022) |
| 02/22/2022 | 61 | TEXT ORDER granting 60 Motion for Extension of Time to Complete Discovery. Scheduling Order to be filed separately. Issued by Hon. Leslie G. Foschio on 2/22/2022. (SDW) (Entered: 02/22/2022) |
| 02/22/2022 | 62 | SCHEDULING ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Plaintiff Expert Witness ID due by 4/4/2022. Defendant Expert Witness ID due by 5/16/2022. Dispositive Motions due by 7/20/2022. Mediation To End by 8/16/2022. Signed by Hon. Leslie G. Foschio on 2/22/2022. (SDW) (Entered: 02/22/2022) |
| 04/21/2022 | 63 | First MOTION for Extension of Time to Complete Discovery by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Sahasrabudhe, Peter) (Entered: 04/21/2022) |
| 04/22/2022 | 64 | TEXT ORDER granting, upon the consent of the parties, 63 Motion for Extension of Time to Complete Discovery. Amended Scheduling Order to be filed separately. Issued by Hon. Leslie G. Foschio on 4/22/2022. (SDW) (Entered: 04/22/2022) |
| 04/22/2022 | 65 | SCHEDULING ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Defendant Expert Witness ID due by 6/13/2022. Expert depositions to be concluded by 8/12/2022. Dispositive Motions due by 8/17/2022. Mediation ends 9/9/2022. Signed by Hon. Leslie G. Foschio on 4/22/2022. (SDW) (Entered: 04/22/2022) |
| 06/13/2022 | 66 | Letter filed by James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach *Requesting Extension of Time to Complete Expert Disclosures*. (Sahasrabudhe, Peter) (Entered: 06/13/2022) |
| 06/14/2022 | | E-Filing Notification: re 66 Letter. This document contains a request for relief and should be filed as a motion. ACTION REQUIRED: Re-file document using the motion event. (CGJ) (Entered: 06/14/2022) |
| 06/14/2022 | 67 | Second MOTION for Extension of Time to Complete Discovery by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina.(Sahasrabudhe, Peter) (Entered: 06/14/2022) |
| 06/14/2022 | 68 | TEXT ORDER granting 67 Motion for Extension of Time to Complete Discovery. Amended Scheduling Order to be filed separately. Issued by Hon. Leslie G. Foschio on 6/14/2022. (SDW) (Entered: 06/14/2022) |
| 06/14/2022 | 69 | SCHEDULING ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Defendant Expert Witness ID due by 8/12/2022. Dispositive Motions due by 9/16/2022. Mediation can continue until 10/3/2022. Signed by Hon. Leslie G. Foschio on 6/14/2022. (SDW) (Entered: 06/14/2022) |

A-11

| | | |
|---|---|---|
| 09/16/2022 | 70 | First MOTION for Extension of Time to File *Defendants' Motion for Summary Judgment* by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 09/16/2022) |
| 09/19/2022 | 71 | NOTICE of Appearance by David M. Lee on behalf of All Defendants (Lee, David) (Entered: 09/19/2022) |
| 09/19/2022 | 72 | TEXT ORDER granting 70 Motion for Extension of Time to File. Amended Scheduling Order to be filed separately. Issued by Hon. Leslie G. Foschio on 9/19/2022. (SDW) (Entered: 09/19/2022) |
| 09/19/2022 | 73 | AMENDED SCHEDULING ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Dispositive Motions due by 10/7/2022. Mediation ends 10/28/2022.. Signed by Hon. Leslie G. Foschio on 9/19/2022. (SDW) (Entered: 09/19/2022) |
| 10/06/2022 | 74 | First MOTION for Leave to File Excess Pages *for Memorandum of Law in Support of Motion* by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 10/06/2022) |
| 10/06/2022 | 75 | TEXT ORDER granting 74 Motion for Leave to File Excess Pages. Issued by Hon. Leslie G. Foschio on 10/6/2022. (SDW) (Entered: 10/06/2022) |
| 10/06/2022 | 76 | NOTICE of Withdrawal of Attorney: Christopher R. Poole no longer appearing for Defendant City of Buffalo.<br><br>CLERK TO FOLLOW UP.<br><br>(Poole, Christopher) (Entered: 10/06/2022) |
| 10/07/2022 | 77 | First MOTION for Summary Judgment by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 10/07/2022) |
| 10/07/2022 | 78 | Declaration of Peter A. Sahasrabudhe in Support of Defendants' Motion For Summary Judgment 77 by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Errata 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 23, # 23 Exhibit 24, # 24 Exhibit 25, # 25 Exhibit 26, # 26 Exhibit 27, # 27 Exhibit 28, # 28 Exhibit 29, # 29 Exhibit 30, # 30 Exhibit 31, # 31 Exhibit 32, # 32 Exhibit 33, # 33 Exhibit 34, # 34 Exhibit 35, # 35 Exhibit 36 (to be filed under seal upon appropriate application), # 36 Exhibit 37 (to be filed under seal upon appropriate application), # 37 Exhibit 38, # 38 Exhibit 39, # 39 Exhibit 40)(Sahasrabudhe, Peter) Modified on 10/11/2022 (CGJ). (Entered: 10/07/2022) |
| 10/07/2022 | 79 | Defendants' Statement of Undisputed Facts Pursuant to Local Rule of Civil Procedure 56(a)(2) re 77 by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) Modified on 10/11/2022 (CGJ). (Entered: 10/07/2022) |
| 10/07/2022 | 80 | Memorandum of Law in Support of Defendants' Motion for Summary Judgment 77 by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) Modified on 10/11/2022 (CGJ). (Entered: 10/07/2022) |
| 10/11/2022 | | E-Filing Notification: re 78 , 79 and 80 . Documents filed improperly as motions. Court terminated motions and modified docket text to correctly reflect filing event. (CGJ) (Entered: 10/11/2022) |
| 10/11/2022 | 81 | TEXT ORDER re 77 First MOTION for Summary Judgment filed by Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, John Bohan. Responses due by 11/28/2022. Replies due by 12/28/2022 Oral argument at the discretion of the court. Issued by Hon. Leslie G. Foschio on 10/11/2022. (SDW) (Entered: 10/11/2022) |
| 11/10/2022 | 82 | MOTION to Seal Document by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 11/10/2022) |
| 11/10/2022 | 83 | TEXT ORDER granting 82 MOTION to Seal Document. The Defendants shall comply with the requirements in the Administrative Procedures Guide for Electronic Filing amended October 2022 for the Western District of New York (https://www.nywd.uscourts.gov/rules-individual-local-federal). Issued by Hon. Leslie G. Foschio on 11/10/2022. (SDW) (Entered: 11/10/2022) |
| 11/14/2022 | 84 | Sealed Document: non-redacted versions of Dkt. #s 78-35, 78-36 (CGJ) (Entered: 11/15/2022) |
| 11/22/2022 | 85 | Joint MOTION for Extension of Time to File *Opposition and Reply to Motion for Summary Judgment* by Cory Epps. (Rickner, Robert) (Entered: 11/22/2022) |

| | | |
|---|---|---|
| 11/28/2022 | 86 | TEXT ORDER granting 85 Motion for Extension of Time to File Response/Reply re 77 First MOTION for Summary Judgment filed by Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, John Bohan. Responses due by 12/19/2022. Replies due by 1/18/2023. Oral argument at the discretion of the court. Issued by Hon. Leslie G. Foschio on 11/28/2022. (SDW) (Entered: 11/28/2022) |
| 12/15/2022 | 87 | Consent MOTION for Extension of Time to File *Opposition to MSJ* by Cory Epps.(Rickner, Robert) (Entered: 12/15/2022) |
| 12/16/2022 | 88 | TEXT ORDER granting 87 Motion for Extension of Time to File Response/Replyre 77 First MOTION for Summary Judgment filed by Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, John Bohan.<br><br>Responses due by 12/21/2022. Replies due by 1/23/2023. Oral argument at the discretion of the court. Issued by Hon. Leslie G. Foschio on 12/16/2022. (SDW) (Entered: 12/16/2022) |
| 12/22/2022 | 89 | DECLARATION signed by Rob Rickner re 77 First MOTION for Summary Judgment filed by Cory Epps filed by Cory Epps. (Attachments: # 1 Exhibit A Trial Transcript, # 2 Exhibit B Massechia Dep, # 3 Exhibit C Chella Dep, # 4 Exhibit D Article, # 5 Exhibit E Wade Huntley Hearing, # 6 Exhibit F Discovery Demands, # 7 Exhibit G P73 Forms, # 8 Exhibit H Identikit, # 9 Exhibit I Sentencing Transcript, # 10 Exhibit J 7-7-97 Correspondence, # 11 Exhibit K Handwritten Note, # 12 Exhibit L Photo Array Epps, # 13 Exhibit M Signed Photo Identification, # 14 Exhibit N Aronica Dep, # 15 Exhibit O 6-24-97 Correspondence, # 16 Exhibit P 7-31-97 Correspondence, # 17 Exhibit Q Dr. Kovera Testimony, # 18 Exhibit R Kovera Report, # 19 Exhibit S Epps Mug Shot, # 20 Exhibit T Anderson Anonymous Letter, # 21 Exhibit U Epps 50-h, # 22 Exhibit V Cotter Declaration, # 23 Exhibit W Bradley Affidavit, # 24 Exhibit X 440, # 25 Exhibit Y Stambach Aff, # 26 Exhibit Z Gunter 440 Aff, # 27 Exhibit AA Schweigler Aff, # 28 Exhibit BB Minor Aff, # 29 Exhibit CC Constantino Aff, # 30 Exhibit DD Chella Aff, # 31 Exhibit EE Giardina Aff, # 32 Exhibit FF Massechia Aff, # 33 Exhibit GG 440 Order, # 34 Exhibit HH Anderson Aff)(Rickner, Robert) (Entered: 12/22/2022) |
| 12/22/2022 | 90 | MEMORANDUM in Opposition re 77 First MOTION for Summary Judgment filed by Cory Epps. (Rickner, Robert) (Entered: 12/22/2022) |
| 12/22/2022 | 91 | STATEMENT OF FACTS *56.1 Counter-Statement of Facts* by Cory Epps Related document: 77 Motion for Summary Judgment. (Rickner, Robert) (Entered: 12/22/2022) |
| 01/20/2023 | 92 | First MOTION for Extension of Time to File Response/Reply as to 90 Memorandum in Opposition to Motion *for Summary Judgment* by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 01/20/2023) |
| 01/20/2023 | 93 | TEXT ORDER granting 92 Motion for Extension of Time to File Response/Reply re 92 First MOTION for Extension of Time to File Response/Reply as to 90 Memorandum in Opposition to Motion *for Summary Judgment*, 77 First MOTION for Summary Judgment.<br><br>Replies due by 1/27/2023. Issued by Hon. Leslie G. Foschio on 1/20/2023. (SDW) (Entered: 01/20/2023) |
| 01/27/2023 | 94 | REPLY to Response to Motion re 77 First MOTION for Summary Judgment filed by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Attachments: # 1 Exhibit 41 - Memorandum & Order, # 2 Affidavit of Patricia Carrington) (Sahasrabudhe, Peter) (Entered: 01/27/2023) |
| 01/27/2023 | 95 | MEMORANDUM in Support re 77 First MOTION for Summary Judgment filed by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Sahasrabudhe, Peter) (Entered: 01/27/2023) |
| 05/11/2023 | 96 | REPORT AND RECOMMENDATIONS re 77 First MOTION for Summary Judgment filed by Defendants Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, and John Bohan should be GRANTED and the Complaint should be DISMISSED as against Defendants City of Buffalo, Bohen, Minor, Stambach, Giardina, and Costantino. Objections due fourteen days from receipt. Signed by Hon. Leslie G. Foschio on 05/11/2023. (TAH) (Entered: 05/11/2023) |
| 05/23/2023 | 97 | First MOTION Joint Request for Clarification and Guidance on How to Proceed by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 05/23/2023) |
| 05/23/2023 | 98 | Consent MOTION for Extension of Time to File *a Motion Under Rule 72 Re: The Report and Recommendations* by Cory Epps.(Rickner, Robert) (Entered: 05/23/2023) |

A-13

| 05/23/2023 | 99 | AMENDED REPORT AND RECOMMENDATION re 77 First MOTION for Summary Judgment filed by Defendants should be GRANTED. (This Amended Report and Recommendation replaces an incorrect date on page 16, and clarifies the status of the non-moving Defendants and the conclusion, but no substantive changes are made). Objections due fourteen days from receipt. Signed by Hon. Leslie G. Foschio on 5/23/2023. (TAH) (Entered: 05/23/2023) |
|---|---|---|
| 05/24/2023 | 100 | TEXT ORDER granting 98 Motion for Extension of Time. The time for the parties to object to the 96 , 99 Report and Recommendation is extended until 6/15/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 5/24/2023. (WMH) (Entered: 05/24/2023) |
| 06/13/2023 | 101 | Consent MOTION for Extension of Time to File *Objections to Report and Recommendations* by Cory Epps.(Rickner, Robert) (Entered: 06/13/2023) |
| 06/14/2023 | 102 | TEXT ORDER granting 101 Motion for Extension of Time. The time for the parties to object to the 96 , 99 Report and Recommendation is extended until 6/22/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 6/14/2023. (WMH) (Entered: 06/14/2023) |
| 06/22/2023 | 103 | OBJECTIONS to REPORT AND RECOMMENDATIONS re 77 First MOTION for Summary Judgment filed by Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, John 99 *Declaration of Peter A. Sahasrabudhe in Support of Limited Objection to R&R* filed by Defendants Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.. (Attachments: # 1 Exhibit A- September 16, 2022 E-mail Correspondence, # 2 Exhibit B- Late September Early October E-mail Correspondence, # 3 Memorandum in Support of Objection to R&R)(Sahasrabudhe, Peter) (Entered: 06/22/2023) |
| 06/22/2023 | 104 | Consent MOTION for Leave to File Excess Pages by Cory Epps.(Rickner, Robert) (Entered: 06/22/2023) |
| 06/22/2023 | 105 | OBJECTIONS to REPORT AND RECOMMENDATIONS re 77 First MOTION for Summary Judgment filed by Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, John 99 filed by Plaintiff Cory Epps.. (Rickner, Robert) (Entered: 06/22/2023) |
| 06/23/2023 | 106 | TEXT ORDER re: 103 , 105 Objections to the 96 , 99 Report and Recommendation. The motion for leave to file excess pages, Docket Item 104 , is GRANTED. Responses due by 7/14/2023. Replies due by 7/28/2023. If necessary, oral argument will be scheduled at a later time. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 6/23/2023. (WMH) (Entered: 06/23/2023) |
| 06/27/2023 | 107 | Letter filed by Cory Epps as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach *requesting permission to filed a corrected version of our brief in opposition to the Magistrates Report and Recommendation regarding summary judgment.*. (Attachments: # 1 Exhibit Corrected version of brief)(Garber, Glenn) (Entered: 06/27/2023) |
| 06/28/2023 | 108 | TEXT ORDER granting the plaintiff's letter request, Docket Item 107 . The plaintiff shall file the corrected version of the brief in support of his objection on the docket. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 6/28/2023. (WMH) (Entered: 06/28/2023) |
| 06/28/2023 | 109 | OBJECTION to 99 Report and Recommendations *Corrected version* by Cory Epps. (Garber, Glenn) (Entered: 06/28/2023) |
| 07/07/2023 | 110 | Letter filed by City of Buffalo as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach . (Sahasrabudhe, Peter) (Entered: 07/07/2023) |
| 07/10/2023 | 111 | TEXT ORDER granting the defendants' request for leave to file excess pages, Docket Item 104 . The page limit for the defendants' response to the plaintiff's objection is increased to 30 pages. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 7/10/2023. (WMH) (Entered: 07/10/2023) |
| 07/12/2023 | 112 | First MOTION for Extension of Time to File Response/Reply *to R&R Objections* by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 07/12/2023) |
| 07/13/2023 | 113 | TEXT ORDER granting 112 Motion for Extension of Time. Responses now due by 7/21/2023. Replies now due by 8/4/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 7/13/2023. (WMH) (Entered: 07/13/2023) |
| 07/20/2023 | 114 | Second MOTION for Extension of Time to File Response/Reply *to R&R Objections* by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach.(Sahasrabudhe, Peter) (Entered: 07/20/2023) |
| 07/21/2023 | 115 | TEXT ORDER granting 114 Second Motion for Extension of Time. Response now due by 7/26/2023. Reply now due by 8/9/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 7/21/2023.(WMH) (Entered: 07/21/2023) |
| 07/26/2023 | 116 | REPLY/RESPONSE to re 105 Objections -- non-motion, *Defendants' Response to Plaintiff's Objections to Report and Recommendation* filed by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Anthony Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Sahasrabudhe, Peter) (Entered: 07/26/2023) |

A-14

| | | |
|---|---|---|
| 08/08/2023 | 117 | First MOTION for Extension of Time to File Response/Reply *reply to response to R&R objections* by Cory Epps. (Garber, Glenn) (Entered: 08/08/2023) |
| 08/09/2023 | 118 | TEXT ORDER granting 117 Motion for Extension of Time. The plaintiff's reply is now due by 8/18/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 8/9/2023. (WMH) (Entered: 08/09/2023) |
| 08/17/2023 | 119 | Letter filed by Cory Epps as to James Giardina, Joseph Riga, John Bohan, Anthony Constantino, Raniero Massechia, City of Buffalo, Robert Chella, Reginald Minor, Charles Aronica, Mark Stambach *requesting extension of time to file a reply*. (Garber, Glenn) (Entered: 08/17/2023) |
| 08/18/2023 | 120 | TEXT ORDER granting 119 Request for Extension of Time. The plaintiff's reply is now due by 8/25/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 8/18/2023. (WMH) (Entered: 08/18/2023) |
| 08/24/2023 | 121 | Consent MOTION for Extension of Time to File Response/Reply by Cory Epps.(Rickner, Robert) (Entered: 08/24/2023) |
| 08/25/2023 | 122 | TEXT ORDER granting 121 Consent Motion for Extension of Time. The plaintiff's reply is now due by 8/28/2023. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 8/25/2023.(WMH) (Entered: 08/25/2023) |
| 08/28/2023 | 123 | Consent MOTION for Leave to File Excess Pages *for R&R Reply* by Cory Epps.(Rickner, Robert) (Entered: 08/28/2023) |
| 08/28/2023 | 124 | REPLY to Response to Motion re 99 REPORT AND RECOMMENDATIONS re 77 First MOTION for Summary Judgment filed by Charles Aronica, Raniero Massechia, James Giardina, Reginald Minor, Mark Stambach, Anthony Constantino, Joseph Riga, Robert Chella, City of Buffalo, John filed by Cory Epps. (Rickner, Robert) (Entered: 08/28/2023) |
| 08/29/2023 | 125 | TEXT ORDER granting 123 Motion for Leave to File Excess Pages. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 8/29/2023.(WMH) (Entered: 08/29/2023) |
| 12/07/2023 | 126 | TEXT ORDER. Contrary to the letter of May 23, 2023, the Court takes no position as to whether Defendant Chella has any liability to Plaintiff. Any further action with regard to Chella's status in this case must await further motion practice directed to Chella. Accordingly, the parties' joint Motion Requesting Clarification and Guidance on How to Proceed (Dkt. 97 ) is DENIED. SO ORDERED. Entered by Hon. Leslie G. Foschio on 12/7/2023. (TAH) (Entered: 12/07/2023) |
| 03/03/2025 | 127 | MOTION to Substitute Party *and Request for Oral Argument* by Cory Epps.(Rickner, Robert) (Entered: 03/03/2025) |
| 04/14/2025 | 128 | TEXT ORDER re 109 Objection to Report and Recommendations filed by Cory Epps. Oral Argument set for 4/28/2025 at 2:00 PM in U.S. Courthouse, 2 Niagara Square, Niagara Courtroom, 8th Floor West, Buffalo, NY 14202-3350 before Hon. Lawrence J. Vilardo. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 4/14/2025. (RFI) (Entered: 04/14/2025) |
| 04/22/2025 | 129 | MOTION to appear pro hac vice ( Filing fee $ 200 receipt number ANYWDC-5463154.) by Cory Epps. (Attachments: # 1 Exhibit Admission sponsor form, # 2 Exhibit Attorney's affidavit, # 3 Exhibit Cert of good standing, # 4 Exhibit Attorney's Oath, # 5 Exhibit Petition for Attorney admission, # 6 Exhibit ECF Registration, # 7 Exhibit Civility principles oath)(Garber, Glenn) (Entered: 04/22/2025) |
| 04/23/2025 | | E-Filing Notification: 129 MOTION to appear pro hac vice: Please note, local counsel is required pursuant to Local Rule 83.2(a)(1). (JLH) (Entered: 04/23/2025) |
| 04/25/2025 | 130 | TEXT ORDER granting 129 Motion for Pro Hac Vice for Alexander D. Garber. Issued by Hon. Leslie G. Foschio on 4/25/2025. (SDW)<br><br>Clerk to Follow up (Entered: 04/25/2025) |
| 04/28/2025 | 131 | Minute Entry for proceedings held before Hon. Lawrence J. Vilardo: Attorney Admission Ceremony of Alexander Garber and Oral Argument re 109 Objection to 96 Report and Recommendations filed by Cory Epps held on 4/28/2025. Court admitted Attorney Alexander Garber to the WDNY. Court reserved decision. Appearances. For plaintiff: Glenn A. Garber and Alexander D. Garber. Plaintiff present. For defendants: Hugh M. Russ, III and Peter A. Sahasrabudhe. (Court Reporter Ann M. Sawyer.) (CMD) (Entered: 04/28/2025) |
| 04/28/2025 | 132 | Letter filed by Cory Epps *re. testimonial immunity*. (Garber, Glenn) (Entered: 04/28/2025) |
| 04/29/2025 | 133 | REPLY/RESPONSE to re 132 Letter filed by Charles Aronica, Joseph Riga, City of Buffalo, John Bohan, Reginald Minor, Mark Stambach, James Giardina, Anthony Constantino, Robert Chella, Raniero Massechia. (Sahasrabudhe, Peter) (Entered: 04/29/2025) |

CM/ECF LIVE(C) - U.S. District Court:nywd

| | | |
|---|---|---|
| 05/05/2025 | 134 | TEXT ORDER re 127 Motion to Substitute. On March 3, 2025, the plaintiff, Cory Epps, moved to substitute Mark R. Constantino, the executor of the estate of a deceased defendant, Anthony Constantino, as a defendant in this matter. The other defendants consent to the substitution. The Clerk of the Court therefore shall substitute Mark R. Constantino, Executor of the Estate of Anthony Constantino, as a defendant in place of Anthony Constantino and amend the caption accordingly. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 5/5/2025. (PTE)<br><br>Clerk to Follow up (Entered: 05/05/2025) |
| 06/03/2025 | 135 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of ATTORNEY ADMISSION OF ALEXANDER DANIEL GARBER, AND ORAL ARGUMENT held on 4/28/25, before Judge Lawrence J. Vilardo. Court Reporter/Transcriber Ann Meissner Sawyer, Ann_Sawyer@nywd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/24/2025. Redacted Transcript Deadline set for 7/8/2025. Release of Transcript Restriction set for 9/2/2025. (AMS) Modified on 6/3/2025 (CGJ). (Entered: 06/03/2025) |
| 06/03/2025 | | E-Filing Notification: re 135 Docket text modified to correct Attorney's name (CGJ) (Entered: 06/03/2025) |
| 01/16/2026 | 136 | DECISION & ORDER granting in part and denying in part 77 Motion for Summary Judgment; adopting in part 99 Amended Report and Recommendation. For the reasons stated in the attached decision, the defendants' motion for summary judgment, Docket Item 77, is GRANTED in part and DENIED in part. Epps's pre-trial due process claims against Stambach, Giardina, and Costantino, as well as his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution, may proceed to trial. But Epps's remaining claims are dismissed. The Court will schedule a status conference to set a trial date. SO ORDERED. Signed by Hon. Lawrence J. Vilardo on 1/16/2026. (RFI) (Entered: 01/16/2026) |
| 02/05/2026 | 137 | NOTICE OF INTERLOCUTORY APPEAL as to 136 Order on Motion for Summary Judgment,, by City of Buffalo, Mark R. Constantino, James Giardina, Mark Stambach. Filing fee $ 605, receipt number ANYWDC-5707868. Appeal Record due by 2/19/2026. (Sahasrabudhe, Peter) (Entered: 02/05/2026) |
| 02/06/2026 | | Within 14 days of filing the Notice of Appeal, the appellant is required to electronically file with the District Court an index of filed documents it wishes the Court of Appeals to consider, called Designation of Record on Appeal. After receipt, the Clerks Office will certify and transmit the index to the Circuit.<br><br>Pursuant to Local Rule 12.1 of the US Court of Appeals for the Second Circuit, Forms C and D must be completed within 14 days after the filing of a notice of appeal. Forms C and D can be obtained at www.ca2.uscourts.gov. (NRE) (Entered: 02/06/2026) |
| 02/18/2026 | 138 | DESIGNATION of Record on Appeal by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Mark R. Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach re 137 Notice of Interlocutory Appeal, CLERK TO FOLLOW UP (Sahasrabudhe, Peter) (Entered: 02/18/2026) |
| 02/19/2026 | 139 | CLERKS CERTIFICATE filed and electronically sent to Court of Appeals. (NRE) (Entered: 02/19/2026) |
| 03/02/2026 | 140 | First MOTION for Settlement by Cory Epps.(Garber, Glenn) (Entered: 03/02/2026) |
| 03/03/2026 | 141 | TEXT ORDER granting 140 First MOTION for Settlement Conference filed by Cory Epps. The parties shall confer and select a Mediator, confirm the Mediator's availability, ensure that the Mediator does not have a conflict with any of the parties in the case, identify a date and time for the initial mediation session, and file a stipulation confirming their selection on the form provided by the Court no later than **3/17/2026**. The initial mediation session shall be held no later than **4/17/2026**. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 3/3/2026. (RFI) (Entered: 03/03/2026) |
| 03/17/2026 | 142 | Letter filed by Cory Epps *re mediator*. (Garber, Glenn) (Entered: 03/17/2026) |
| 03/18/2026 | | E-Filing Notification regarding 142 Letter filed by Cory Epps *re mediator*: The incorrect form was submitted. Action required: Filer should complete the Stipulation form and file it in CM/ECF using the option for Stipulation-Selection of Mediator. Form can be located on Courts Web Site at www.nywd.uscourts.gov/ alternative-dispute-resolution. (LB) (Entered: 03/18/2026) |
| 03/20/2026 | 143 | Stipulation-Selection of Mediator by Cory Epps(Garber, Glenn) (Entered: 03/20/2026) |
| 04/08/2026 | 144 | Mediation Certification by Michael A. Brady. The case has not settled mediation will continue on 5/22/2026.(Brady, Michael) (Entered: 04/08/2026) |
| 04/21/2026 | 145 | MOTION to Withdraw as Attorney by Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Mark R. Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach. (Attachments: # 1 Declaration of Peter A. Sahasrabudhe)(Sahasrabudhe, Peter) (Entered: 04/21/2026) |
| 04/22/2026 | 146 | TEXT ORDER granting 145 Motion to Withdraw as Attorney. Attorney Peter A. Sahasrabudhe terminated. Issued by Hon. Leslie G. Foschio on 4/22/2026. (SDW) (Entered: 04/22/2026) |
| 04/29/2026 | 147 | NOTICE of Appearance by Cheyenne Nicole Freely on behalf of Charles Aronica, John Bohan, Robert Chella, City of Buffalo, Mark R. Constantino, James Giardina, Raniero Massechia, Reginald Minor, Joseph Riga, Mark Stambach |

A-16

| | | (Freely, Cheyenne) (Entered: 04/29/2026) |
|---|---|---|

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/08/2026 17:20:51 | | |
| **PACER Login:** cpnycpara16 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 1:19-cv-00281-LJV-LGF |
| **Billable Pages:** 22 | **Cost:** | 2.20 |

A-17

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CORY EPPS,

                          Plaintiff,

          -against-

THE CITY OF BUFFALO, DETECTIVE
JOHN BOHAN, DETECTIVE
REGINALD MINOR, DETECTIVE
MARK STAMBACH, DETECTIVE
JAMES GIARDINA, DETECTIVE
ANTHONY CONSTANTINO,
DETECTIVE ROBERT CHELLA,
RANIERO MASSECHIA, CHARLES
ARONICA AND CHIEF JOSEPH RIGA.

                          Defendants.

**COMPLAINT**

**Dkt. No. 19 cv _____**

**PLEASE TAKE NOTICE** that Plaintiff Cory Epps, through his attorneys, Glenn A. Garber, P.C. and Rickner PLLC, hereby alleges as follows:

## NATURE OF THE CASE

1.       Although innocent, Plaintiff Cory Epps ("Epps") was wrongfully convicted of the 1997 murder of Tomika Means ("Means") and served more than twenty years in prison until he was finally exonerated and released in 2017.

2.       Epps was convicted due to the wrongdoing of detectives in the small homicide unit of the Buffalo Police Department who were simultaneously investigating the Means murder and the murder of Paul Pope, investigations which overlapped prior to Epps' conviction. Days before Epps was going to trial for the Means' murder, the police became aware that Russell Montgomery ("Montgomery"), who was suspected of murdering Pope (and who was later convicted of that crime) was also a viable suspect in the Means murder. Nevertheless, detectives

1

A-18

suppressed this exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny ("*Brady*"). Had this evidence been disclosed to Epps and his trial counsel, Epps, who had a compelling alibi, would not have been convicted.

3.      When Epps' defense attorneys finally learned at least part of what happened, they filed motions for a new trial conviction – first a motion in 1998 under CPL § 330.30 after verdict but before sentencing ("330 motion"), then one in 2000 under CPL § 440.10 ("440 motion"). Both were denied.  However, the denial of these motions was caused by the pretrial suppression of evidence that linked Montgomery to the Means murder, including a statement from a witness that directly implicated Montgomery; suppression of the identity of the exculpatory witness that destroyed any chance of success of the 330 motion and that delayed the 440 motion by two years and undermined it; and perjurious and misleading testimony at the 440 hearing that covered-up the suppression of the exculpatory evidence.  After Epps' conviction but before the 440 hearing, additional exculpatory evidence that implicated Montgomery in the Means murder and exculpated Epps was also withheld that further made 440 litigation incomplete and unfair and further undermined the integrity of the process and proceeding.

4.      Moreover, during the initial investigation of the Means murder, the detectives employed suggestive identification procedures with the only eyewitness that led to Epps' misidentification and then improperly bolstered the eyewitness' certainty of the misidentification, causing Epps to be maliciously prosecuted without probable and unfairly tried.

5.      As a result of the police misconduct, Epps spent over two decades in jail.

6.      His nightmare finally ended in 2017 when even more exculpatory evidence came to light that finally enabled a fair and successful 440 determination.

7.      In conceding Epps' motion and agreeing to vacate his conviction and dismiss the

2

A-19

indictment, the Erie County District Attorney John Flynn was emphatic that Epps "should not spend one more night in prison."  Flynn also stated Epps and Montgomery look "eerily similar" to Russell Montgomery the real killer of Tomika Means.

## JURISDICTION AND VENUE

8.     This Court has original subject matter jurisdiction over Epps' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Epps' claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution.

9.     This Court has supplemental jurisdiction over Epps' state law claims pursuant to 28 U.S.C. § 1367(a).

10.    Epps complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on the City of Buffalo on February 22, 2018.  More than 30 days have elapsed since the notice of claim, and no offer of settlement has been made.

11.    Epps submitted to a hearing pursuant to New York General Municipal Law Section 50-h on May 24, 2018.

12.    Venue is lodged in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391(b) because substantial parts of the events or omissions giving rise to the claim occurred in the Western District of New York, including the defective investigation and *Brady* violations by the Defendants.

## JURY DEMAND

13.    Days demands trial by jury in this action.

## PARTIES

14.    Plaintiff Cory Epps was wrongfully indicted, prosecuted, tried, convicted, and

3

imprisoned by the actions of the Defendants named herein. He lives in Erie County, in the State of New York.

15.     Defendant City of Buffalo is and was a municipal corporation organized and existing under the laws of the State of New York, with principal offices in the City of Buffalo, County of Erie, State of New York, and is fully responsible for the Buffalo Police Department.

16.     Defendant Detective John Bohan ("Detective Bohan"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

17.     Defendant Detective Bohan is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

18.     Defendant Detective Reginald Minor ("Detective Minor"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

19.     Defendant Detective Minor is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

4

20.     Defendant Detective Mark Stambach ("Detective Stambach"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

21.     Defendant Detective Stambach is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

22.     Defendant Detective James Giardina ("Detective Giardina"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

23.     Defendant Detective Giardina is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

24.     Defendant Detective Anthony Constantino ("Detective Constantino"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a

5

member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

25. Defendant Detective Constantino is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

26. Defendant Detective Robert Chella ("Detective Chella"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

27. Defendant Detective Chella is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

28. Defendant Detective Raniero Massechia ("Detective Massechia"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

29. Defendant Detective Massechia is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

30.    Defendant Detective Charles Aronica ("Detective Aronica"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

31.    Defendant Detective Aronica is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

32.    Defendant Chief Joseph Riga ("Chief Riga"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

33.    Defendant Chief Riga is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

34.    Together, Detectives Bohan, Minor, Stambach, Giardina, Constantino, Chella, Massechia, and Aronica, and Chief Riga are referred to collectively as the "Defendant Detectives."

7

A-24

**FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS**

**Russell Montgomery Kills Tomika Means and the Initial Investigation**

35.    On Monday, May 26, 1997, shortly after four o'clock in the morning, Tomika Nicole Means was murdered while driving home from Birchfield's, a popular Buffalo nightclub.

36.    The murder occurred in a "road rage" incident.  Means was with her friend Jacqueline Bradley, who was in the passenger seat, when a car cut them off nearly causing an accident.  Means honked the car horn and continued driving.  The same car that had cut in front of them then pulled up alongside, and Montgomery leaned out of the front passenger seat and yelled at Means.

37.    When Means and Bradley reached the intersection of East Delevan and Chelsea Street, the same car cut in front of them again and stopped.  Montgomery exited the passenger seat of the vehicle and approached the passenger side window of Means' car.  He leaned in, drew a gun, and pointed it at Means. Bradley said, "It ain't worth it," but he replied, "Fuck that, bitch," and shot Means once in the head before returning to his car and fleeing the scene.

38.    Bradley described the shooter as a black male, five feet eight inches or five feet nine inches tall and weighing approximately 250 pounds, with noticeable pockmarks on his face, and a light goatee or beard. The pockmarks – scarring from acne – were particularly visible, because Montgomery was leaning into the passenger side, just inches away from Bradley. He was also wearing a baseball cap.

39.    Bradley also described the driver of the shooter's car as a light-skinned black female of slight build, with long black hair, and a gap in her teeth.  And, Bradley stated that the car the unknown woman and Montgomery were driving in was a gray or light blue Oldsmobile Delta 88 or Pontiac 6000.

8

40. The day following the murder, Bradley aided the Police in creating a composite sketch of the male shooter and female driver. The composite sketch of the shooter (now known to be Montgomery) did not include the pockmarks which Bradley had initially described. The sketch also had the shooter wearing a hat.

41. Bradley also said that she knew of the shooter from a popular local bar, Birchfield's but did not know his name (both Montgomery and Epps frequented Birchfield's).

### Cory Epps is Falsely Identified

42. There was no evidence, whatsoever, to connect Epps to the Means murder. No leads suggested he was involved. No witnesses said he was in the area. And no forensic or physical evidence linked Epps to the crime.

43. Several weeks went by, and the police were out of leads.

44. Eventually, information may have surfaced that Epps resembled the composite sketch created by Bradley. But Epps did not fit the description in two important ways. *First*, he is six foot two inches tall – roughly six inches taller than Montgomery, and six inches taller than the description provided by Bradley. *Second*, Epps has smooth skin, unlike Montgomery, who has acne scars, scars that Bradley saw first-hand when he leaned into the car to shoot Means.

45. Nevertheless, Detective Minor and Detective Bohan showed photographs to Bradley, with Epps' photo being amongst them. Even though she did not initially identify Epps, the detectives continued to show her the photographs, with Epp's among them, until she made an identification.

46. On July 6, 1997, after eventually identifying Epps from photographs, the detectives bolstered the identification by telling Bradley that she had in fact identified Cory Epps.

47.     Moreover, even though Bradley did not know Epps by name, upon information and belief other people she knew did know him, and once his name was introduced, Bradley's identification became bolstered even more.

48.     On July 9, 1997, Detective Raniero Massecchia went to speak with Jerriah Johnson, Epps' girlfriend, at her home and to examine her car, which did not match the description of the vehicle provided by Bradley.  Johnson was not home, but Epps was, and passed along the detective's message that he wished to speak with Johnson. Later that day, Epps accompanied Johnson to police headquarters to assist with the police investigation.

49.     Once there, Epps readily agreed to speak with detectives regarding the Means murder and waived his *Miranda* rights. He was open and cooperative with officers and denied any knowledge of or participation in the Means murder.

50.     Then on July 30, 1997, believing it would prove his innocence, Epps agreed to participate in a lineup.  The line-up procedure was conducted by Detectives Minor and Bohan.

51.     Bradley identified Epps in an initial line-up, a procedure that took several minutes and involved the subjects and target stepping forward and turning around.  Despite the identification, the detectives inexplicably placed Epps in another line-up within minutes of the first one where she was permitted to review Epps again.  Unsurprisingly, she identified Epps a second time.

52.     Collectively, the photographic procedures, the confirmation by the police that she had chosen the right person, the revelation of Epps' name to Bradley to discuss with others, and the redundant lineups all worked together to both teach Bradley that Epps looked like the perpetrator, and to bolster her identification and convince her that she was correctly identifying the right person.

10

A-27

**Epps' Trial and Sentencing**

53.    Epps' trial started on April 20, 1997.

54.    At trial, Bradley identified Epps as the person she observed shoot and kill Tomika Means.  She said she was "certain" that Epps was the shooter even though she had been drinking that night and only saw the shooter very briefly in the dark under terribly stressful circumstances when he exited his vehicle and approached Means' car with a gun in his hand.

55.    Epps' attorney was allowed to cross examine Bradley with photos of other suspects that had emerged, and about how Epps did not have acne and was much taller.  But Epps' attorney did not know about Montgomery, so he could not cross-examine Bradley with his photo – despite his eerie similarity to Epps. Nor, was he able to investigate and advance an alternate suspect defense.

56.    In his defense case, Epps raised an alibi which showed that he was on his way to Perkins, a restaurant across town, to eat breakfast with his girlfriend Jerriah Johnson when Means was killed.

57.    Johnson testified that Epps drove her to Perkins at around 4:30 a.m. in his car, a "four-door hunter green Chevy Malibu" (a different car than the one the killer was described as driving).   She recalled where they had sat in the restaurant, what their server looked like, and what they ordered.

58.    Johnson explained that she and Epps sat in the front of the restaurant near the window because "Cory wanted to watch his car."  She described the waiter as a "skinny white male, about five eight" who had "brownish blond hair" and who "appeared to be nervous or new."  Johnson testified that she ordered an omelet and Epps had French toast, a brownie, and a soda.  They chose Perkins because Epps wanted the brownie after having seen it advertised in a

11

display case in the restaurant.

59.     Joseph Murphy, a manager at Perkins, testified that he examined the schedule and learned that Mike Strasser, who was still new at the restaurant, was on duty that night, and confirmed that Strasser matched the description of the waiter Johnson provided.

60.     Murphy also located a receipt in the Perkins computer system which corroborated Johnson's testimony.  In particular, it showed the items Johnson and Epps ordered; that Strasser had been their server; that the couple sat at a table in the front of the restaurant near the window; and that Johnson and Epps were present in the restaurant when the server input their order into the computer at 5:01 a.m., all corroborative of Johnson's testimony including that she and Epps would have been en route to Perkins at the time Means was shot and killed.

61.     Nevertheless, on April 24, 1998, Epps was convicted of murder.

**Prior to Epp's Conviction Detectives Become Aware
that Montgomery is a Suspect for the Means Murder**

62.     On April 16, 1998, shortly before Epps' trial, Russell Montgomery murdered Paul Pope.

63.     Evidence quickly pointed to Montgomery.

64.     On April 17, 1998, Wymiko "Pumpkin" Anderson, the mother of Pope's child, was interviewed by Detectives.  Detective Stambach and Detective Giardina first talked to her at her home on April 17, 1998, and then brought her to the Homicide Squad officer where she also saw and spoke with Chief of the Homicide Unit, Joseph Riga and Detectives Aronica, Constantino, and Massechia.  During the interview, the detectives and chief not only learned about Montgomery's involvement in the Pope murder, they also came to suspect him for the Means murder.

65.     When the detectives asked Anderson what Montgomery looked like, she told them that he looked just like the sketch of the guy who killed Tomika Means, the sketch that had been on the news.  Also, Anderson was friends with Means' boyfriend, so she had a particular interest in, and had reason to be focused on, the Mean's case.

66.     After hearing that Montgomery looked just like the composite sketch Bradley generated during the Means investigation, Detectives Stambach and Detective Giardina left the room. When they came back into the room, Detective Stambach dismissed Anderson's statements about Montgomery and the Means murder and told her they were pretty sure that they had the right guy because all the evidence pointed to Epps.  Anderson responded that they (Epps and Montgomery) look alike, but she was told it was not enough.

67.     Then, in addition to making the Montgomery/Epps resemblance connection, Anderson told Detective Stambach and Detective Giardina that at 9 a.m. on May 26, 1997 (the day of the Means murder), Montgomery came to a house where she was Pope were sleeping together. Montgomery and Pope left for a while, and when Pope came back, Pope told Anderson that Montgomery had confessed to killing Means earlier that morning.

68.     These revelations not only formed a motive for Montgomery to kill Pope – because Pope was telling others that Montgomery killed Means – they further linked Montgomery to the Means murder.

69.     Notwithstanding what Anderson told the police, on information and belief the police were aware of the connection between Montgomery and the Means murder after learning what Montgomery looked like, which was on or before April 17, 1998.  They had to have realized that he looked like Epps and was an alternative suspect in the Means murder.

70.     Notably, Detective Chella interviewed Montgomery for five hours on April 19,

13

A-30

1998, and took a sworn statement from him. During this interview, he had an ample opportunity to examine Montgomery in person. (He also took extensive notes, which mysteriously disappeared until January 22, 2000, when he found them in some papers, and turned them over in the 440 proceeding in 2001.)

71.     Furthermore, it was also only a few days before Epps' trial started in which Epp's identification was the focus of the trial as it was the only evidence against him. What Epps looked like was a known fact in the small homicide unit in the Buffalo Police Department that consisted of only a dozen or so detectives.   On information and belief, it became immediately apparent that, despite the differences between Montgomery and Epps, the resemblance was palpable, and that Montgomery became a viable suspect in the Means murder.

72.     Indeed, Montgomery matched the description Bradley provided of the person who shot Means – male black, 5'8" or 5'9" 235 pounds and acne; and he was certainly closer to Bradley's description than Epps, who was much taller and did not have acne.

73.     In addition, through investigation before Epp's trial and jury verdict on April 24, 1998, the Defendant Detectives discovered several additional pieces of evidence that further linked Montgomery to the Means killing and placed him above Epps as the likely perpetrator of the Mean murder:

   a.     Montgomery lived at 1118 East Delevan Avenue, less than a mile from where Means was killed, and only half a mile from where Bradley saw a similar looking suspect in a white car, who recognized her and quickly turned a corner;

   b.     Montgomery frequented Birchfield's, the same club Bradley says she recognized the shooter from;

   c.     Montgomery had a Buick Park Avenue, possibly tan, which is similar to the car

14

Bradley described the night of the shooting;

d.    Montgomery was engaged in criminal activity, including dealing large quantities

of illegal drugs;

e.    Montgomery regularly carried a gun;

f.    Montgomery murdered Pope in an awful act of cold-blooded violence, much like

the Means murder, and stuffed him into the trunk of a car; and

74.    In an effort to cover up the connection between Montgomery and the Means

murder and *Brady* material for Epps, Detectives Stambach and Giardino prepared a statement

from Anderson about the Pope murder that excluded mention of Montgomery's involvement in

the Means murder and resemblance to Epps, which they had Anderson sign.

75.    Anderson returned to the Homicide Squad on April 20, 1998, with her aunt's

boyfriend, who was also giving a statement related to the Pope murder. But the Defendant

Detectives never asked her any other questions about Montgomery, despite this powerful

evidence that he killed Means.

76.    Worse, the Defendant Detectives never disclosed this powerful, exculpatory

evidence to the prosecution or Epps before his trial, even though they possessed it. Consequently,

Epps' attorney – who was preparing to go to trial only days later – had no idea that Epps' had a

viable and strong alternate perpetrator defense.

**The Subversion of Epp's Post-Verdict 330 Motion and Post-Sentence 440 Motion**

77.    Three days after the verdict against Epps, after seeing it on the news, Anderson

wrote an anonymous letter to Epps' attorney telling him that Montgomery killed Means and that

he also killed Pope because Pope was gossiping about the Means murder. She also pointed out

the similarities between Epps and Montgomery.  Anderson wrote the letter knowing that the

15

police dismissed her claim about Montgomery being the killer of Means and in an effort to get the truth out.

78.    After Epps' counsel received this letter, he immediately went to the trial judge, and on June 2, 1998 he asked the court to delay sentencing so he could make a C.P.L. § 330 motion to reverse the outcome of the trial.

79.    The prosecution forwarded this letter to the Defendant Detectives, including Detective Chella, who spoke to Anderson over the phone. She admitted she wrote the letter and then returned to the Homicide Squad and spoke with Detective Chella and Detective Constantino, reiterating what she had said on April 17, 1998 about how Montgomery killed Means.

80.    However, the police continued to dismiss the significance of Anderson's implication of Montgomery in the Means murder, the resemblance between Montgomery and Epps, and the other evidence that linked Montgomery to Means murder.

81.    The anonymous letter became the subject of a C.P.L. § 330 motion which was argued at Epps sentencing on June 10, 1998.  But Epps' attorney was never made aware of who the author of the letter was or other information the officers knew about before Epps' trial that made Montgomery a viable alternate suspect in the Means murder.

82.    Given the withholding of Anderson's identity and the suppression of other evidence linking Montgomery to the Means murder, the court denied the motion.  The grounds were that that the letter was unsworn and that Anderson's anonymous account was undeveloped and questionable.

83.    Had Anderson's identity been known to the Epps' counsel, had the police disclosed the truth about what she told them and when, had the police revealed the

16

Montgomery/Epps resemblance and that Montgomery looked more like Bradley's description, and had the police disclosed the connections they made between Montgomery and the Means murder, all of which was known before Epps trial and/or verdict, the 330 motion would have been granted, Epps would have received a new trial, and his case would have been dismissed or he would have been acquitted in a retrial.

84.    The court sentenced Epps to twenty-five years to life in prison.  But, notably it directed the district attorney, "in light of the defendant's protestations of innocence and at least this suggestion that there may be someone else responsible, and based upon a general premise that eyewitness testimony in and of itself, without corroboration, is not the most satisfying of evidence that can be received in a courtroom, and that therefore the district attorney has an ongoing obligation to continue to make sure that justice has been done in this case."

<b>Montgomery Confesses to the Means Murder, which is Suppressed;<br>He is Tried and Convicted for the Pope Murder</b>

85.    The Pope murder investigation continued, and the Defendant Detectives uncovered even more evidence that Montgomery killed Means. On May 4, 1998, Detective Constantino and Detective Aronica interviewed Gino Johnson ("G. Johnson"), who knew Montgomery. G. Johnson's stepfather was married to Montgomery's mother (and all three of them lived less than a mile from where Montgomery killed Means).

86.    On June 28, 1998, Detective Minor was following up on leads in the Pope murder from the interview with G. Johnson. On information and belief, based on an unsigned note with handwriting that matches handwriting by Detective Minor, Detective Minor spoke with G. Johnson, who told him that Montgomery was hot tempered and that he shot a girl on Delevan and Chelsea (the location of the Means murder).

17

A-34

87.    Montgomery was later charged with killing Pope, and on June 9, 2000 he was convicted of that murder, and subsequently sentenced to 25 years to life.

**The 2000 440 Motion**

88.    The detectives continued to withhold from Epps Anderson's identity and other exculpatory evidence implicating Montgomery in the Means murder.

89.    Two years after sentencing, Epps' new counsel learned serendipitously that the anonymous author of the letter was Wymiko Anderson.  Counsel learned of this revelation in a chance encounter in the courthouse during the Pope trial.

90.    Anderson signed an affidavit on May 7, 2000, which was submitted as part of a C.P.L. § 440 motion, alleging that Pope told Anderson that Montgomery confessed to killing Means, that Montgomery murdered Pope to silence him, and that Anderson had told this to police prior to Epps' trial.

91.    Epps' new counsel also attempted to obtain additional information regarding the Pope murder, but the court denied him access to the full file.

92.    The Defendant Detectives, then undermined the § 440 motion with false statements and strategic omissions. Detectives Stambach, Giardina, and Minor provided affidavits with false and misleadingly incomplete information, stating that on April 17, 1998, Anderson never told him that Montgomery killed Means. These were used to oppose the § 440 motion.

93.    At the 440 hearing, Anderson testified first, detailing how she had told Detectives that Montgomery looked just like the composite sketch from the Means murder. She explained that Detectives Stambach and Giardina left the room right after, came back, and said she was wrong. She argued with them, and then told them about how Montgomery had confessed to Pope

18

A-35

only hours after the Means murder.

94.    The prosecution called Detectives Giardina, Stamback, Constantino, and Massechia, who testified falsely that Anderson had not told them about Montgomery's link to the Means murder before Epps was convicted.

95.    During the hearing the Detectives never disclosed that they made the connection between Montgomery and the Means murder even without Anderson's revelation.  Nor, did they reveal the additional information they learned before Epp's verdict that connected Montgomery to the Means murder, like the fact he lived very close to where the murder occurred and how Bradley said she saw the shooter only half a mile from his house.

96.    Furthermore, prior to the 440 hearing in 2001, Defendant Detectives never disclosed that Montgomery had confessed to the Means murder to Gino Johnson; thus, Epps attorney could not make use of it at the hearing.

97.    Central to Epps' case at the hearing was Anderson's credibility.  Related was the notion that Epps, not Montgomery, killed Means.  Certainly, the fact that Montgomery confessed to the Means murder to Gino Johnson on June 28, 1998, was a critical material fact for the 440 Court.  However, the 440 Court was not made aware of it (indeed this information recently came to light), and as such it was were deprived of the opportunity to consider it.  Undoubtedly, its significance, especially when viewed in conjunction with the additional exculpatory evidence, cannot be overstated.

98.    On September 13, 2001, and based on false, misleading and incomplete information the court denied Epps' motion and he remained in custody.

**Epps' Exoneration**

99.    Almost two decades after he was first arrested, the Exoneration Initiative, Epp's

19

A-36

most recent post-conviction attorneys, received new information proving that Montgomery killed Means.

100.    In February 2017, Epps moved to vacate his conviction based on a claim of newly discovered evidence pursuant to C.P.L. § 440.10(1)(g), among other grounds. Much of this motion was placed under seal.

101.    Initially, the prosecution opposed the motion, but they were quickly persuaded that Epps was innocent. On the morning of December 1, 2017, the District Attorney joined Epps' motion to vacate his conviction based on the ground of newly discovered evidence and it moved to dismiss the indictment.  The Court then granted the motion and dismissed the indictment.

102.    The hearing was also reopened on consent wherein photographs of Epps and Montgomery possessed by the prosecution were admitted into evidence.  The photographs, depict a stark resemblance between the two men.

103.    Given that Montgomery, and his associates, are still an active threat, and given that Montgomery personally murdered Pope for gossiping about the Means murder, this information is kept strictly confidential and not addressed in this filing.  Suffice it to say, Epps' innocence cannot be in dispute, given the resounding the other evidence that links Montgomery to the Means murder and the manner in which the case against Epps was dismissed.

104.    Shortly after the order of vacatur and dismissal, Erie County District Attorney John Flynn held a press conference and stated that Epps and the true killer looked "eerily similar" and essentially conceded that Epps was innocent.

105.    As posted on the Erie County District Attorney's website Flynn stated:

> After reviewing this case, it has become clear to me that Mr. Epps should not spend one more night in prison…This Office is committed to not only convicting the guilty, but protecting the innocent.

A-37

106.    Epps was released from custody on December 1, 2017, finally a free man after more than two decades of being wrongfully imprisoned.

**Damages**

107.    From 1997 to 2017 (more than 20 years) Epps was confined in pre-trial detention and then to the custody of the State of New York, post-conviction.  During this period, he suffered greatly as a victim of unjust conviction and incarceration.

108.    The injuries and damages sustained by Epps arising from his unjust conviction and imprisonment include, but are not limited to: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family; loss of companionship; loss of love; loss of income; infliction of physical and mental illness; humiliation; indignities; embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, travel, enjoyment, and expression.   As a direct result of Epp's unjust conviction and imprisonment, many of the effects of these disabilities continue to plague him to this day and will continue to plague him for the rest of his life.

**FIRST CAUSE OF ACTION**

**Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against the Defendant Detectives**.

**(Pre-Trial Due Process and *Brady* Violations)**

109.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

110.    The Defendant Detectives, individually and in concert, failed to timely disclose

21

A-38

material favorable to the defense in contravention of *Brady*. There was substantial evidence that Montgomery killed Means, evidence that could have been used to cross Bradley and to present an alternate suspect defense, that was known by the Defendant Detectives prior to Plaintiff's trial. This was never disclosed to either the prosecution or Plaintiff's attorney.

111.   This misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

112.   Alternatively, each of the Defendant Detectives had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

113.   Each of the Defendant Detectives knew that this exculpatory evidence was being withheld and did nothing to intervene.

114.   In failing to intervene, the Defendant Detectives proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

115.   The above misconduct was outrageous and shocking to the conscience.

116.   Plaintiff was unable to uncover this wrongdoing until after he was convicted.

117.   The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983. Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against the Defendant Detectives.**

**(Post-Trial Due Process)**

118. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

119. Plaintiff filed motions under C.P.L. § 330 and C.P.L. § 440 and was granted a hearing pursuant to C.P.L. § 440. Plaintiff has a right to a fair and honest consideration of his motions and to a fair hearing, based on full disclosure of the true facts by all relevant witnesses, including the Defendant Detectives.

120. The Defendant Detectives, individually and in concert, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, lied and withheld information, to provide false and misleading information to the prosecution, information that undercut Anderson's credibility and undermined Plaintiff's ability to fairly and effectively litigate a violation of his rights under *Brady*, as well as to strengthen the identification by Bradley.

121. But for this false and misleading information, Plaintiff would have received fair consideration of his C.P.L. §§ 330 and 440 motions, leading, on information and belief, to a retrial and an exoneration years before he was ultimately exonerated in 2017.

122. This misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

123. Alternatively, each of the Defendant Detectives had an affirmative duty to

23

Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

124. Each of the Defendant Detectives knew that this exculpatory evidence was being withheld and did nothing to intervene.

125. In failing to intervene, the Defendant Detectives proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

126. The above misconduct was outrageous and shocking to the conscience.

127. Plaintiff was unable to uncover this wrongdoing until after he was convicted.

128. The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

**State-law Malicious Prosecution Against the Defendant Detectives and the City of Buffalo.**

129. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

130. The Defendant Detectives individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause.

131. The proceedings terminated in Plaintiff's favor.

132. Defendant City of Buffalo is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

24

A-41

133.    Consequently, the Defendant Detectives and the City of Buffalo are liable to Plaintiff for compensatory and punitive damages.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments Against the Defendant Detectives.**

134.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

135.    The Defendant Detectives, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

136.    The proceedings terminated in Plaintiff's favor.

137.    The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

**Violations of the New York State Constitution
Against the Defendant Detectives and the City of Buffalo.**

138.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

139.    By virtue of the aforementioned acts, the Defendant Detectives are liable to Plaintiff for violating his right to due process under Article I, § 6 of the New York State Constitution, and his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

A-42

140.    Defendant City of Buffalo is liable for these violations of the New York State Constitution under the principle of *respondeat superior*.

141.    Consequently, the Defendant Detectives and the City of Buffalo are liable to Plaintiff for compensatory and punitive damages.

**WHEREFORE**, it is respectfully requested that this Court grant judgment in favor of Plaintiff against the City of Buffalo and Detectives Bohan, Minor, Stambach, Giardina, Constantino, Chella, Aronica, and Massechia, and Chief Riga in the nature of:

1.    Compensatory damages in an amount to be determined;

2.    Punitive damages in an amount to be determined;

3.    Pre-judgment interest as allowed by law;

4.    An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.    Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 28, 2019

GLENN A. GARBER, P.C.

By:        /s/

Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
Phone: (212) 965-9370

RICKNER PLLC

By:        /s/

Rob Rickner

26

A-43

The Woolworth Building
233 Broadway Suite 2220
New York, New York 10279
Phone: (212) 300-6506

*Attorneys for Plaintiff Cory Epps*

A-44

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**CORY EPPS,**

                    **Plaintiff,**

-vs-

**THE CITY OF BUFFALO, DETECTIVE JOHN**
**BOHAN, DETECTIVE MARK STAMBACH,**
**DETECTIVE JAMES GIARDINA, DETECTIVE**
**ANTHONY CONSTANTINO, DETECTIVE**
**ROBERT CHELLA, RANIERO MASSECHIA,**
**CHARLES ARONICA AND CHIEF JOSEPH RIGA.**

                    **Defendants.**

**ANSWER TO**
**COMPLAINT**

**19-CV-00211**

**DEFENDANTS**
**DEMAND TRIAL**
**BY JURY**

Defendants, **THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY COSTANTINO** (incorrectly named as "CONSTANTINO" here)**, DETECTIVE ROBERT CHELLA, RANIERO MASSECHIA, CHARLES ARONICA,** and **CHIEF JOSEPH RIGA** (collectively hereinafter "Defendants"), by their attorney, Maeve E. Huggins, Esq., Assistant Corporation Counsel, *of counsel* to Corporation Counsel, Timothy A. Ball, Esq., as and for their Answer to the Plaintiff's Complaint in the above action, allege as follows:

**NATURE OF THE CASE**

1.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "1" of Plaintiff's Complaint.

2.     Deny the allegations contained in paragraph "2" of Plaintiff's Complaint.

- 1 -

A-45

3. Deny all allegations of any "suppression of evidence," "perjurious and misleading testimony," "cover-up," and any other wrongful conduct by the Defendants and deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph "3" of Plaintiff's Complaint.

4. Deny the allegations contained in paragraph "4" of Plaintiff's Complaint.

5. Deny the allegations contained in paragraph "5" of Plaintiff's Complaint.

6. Deny any allegation that the prior 440 determination was unfair and deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph "6" of Plaintiff's Complaint.

7. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "7" of Plaintiff's Complaint.

## JURISDICTION AND VENUE

8. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "8" of Plaintiff's Complaint and defer all questions of law to the Court.

9. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "9" of Plaintiff's Complaint and defers all questions of law to the Court.

10. Admit so much of the allegations contained in paragraph "10" of Plaintiff's Complaint that allege the City of Buffalo is entitled to statutory rights and protections under the General Municipal Law of the State of New York, but deny knowledge or

A-46

information sufficient to form a belief as to the truth of all other allegations contained in said paragraph, and defer all questions of law to the Court.

11.     Admit the allegations contained in paragraph "11" of Plaintiff's Complaint.

12.     Deny any allegation of "the defective investigation and *Brady* violations by the Defendants," deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph "12" of Plaintiff's Complaint, and defer all questions of law to the Court.

## JURY DEMAND

13.     To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "13" of Plaintiff's Complaint.

## PARTIES

14.     Deny all allegations of wrongful conduct by the Defendants and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "14" of Plaintiff's Complaint.

15.     With respect to the allegations in paragraph "15" of Plaintiff's Complaint, admit that the City of Buffalo is a municipal corporation organized and existing under the laws of the State of New York and clarify that the Buffalo Police Department is an administrative arm of the City of Buffalo but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in the paragraph.

16.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "16" of Plaintiff's Complaint.

17.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "17" of Plaintiff's Complaint, and defer all questions of law to the Court.

18.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "18" of Plaintiff's Complaint.

19.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "19" of Plaintiff's Complaint, and defer all questions of law to the Court.

20.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "20" of Plaintiff's Complaint.

21.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "21" of Plaintiff's Complaint, and defer all questions of law to the Court.

22.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "22" of Plaintiff's Complaint.

23.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "23" of Plaintiff's Complaint, and defer all questions of law to the Court.

24.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "24" of Plaintiff's Complaint.

25.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "25" of Plaintiff's Complaint, and defer all questions of law to the Court.

26.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "26" of Plaintiff's Complaint.

27.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "27" of Plaintiff's Complaint, and defers all questions of law to the Court.

28.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "28" of Plaintiff's Complaint.

29.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity

A-49

of the allegations in paragraph "29" of Plaintiff's Complaint, and defer all questions of law to the Court.

30.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "30" of Plaintiff's Complaint.

31.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "31" of Plaintiff's Complaint, and defer all questions of law to the Court.

32.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "32" of Plaintiff's Complaint.

33.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "33" of Plaintiff's Complaint, and defer all questions of law to the Court.

34.    To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "34" of Plaintiff's Complaint.

**FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS**

35.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "35" of Plaintiff's Complaint.

36.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "36" of Plaintiff's Complaint.

37.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "37" of Plaintiff's Complaint.

38.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "38" of Plaintiff's Complaint.

39.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "39" of Plaintiff's Complaint.

40.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "40" of Plaintiff's Complaint.

41.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "41" of Plaintiff's Complaint.

42.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "42" of Plaintiff's Complaint.

43.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "43" of Plaintiff's Complaint.

44.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "44" of Plaintiff's Complaint.

45.    With respect to the allegations in paragraph "45" of Plaintiff's Complaint, deny that Defendants Minor and Bohan's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

46. With respect to the allegations in paragraph "46" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

47. With respect to the allegations in paragraph "47" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

48. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "48" of Plaintiff's Complaint.

49. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "49" of Plaintiff's Complaint.

50. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "50" of Plaintiff's Complaint.

51. With respect to the allegations in paragraph "51" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

52. Deny the allegations contained in paragraph "52" of Plaintiff's Complaint.

53. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "53" of Plaintiff's Complaint.

54. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "54" of Plaintiff's Complaint.

55.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "55" of Plaintiff's Complaint.

56.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "56" Plaintiff's Complaint.

57.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "57" of Plaintiff's Complaint.

58.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "58" of Plaintiff's Complaint.

59.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "59" of Plaintiff's Complaint.

60.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "60"of Plaintiff's Complaint.

61.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "61" of Plaintiff's Complaint.

62.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "62" of Plaintiff's Complaint.

63.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "63" of Plaintiff's Complaint.

64.     With respect to the allegations in paragraph "64" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

65.     With respect to the allegations in paragraph "65" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

66.     Denies the allegations contained in paragraph "66" of Plaintiff's Complaint.

67.     With respect to the allegations in paragraph "67" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

68.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "68" of Plaintiff's Complaint.

69.     Deny the allegations in paragraph "69" of Plaintiff's Complaint.

70.     With respect to the allegations in paragraph "70" of Plaintiff's Complaint, deny that Defendant Chella's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

71.     Deny the allegations in paragraph "71" of Plaintiff's Complaint.

72.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "72" of Plaintiff's Complaint.

73.     Deny the allegations contained in paragraph "73" of Plaintiff's Complaint.

74.     Deny the allegations that Defendants Stambach and Giardino acted "[i]n an effort to cover up the connection between Montgomery and the Means murder and Brady material for Epps" and deny knowledge or information sufficient to form a belief as to

the truth or falsity of the remaining allegations contained in paragraph "74" of Plaintiff's Complaint.

75. With respect to the allegations in paragraph "75" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

76. Deny the allegations in paragraph "76" of Plaintiff's Complaint.

77. With respect to the allegations in paragraph "77" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

78. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "78" of Plaintiff's Complaint.

79. With respect to the allegations in paragraph "79" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

80. Deny the allegations in paragraph "80" of Plaintiff's Complaint.

81. With respect to the allegations in paragraph "81" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

82. With respect to the allegations in paragraph "82" of Plaintiff's Complaint, deny "the withholding of Anderson's identity and the suppression of other evidence

linking Montgomery to the Means murder" and any wrongful conduct by the Defendants, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

83. Deny the allegations in paragraph "83" of Plaintiff's Complaint.

84. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "84" of Plaintiff's Complaint.

85. With respect to the allegations in paragraph "85" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful and that they "uncovered even more evidence that Montgomery killed Means," but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

86. With respect to the allegations in paragraph "86" of Plaintiff's Complaint, deny that Defendant Minor's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

87. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "87" of Plaintiff's Complaint.

88. Deny the allegations in paragraph "88" of Plaintiff's Complaint.

89. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "89" of Plaintiff's Complaint.

90. With respect to the allegations in paragraph "90" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations.

91.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "91" of Plaintiff's Complaint.

92.    Deny the allegations in paragraph "92" of Plaintiff's Complaint.

93.    With respect to the allegations in paragraph "93" of Plaintiff's Complaint, deny that Defendants Stambach and Giardina's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

94.    Deny the allegations in paragraph "94" of Plaintiff's Complaint.

95.    Deny the allegations in paragraph "95" of Plaintiff's Complaint.

96.    Deny the allegations in paragraph "96" of Plaintiff's Complaint.

97.    Deny the allegations in paragraph "97" of Plaintiff's Complaint.

98.    With respect to the allegations in paragraph "98" of Plaintiff's Complaint, deny that the Defendants' conduct was wrongful and deny the allegation of "false, misleading, and incomplete information," but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegation that "the court denied Epps' motion and he remained in custody."

99.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "99" of Plaintiff's Complaint.

100.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "100" of Plaintiff's Complaint.

101.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "101" of Plaintiff's Complaint.

102.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "102" of Plaintiff's Complaint.

103.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "103" of Plaintiff's Complaint.

104.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "104" of Plaintiff's Complaint.

105.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "105" of Plaintiff's Complaint.

106.    With respect to the allegations in paragraph "106" of Plaintiff's Complaint, deny that Defendants' conduct caused or contributed to Plaintiff "being wrongfully imprisoned," but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations regarding the date of Plaintiff's release from custody and the length of time Plaintiff spent in custody.

### Damages

107.    Deny the allegations in paragraph "107" of Plaintiff's Complaint.

108.    Deny the allegations in paragraph "108" of Plaintiff's Complaint.

### FIRST CAUSE OF ACTION

- 14 -

109. With respect to the allegations in paragraph "109" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

110. Deny the allegations contained in paragraph "110" of Plaintiff's Complaint.

111. Deny the allegations contained in paragraph "111" of Plaintiff's Complaint.

112. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "112" of Plaintiff's Complaint and defer all questions of law to the Court.

113. Deny the allegations contained in paragraph "113" of Plaintiff's Complaint.

114. Deny the allegations contained in paragraph "114" of Plaintiff's Complaint.

115. Deny the allegations contained in paragraph "115" of Plaintiff's Complaint.

116. Deny the allegations contained in paragraph "116" of Plaintiff's Complaint.

117. Deny the allegations contained in paragraph "117" of Plaintiff's Complaint.

**SECOND CAUSE OF ACTION**

118. With respect to the allegations in paragraph "118" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

119. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "119" and defer all questions of law to the Court.

120. Deny the allegations in paragraph "120" of Plaintiff's Complaint.

A-59

121.   Deny the allegations in paragraph "121" of Plaintiff's Complaint.

122.   Deny the allegations in paragraph "122" of Plaintiff's Complaint.

123.   Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "123" of Plaintiff's Complaint and respectfully refer all questions of law to the Court.

124.   Deny the allegations in paragraph "124" of Plaintiff's Complaint.

125.   Deny the allegations in paragraph "125" of Plaintiff's Complaint.

126.   Deny the allegations in paragraph "126" of Plaintiff's Complaint.

127.   Deny the allegations in paragraph "127" of Plaintiff's Complaint.

128.   Deny the allegations in paragraph "128" of Plaintiff's Complaint.

<b>THIRD CAUSE OF ACTION</b>

129.   With respect to the allegations in paragraph "129" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

130.   Deny the allegations in paragraph "130" of Plaintiff's Complaint.

131.   Deny knowledge of information sufficient to form belief as to the truth or falsity of the allegations in paragraph "131" of Plaintiff's Complaint.

132.   Deny the allegations in paragraph "132" of Plaintiff's Complaint.

133.   Deny the allegations in paragraph "133" of Plaintiff's Complaint.

<b>FOURTH CAUSE OF ACTION</b>

134.    With respect to the allegations in paragraph "134" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

135.    Deny the allegations in paragraph "135" of Plaintiff's Complaint.

136.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "136" of Plaintiff's Complaint.

137.    Deny the allegations in paragraph "137" of Plaintiff's Complaint.

## FIFTH CAUSE OF ACTION

138.    With respect to the allegations in paragraph "138" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

139.    Deny the allegations in paragraph "139" of Plaintiff's Complaint.

140.    Deny the allegations in paragraph "140" of Plaintiff's Complaint.

141.    Deny the allegations in paragraph "141" of Plaintiff's Complaint.

## GENERAL DENIAL

142.    Deny each and every other allegation of Plaintiff's Complaint not specifically admitted, denied, or otherwise controverted herein.

## AFFIRMATIVE DEFENSES

## AS AND FOR A FIRST DEFENSE:

143.    Upon information and belief, Plaintiff's Complaint, in whole or in part, fails to state a cause of action against the Defendants.

- 17 -

A-61

### AS AND FOR A SECOND DEFENSE:

144.　Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, by the applicable statute of limitations.

### AS AND FOR A THIRD DEFENSE:

145.　Upon information and belief, the Complaint is barred, in whole or in part, for failure to comply with Article Four of the New York State General Municipal Law.

### AS AND FOR A FOURTH DEFENSE:

146.　Upon information and belief, the detention, arrest, seizure, search, and/or prosecution of Plaintiff, if any such detention, arrest, seizure, search, and/or prosecution occurred, was based on probable cause.

### AS AND FOR A FIFTH DEFENSE:

147.　Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, upon the doctrine of qualified immunity.

### AS AND FOR A SIXTH DEFENSE:

148.　Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, upon the grounds that the Defendants exercised their professional judgment under the circumstances and therefore their actions are cloaked with immunity.

### AS AND FOR A SEVENTH DEFENSE:

149.　Upon information and belief, Plaintiff failed to obtain subject matter and/or personal jurisdiction over one or more of these Defendants.

### AS AND FOR AN EIGHTH DEFENSE:

A-62

150.   Upon information and belief, Plaintiff failed to name and/or join a necessary party.

**AS AND FOR A NINTH DEFENSE:**

151.   Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, on the grounds that the actions of the Defendants did not violate any of Plaintiff's Constitutional rights.

**AS AND FOR A TENTH DEFENSE:**

152.   Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, on the grounds that the actions of the City Defendants were without malice and were objectively reasonable under the totality of the circumstances.

**AS AND FOR AN ELEVENTH DEFENSE:**

153.   Under relevant state and federal law, punitive damages cannot be awarded against certain municipal defendants.

**AS AND FOR A TWELFTH DEFENSE:**

154.   Upon information and belief, the detention, arrest, seizure, search, and/or prosecution of Plaintiff, if any such detention, arrest, seizure, search, and/or prosecution occurred, was based on "arguable probable cause".

**AS AND FOR A THIRTEENTH DEFENSE:**

155.   Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, upon the grounds of any sovereign, governmental, or qualified immunity available to municipalities and their employees including but not limited to governmental

A-63

immunity for alleged errors of judgment in discretionary decisions and absolute immunity for witness testimony provided at criminal proceedings.

### AS AND FOR A FOURTEENTH DEFENSE:

156.    The damages complained of, if any, were caused by the culpable conduct of others over whom the Defendants exercised no control and for whom the Defendants bear no responsibility.

### AS AND FOR A FIFTEENTH DEFENSE:

157.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata.

### AS AND FOR A SIXTEENTH DEFENSE:

158.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, by the Plaintiff's failure to obtain personal jurisdiction based on insufficient and/or improper service of process on one or more of the Defendants.

### AS AND FOR A SEVENTEENTH DEFENSE:

159.    Upon information and belief, no special relationship existed between the Plaintiff and Defendants that would create a special duty of protection to the Plaintiff.

### AS AND FOR AN EIGHTEENTH DEFENSE:

160.    Upon information and belief, the Complaint is barred, in whole or in part, for failure to file a timely notice of claim pursuant to the General Municipal Law.

### AS AND FOR A NINETEENTH DEFENSE:

161.    Upon information and belief, if Plaintiff reaches a settlement with any person claimed to be liable the Defendant may be entitled to a setoff against such settlement.

### AS AND FOR A TWENTIFTH DEFENSE:

162.    Any award for Plaintiff must be reduced by the amount he has received or will receive from collateral sources.

### AS AND FOR A TWENTY-FIRST DEFENSE:

163.    Plaintiff's damages, if any, must be diminished by his failure to mitigate such damages.

WHEREFORE, the Defendants, **THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY COSTANTINO** (incorrectly named as "CONSTANTINO" here), **DETECTIVE ROBERT CHELLA, RANIERO MASSECHIA, CHARLES ARONICA,** and **CHIEF JOSEPH RIGA,** demand judgment dismissing the Plaintiff's Complaint herein, together with the costs and disbursements of this Action, an award of attorney's fees pursuant to Fed. R. Civ. P. 54 and 42 U.S.C. §1988, and for such other and further relief as to this Court may deem just

A-65

and proper.

Dated:      May 1, 2019
            Buffalo, New York

                                        **TIMOTHY A. BALL, ESQ.**
                                        Corporation Counsel
                                        *Attorney for Defendants*

                                        */s/ Maeve E. Huggins*
                                        By: Maeve E. Huggins
                                        Assistant Corporation Counsel
                                        65 Niagara Square, 11th Floor
                                        Buffalo, New York 14202
                                        Tel.: (716) 851-4317
                                        Fax.: (716) 851-4105
                                        mhuggins@city-buffalo.com

TO:         Rob Rickner, Esq.
            Rickner PLLC
            *Attorney for the Plaintiff*
            233 Broadway, Suite 2220
            New York, New York 10279

            Glenn A. Garber, Esq.
            Glenn A. Garber, P.C.
            *Attorney for the Plaintiff*
            233 Broadway, Suite 2370
            New York, New York 10279

A-66

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CORY EPPS,

                          Plaintiff,

      v.                                                    Case No. 1:19-cv-00281

THE CITY OF BUFFALO,
DETECTIVE JOHN BOHAN,
DETECTIVE REGINALD MINOR,
DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA,
DETECTIVE ANTHONY CONSTANTINO,
DETECTIVE ROBERT CHELLA,
RANIERO MASSECHIA, CHARLES ARONICA,
AND CHIEF JOSEPH RIGA,

                          Defendants.

## **<u>NOTICE OF MOTION FOR SUMMARY JUDGMENT</u>**

| | |
|---|---|
| Nature of Action: | Civil Rights/Wrongful Prosecution |
| Moving Party: | Defendants |
| Directed To: | Plaintiff |
| Return Date: | At a date and time to be set by the Court |
| Place: | The Chambers of the Honorable Leslie G. Foschio, United States Magistrate Judge, located at 2 Niagara Square, Buffalo, NY 14202, for report and recommendation to the Honorable Lawrence J. Vilardo, United States District Court Judge. |
| Supporting Papers: | Declaration of Peter A. Sahasrabudhe dated October 7, 2022, with exhibits, Statement of Undisputed Facts dated October 7, 2022, and Memorandum of Law in Support of Defendant's Motion for Summary Judgement, dated October 7, 2022. |
| Answering Papers: | Pursuant to Local Rule 7.1(b)(2)(a), Plaintiff shall file his papers opposing this motion on or before November 4, 2022, which is twenty-eight (28) days from service of this motion. |

A-67

|  |  |
|---|---|
|  | Defendants intend to file and serve reply papers, which shall be filed on or before November 18, 2022, fourteen (14) days after Plaintiff's opposition is filed.  The above briefing schedule is subject to change if the Court is inclined to set its own briefing schedule for this motion. |
| Relief Requested: | Defendants seek an order of summary judgment disposing of each of Plaintiff's five causes of action and granting such additional and further relief as this Court deems just proper. |
| Grounds for Relief: | Fed. R. Civ. P. 56 |
| Oral Argument: | Pursuant to the Court's Individual Rules, oral argument will be scheduled only if the Court deems it necessary. |

Dated:    Buffalo, New York
          October 7, 2022

**HODGSON RUSS** LLP
*Attorneys for City of Buffalo Defendants*

By:    //s Peter A. Sahasrabudhe
       Hugh M. Russ, Esq.
       Peter A. Sahasrabudhe, Esq.
    The Guaranty Building
    140 Pearl Street – Suite 100
    Buffalo, New York  14202
    Telephone:   716-856-4000

TO:    GLENN A. GARBER, ESQ.
       *Attorneys for Plaintiff*
       Glenn A. Garber, Esq.
       233 Broadway
       New York, New York  10279
       ggarber@glenngarber.com

       RICKNER PLLC
       *Attorneys for Plaintiff*
       Rob Rickner, Esq.
       14 Wall Street – Suite 1603
       New York, New York  10005
       rob@ricknerpllc.com

017635.00059 Litigation 16323797v1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CORY EPPS,

Plaintiff,

v.                                                          Case No. 1:19-cv-00281

THE CITY OF BUFFALO,
DETECTIVE JOHN BOHEN,
DETECTIVE REGINALD MINOR,
DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA,
DETECTIVE ANTHONY COSTANTINO,
DETECTIVE ROBERT CHELLA,
RANIERO MASSECHIA, CHARLES ARONICA,
AND CHIEF JOSEPH RIGA,

Defendants.

---

## DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**PETER A. SAHASRABUDHE**, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares the following to be true and correct:

1.      I am an attorney associated with Hodgson Russ LLP, attorneys for the City of Buffalo and each of the above-named individual defendants in this action. I am duly admitted to practice law in the State of New York and in this District.

2.      I submit this declaration in support of the defendants' motion for summary judgment, which seeks an order disposing of each of the five causes of action brought by plaintiff, Cory Epps. The purpose of this declaration is to place before the Court the relevant

A-69

- 2 -

documentary and testimonial evidence necessary for the Court's consideration of defendants' motion.

**Pleadings**

3.     Epps's complaint in this matter, which is dated March 1, 2019, is provided as **Exhibit 1**.  Epps's complaint states five causes of action, which are fully described in the accompanying Memorandum of Law.

4.     The defendants' answer to Epps's complaint, which was filed and served on May 1, 2019, is provided as **Exhibit 2**.  The defendants' answer asserted various affirmative defenses, including qualified immunity for the individual defendants and absolute immunity for the individual defendants with respect to any testimony they gave in judicial proceedings.

**Deposition Testimony**

5.     A true and accurate transcript of the deposition testimony given by defendant John Bohen is provided as **Exhibit 3**.

6.     A true and accurate transcript of the deposition testimony given by defendant Reginald Minor is provided as **Exhibit 4**.

7.     A true and accurate transcript of the deposition testimony given by defendant Mark Stambach as is provided as **Exhibit 5**.

8.     A true and accurate transcript of the deposition testimony given by defendant James Giardina is provided as **Exhibit 6**.

A-70

- 3 -

9.      A true and accurate transcript of the deposition testimony given by defendant Anthony Costantino is provided as **Exhibit 7**.

10.      A true and accurate transcript of the deposition testimony given by Wymiko Anderson is provided as **Exhibit 8**.

11.      A true and accurate transcript of the deposition testimony given by Jaqueline Bradley is provided as **Exhibit 9**.

## Other Relevant Testimonial Evidence

12.      A true and accurate transcript of grand jury testimony given by Jaqueline Bradley in connection with criminal charges brought against Epps in 1997 is provided as **Exhibit 10**.

13.      A true and accurate transcript of trial testimony given by Jaqueline Bradley in connection with Epps's criminal trial in 1998 is provided as **Exhibit 11**.

14.      A true and accurate transcript of testimony given by Wymiko Anderson in connection with a post-conviction motion brought by Epps in 2000 is provided as **Exhibit 12**.

15.      A true and accurate transcript of testimony given by Mark Stambach in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 13**.

16.      A true and accurate transcript of testimony given by James Giardina in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 14**.

- 4 -

17.    A true and accurate transcript of testimony given by Anthony Costantino in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 15**.

18.    A true and accurate transcript of a *Wade* hearing held before New York County Court Judge Joseph McCarthy is provided as **Exhibit 16**.  The *Wade* hearing was held in connection with criminal charges brought against Epps in 1997.

**Affidavits and Other Judicial Documents**

19.    An affidavit signed by former Erie County Assistant District Attorney Patricia Carrington in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 17**.

20.    An affidavit signed by Wymiko Anderson in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 18**.

21.    An affidavit signed by Anthony Costantino in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 19**.

22.    An affidavit signed by Mark Stambach in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 20**.

23.    An affidavit signed by James Giardina in connection with Epps's 2000 post-conviction motion is provided as **Exhibit 21**.

24.    An application made by ADA Carrington for an order directing Epps to appear for an in person lineup in July of 1997 is provided as **Exhibit 23**.

- 5 -

25.     An order issued by New York County Court Judge Timothy Drury granting ADA Carrington's application for an in person lineup is provided as **Exhibit 24**.

26.     An order issued by New York Supreme Court Justice Joseph McCarthy denying Epps's post-conviction motion which sought reversal of his conviction on the grounds of newly discovered evidence is provided as **Exhibit 25**.

27.     An order issued by New York Supreme Court Justice Joseph McCarthy denying Epps post-conviction motion which sought reversal of his conviction based on an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963) is provided as **Exhibit 26**.

28.     An order issued by Judge McCarthy denying Epps's motion to preclude evidence of identification procedures implemented by the Buffalo Police Department and Erie County District Attorney's Office is provided as **Exhibit 27**.

**Other Documentary Evidence**

29.     A true and accurate copy of a photo array shown by John Bohen to Jaqueline Bradley on July 6, 1997, along with an affidavit signed by Bradley in connection with the photo array, is provided as **Exhibit 28**.

30.     A true and accurate copy of previous photo array shown by John Bohen to Bradley is provided as **Exhibit 29**.

31.     A true and accurate copy of a photo array put together by non-party, Juan Morales, is provided as **Exhibit 30**.

- 6 -

32.     A copy of an indictment issued against Epps on August 7, 1997 is provided as **Exhibit 31**.

33.     A copy of a statement by Wymiko Anderson given to homicide detectives on April 17, 1997 is provided as **Exhibit 32**.

34.     A copy of an anonymous letter authored by Wymiko Anderson after Epps's conviction is provided as **Exhibit 33**.

35.     A copy of a statement given by Cory Epps to police in July of 1997 is provided as **Exhibit 34**.

36.     True and accurate copies of police reports generated by John Bohen during his investigation of the Tomika means are collectively provided as **Exhibit 35.**

**<u>Witness 1</u>**

37.     Epps's conviction for the murder of Tomika Means was vacated based on an account given by an individual whose identity the parties are keeping secret.  However, defendants wish to file this witness's statement and testimony with the Court under seal to provide the Court with context for why Epps's conviction was overturned.

38.     Provided as **Exhibit 36**, which will be filed under seal after an appropriate application to the Court, is an affidavit signed by Witness 1 on September 14, 2014.

A-74

- 7 -

39.    Provided as **Exhibit 37**, which will be filed under seal after an appropriate application to the Court, is a copy of testimony given by Witness 1 in 2017 in connection with post-conviction proceedings which ultimately led to the reversal of Epps's conviction.

40.    Provided as **Exhibit 38** is the deposition testimony of Joseph Riga, which describes his interview and interactions with Witness 1.

41.    Provided as **Exhibit 39** is the 2017 order vacating Epps's 1998 criminal convictions.

**Miscellaneous Exhibits**

42.    Provided as **Exhibit 40** is an excerpt from a statement of facts in a submission filed in connection with Epps's criminal proceedings.  The statement of facts relays that the exact date of Epps's indictment is August 7, 1997.  Upon information and belief, this is the date when Epps was indicted.

**Conclusion**

43.    Based on the evidence submitted here, and based on the arguments presented in the accompanying Memorandum of Law, defendants respectfully request that the Court grant their motion for summary judgment in its entirety, and that the Court grant such other additional relief as it may deem just and proper.

Dated:       Buffalo, New York
             October 7, 2022

             ____ //s Peter A. Sahasrabudhe
             PETER A. SAHASRABUDHE

A-75

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORY EPPS,<br><br>       Plaintiff,<br><br>  -against-<br><br>THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY CONSTANTINO, DETECTIVE ROBERT CHELLA, RANIERO MASSECHIA, CHARLES ARONICA AND CHIEF JOSEPH RIGA.<br><br>       Defendants. | **COMPLAINT**<br><br>Dkt. No. 19 cv _____ |

PLEASE TAKE NOTICE that Plaintiff Cory Epps, through his attorneys, Glenn A. Garber, P.C. and Rickner PLLC, hereby alleges as follows:

## NATURE OF THE CASE

1. Although innocent, Plaintiff Cory Epps ("Epps") was wrongfully convicted of the 1997 murder of Tomika Means ("Means") and served more than twenty years in prison until he was finally exonerated and released in 2017.

2. Epps was convicted due to the wrongdoing of detectives in the small homicide unit of the Buffalo Police Department who were simultaneously investigating the Means murder and the murder of Paul Pope, investigations which overlapped prior to Epps' conviction. Days before Epps was going to trial for the Means' murder, the police became aware that Russell Montgomery ("Montgomery"), who was suspected of murdering Pope (and who was later convicted of that crime) was also a viable suspect in the Means murder. Nevertheless, detectives

1

suppressed this exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny ("*Brady*"). Had this evidence been disclosed to Epps and his trial counsel, Epps, who had a compelling alibi, would not have been convicted.

3.    When Epps' defense attorneys finally learned at least part of what happened, they filed motions for a new trial conviction – first a motion in 1998 under CPL § 330.30 after verdict but before sentencing ("330 motion"), then one in 2000 under CPL § 440.10 ("440 motion"). Both were denied.  However, the denial of these motions was caused by the pretrial suppression of evidence that linked Montgomery to the Means murder, including a statement from a witness that directly implicated Montgomery; suppression of the identity of the exculpatory witness that destroyed any chance of success of the 330 motion and that delayed the 440 motion by two years and undermined it; and perjurious and misleading testimony at the 440 hearing that covered-up the suppression of the exculpatory evidence.  After Epps' conviction but before the 440 hearing, additional exculpatory evidence that implicated Montgomery in the Means murder and exculpated Epps was also withheld that further made 440 litigation incomplete and unfair and further undermined the integrity of the process and proceeding.

4.    Moreover, during the initial investigation of the Means murder, the detectives employed suggestive identification procedures with the only eyewitness that led to Epps' misidentification and then improperly bolstered the eyewitness' certainty of the misidentification, causing Epps to be maliciously prosecuted without probable and unfairly tried.

5.    As a result of the police misconduct, Epps spent over two decades in jail.

6.    His nightmare finally ended in 2017 when even more exculpatory evidence came to light that finally enabled a fair and successful 440 determination.

7.    In conceding Epps' motion and agreeing to vacate his conviction and dismiss the

2

A-77

indictment, the Erie County District Attorney John Flynn was emphatic that Epps "should not spend one more night in prison." Flynn also stated Epps and Montgomery look "eerily similar" to Russell Montgomery the real killer of Tomika Means.

## JURISDICTION AND VENUE

8.  This Court has original subject matter jurisdiction over Epps' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Epps' claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution.

9.  This Court has supplemental jurisdiction over Epps' state law claims pursuant to 28 U.S.C. § 1367(a).

10.  Epps complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on the City of Buffalo on February 22, 2018. More than 30 days have elapsed since the notice of claim, and no offer of settlement has been made.

11.  Epps submitted to a hearing pursuant to New York General Municipal Law Section 50-h on May 24, 2018.

12.  Venue is lodged in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391(b) because substantial parts of the events or omissions giving rise to the claim occurred in the Western District of New York, including the defective investigation and *Brady* violations by the Defendants.

## JURY DEMAND

13.  Days demands trial by jury in this action.

## PARTIES

14.  Plaintiff Cory Epps was wrongfully indicted, prosecuted, tried, convicted, and

imprisoned by the actions of the Defendants named herein. He lives in Erie County, in the State of New York.

15.    Defendant City of Buffalo is and was a municipal corporation organized and existing under the laws of the State of New York, with principal offices in the City of Buffalo, County of Erie, State of New York, and is fully responsible for the Buffalo Police Department.

16.    Defendant Detective John Bohan ("Detective Bohan"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

17.    Defendant Detective Bohan is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

18.    Defendant Detective Reginald Minor ("Detective Minor"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

19.    Defendant Detective Minor is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

4

20.     Defendant Detective Mark Stambach ("Detective Stambach"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

21.     Defendant Detective Stambach is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

22.     Defendant Detective James Giardina ("Detective Giardina"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

23.     Defendant Detective Giardina is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

24.     Defendant Detective Anthony Constantino ("Detective Constantino"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a

5

member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

25.    Defendant Detective Constantino is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

26.    Defendant Detective Robert Chella ("Detective Chella"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

27.    Defendant Detective Chella is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

28.    Defendant Detective Raniero Massechia ("Detective Massechia"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

29.    Defendant Detective Massechia is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

A-81

30.     Defendant Detective Charles Aronica ("Detective Aronica"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

31.     Defendant Detective Aronica is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

32.     Defendant Chief Joseph Riga ("Chief Riga"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

33.     Defendant Chief Riga is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

34.     Together, Detectives Bohan, Minor, Stambach, Giardina, Constantino, Chella, Massechia, and Aronica, and Chief Riga are referred to collectively as the "Defendant Detectives."

A-82

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### Russell Montgomery Kills Tomika Means and the Initial Investigation

35.     On Monday, May 26, 1997, shortly after four o'clock in the morning, Tomika Nicole Means was murdered while driving home from Birchfield's, a popular Buffalo nightclub.

36.     The murder occurred in a "road rage" incident.  Means was with her friend Jacqueline Bradley, who was in the passenger seat, when a car cut them off nearly causing an accident.  Means honked the car horn and continued driving.  The same car that had cut in front of them then pulled up alongside, and Montgomery leaned out of the front passenger seat and yelled at Means.

37.     When Means and Bradley reached the intersection of East Delevan and Chelsea Street, the same car cut in front of them again and stopped.  Montgomery exited the passenger seat of the vehicle and approached the passenger side window of Means' car.  He leaned in, drew a gun, and pointed it at Means. Bradley said, "It ain't worth it," but he replied, "Fuck that, bitch," and shot Means once in the head before returning to his car and fleeing the scene.

38.     Bradley described the shooter as a black male, five feet eight inches or five feet nine inches tall and weighing approximately 250 pounds, with noticeable pockmarks on his face, and a light goatee or beard. The pockmarks – scarring from acne – were particularly visible, because Montgomery was leaning into the passenger side, just inches away from Bradley. He was also wearing a baseball cap.

39.     Bradley also described the driver of the shooter's car as a light-skinned black female of slight build, with long black hair, and a gap in her teeth.  And, Bradley stated that the car the unknown woman and Montgomery were driving in was a gray or light blue Oldsmobile Delta 88 or Pontiac 6000.

8

40.     The day following the murder, Bradley aided the Police in creating a composite sketch of the male shooter and female driver.  The composite sketch of the shooter (now known to be Montgomery) did not include the pockmarks which Bradley had initially described. The sketch also had the shooter wearing a hat.

41.     Bradley also said that she knew of the shooter from a popular local bar, Birchfield's but did not know his name (both Montgomery and Epps frequented Birchfield's).

### Cory Epps is Falsely Identified

42.     There was no evidence, whatsoever, to connect Epps to the Means murder.  No leads suggested he was involved. No witnesses said he was in the area. And no forensic or physical evidence linked Epps to the crime.

43.     Several weeks went by, and the police were out of leads.

44.     Eventually, information may have surfaced that Epps resembled the composite sketch created by Bradley.  But Epps did not fit the description in two important ways. *First*, he is six foot two inches tall – roughly six inches taller than Montgomery, and six inches taller than the description provided by Bradley. *Second*, Epps has smooth skin, unlike Montgomery, who has acne scars, scars that Bradley saw first-hand when he leaned into the car to shoot Means.

45.     Nevertheless, Detective Minor and Detective Bohan showed photographs to Bradley, with Epps' photo being amongst them.  Even though she did not initially identify Epps, the detectives continued to show her the photographs, with Epp's among them, until she made an identification.

46.     On July 6, 1997, after eventually identifying Epps from photographs, the detectives bolstered the identification by telling Bradley that she had in fact identified Cory Epps.

9

47.    Moreover, even though Bradley did not know Epps by name, upon information and belief other people she knew did know him, and once his name was introduced, Bradley's identification became bolstered even more.

48.    On July 9, 1997, Detective Raniero Massecchia went to speak with Jerriah Johnson, Epps' girlfriend, at her home and to examine her car, which did not match the description of the vehicle provided by Bradley.  Johnson was not home, but Epps was, and passed along the detective's message that he wished to speak with Johnson. Later that day, Epps accompanied Johnson to police headquarters to assist with the police investigation.

49.    Once there, Epps readily agreed to speak with detectives regarding the Means murder and waived his *Miranda* rights. He was open and cooperative with officers and denied any knowledge of or participation in the Means murder.

50.    Then on July 30, 1997, believing it would prove his innocence, Epps agreed to participate in a lineup.  The line-up procedure was conducted by Detectives Minor and Bohan.

51.    Bradley identified Epps in an initial line-up, a procedure that took several minutes and involved the subjects and target stepping forward and turning around.  Despite the identification, the detectives inexplicably placed Epps in another line-up within minutes of the first one where she was permitted to review Epps again.  Unsurprisingly, she identified Epps a second time.

52.    Collectively, the photographic procedures, the confirmation by the police that she had chosen the right person, the revelation of Epps' name to Bradley to discuss with others, and the redundant lineups all worked together to both teach Bradley that Epps looked like the perpetrator, and to bolster her identification and convince her that she was correctly identifying the right person.

10

**Epps' Trial and Sentencing**

53.    Epps' trial started on April 20, 1997.

54.    At trial, Bradley identified Epps as the person she observed shoot and kill Tomika Means.  She said she was "certain" that Epps was the shooter even though she had been drinking that night and only saw the shooter very briefly in the dark under terribly stressful circumstances when he exited his vehicle and approached Means' car with a gun in his hand.

55.    Epps' attorney was allowed to cross examine Bradley with photos of other suspects that had emerged, and about how Epps did not have acne and was much taller.  But Epps' attorney did not know about Montgomery, so he could not cross-examine Bradley with his photo – despite his eerie similarity to Epps. Nor, was he able to investigate and advance an alternate suspect defense.

56.    In his defense case, Epps raised an alibi which showed that he was on his way to Perkins, a restaurant across town, to eat breakfast with his girlfriend Jerriah Johnson when Means was killed.

57.    Johnson testified that Epps drove her to Perkins at around 4:30 a.m. in his car, a "four-door hunter green Chevy Malibu" (a different car than the one the killer was described as driving).  She recalled where they had sat in the restaurant, what their server looked like, and what they ordered.

58.    Johnson explained that she and Epps sat in the front of the restaurant near the window because "Cory wanted to watch his car."  She described the waiter as a "skinny white male, about five eight" who had "brownish blond hair" and who "appeared to be nervous or new." Johnson testified that she ordered an omelet and Epps had French toast, a brownie, and a soda. They chose Perkins because Epps wanted the brownie after having seen it advertised in a

11

A-86

display case in the restaurant.

59.     Joseph Murphy, a manager at Perkins, testified that he examined the schedule and learned that Mike Strasser, who was still new at the restaurant, was on duty that night, and confirmed that Strasser matched the description of the waiter Johnson provided.

60.     Murphy also located a receipt in the Perkins computer system which corroborated Johnson's testimony.  In particular, it showed the items Johnson and Epps ordered; that Strasser had been their server; that the couple sat at a table in the front of the restaurant near the window; and that Johnson and Epps were present in the restaurant when the server input their order into the computer at 5:01 a.m., all corroborative of Johnson's testimony including that she and Epps would have been en route to Perkins at the time Means was shot and killed.

61.     Nevertheless, on April 24, 1998, Epps was convicted of murder.

### Prior to Epp's Conviction Detectives Become Aware that Montgomery is a Suspect for the Means Murder

62.     On April 16, 1998, shortly before Epps' trial, Russell Montgomery murdered Paul Pope.

63.     Evidence quickly pointed to Montgomery.

64.     On April 17, 1998, Wymiko "Pumpkin" Anderson, the mother of Pope's child, was interviewed by Detectives.  Detective Stambach and Detective Giardina first talked to her at her home on April 17, 1998, and then brought her to the Homicide Squad officer where she also saw and spoke with Chief of the Homicide Unit, Joseph Riga and Detectives Aronica, Constantino, and Massechia.  During the interview, the detectives and chief not only learned about Montgomery's involvement in the Pope murder, they also came to suspect him for the Means murder.

65.    When the detectives asked Anderson what Montgomery looked like, she told them that he looked just like the sketch of the guy who killed Tomika Means, the sketch that had been on the news.  Also, Anderson was friends with Means' boyfriend, so she had a particular interest in, and had reason to be focused on, the Mean's case.

66.    After hearing that Montgomery looked just like the composite sketch Bradley generated during the Means investigation, Detectives Stambach and Detective Giardina left the room.  When they came back into the room, Detective Stambach dismissed Anderson's statements about Montgomery and the Means murder and told her they were pretty sure that they had the right guy because all the evidence pointed to Epps.  Anderson responded that they (Epps and Montgomery) look alike, but she was told it was not enough.

67.    Then, in addition to making the Montgomery/Epps resemblance connection, Anderson told Detective Stambach and Detective Giardina that at 9 a.m. on May 26, 1997 (the day of the Means murder), Montgomery came to a house where she was Pope were sleeping together. Montgomery and Pope left for a while, and when Pope came back, Pope told Anderson that Montgomery had confessed to killing Means earlier that morning.

68.    These revelations not only formed a motive for Montgomery to kill Pope – because Pope was telling others that Montgomery killed Means – they further linked Montgomery to the Means murder.

69.    Notwithstanding what Anderson told the police, on information and belief the police were aware of the connection between Montgomery and the Means murder after learning what Montgomery looked like, which was on or before April 17, 1998.  They had to have realized that he looked like Epps and was an alternative suspect in the Means murder.

70.    Notably, Detective Chella interviewed Montgomery for five hours on April 19,

13

1998, and took a sworn statement from him. During this interview, he had an ample opportunity to examine Montgomery in person. (He also took extensive notes, which mysteriously disappeared until January 22, 2000, when he found them in some papers, and turned them over in the 440 proceeding in 2001.)

71.     Furthermore, it was also only a few days before Epps' trial started in which Epp's identification was the focus of the trial as it was the only evidence against him. What Epps looked like was a known fact in the small homicide unit in the Buffalo Police Department that consisted of only a dozen or so detectives.   On information and belief, it became immediately apparent that, despite the differences between Montgomery and Epps, the resemblance was palpable, and that Montgomery became a viable suspect in the Means murder.

72.     Indeed, Montgomery matched the description Bradley provided of the person who shot Means – male black, 5'8" or 5'9" 235 pounds and acne; and he was certainly closer to Bradley's description than Epps, who was much taller and did not have acne.

73.     In addition, through investigation before Epp's trial and jury verdict on April 24, 1998, the Defendant Detectives discovered several additional pieces of evidence that further linked Montgomery to the Means killing and placed him above Epps as the likely perpetrator of the Mean murder:

    a.    Montgomery lived at 1118 East Delevan Avenue, less than a mile from where Means was killed, and only half a mile from where Bradley saw a similar looking suspect in a white car, who recognized her and quickly turned a corner;

    b.    Montgomery frequented Birchfield's, the same club Bradley says she recognized the shooter from;

    c.    Montgomery had a Buick Park Avenue, possibly tan, which is similar to the car

A-89

Bradley described the night of the shooting;

d.     Montgomery was engaged in criminal activity, including dealing large quantities of illegal drugs;

e.     Montgomery regularly carried a gun;

f.     Montgomery murdered Pope in an awful act of cold-blooded violence, much like the Means murder, and stuffed him into the trunk of a car; and

74.     In an effort to cover up the connection between Montgomery and the Means murder and *Brady* material for Epps, Detectives Stambach and Giardino prepared a statement from Anderson about the Pope murder that excluded mention of Montgomery's involvement in the Means murder and resemblance to Epps, which they had Anderson sign.

75.     Anderson returned to the Homicide Squad on April 20, 1998, with her aunt's boyfriend, who was also giving a statement related to the Pope murder. But the Defendant Detectives never asked her any other questions about Montgomery, despite this powerful evidence that he killed Means.

76.     Worse, the Defendant Detectives never disclosed this powerful, exculpatory evidence to the prosecution or Epps before his trial, even though they possessed it. Consequently, Epps' attorney – who was preparing to go to trial only days later – had no idea that Epps' had a viable and strong alternate perpetrator defense.

**The Subversion of Epp's Post-Verdict 330 Motion and Post-Sentence 440 Motion**

77.     Three days after the verdict against Epps, after seeing it on the news, Anderson wrote an anonymous letter to Epps' attorney telling him that Montgomery killed Means and that he also killed Pope because Pope was gossiping about the Means murder. She also pointed out the similarities between Epps and Montgomery.  Anderson wrote the letter knowing that the

A-90

police dismissed her claim about Montgomery being the killer of Means and in an effort to get the truth out.

78.     After Epps' counsel received this letter, he immediately went to the trial judge, and on June 2, 1998 he asked the court to delay sentencing so he could make a C.P.L. § 330 motion to reverse the outcome of the trial.

79.     The prosecution forwarded this letter to the Defendant Detectives, including Detective Chella, who spoke to Anderson over the phone. She admitted she wrote the letter and then returned to the Homicide Squad and spoke with Detective Chella and Detective Constantino, reiterating what she had said on April 17, 1998 about how Montgomery killed Means.

80.     However, the police continued to dismiss the significance of Anderson's implication of Montgomery in the Means murder, the resemblance between Montgomery and Epps, and the other evidence that linked Montgomery to Means murder.

81.     The anonymous letter became the subject of a C.P.L. § 330 motion which was argued at Epps sentencing on June 10, 1998.  But Epps' attorney was never made aware of who the author of the letter was or other information the officers knew about before Epps' trial that made Montgomery a viable alternate suspect in the Means murder.

82.     Given the withholding of Anderson's identity and the suppression of other evidence linking Montgomery to the Means murder, the court denied the motion.  The grounds were that that the letter was unsworn and that Anderson's anonymous account was undeveloped and questionable.

83.     Had Anderson's identity been known to the Epps' counsel, had the police disclosed the truth about what she told them and when, had the police revealed the

Montgomery/Epps resemblance and that Montgomery looked more like Bradley's description, and had the police disclosed the connections they made between Montgomery and the Means murder, all of which was known before Epps trial and/or verdict, the 330 motion would have been granted, Epps would have received a new trial, and his case would have been dismissed or he would have been acquitted in a retrial.

84. The court sentenced Epps to twenty-five years to life in prison. But, notably it directed the district attorney, "in light of the defendant's protestations of innocence and at least this suggestion that there may be someone else responsible, and based upon a general premise that eyewitness testimony in and of itself, without corroboration, is not the most satisfying of evidence that can be received in a courtroom, and that therefore the district attorney has an ongoing obligation to continue to make sure that justice has been done in this case."

### Montgomery Confesses to the Means Murder, which is Suppressed; He is Tried and Convicted for the Pope Murder

85. The Pope murder investigation continued, and the Defendant Detectives uncovered even more evidence that Montgomery killed Means. On May 4, 1998, Detective Constantino and Detective Aronica interviewed Gino Johnson ("G. Johnson"), who knew Montgomery. G. Johnson's stepfather was married to Montgomery's mother (and all three of them lived less than a mile from where Montgomery killed Means).

86. On June 28, 1998, Detective Minor was following up on leads in the Pope murder from the interview with G. Johnson. On information and belief, based on an unsigned note with handwriting that matches handwriting by Detective Minor, Detective Minor spoke with G. Johnson, who told him that Montgomery was hot tempered and that he shot a girl on Delevan and Chelsea (the location of the Means murder).

87.    Montgomery was later charged with killing Pope, and on June 9, 2000 he was convicted of that murder, and subsequently sentenced to 25 years to life.

**The 2000 440 Motion**

88.    The detectives continued to withhold from Epps Anderson's identity and other exculpatory evidence implicating Montgomery in the Means murder.

89.    Two years after sentencing, Epps' new counsel learned serendipitously that the anonymous author of the letter was Wymiko Anderson.  Counsel learned of this revelation in a chance encounter in the courthouse during the Pope trial.

90.    Anderson signed an affidavit on May 7, 2000, which was submitted as part of a C.P.L. § 440 motion, alleging that Pope told Anderson that Montgomery confessed to killing Means, that Montgomery murdered Pope to silence him, and that Anderson had told this to police prior to Epps' trial.

91.    Epps' new counsel also attempted to obtain additional information regarding the Pope murder, but the court denied him access to the full file.

92.    The Defendant Detectives, then undermined the § 440 motion with false statements and strategic omissions. Detectives Stambach, Giardina, and Minor provided affidavits with false and misleadingly incomplete information, stating that on April 17, 1998, Anderson never told him that Montgomery killed Means. These were used to oppose the § 440 motion.

93.    At the 440 hearing, Anderson testified first, detailing how she had told Detectives that Montgomery looked just like the composite sketch from the Means murder. She explained that Detectives Stambach and Giardina left the room right after, came back, and said she was wrong. She argued with them, and then told them about how Montgomery had confessed to Pope

18

A-93

only hours after the Means murder.

94.    The prosecution called Detectives Giardina, Stamback, Constantino, and Massechia, who testified falsely that Anderson had not told them about Montgomery's link to the Means murder before Epps was convicted.

95.    During the hearing the Detectives never disclosed that they made the connection between Montgomery and the Means murder even without Anderson's revelation.  Nor, did they reveal the additional information they learned before Epp's verdict that connected Montgomery to the Means murder, like the fact he lived very close to where the murder occurred and how Bradley said she saw the shooter only half a mile from his house.

96.    Furthermore, prior to the 440 hearing in 2001, Defendant Detectives never disclosed that Montgomery had confessed to the Means murder to Gino Johnson; thus, Epps attorney could not make use of it at the hearing.

97.    Central to Epps' case at the hearing was Anderson's credibility.  Related was the notion that Epps, not Montgomery, killed Means.  Certainly, the fact that Montgomery confessed to the Means murder to Gino Johnson on June 28, 1998, was a critical material fact for the 440 Court.  However, the 440 Court was not made aware of it (indeed this information recently came to light), and as such it was were deprived of the opportunity to consider it.  Undoubtedly, its significance, especially when viewed in conjunction with the additional exculpatory evidence, cannot be overstated.

98.    On September 13, 2001, and based on false, misleading and incomplete information the court denied Epps' motion and he remained in custody.

### Epps' Exoneration

99.    Almost two decades after he was first arrested, the Exoneration Initiative, Epp's

19

most recent post-conviction attorneys, received new information proving that Montgomery killed Means.

100.    In February 2017, Epps moved to vacate his conviction based on a claim of newly discovered evidence pursuant to C.P.L. § 440.10(1)(g), among other grounds. Much of this motion was placed under seal.

101.    Initially, the prosecution opposed the motion, but they were quickly persuaded that Epps was innocent. On the morning of December 1, 2017, the District Attorney joined Epps' motion to vacate his conviction based on the ground of newly discovered evidence and it moved to dismiss the indictment.  The Court then granted the motion and dismissed the indictment.

102.    The hearing was also reopened on consent wherein photographs of Epps and Montgomery possessed by the prosecution were admitted into evidence.  The photographs, depict a stark resemblance between the two men.

103.    Given that Montgomery, and his associates, are still an active threat, and given that Montgomery personally murdered Pope for gossiping about the Means murder, this information is kept strictly confidential and not addressed in this filing.  Suffice it to say, Epps' innocence cannot be in dispute, given the resounding the other evidence that links Montgomery to the Means murder and the manner in which the case against Epps was dismissed.

104.    Shortly after the order of vacatur and dismissal, Erie County District Attorney John Flynn held a press conference and stated that Epps and the true killer looked "eerily similar" and essentially conceded that Epps was innocent.

105.    As posted on the Erie County District Attorney's website Flynn stated:

> After reviewing this case, it has become clear to me that Mr. Epps should not spend one more night in prison…This Office is committed to not only convicting the guilty, but protecting the innocent.

20

106.    Epps was released from custody on December 1, 2017, finally a free man after more than two decades of being wrongfully imprisoned.

### Damages

107.    From 1997 to 2017 (more than 20 years) Epps was confined in pre-trial detention and then to the custody of the State of New York, post-conviction.  During this period, he suffered greatly as a victim of unjust conviction and incarceration.

108.    The injuries and damages sustained by Epps arising from his unjust conviction and imprisonment include, but are not limited to: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family; loss of companionship; loss of love; loss of income; infliction of physical and mental illness; humiliation; indignities; embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, travel, enjoyment, and expression.  As a direct result of Epp's unjust conviction and imprisonment, many of the effects of these disabilities continue to plague him to this day and will continue to plague him for the rest of his life.

### FIRST CAUSE OF ACTION

**Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against the Defendant Detectives.**

**(Pre-Trial Due Process and *Brady* Violations)**

109.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

110.    The Defendant Detectives, individually and in concert, failed to timely disclose

21

material favorable to the defense in contravention of *Brady*. There was substantial evidence that Montgomery killed Means, evidence that could have been used to cross Bradley and to present an alternate suspect defense, that was known by the Defendant Detectives prior to Plaintiff's trial. This was never disclosed to either the prosecution or Plaintiff's attorney.

111. This misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

112. Alternatively, each of the Defendant Detectives had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

113. Each of the Defendant Detectives knew that this exculpatory evidence was being withheld and did nothing to intervene.

114. In failing to intervene, the Defendant Detectives proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

115. The above misconduct was outrageous and shocking to the conscience.

116. Plaintiff was unable to uncover this wrongdoing until after he was convicted.

117. The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

A-97

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983. Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against the Defendant Detectives.

#### (Post-Trial Due Process)

118.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

119.     Plaintiff filed motions under C.P.L. § 330 and C.P.L. § 440 and was granted a hearing pursuant to C.P.L. § 440. Plaintiff has a right to a fair and honest consideration of his motions and to a fair hearing, based on full disclosure of the true facts by all relevant witnesses, including the Defendant Detectives.

120.     The Defendant Detectives, individually and in concert, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, lied and withheld information, to provide false and misleading information to the prosecution, information that undercut Anderson's credibility and undermined Plaintiff's ability to fairly and effectively litigate a violation of his rights under *Brady*, as well as to strengthen the identification by Bradley.

121.     But for this false and misleading information, Plaintiff would have received fair consideration of his C.P.L. §§ 330 and 440 motions, leading, on information and belief, to a retrial and an exoneration years before he was ultimately exonerated in 2017.

122.     This misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

123.     Alternatively, each of the Defendant Detectives had an affirmative duty to

23

A-98

Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

124. Each of the Defendant Detectives knew that this exculpatory evidence was being withheld and did nothing to intervene.

125. In failing to intervene, the Defendant Detectives proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

126. The above misconduct was outrageous and shocking to the conscience.

127. Plaintiff was unable to uncover this wrongdoing until after he was convicted.

128. The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

### State-law Malicious Prosecution Against the Defendant Detectives and the City of Buffalo.

129. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

130. The Defendant Detectives individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause.

131. The proceedings terminated in Plaintiff's favor.

132. Defendant City of Buffalo is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

24

A-99

133.    Consequently, the Defendant Detectives and the City of Buffalo are liable to Plaintiff for compensatory and punitive damages.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments Against the Defendant Detectives.**

134.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

135.    The Defendant Detectives, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

136.    The proceedings terminated in Plaintiff's favor.

137.    The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

**Violations of the New York State Constitution
Against the Defendant Detectives and the City of Buffalo.**

138.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

139.    By virtue of the aforementioned acts, the Defendant Detectives are liable to Plaintiff for violating his right to due process under Article I, § 6 of the New York State Constitution, and his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

A-100

140.   Defendant City of Buffalo is liable for these violations of the New York State Constitution under the principle of *respondeat superior*.

141.   Consequently, the Defendant Detectives and the City of Buffalo are liable to Plaintiff for compensatory and punitive damages.

**WHEREFORE**, it is respectfully requested that this Court grant judgment in favor of Plaintiff against the City of Buffalo and Detectives Bohan, Minor, Stambach, Giardina, Constantino, Chella, Aronica, and Massechia, and Chief Riga in the nature of:

1.   Compensatory damages in an amount to be determined;

2.   Punitive damages in an amount to be determined;

3.   Pre-judgment interest as allowed by law;

4.   An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.   Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 28, 2019

GLENN A. GARBER, P.C.

By:       /s/

Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
Phone: (212) 965-9370

RICKNER PLLC

By:       /s/

Rob Rickner

26

A-101

The Woolworth Building
233 Broadway Suite 2220
New York, New York 10279
Phone: (212) 300-6506

*Attorneys for Plaintiff Cory Epps*

A-102

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

CORY EPPS

**DEFENDANTS**

THE CITY OF BUFFALO, DET. JOHN BOHAN, DET. REGINALD MINOR, DET. MARK STAMBACH, DET. JAMES GIARDINA, DET. ANTHONY CONSTANTINO, et al.

**(b)** County of Residence of First Listed Plaintiff   Erie
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Erie
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Glenn Garber, Glenn A. Garber, PC, 233 Broadway, Suite 2370, NY, NY 10279, 212-965-9370; Rob Rickner, Rickner PLLC, 233 Broadway, Suite 2220, NY, NY 10279, 212-300-6506

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|   & Enforcement of Judgment |    Slander   Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | |   New Drug Application | ☐ 470 Racketeer Influenced and |
|   Student Loans | ☐ 340 Marine   Injury Product | | ☐ 840 Trademark |   Corrupt Organizations |
|   (Excludes Veterans) | ☐ 345 Marine Product   Liability | |  | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer |
|   of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |   Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |   Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract |    Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Property Damage |   Relations | ☐ 864 SSID Title XVI |   Exchange |
| ☐ 196 Franchise |    Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury -   Product Liability | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| |    Medical Malpractice |   Leave Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff |   Act |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee |   Income Security Act |   or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | |   26 USC 7609 |   Act/Review or Appeal of |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | |   Agency Decision |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of |
| |    Employment   **Other:** | ☐ 462 Naturalization Application | |   State Statutes |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other   ☐ 550 Civil Rights |   Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |   ☐ 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause:
Wrongful conviction, Violations of Constitutional Rights, Malicious Prosecution

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
03/01/2019

SIGNATURE OF ATTORNEY OF RECORD
*Rob Rickner*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

A-103

JS 44 Reverse (Rev. 02/19)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

A-104

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CORY EPPS,

                Plaintiff,

-vs-

THE CITY OF BUFFALO, DETECTIVE JOHN
BOHAN, DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA, DETECTIVE
ANTHONY CONSTANTINO, DETECTIVE
ROBERT CHELLA, RANIERO MASSECHIA,
CHARLES ARONICA AND CHIEF JOSEPH RIGA.

                Defendants.

**ANSWER TO
COMPLAINT**

19-CV-00211

**DEFENDANTS
DEMAND TRIAL
BY JURY**

Defendants, THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY COSTANTINO (incorrectly named as "CONSTANTINO" here), DETECTIVE ROBERT CHELLA, RANIERO MASSECHIA, CHARLES ARONICA, and CHIEF JOSEPH RIGA (collectively hereinafter "Defendants"), by their attorney, Maeve E. Huggins, Esq., Assistant Corporation Counsel, *of counsel* to Corporation Counsel, Timothy A. Ball, Esq., as and for their Answer to the Plaintiff's Complaint in the above action, allege as follows:

### NATURE OF THE CASE

1.      Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "1" of Plaintiff's Complaint.

2.      Deny the allegations contained in paragraph "2" of Plaintiff's Complaint.

-1-

3.      Deny all allegations of any "suppression of evidence," "perjurious and misleading testimony," "cover-up," and any other wrongful conduct by the Defendants and deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph "3" of Plaintiff's Complaint.

4.      Deny the allegations contained in paragraph "4" of Plaintiff's Complaint.

5.      Deny the allegations contained in paragraph "5" of Plaintiff's Complaint.

6.      Deny any allegation that the prior 440 determination was unfair and deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph "6" of Plaintiff's Complaint.

7.      Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "7" of Plaintiff's Complaint.

## JURISDICTION AND VENUE

8.      Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "8" of Plaintiff's Complaint and defer all questions of law to the Court.

9.      Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "9" of Plaintiff's Complaint and defers all questions of law to the Court.

10.     Admit so much of the allegations contained in paragraph "10" of Plaintiff's Complaint that allege the City of Buffalo is entitled to statutory rights and protections under the General Municipal Law of the State of New York, but deny knowledge or

information sufficient to form a belief as to the truth of all other allegations contained in said paragraph, and defer all questions of law to the Court.

11.     Admit the allegations contained in paragraph "11" of Plaintiff's Complaint.

12.     Deny any allegation of "the defective investigation and *Brady* violations by the Defendants," deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph "12" of Plaintiff's Complaint, and defer all questions of law to the Court.

## JURY DEMAND

13.     To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "13" of Plaintiff's Complaint.

## PARTIES

14.     Deny all allegations of wrongful conduct by the Defendants and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "14" of Plaintiff's Complaint.

15.     With respect to the allegations in paragraph "15" of Plaintiff's Complaint, admit that the City of Buffalo is a municipal corporation organized and existing under the laws of the State of New York and clarify that the Buffalo Police Department is an administrative arm of the City of Buffalo but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in the paragraph.

A-107

16.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "16" of Plaintiff's Complaint.

17.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "17" of Plaintiff's Complaint, and defer all questions of law to the Court.

18.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "18" of Plaintiff's Complaint.

19.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "19" of Plaintiff's Complaint, and defer all questions of law to the Court.

20.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "20" of Plaintiff's Complaint.

21.     To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "21" of Plaintiff's Complaint, and defer all questions of law to the Court.

22.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "22" of Plaintiff's Complaint.

Case 1:19-cv-00281-LJV-LGF   Document 78-2   Filed 10/07/22   Page 5 of 23
Case 1:19-cv-00281-LJV-HKS   Document 4   Filed 05/01/19   Page 5 of 22

23.   To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "23" of Plaintiff's Complaint, and defer all questions of law to the Court.

24.   Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "24" of Plaintiff's Complaint.

25.   To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "25" of Plaintiff's Complaint, and defer all questions of law to the Court.

26.   Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "26" of Plaintiff's Complaint.

27.   To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "27" of Plaintiff's Complaint, and defers all questions of law to the Court.

28.   Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "28" of Plaintiff's Complaint.

29.   To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity

of the allegations in paragraph "29" of Plaintiff's Complaint, and defer all questions of law to the Court.

30.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "30" of Plaintiff's Complaint.

31.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "31" of Plaintiff's Complaint, and defer all questions of law to the Court.

32.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "32" of Plaintiff's Complaint.

33.    To the extent a response is required, deny this allegation as premature, further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "33" of Plaintiff's Complaint, and defer all questions of law to the Court.

34.    To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "34" of Plaintiff's Complaint.

**FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS**

35.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "35" of Plaintiff's Complaint.

A-110

36.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "36" of Plaintiff's Complaint.

37.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "37" of Plaintiff's Complaint.

38.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "38" of Plaintiff's Complaint.

39.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "39" of Plaintiff's Complaint.

40.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "40" of Plaintiff's Complaint.

41.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "41" of Plaintiff's Complaint.

42.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "42" of Plaintiff's Complaint.

43.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "43" of Plaintiff's Complaint.

44.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "44" of Plaintiff's Complaint.

45.     With respect to the allegations in paragraph "45" of Plaintiff's Complaint, deny that Defendants Minor and Bohan's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

-7-

46.     With respect to the allegations in paragraph "46" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

47.     With respect to the allegations in paragraph "47" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

48.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "48" of Plaintiff's Complaint.

49.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "49" of Plaintiff's Complaint.

50.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "50" of Plaintiff's Complaint.

51.     With respect to the allegations in paragraph "51" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

52.     Deny the allegations contained in paragraph "52" of Plaintiff's Complaint.

53.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "53" of Plaintiff's Complaint.

54.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "54" of Plaintiff's Complaint.

A-112

55. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "55" of Plaintiff's Complaint.

56. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "56" Plaintiff's Complaint.

57. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "57" of Plaintiff's Complaint.

58. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "58" of Plaintiff's Complaint.

59. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "59" of Plaintiff's Complaint.

60. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "60"of Plaintiff's Complaint.

61. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "61" of Plaintiff's Complaint.

62. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "62" of Plaintiff's Complaint.

63. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "63" of Plaintiff's Complaint.

64. With respect to the allegations in paragraph "64" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

A-113

65.     With respect to the allegations in paragraph "65" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

66.     Denies the allegations contained in paragraph "66" of Plaintiff's Complaint.

67.     With respect to the allegations in paragraph "67" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

68.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "68" of Plaintiff's Complaint.

69.     Deny the allegations in paragraph "69" of Plaintiff's Complaint.

70.     With respect to the allegations in paragraph "70" of Plaintiff's Complaint, deny that Defendant Chella's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

71.     Deny the allegations in paragraph "71" of Plaintiff's Complaint.

72.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "72" of Plaintiff's Complaint.

73.     Deny the allegations contained in paragraph "73" of Plaintiff's Complaint.

74.     Deny the allegations that Defendants Stambach and Giardino acted "[i]n an effort to cover up the connection between Montgomery and the Means murder and Brady material for Epps" and deny knowledge or information sufficient to form a belief as to

the truth or falsity of the remaining allegations contained in paragraph "74" of Plaintiff's Complaint.

75.    With respect to the allegations in paragraph "75" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

76.    Deny the allegations in paragraph "76" of Plaintiff's Complaint.

77.    With respect to the allegations in paragraph "77" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

78.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "78" of Plaintiff's Complaint.

79.    With respect to the allegations in paragraph "79" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

80.    Deny the allegations in paragraph "80" of Plaintiff's Complaint.

81.    With respect to the allegations in paragraph "81" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

82.    With respect to the allegations in paragraph "82" of Plaintiff's Complaint, deny "the withholding of Anderson's identity and the suppression of other evidence

linking Montgomery to the Means murder" and any wrongful conduct by the Defendants, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

83.    Deny the allegations in paragraph "83" of Plaintiff's Complaint.

84.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "84" of Plaintiff's Complaint.

85.    With respect to the allegations in paragraph "85" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful and that they "uncovered even more evidence that Montgomery killed Means," but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

86.    With respect to the allegations in paragraph "86" of Plaintiff's Complaint, deny that Defendant Minor's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

87.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "87" of Plaintiff's Complaint.

88.    Deny the allegations in paragraph "88" of Plaintiff's Complaint.

89.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "89" of Plaintiff's Complaint.

90.    With respect to the allegations in paragraph "90" of Plaintiff's Complaint, deny that defendant detectives' conduct was wrongful, but deny knowledge or

A-116

information sufficient to form a belief as to the truth or falsity of the remaining allegations.

91.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "91" of Plaintiff's Complaint.

92.    Deny the allegations in paragraph "92" of Plaintiff's Complaint.

93.    With respect to the allegations in paragraph "93" of Plaintiff's Complaint, deny that Defendants Stambach and Giardina's conduct was wrongful, but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.

94.    Deny the allegations in paragraph "94" of Plaintiff's Complaint.

95.    Deny the allegations in paragraph "95" of Plaintiff's Complaint.

96.    Deny the allegations in paragraph "96" of Plaintiff's Complaint.

97.    Deny the allegations in paragraph "97" of Plaintiff's Complaint.

98.    With respect to the allegations in paragraph "98" of Plaintiff's Complaint, deny that the Defendants' conduct was wrongful and deny the allegation of "false, misleading, and incomplete information," but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegation that "the court denied Epps' motion and he remained in custody."

99.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "99" of Plaintiff's Complaint.

A-117

100.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "100" of Plaintiff's Complaint.

101.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "101" of Plaintiff's Complaint.

102.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "102" of Plaintiff's Complaint.

103.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "103" of Plaintiff's Complaint.

104.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "104" of Plaintiff's Complaint.

105.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "105" of Plaintiff's Complaint.

106.    With respect to the allegations in paragraph "106" of Plaintiff's Complaint, deny that Defendants' conduct caused or contributed to Plaintiff "being wrongfully imprisoned," but deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations regarding the date of Plaintiff's release from custody and the length of time Plaintiff spent in custody.

**Damages**

107.    Deny the allegations in paragraph "107" of Plaintiff's Complaint.

108.    Deny the allegations in paragraph "108" of Plaintiff's Complaint.

**FIRST CAUSE OF ACTION**

- 14 -

A-118

109. With respect to the allegations in paragraph "109" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

110. Deny the allegations contained in paragraph "110" of Plaintiff's Complaint.

111. Deny the allegations contained in paragraph "111" of Plaintiff's Complaint.

112. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "112" of Plaintiff's Complaint and defer all questions of law to the Court.

113. Deny the allegations contained in paragraph "113" of Plaintiff's Complaint.

114. Deny the allegations contained in paragraph "114" of Plaintiff's Complaint.

115. Deny the allegations contained in paragraph "115" of Plaintiff's Complaint.

116. Deny the allegations contained in paragraph "116" of Plaintiff's Complaint.

117. Deny the allegations contained in paragraph "117" of Plaintiff's Complaint.

**SECOND CAUSE OF ACTION**

118. With respect to the allegations in paragraph "118" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

119. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "119" and defer all questions of law to the Court.

120. Deny the allegations in paragraph "120" of Plaintiff's Complaint.

A-119

121.    Deny the allegations in paragraph "121" of Plaintiff's Complaint.

122.    Deny the allegations in paragraph "122" of Plaintiff's Complaint.

123.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "123" of Plaintiff's Complaint and respectfully refer all questions of law to the Court.

124.    Deny the allegations in paragraph "124" of Plaintiff's Complaint.

125.    Deny the allegations in paragraph "125" of Plaintiff's Complaint.

126.    Deny the allegations in paragraph "126" of Plaintiff's Complaint.

127.    Deny the allegations in paragraph "127" of Plaintiff's Complaint.

128.    Deny the allegations in paragraph "128" of Plaintiff's Complaint.

## THIRD CAUSE OF ACTION

129.    With respect to the allegations in paragraph "129" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

130.    Deny the allegations in paragraph "130" of Plaintiff's Complaint.

131.    Deny knowledge of information sufficient to form belief as to the truth or falsity of the allegations in paragraph "131" of Plaintiff's Complaint.

132.    Deny the allegations in paragraph "132" of Plaintiff's Complaint.

133.    Deny the allegations in paragraph "133" of Plaintiff's Complaint.

## FOURTH CAUSE OF ACTION

A-120

134.    With respect to the allegations in paragraph "134" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

135.    Deny the allegations in paragraph "135" of Plaintiff's Complaint.

136.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph "136" of Plaintiff's Complaint.

137.    Deny the allegations in paragraph "137" of Plaintiff's Complaint.

### FIFTH CAUSE OF ACTION

138.    With respect to the allegations in paragraph "138" of Plaintiff's Complaint, admit so much of the allegations as are elsewhere herein admitted, and deny so much of the allegations of said paragraph as are elsewhere herein denied.

139.    Deny the allegations in paragraph "139" of Plaintiff's Complaint.

140.    Deny the allegations in paragraph "140" of Plaintiff's Complaint.

141.    Deny the allegations in paragraph "141" of Plaintiff's Complaint.

### GENERAL DENIAL

142.    Deny each and every other allegation of Plaintiff's Complaint not specifically admitted, denied, or otherwise controverted herein.

### AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST DEFENSE:

143.    Upon information and belief, Plaintiff's Complaint, in whole or in part, fails to state a cause of action against the Defendants.

## AS AND FOR A SECOND DEFENSE:

144.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, by the applicable statute of limitations.

## AS AND FOR A THIRD DEFENSE:

145.    Upon information and belief, the Complaint is barred, in whole or in part, for failure to comply with Article Four of the New York State General Municipal Law.

## AS AND FOR A FOURTH DEFENSE:

146.    Upon information and belief, the detention, arrest, seizure, search, and/or prosecution of Plaintiff, if any such detention, arrest, seizure, search, and/or prosecution occurred, was based on probable cause.

## AS AND FOR A FIFTH DEFENSE:

147.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, upon the doctrine of qualified immunity.

## AS AND FOR A SIXTH DEFENSE:

148.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, upon the grounds that the Defendants exercised their professional judgment under the circumstances and therefore their actions are cloaked with immunity.

## AS AND FOR A SEVENTH DEFENSE:

149.    Upon information and belief, Plaintiff failed to obtain subject matter and/or personal jurisdiction over one or more of these Defendants.

## AS AND FOR AN EIGHTH DEFENSE:

150.    Upon information and belief, Plaintiff failed to name and/or join a necessary party.

## AS AND FOR A NINTH DEFENSE:

151.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, on the grounds that the actions of the Defendants did not violate any of Plaintiff's Constitutional rights.

## AS AND FOR A TENTH DEFENSE:

152.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, on the grounds that the actions of the City Defendants were without malice and were objectively reasonable under the totality of the circumstances.

## AS AND FOR AN ELEVENTH DEFENSE:

153.    Under relevant state and federal law, punitive damages cannot be awarded against certain municipal defendants.

## AS AND FOR A TWELFTH DEFENSE:

154.    Upon information and belief, the detention, arrest, seizure, search, and/or prosecution of Plaintiff, if any such detention, arrest, seizure, search, and/or prosecution occurred, was based on "arguable probable cause".

## AS AND FOR A THIRTEENTH DEFENSE:

155.    Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, upon the grounds of any sovereign, governmental, or qualified immunity available to municipalities and their employees including but not limited to governmental

A-123

immunity for alleged errors of judgment in discretionary decisions and absolute immunity for witness testimony provided at criminal proceedings.

**AS AND FOR A FOURTEENTH DEFENSE:**

156. The damages complained of, if any, were caused by the culpable conduct of others over whom the Defendants exercised no control and for whom the Defendants bear no responsibility.

**AS AND FOR A FIFTEENTH DEFENSE:**

157. Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata.

**AS AND FOR A SIXTEENTH DEFENSE:**

158. Upon information and belief, Plaintiff's Complaint is barred, in whole or in part, by the Plaintiff's failure to obtain personal jurisdiction based on insufficient and/or improper service of process on one or more of the Defendants.

**AS AND FOR A SEVENTEENTH DEFENSE:**

159. Upon information and belief, no special relationship existed between the Plaintiff and Defendants that would create a special duty of protection to the Plaintiff.

**AS AND FOR AN EIGHTEENTH DEFENSE:**

160. Upon information and belief, the Complaint is barred, in whole or in part, for failure to file a timely notice of claim pursuant to the General Municipal Law.

**AS AND FOR A NINETEENTH DEFENSE:**

A-124

161.    Upon information and belief, if Plaintiff reaches a settlement with any person claimed to be liable the Defendant may be entitled to a setoff against such settlement.

## AS AND FOR A TWENTIFTH DEFENSE:

162.    Any award for Plaintiff must be reduced by the amount he has received or will receive from collateral sources.

## AS AND FOR A TWENTY-FIRST DEFENSE:

163.    Plaintiff's damages, if any, must be diminished by his failure to mitigate such damages.

WHEREFORE, the Defendants, THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY COSTANTINO (incorrectly named as "CONSTANTINO" here), DETECTIVE ROBERT CHELLA, RANIERO MASSECHIA, CHARLES ARONICA, and CHIEF JOSEPH RIGA, demand judgment dismissing the Plaintiff's Complaint herein, together with the costs and disbursements of this Action, an award of attorney's fees pursuant to Fed. R. Civ. P. 54 and 42 U.S.C. §1988, and for such other and further relief as to this Court may deem just

A-125

and proper.

Dated:      May 1, 2019
            Buffalo, New York

                                        **TIMOTHY A. BALL, ESQ.**
                                        Corporation Counsel
                                        *Attorney for Defendants*

                                        */s/ Maeve E. Huggins*
                                        By: Maeve E. Huggins
                                        Assistant Corporation Counsel
                                        65 Niagara Square, 11th Floor
                                        Buffalo, New York 14202
                                        Tel.: (716) 851-4317
                                        Fax.: (716) 851-4105
                                        mhuggins@city-buffalo.com

TO:         Rob Rickner, Esq.
            Rickner PLLC
            *Attorney for the Plaintiff*
            233 Broadway, Suite 2220
            New York, New York 10279

            Glenn A. Garber, Esq.
            Glenn A. Garber, P.C.
            *Attorney for the Plaintiff*
            233 Broadway, Suite 2370
            New York, New York 10279

A-126

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CORY EPPS,                                            **CERTIFICATE OF SERVICE**

                Plaintiff,               Docket No.: 19-CV-00281

   v.

THE CITY OF BUFFALO, et al.,

                Defendants.

_____

I hereby certify that on May 1, 2019, I electronically filed the foregoing Answer to Plaintiff's Complaint on behalf of Defendants, THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY CONSTANTINO, DETECTIVE ROBERT CHELLA, RANIERO MASSECHIA, CHARLES ARONICA, and CHIEF JOSEPH RIGA, with the Clerk of the U.S. District Court, Western District of New York, using its CM/ECF system, which would then electronically notify all CM/ECF participants on this case.

I certify under penalty of perjury that the foregoing is true and correct.

TIMOTHY A. BALL, ESQ.
Corporation Counsel

*/s/ Maeve E. Huggins*
Assistant Corporation Counsel
65 Niagara Square, 11th Floor
Buffalo, New York 14202
Tel.: (716) 851-4317
Fax.: (716) 851-4105
mhuggins@city-buffalo.com

A-127

1

```
         UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF NEW YORK
         --------------------------x

         CORY EPPS,

                 Plaintiff,

                 v.              1:19-cv-00281-LJV

         THE CITY OF BUFFALO, DETECTIVE
         JOHN BOHAN, DETECTIVE
         REGINALD MINOR, DETECTIVE
         MARK STAMBACH, DETECTIVE
         JAMES GIARDINA DETECTIVE
         ANTHONY CONSTANTINO,
         DETECTIVE ROBERT CHELLA,
         RANIERO MASSECHIA, CHARLES
         ARONICA AND CHIEF JOSEPH RIGA,

                 Defendants.

         --------------------------x
                                 January 19, 2021
                                 11:22 a.m.
```

Videoconference deposition of JOHN

BOHEN, taken by plaintiff, pursuant to

notice, before Joseph B. Pirozzi, a

Registered Professional Reporter and Notary

Public of the State of New York.

A-128

                                                                    2

APPEARANCES: (ALL APPEARING REMOTELY)


RICKNER PLLC

        Attorneys for plaintiff

        14 Wall Street

        Suite 1603

        New York, NY 10005

BY:  ROB RICKNER


GLENN A. GARBER P.C.

        Attorney for plaintiff

        233 Broadway

        #2370

        New York, NY 10279

BY:  GLENN A. GARBER

A-129

3

APPEARANCES (Continued):


CITY OF BUFFALO LAW DEPARTMENT

CORPORATION COUNSEL'S OFFICE

        Attorneys for defendants

        65 Niagara Square

        Room 1112

        Buffalo, NY 14202-3313

BY:  MAEVE HUGGINS

        m.huggins@city-buffalo.com


PRESENT:

STEPHANIE PANOUSIERIS

4

STIPULATIONS


IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the deposition may be signed and sworn to before any officer authorized to administer an oath.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the deposition be waived.

5

THE REPORTER:  "The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

"They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely, pursuant to Executive Order Number 202.7 issued by Governor Cuomo on March 19, 2020.

"The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

"Please indicate your agreement by stating your name and your agreement on the record."

MR. RICKNER:  Plaintiff agrees.

MS. HUGGINS:  I agree on behalf of defendant.

(Continued on next page)

```
                        Bohen                    6
JOHN BOHEN,

      called as a witness, having been duly

      sworn, testified as follows:

EXAMINATION

BY MR. RICKNER:

      Q.    Officer Bohen --

      A.    Yes.

      Q.    -- have you ever had your

deposition taken before?

      A.    Yeah, I believe I have.

      Q.    Okay.  I just want to go over

some ground rules.  Maybe your attorney

also went over them, but this is really

just to make sure that we get a nice, clear

transcript.

      A.    Okay.

      Q.    You have to answer every question

verbally, even though you are on camera and

being recorded, for the purpose of the

transcript you can't go uh-huh, you have to

say yes or no.  Gestures or more vague

statements that we use in conversation

aren't enough.

            Do you understand?
```

Bohen                          7

A.    Yes.

MS. HUGGINS:  Hang on just one moment, just a point of clarification. Did you say that the video portion is being recorded?

MR. RICKNER:  That was my understanding, yeah.

MS. HUGGINS:  I don't think that I was given notice of that.  It does not look like it's actually being recorded.

MR. RICKNER:  I'm fine -- for the nonparties I'm going to probably insist on it.  For the officers I don't mind.

MS. HUGGINS:  I don't think it was noticed that way.  I also don't see it actually recording.

MR. RICKNER:  It says paused, but I was going to mention we have to unpause it, but it's fine.  I don't need it --

MS. HUGGINS:  Okay.  All right.

MR. RICKNER:  Although I do think it was noticed that way.  The form I

Bohen                          8

use only notices -- I always do it, so
pretty sure I did.

MS. HUGGINS:  Okay.

MR. RICKNER:  But for the
officers, fine, no problem at all.

MS. HUGGINS:  Or at least for
this one and then we can talk about it
for the rest.  Thank you.

MR. RICKNER:  Absolutely.  I'm
not dressed up anyway.

Q.    So, Officer Bohen, the other
thing that we need to make sure to do, is
that even though I ask these long, rambling
questions and you may know exactly where
I'm going, you still have to wait until I'm
finished asking the question before you
jump in and answer.

Can you do that for me?

A.    Yes.

Q.    Do you have any medical reason
why you can't give full and truthful
testimony today?

A.    No.

Q.    You said you had your deposition

A-135

Bohen                              9

taken before.  Can you tell me when that

was?

        A.    Sometime in 1970.

        Q.    Since 1970, have you ever had

your deposition taken?

        A.    No, I don't believe so.

        Q.    Is it fair to say that you have

testified in court?

        A.    Yes.

        Q.    Have you testified in grand jury

proceedings?

        A.    Yes.

        Q.    When you testified in court, were

you ever cross-examined with grand jury

proceedings?

        A.    Yes.

        Q.    So is it fair to say that you

understand that you need to be careful to

give accurate answers when you're on the

record?

        A.    Yes.

        Q.    Did you do anything to prepare

for this deposition today?

        A.    Just met with Maeve.

Bohen                       10

Q.   Without going into any of the content of your conversations, can you tell me how long you met with her?

A.   Oh, a couple of hours.

Q.   Besides the couple of hours that you met with Maeve, did you do anything else to prepare for this deposition?

A.   No.

Q.   When did you first have notice that Cory Epps was bringing claims against you?

A.   I was sent a mail on it and, in fact, if I can look at it, I don't know exactly what date.

MS. HUGGINS:  For the record, it was just a communication from counsel.

Q.   Can you disclose the date for me?

A.   You're asking me?

Q.   I don't need to know the contents of that communication because that's privileged, but the date would not be.

MS. HUGGINS:  If you want to take a look inside the letter that I sent you and just tell him the date only

PIROZZI & HILLMAN
212-213-5858

A-137

Bohen                    11

that I sent that letter to you.

A.    It looks like May 30th of 2019.

Q.    Do you know -- withdrawn.

Besides Maeve Huggins, have you discussed this lawsuit with anyone else?

A.    No, sir.

Q.    Do you know Detective Reginald Minor?

A.    Yes, I do.

Q.    When was the last time you spoke with Detective Minor?

A.    Probably 24 years ago when I retired.

Q.    Fair enough.

Do you know Detective Mark Stambach?

A.    Yes.

Q.    When was the last time you spoke with Detective Stambach?

A.    Probably the same, 24 years ago.

Q.    Do you know Detective James Giardina?

A.    Yes, I do.

Q.    When was the last time you spoke

Bohen                          12

with Detective Giardina?

A.   Probably about the same, 24 years ago.

Q.   Do you know Detective Anthony Constantino?

A.   Yes, I do.

Q.   When was the last time you spoke with Detective Constantino?

A.   About 24 years ago.

Q.   And do you know Detective Robert Chella?

A.   Yes, I do.

Q.   When was the last time you spoke with Detective Chella?

A.   24 years ago.

Q.   Do you know Detective Raniero Massechia?

A.   Yes, I do.

Q.   When was the last time you spoke with Detective Massechia?

A.   24 years ago.

Q.   And do you know Detective Charles Aronica?

A.   Yes, I do.

A-139

Bohen                          13

Q.    When was the last time you spoke with Detective Aronica?

A.    24 years ago.

Q.    Do you know Chief Joseph Riga?

A.    Yes, I do.

Q.    When was the last time you spoke with Chief Riga?

A.    24 years ago.

Q.    So it's fair to say you haven't really kept in contact with the old squad since you retired?

A.    Yes, sir.

Q.    When did you graduate high school?

A.    1950 -- no, high school, 1962.

Q.    And did you go to college?

A.    For a short time.

Q.    A year or two?

A.    Less than that.  Well, probably at least a year.

Q.    So it's fair to say you didn't earn a degree?

A.    No, I did not.

Q.    Prior to joining the police

A-140

Bohen                    14

department in Buffalo, did you work at any other police departments?

A.    No.

Q.    When did you join the Buffalo Police Department?

A.    August 1968.

Q.    Between 1962 and 1968, did you have any jobs in law enforcement?

A.    1962 to '68, yes, sir, I did.

Q.    And what was that?

A.    I got to go back.  I was with the Erie County Sheriff's Department as a jail guard.

Q.    And what years did you have that position?

A.    Oh, probably, let me think, probably 1967 to 1968.

Q.    And prior to 1967, did you have any jobs in law enforcement?

A.    No, sir.

Q.    After you joined the police department in August of 1968, did you go to some sort of basic training?

A.    Yes, sir.

Bohen                       15

Q.    And about how long did that take?

A.    I believe it was maybe four months.

Q.    During that training, did you receive any instruction regarding lineup procedures?  And by that, I mean physical lineup procedures where the people are actually there.

A.    No, sir.

Q.    Did you receive any training regarding photograph lineups, meaning where you put six photographs on a sheet and then show them to a witness?

A.    No, sir.

Q.    Did you receive any -- well, let me try to get the dates right.

Did you receive any training regarding Brady material, meaning exculpatory material that needs to be turned over to, ultimately, the criminal defendant in a case?

A.    No, sir.

Q.    Now --

MS. HUGGINS:  Are you asking in

A-142

```
                       Bohen                    16
```

terms of in the basic academy level training or are you asking generally?

MR. RICKNER:  I'm asking specifically in the four months.  And to be clear, my memory isn't perfect, he may have actually gone to training before Brady was enacted.  But I asked the question anyway, as to whether or not it matters, we'll find out later.

MS. HUGGINS:  I'm just asking you to clarify the time frame.

MR. RICKNER:  I'm specifically talking about the four months and then we're going to move on to other training as we sort of march through his career, hopefully make it quick.

Q.    So is it fair to say that you started as some sort of patrol officer or line-level officer?

A.    Yes, sir.

Q.    Did you have a title?

A.    Patrolman.

Q.    How long were you a patrolman?

A.    I think it was about 15 years.

Bohen                              17

Q.    So is it fair to say that you were a patrolman from 1968 until 1983?

A.    Somewhere in there, yes.

Q.    After -- well, withdrawn.

During those 15 years when you were a patrolman, did you get any additional training?

A.    Yeah, probably.  What I got, I don't know.

Q.    Okay.  Fair enough.

During the 15 years you were a patrolman, did you get any training regarding lineup procedures, either photograph or in person?

A.    No, sir.

Q.    Did you get any training regarding interrogation techniques?

A.    That's possible.

Q.    And did you get any training regarding Brady or the obligation to turn over exculpatory evidence in those 15 years?

A.    Not that I can recall.

Q.    After you stopped being a

Bohen                    18

patrolman, were you promoted to a new position?

A.   Yes, sir.

Q.   And what was that position?

A.   Detective.

Q.   And when did you retire from the Buffalo Police Department?

A.   December 18, 1997.

Q.   You said 1997?

A.   Yes.

Q.   Were you a detective continuously from 1983 until your retirement in 1997?

A.   Yes.

Q.   When you started as a detective, did you get -- I'm sorry.

(Pause)

MR. RICKNER:  Can everyone see me and hear me again?

(Discussion off the record)

MR. RICKNER:  So back on the record hopefully.

Q.   When you started work as a detective in 1983, did you go back to the academy for any additional training?

PIROZZI & HILLMAN
212-213-5858

Bohen                        19

A.    Not that I'm aware of.

Q.    Did you take any classes where you learned how to be a detective?

A.    No.

Q.    Did you receive on-the-job training?

A.    Yes.

Q.    When you received on-the-job training, was there a particular structure to it, meaning that the people who are instructing you were following some sort of plan in training you to be a detective?

MS. HUGGINS:  Form.

A.    Yes.

Q.    Okay.  Could you describe that process?

A.    Well, you know, basically, it was on a daily type basis where you would go out with another detective who had cases to work at and just kind of follow his lead and watch what, you know, listen and watch what he was doing.

Q.    Was there a particular detective that you were assigned to follow?

Bohen                            20

A.    No.

Q.    How long did the on-the-job training take place; was it a year, six months, something else?

A.    I would say, I might have had that for all the years I was a detective, you know, because you were learning things at different times.

Q.    Sure.

Besides learning from other officers, during your time as a detective, did you ever take any classes regarding detective work of any kind?

A.    Yes, sir.

Q.    Okay.  Did any of those classes include instruction on lineup procedures?

A.    No, not really.

Q.    Did any of the classes concern Brady materials or exculpatory evidence?

A.    Not that I can say.

Q.    Did you go to any seminars while you were a detective, maybe not a formal class, but a place where you would go and hear about certain issues for being a

A-147

Bohen                    21

detective?

A.    Yes, sir.

Q.    Did any of those seminars involve lineup procedures?

A.    No.

Q.    Any of these seminars involve Brady material?

A.    No.

MS. HUGGINS:  Form.

When he's using the term Brady, do you know what that means?

THE WITNESS:  No, not really.

Q.    Well, let me ask that.

Do you know what Brady material is?

A.    No, sir, I don't.  I've heard of it.

Q.    Do you understand that there's an obligation to turn over evidence to the prosecutor that may be exculpatory, meaning that the criminal defendant may benefit from getting it?

A.    Yes, sir.

Q.    Did you have a name for that

Bohen                       22

exculpatory evidence when you were working as a detective?

A.    No, not that I can remember.

Q.    Was there any policy regarding exculpatory evidence when you were working as a detective?

A.    No.

Q.    Did you understand that you had an obligation to record exculpatory evidence and give it to the prosecutor to ultimately be turned over to the criminal defense attorney?

A.    Yes.

Q.    And how did you learn that?

A.    Through the assistant district attorneys we worked with.

Q.    So the assistant district attorneys would ask you, can you give me the exculpatory evidence?

A.    Yes.

Q.    Besides that, did you have any other instruction or training regarding exculpatory evidence?

A.    No, not that I can remember, no.

```
                           Bohen                    23
        Q.    Now, at some point in your time
as a detective, you learned how to make
photo arrays?
        A.    Yes.
        Q.    How did you learn how to make
photo arrays?
        A.    Probably through other detectives
when I'd worked with them in the precinct.
        Q.    And when you make a photo array,
was there a particular procedure that you
were required to use?
        A.    Yes.
        Q.    And what was that procedure?
        A.    Well, you submitted, you
submitted the person's photo, the suspect,
the person of interest, you submit it for a
picture of that person.  You would go to
ID, identification bureau, which was on the
fourth floor at police headquarters or you
would call them and talk to somebody there.
        Q.    Is it fair to say that the
identification bureau had a collection of
photographs of different people to be used
in photo arrays?
```

A-150

```
                      Bohen                    24
        A.    Yes, sir.
        Q.    Now, when you would make a photo
array, would you be the one who actually
made the choice as to which photographs
were used as fillers?
        A.    Yes, sir.
        Q.    Now, you say there's this
identification bureau on the fourth floor.
Were the photographs in there organized in
any particular way?
        A.    Not that I remember, no.
        Q.    If you were looking to find
filler photographs, what process would you
use at the identification bureau to do it?
        A.    Well, you would just go to the
cabinet where they kept the photos and
you'd just got to weed through them.
        Q.    You say the cabinet where they
kept the photos.  Were these just loose
photos in a cabinet or were they organized
in some fashion?
        A.    No, they're, basically, if I
remember right, they were just loose.
        Q.    Did the photos have any kind of
```

Bohen                          25

information on them like the date they were taken or who it was?

A.   Yes, sir, I believe so.

Q.   Was that, for example, written on the back?

A.   It could have been, yes.

Q.   About how many photographs would you say were in the cabinet, if you can estimate?

A.   Hundreds.

Q.   And where did those photographs come from?

A.   From when a person got arrested and charged with a crime, all their information would be sent up to identification bureau.

Q.   Now, is it fair to say that you also learned how to do in-person lineups?

A.   Very little.  Very little.

Q.   When you say "very little," what do you mean?

A.   Like, I mean, you know, we weren't -- there were certain individuals, detectives, who were trained more in that

A-152

Bohen                        26

than I was.

Q.   Okay.  In 1997, which detectives were trained more than you were regarding lineup procedures?

A.   I would say -- you want name-wise you mean?

Q.   Yes.

A.   I would say probably Detective Andy Ortiz, Detective Juan Morales, Detective Mark Stambach, maybe Detective Charles Aronica, Detective Raniero Massechia, and there might be others but I can't recall them right now.

Q.   When you would do a lineup, let's say in 1997, would you call on one of the five officers you just listed for advice on how to do it?

A.   Well, actually, I never put a lineup together, you know.

We worked -- we always worked as a squad.  So most of the people within the squad within the homicide unit would be aware of cases going on.  So they would more or less handle those physical lineups.

```
                    Bohen                    27
        Q.    So just to be clear, you never
put a lineup together yourself?
        A.    No, sir, I did not.
        Q.    And was there more than one
detective squad in the Buffalo Police
Department?
        A.    Yes, sir.
        Q.    Were you assigned to a specific
squad?
        A.    I was assigned to homicide unit.
              MS. HUGGINS:  Form.  What year
        are you referring to?
        Q.    That was my next question.
              From 1983 to 1997 when you
retired, did you have more than one
assignment within the detective squad?
        A.    Oh, yes, sir.
        Q.    Let's go back to the beginning.
In 1983, where were you assigned?
        A.    Precinct number 8.
        Q.    And precinct number 8, did you
have any particular duties as a detective
there?
        A.    Yes, sir.
```

A-154

Bohen                    28

Q.    What were those, just roughly?

A.    I investigated house burglaries, business burglaries, assaults, purse snatchings, larcenies, different larcenies, grand larcenies, petit larcenies, crimes within the precinct.

Q.    Is it fair to say that certain felonies within the precinct would be investigated by detectives at the precinct and that for other crimes there may be a focused detective unit?

A.    Yes, sir.

Q.    Okay.  So at some point you were assigned to the homicide unit?

A.    Yes, sir.

Q.    And when did you start at the homicide unit in Buffalo?

A.    It would have been probably early part of 1997.

Q.    So is it fair to say that you were assigned to the homicide unit less than a year?

A.    Yes.

Q.    Was working at the homicide unit

A-155

Bohen                             29

a promotion?

A.    No, not really.

Q.    When you were assigned to the homicide unit, did you get an increase in salary?

A.    Well, you got more overtime pay so, but salary-wise it was basically the same.

Q.    Is your pension calculated based on the overtime in your final year at the police department?

A.    Yes, it is.

Q.    So is it fair to say by working more time -- withdrawn.

Would it be correct to say that by working more overtime at the homicide unit, you were ultimately able to secure a better pension?

MS. HUGGINS:  Objection.  Form.

A.    Yes, sir.

Q.    Now, was there more than one shift at the homicide detectives unit at the Buffalo PD?

A.    Yes, sir.

Bohen                                30

Q.    Is it fair to say that the day was divided into three parts?

A.    Yes, sir.

Q.    Which particular shift were you assigned to?

A.    You worked all three.

Q.    Okay.  So it would alternate?

A.    Yes, sir.

MS. HUGGINS:  Form.

Just for accuracy, how many shifts were there on the homicide detective squad?

THE WITNESS: Oh, yeah.  Actually there were only two.  It was a day shift and the day shift went into the afternoon shift, the afternoon shift went into the evening.  So there was two.

Q.    Okay.  And what were the times that demarcated between the day shift and the night shift?

A.    The day shift was 0900 hours to 1600 and then it was 1600 to 0200.

Q.    And from 0200 to 0900, there was

Bohen                31

nobody working?

A.    There was nobody working but you were at call.

Q.    So if there was a homicide very early in the morning, for example, somebody would get called in for it?

A.    Yes, sir.

Q.    Okay.  Now, when you worked at the homicide -- well, withdrawn.

Was there a specific name for this homicide detective unit?

A.    No.  Just --

MS. HUGGINS:  Form.  Just at what time are you referring?

Q.    In 1997, was there any name for the homicide detective unit?

A.    Just homicide.

Q.    So when you were working at homicide in 1997, how many detectives were there total?

A.    Off the top of my head, I got to say maybe ten.

Q.    And was there somebody who was an immediate superior to the detectives at the

Bohen                     32

homicide unit?

A.    Yes, sir.

Q.    And who was that?

A.    That would have been Captain Joseph Riga and below him, second in command Lieutenant William Conwall.

Q.    So when you listed the ten people in the detective unit, were you including Joseph Riga and Conwall?

A.    No, I don't -- no.

Q.    So there were ten detectives and then two superior officers?

A.    Yes.

Q.    In any given year, how many homicides -- withdrawn.  Let's make it easier.

In 1997, how many homicides were there in Buffalo?

A.    I believe 64.

Q.    And, if you know, how many homicides were there in 1996?

A.    No, I don't.

Q.    Do you remember --

MS. HUGGINS:  I'm sorry, I missed

Bohen                    33

the last question.

MR. RICKNER:  I'm just wondering how many homicides there were in 1996, if he knew, in Buffalo.

MS. HUGGINS:  What was your previous question before that?

MR. RICKNER:  How many there were in 1997.

MS. HUGGINS:  And then your next question is how many were in 1996?

MR. RICKNER:  Right.

MS. HUGGINS:  Sorry, I just couldn't hear you.  Thank you.

Q.   Do you remember anyone saying that 1997 was a particularly bad year for homicides?

A.   No, not really.

Q.   Is it fair to say to your knowledge that was roughly a normal number of homicides, unfortunately, in Buffalo?

MS. HUGGINS:  Form.  You can answer.

A.   Yes.

Q.   Is it fair to say that some of

Bohen                    34

the homicides would go to trial?

A.    Yes.

Q.    When a homicide was going to trial, would there be conversations about it at the homicide unit?

A.    Yes.

Q.    Is it fair to say that the officers would know when a homicide trial was going on?

A.    Yes.

Q.    Now, just for the record, since 1997, have you had any other jobs in law enforcement?

A.    No.

Q.    During your time at the Buffalo Police Department, were you ever disciplined?

A.    Yes.

Q.    Was any of that discipline for making a false or inaccurate statement?

A.    No.

Q.    Now, when you were working as -- withdrawn.

During your time at the Buffalo

A-161

Bohen                    35

Police Department, did you ever come to know somebody named Cory Epps?

A.   Yes.

Q.   Now, I know, and we'll go into it later, that ultimately Epps was placed into identification procedure, but prior to Epps being implicated in the murder of Tomika Means, did you know of Cory Epps?

A.   No, sir.

Q.   So is it fair to say that Cory Epps did not have a reputation in the police department to your knowledge?

A.   To my knowledge, yes.

Q.   Did you know somebody named Russell Montgomery?

A.   No.

Q.   Did you know -- during your time as a police officer or a detective, did you know somebody named Paul Pope?

A.   No.

Q.   Is it correct to say that at some point you were assigned to work on the homicide of Tomika Means?

A.   Yes.

A-162

Bohen                               36

Q.    How did you receive that assignment?

A.    It would have probably been through Captain Joseph Riga.

Q.    And I don't know if you used this term in Buffalo, but "catch a case," do you know what I mean when I say that?

A.    Yes.

Q.    When you would catch a case, would it always come from your superior officer, Captain Riga?

A.    Yes.

Q.    And when you were assigned a case, was there some sort of formal procedure; you would get a packet, you would get a form, something you would get written down?

A.    I don't recall that.  But, you know, you would be informed what the circumstances are.

Q.    Okay.  When somebody was investigating a homicide, were the documents relating to the homicide collected in some place inside the homicide

A-163

Bohen                37

unit?

A.    Yes, they were.

Q.    And would you have access to those documents?

A.    Yes.

Q.    So, for example, if you wanted to look up a prior witness statement, you could go to where those documents were stored and look it up?

A.    Yes.

Q.    Was there an index created of those documents, meaning did somebody start at report number one and write it down and then go all the way until the case was finished?

A.    No, but whatever you personally did, whatever a detective did personally regarding that particular case, he had to record it and then you turned it in to the report technician who worked in our office and she put it in the file.

Q.    What was the name of the report technician?

A.    Marilyn Lanc.

Bohen 38

Q. Were there any other report technicians?

A. No.

Q. So would it be correct to say that Marilyn Lanc was responsible for keeping all of the documents and reports relating to a homicide in one file?

A. Yes.

Q. Did the files have numbers on them?

A. Yes, they did.

Q. Now, do you know if more than one copy of each file was created?

A. Not as far as I know.

Q. Going back to the murder of Tomika Means, when were you assigned to work on that investigation?

A. Probably it would have been shortly, maybe a day or two after the homicide.

Q. Now, when you worked as a detective, did you have a memo book?

A. Yes.

Q. Were these memo books assigned to

Bohen                          39

you by the department?

A.    Not that I'm aware of.

Q.    Did you have to buy your own?

A.    No.

Q.    When a memo book was full, meaning that all of the pages had been written on, would you store it someplace?

A.    I don't remember that.

Q.    When you retired, did you take your memo books with you?

A.    No.

Q.    Did you leave them somewhere?

A.    Left them at the office, probably gave them to Marilyn Lanc.

Q.    Do you know as you sit --

MS. HUGGINS:  Do you know exactly what you did with your memo books?

THE WITNESS:  No, I don't.

Q.    Was there any procedure for storing memo books that were full or after an officer retired?

A.    Not that I'm aware of.

Q.    This is going to sound stupid, but what size were the memo books; were

```
                    Bohen                 40
these full-size, 8 1/2 by 11 pads or were
these smaller?
     A.    Probably smaller.  Probably,
maybe eight inches long by three inches
wide.
     Q.    So you could fit it in a large
pocket?
     A.    Yes.
     Q.    Following a homicide
investigation, would you turn over your
memo book pages relating to that
investigation to the district attorney?
     A.    Yeah.
     Q.    Would you actually rip them out
or would you make a photocopy?
     A.    Probably, I probably would have
ripped them out.
     Q.    Now, the murder of Tomika Means,
is it fair to say it took place on a street
or highway?
     A.    Yes, sir.
     Q.    Did you actually go to the scene
of the crime?
     A.    No, I didn't.
```

Bohen                          41

Q.   After -- withdrawn.

Starting from the beginning, what was the first thing that you remember doing with regards to the Tomika Means investigation?

A.   You know, the most vivid in my memory would be doing a photo array of the suspect.  That's the biggest thing I remember.

Q.   Which suspect?

A.   Cory Epps.

Q.   Is it fair to say that was in July of 1997?

A.   Yes, sir.

Q.   Do you remember the date that Tomika Means was murdered?

A.   I believe it was in May, May 27th or something.

Q.   So there were several weeks between the Tomika Means murder and the identification procedure involving Mr. Epps, is that correct?

A.   Yes.

Q.   Between those two times, do you

A-168

Bohen                    42

remember anything that you did with respect to the Tomika Means investigation?

A.    No.  Other than talk to several people, not necessarily witnesses, but people that sent information down to homicide.

Q.    Okay.  You said you spoke to several people.  Can you tell me who you spoke to?

A.    I believe it was, let's see, I believe it was Tomika Means's aunt and a friend of hers.

Q.    A friend of Tomika Means or a friend of Tomika Means's aunt?

A.    A friend of Tomika Means herself.

Q.    Okay.  Now, do you remember the name of Tomika Means's aunt?

A.    No, not offhand.

Q.    If I told you the name Linda, does that refresh your recollection?

A.    Slightly, yes.

Q.    Okay.  Between the death of Tomika Means and the identification procedure involving Mr. Epps, how many

Bohen                    43

times did you speak with Tomika Means's aunt?

A.    How many times did I speak with Tomika Means?

Q.    Her aunt.

A.    Oh, her aunt.  As far as I can recall, once.

Q.    Was that in person or over the phone?

A.    No, I think it might have been in person.  I'm a little vague about it.

Q.    When you worked at the Buffalo Police Department Homicide Unit, was there a document called the P-73?

A.    Yes, sir, there was.

Q.    What's a P-73?

A.    That's a departmental correspondence from me or any detective that's doing an investigation with notes that he took from his notebook and what was corresponded to him and then you are corresponding it to Captain Joseph Riga.

Q.    Were these correspondence memos the way that information regarding a

Bohen                          44

homicide investigation was stored, kept track of?

A.    Yes.

Q.    Besides the P-73, were there any other kind of memorandum or documents that were generated with regard to a homicide investigation?

A.    Well, if you would, if you requested photos for a lineup, you would have to submit a paperwork form on that and anything that you submitted that you wanted information for, you had to submit a request for correspondence on it.

Q.    Got it.  Let me ask this question a different way.

Sometimes when you would speak with a witness, you would actually get a written witness statement, right?

A.    At some point, yes.

Q.    And there were other instances where you didn't get a written witness statement but you would record the conversation, sum and substance, in a P-73?

A.    Yes.

Bohen                     45

Q.   Now, I'd like you to -- let's see if I can pull this out.

If you go to --

MR. RICKNER:  I marked it as document number 9, Maeve.

MS. HUGGINS:  Does it have a Bates number on the bottom of it?

MR. RICKNER:  This one doesn't. It was part of the DA's file.  It's the 7/7/97 -- well, you know what, it's this.  I can do a screen share.  There are two of them that look nearly identical.  I just want to talk about the 7/7/97 one.

MS. HUGGINS:  So, for the record, your office shared via email PDF forms, some of which were disclosed in discovery.  I have printed all of those out and those are in front of the witness.

He is now referring to a log dated 7/7/97 and could you just identify it for the record what this log is?

A-172

Bohen                    46

Q.    Yes, that was my next question.

A.    Yeah.  This is what you did, what each detective did during his tour of duty. These are, you know, whatever information you gathered or whoever you talked with, you would put down on this paper.

Q.    Got it.

Now, the title of this in the copy I got was cut off, but is there a name for this particular document?

A.    I can't recall it, sir.

MR. RICKNER:  Can we mark the 7/7/1997 log as Exhibit 1.

I did number them but that was not the numbers that I intend on using them.  It felt like a smarter way to do it than just giving the names.

MS. HUGGINS:  So for the purposes of the deposition, I've written the exhibit number on it for the witness. So we'll deem this Exhibit 1.  If at some point we want to somehow mark them more formally, maybe at the end of the deposition on the record, I'm fine with

A-173

Bohen                             47

that, and then we circulate PDFs with the actual exhibit number on it, that might be most efficient.

MR. RICKNER:  Well, the way I've been doing it is actually having the court reporter who also has identical copies of all of these documents -- I don't know if we do it at the end or concurrently, I don't really care, but I've been having him or her mark it as the depositions go on and then when they circulate the transcripts, they give us copies.

MS. HUGGINS:  That's acceptable.

MR. RICKNER:  Okay.  But one thing, I don't know if this is your normal practice but it is my normal practice, I'm going to do consecutive deposition numbers, meaning that the first deposition document in the next deposition could be number 15, but I'm not going to be re-marking things.

So if we ever talk about Exhibit 1 again in a different

Bohen                        48

deposition, it's just going to be the same Exhibit 1 rather than re-marking things.

MS. HUGGINS:  That's how I do it too.

MR. RICKNER:  Great.

(Log dated July 7, 1997 was marked Exhibit 1 for identification)

Q.    All right.  Sorry to bore you with that, detective.

A.    No problem.

Q.    So here it says Sergeant Bratos, Detective Bohen, and Detective Minor in the upper left-hand corner of Exhibit 1, is that correct?

A.    Yes.

Q.    And this is going to Lieutenant Conwall, right?

A.    Yes.

Q.    Would this document actually be handed to Lieutenant Conwall?

A.    No, it would have been turned over to the report technician.

Q.    And it says -- it's from three

Bohen 49

different individuals, that's correct?

A. Yes.

Q. So does this collect what all three of you did on that day?

A. Yes, could be.

Q. Were there some days where you would just individually submit one of these documents?

A. Yes.

Q. And is it correct to say looking at the bottom half, that this document records activities regarding multiple different cases?

A. Yes.

Q. In fact, only, I believe two of the five entries involve the Tomika Means murder?

A. Yes.

Q. Were these documents stored together, by which I mean, you know, every day all of the documents relating to these activities would be collected in one place or were they handed to different files depending on which files worked on or

Bohen                              50

anything else?

MS. HUGGINS:  Form.  You can answer.

A.    I'm not sure about that.

Q.    Okay.  Out of curiosity, do you know if Marilyn Lanc is still alive?

A.    No, I believe she passed away.

Q.    So just looking at the bottom entry, is it correct to say that this reports the discussion that someone had with Linda Means?

A.    Yes.

Q.    And it says she called at 23:30?

A.    Yes.

Q.    Now, it lists four initials at the bottom, is that correct?

A.    Yes, sir.

Q.    And it's fair to say that that's the initials that correspond to Bratos, Bohen, and Minor?

A.    Yes, sir.

Q.    From this entry, can you tell me who spoke with Linda Means?

A.    No, it doesn't specifically say.

Bohen                              51

Oh, I don't know who specifically talked.

Q.   Just to be clear, do you remember speaking to Linda Means at any point?

A.   Vaguely.  I mean, this might have been my conversation with her but I'm not 100 percent sure.

Q.   Now, just going back, so we discussed your memo book.

A.   Yes.

Q.   Now, when you would have a conversation with a witness, would you make notes in your memo book?

A.   Either that or on a piece of paper, you know, you carried a note -- not a notebook but you carried blank pieces of paper.

Q.   When you say blank pieces of paper, do you actually mean --

A.   Like notebook paper.

Q.   By notebook paper, do you mean loose leaf, like it's not connected on one edge?

A.   Yes, sir.

Q.   So we've discussed that you kept

A-178

Bohen                    52

handwritten notes, that there's the forms such as Exhibit 1, there's P-73s, and there's also witness statements.

Besides those four sets of documents, were there any other places that you would record conversations that you had with witnesses?

A.   No, I would say that would be it.

Q.   All right, so just going to go back in time a bit.

MR. RICKNER:  I'd like to mark as Exhibit 2 the Buffalo Police Department Intra-Departmental Correspondence dated June 9, 1997.

MS. HUGGINS:  June 25, 1997?

MR. RICKNER:  No, the 9th.

MS. HUGGINS:  Oh, the 9th.  Hang on.

Can you just give me a moment, I'm going to get a different colored pen.

MR. RICKNER:  Actually, if we could go off the record for two minutes.

Bohen                    53

(Buffalo Police Department Intra-Departmental Correspondence dated June 9, 1997 marked Exhibit 2 for identification)

(Pause)

MR. RICKNER:  Thank you very much.

Q.    Detective, is Exhibit 2 an example of a P-73?

A.    Yes, it is, sir.

Q.    Now, when you drafted this document, did you use a typewriter?

A.    Yes, I did.

Q.    Where were the typewriters located at the homicide unit?

A.    In the homicide office.

Q.    Okay.  Do you remember how many typewriters there were?

A.    There were as many as there were detectives.

Q.    Did you have your own or was there just enough to go around?

A.    We had enough to go around, so I had my own.

PIROZZI & HILLMAN
212-213-5858

A-180

Bohen                               54

Q.    Okay.  Now, is it fair to say that sometimes -- well, withdrawn.

If you had -- when you were in the field, did you have access to a typewriter?

A.    No.

Q.    So when you needed to draft a P-73, how would you go about recording information?

A.    Well, you would, when you were in the field, you took your notes, you know, on paper and then when you got back to the office, you would put them, you know, type them up.

Q.    And would you hold on to your original notes as well?

A.    Probably for a while.

Q.    But you might throw them away?

A.    No, never.

Q.    Okay.  So where would you put them?

A.    Keep them with you or you would turn them over to Marilyn Lanc.

Q.    Now, going back to Exhibit 2, if

Bohen                         55

I'm reading this correctly, there was a witness that was brought to your attention by another officer, is that correct?

A.    Yes.

Q.    Now, can you tell me from looking at this document, who was the witness that was brought to your attention?

A.    Well, I don't -- I don't know if he was, if you could say he was a witness. I think he was more of a possible suspect or person of interest, and his name was Donald Faison.

Q.    Now, can you tell me where the name Donald Faison first originated in the investigation?

A.    Well, it was two patrol officers who stopped him at a traffic stop and they wrote the information down and then they forwarded it to the homicide office for my attention.

Q.    Now, can you tell me what about the traffic stop made you or the officers believe that Donald Faison might be involved in the murder?

A-182

Bohen                        56

MS. HUGGINS:  Form.  He can answer.

A.    It's just the idea that he was a person of interest.

Q.    How did Donald Faison become a person of interest?

A.    I think probably because of his physical makeup and maybe the car that he was driving -- that he was riding in.  It just kind of caught the officer's eye.

Q.    Is it correct to say that a composite of the assailant in the Tomika Means murder was generated at some point?

A.    Yes.

Q.    Now, those composites, were they circulated fairly widely inside of the homicide unit?

A.    Yes.

Q.    Was there a board where all of the composites for the current cases were hung up on, for example?

A.    We did have that, yes.

Q.    And did you have a board like that also for the other officers so they

A-183

Bohen                          57

would know who you were looking for?

A.      For the detectives?

Q.      Oh, I mean besides the detectives.  Just ordinary police officers.

A.      No.

Q.      I guess what I'm trying to ask is, these patrol officers who brought Donald Faison to your attention, how would they have known it looked like the assailant that you were looking for in the Tomika Means murder?

A.      Probably, might have been a radio call out, and I don't know by who, but, you know, stating that there was a shooting that happened and there was this car and an individual in the car might have been part of the shooting.

MS. HUGGINS:  Form as to the last question.

MR. RICKNER:  I'd like to mark two documents.  So one of these documents has the Bates stamp 953, and let's make that -- that's number 17 that I marked on the file but it's

A-184

Bohen                          58

going to be our Exhibit 3.

And then number 12 which has the Bates stamp 986, that's COB 986, I'd like to mark as Exhibit 4.

You know what, I marked the wrong one.  My apologies.  To avoid the record being unclear, Exhibit 5, let's do COB 981.

(Discussion off the record)

MS. HUGGINS:  What did you say would be Exhibit 3 and 4?

MR. RICKNER:  Exhibit 4 is COB 986.

MS. HUGGINS:  Let me look for that first.

(Discussion off the record)

MS. HUGGINS:  Number 3 is going to be 986?

MR. RICKNER:  No, number 3 is 953 and 981 is Exhibit 5 and then Exhibit 4 is the blue one.

MS. HUGGINS:  Okay, Exhibit 4 is 986.

MR. RICKNER:  Yes.

A-185

Bohen                         59

MS. HUGGINS:  Okay.  So repeat Exhibit 3 again.

MR. RICKNER:  953.

(Discussion off the record)

(Buffalo Police Department Intra-Departmental Correspondence dated July 3, 1997 marked Exhibit 3 for identification)

(Photo Spread Information, Bates No. COB 986 marked Exhibit 4 for identification)

(Buffalo Police Department Intra-Departmental Correspondence dated June 24, 1997 marked Exhibit 5 for identification)

Q.    Taking a look at Exhibit 5, can you tell me what this is?

A.    This is a request for photos to be placed in a photo array.

Q.    Now, at the top and at the bottom it has your name?

A.    Yes.

Q.    Does that indicate that you created this photo array?

PIROZZI & HILLMAN
212-213-5858

A-186

Bohen                          60

A.    Yes.

Q.    Now, there is Donald Faison's name and then a mug number 215197?

A.    Yes.

Q.    Does that indicate that you had a mug shot of Donald Faison from some earlier arrest?

A.    Yes.  From his, yes.

Q.    Right.  Now, there's also a list of five other mug numbers.

Do you see that?

A.    Yes, sir.

Q.    Does each one of those correspond to a photograph that would be placed in a photo array as a filler?

A.    Yes, sir.

Q.    Now, I'd like to look at Exhibit 4.  Can you identify this for the record?

A.    This is a -- it looks like a copy of the blue cardboard papers we used to show the photo array.

Q.    Okay.  Were there sort of blanks that you would then fill in or clip in the

A-187

Bohen                        61

photos?

        A.    Yeah, there were slices where you could slip each photo down into, you know, onto the page.

        Q.    Got it.

              So if you look at Exhibit 2 -- or if you look at page 2 of Exhibit 4, rather, would it be correct to say that these photos are loose but sitting in little pockets on this blue sheet?

        A.    They may be loose, but it's very possible that at times personally, myself, I would slightly glue them so they wouldn't get jostled and moved around.

        Q.    Got it.

              Now, these blue folders, how many pages were they?  Was it one sheet that folded in half?

        A.    No, it was two separate pieces. One would be the -- the front page would be basically what, you know, it shows the CD number which is the complaint number, the officer that requested it, the unit and the list of mug shots.

Bohen                        62

The second page would be the actual photos that were used in the array.

Q.   Were these two pages attached in some way?

A.   No, you attached them at some other time with the staple.

Q.   Got it.

Now, what is the CD number?

A.   That's complaint desk number. When somebody calls 911, each call coming in is given a number which is the complaint desk number.

Q.   Okay.  So just going back to Exhibit 2 for a moment.  If you look at the top, there's a file number?

A.   Yes.

Q.   Now, that file number is 97-083, is that correct?

A.   Yes.

Q.   That's different from the complaint desk number?

A.   Yes, sir.

Q.   And going back to Exhibit 4, the mug numbers, those correspond with the

Bohen                                    63

different photographs?

A.    Yes, sir.

Q.    And so here, Donald Faison, comparing Exhibit 5 and Exhibit 4, would have been in slot number 5?

A.    Yes, sir.

Q.    Once you were done creating a photo lineup, what would you do with it?

A.    You mean after you had showed it to the witness or --

Q.    Yeah -- no, after you are finished with it, after you have shown it to a witness, what would you do with it?

A.    You would turn it over to the report technician and she would put it in the large file.

Q.    So would it be correct to say that every photo lineup that was performed during an investigation would eventually become part of the file?

A.    Yes, sir.

MR. RICKNER:  I'd like to mark as Exhibit 6, COB 119, it's a P-73 dated June 25, 1997.

Bohen                        64

MS. HUGGINS:  Exhibit 6?

MR. RICKNER:  Yes.

(Buffalo Police Department Intra-Departmental Correspondence dated June 25, 1997 marked Exhibit 6 for identification)

Q.    Can you please identify Exhibit 6 for the record?

A.    Yes.  It's a Buffalo Police Department Intra-Departmental Correspondence for a photo array being shown to a witness.

Q.    Now, is it correct to say that based on this document, on June 25, 1997, you showed a photo array to Jacqueline Bradley?

A.    Yes, sir.

Q.    That photo array contains Donald Faison?

A.    Yes, sir.

Q.    And, in fact, the photo array that you showed her is currently marked as Exhibit 4?

A.    Yes, sir.

PIROZZI & HILLMAN
212-213-5858

A-191

Bohen                    65

Q.    Do you remember showing this photo array to Jacqueline Bradley?

A.    No, I don't recall it.  But I would have to say I was there.

Q.    Okay.  In general, what was the procedure by which you showed a photo array to a witness, meaning what steps did you actually take in presenting it to them and letting them review it?

MS. HUGGINS:  Form.  You can answer.

A.    Well, we would ask the witness if she wore glasses or he wore glasses.  We'd make sure the lighting in the room was sufficient.  We would tell them once you open up the photo array, take your time, look it over carefully, and if you see the party that you say caused the problem or that you witnessed doing something wrong, point to that person.

Q.    Was there a certain period of time that you would let them look at it?

A.    Well, just at their will.

Q.    Based on Exhibit 6, can you tell

PIROZZI & HILLMAN
212-213-5858

Bohen                          66

me where Jacqueline Bradley was when she reviewed Exhibit 4?

A.    I would say that she was at her home.

Q.    Would you typically record where a photo array was shown to a witness?

A.    Yes.

Q.    Now, going back to Exhibit 5, there's a date on the top right-hand corner?

A.    Yes.

Q.    Does that indicate the date that you made your request for a photo array?

You know what, let me withdraw that question.

Which comes first, Exhibit 4 or Exhibit 5, meaning which would be created by you first in the photo array process?

A.    I would say Exhibit 5.

Q.    So you start out by making the request and then you actually fill out the photo array itself?

A.    Yes, sir.

Q.    Now, looking at Exhibit 4,

A-193

Bohen                          67

there's a remark that says, "Photo array set up 6-24-97"?

A.    Exhibit 4?

Q.    Yes.  The blue one.

A.    Okay.  Okay, yes.

Q.    Does that mean that you actually put together the photo array on that date?

A.    Yes.  6/24, yes.

Q.    After you showed Jacqueline Bradley the photo array, did you ask her if she knew Donald Faison?

A.    No, I don't believe I did.

MR. RICKNER:  I'd like to mark as Exhibit 7, the handwritten P-73 Bates stamped COB 90.

MS. HUGGINS:  Undated Bates stamp COB 90 is Exhibit 7?

MR. RICKNER:  Yes, that's correct.  It's undated.

(Buffalo Police Department Intra-Departmental Correspondence, Bates No. COB 90 marked Exhibit 7 for identification)

Q.    Now, detective, would it be

A-194

                         Bohen                    68

correct to say that Exhibit 7 was the

document you got regarding Donald Faison?

        A.    Yes, sir.

        Q.    Besides this document, did you

talk to the police officers?

        A.    You know, I don't recall that.

        Q.    Now, there's a notation on the

right.  It says, "John, here's the info on

the guy we stopped.  Thanks, Mary."

        A.    Yeah, it's Marty.

        Q.    Marty, got it.

              Would that be Marty Sentiff?

        A.    Sentiff, right.

        Q.    Gotcha.

              MR. RICKNER:  I'd like to mark as

        Exhibit 8, this is the second of the

        activity reports, it's dated June 26,

        1997.

              (Buffalo Police Department

        Activity Report dated June 26, 1997

        marked Exhibit 8 for identification)

        Q.    This is similar to the activity

reports that we discussed beforehand?

        A.    Uh-huh.

A-195

Bohen                          69

MS. HUGGINS:  For the benefit of the court reporter, um-hums are difficult to report.  A yes or no is better.

A.    I'm sorry.  Yes.

Q.    Now, this says from Detective Callari and Detective Bohen.

Do you see that?

A.    Yes.

Q.    Would that indicate that you and Detective Callari were working together that day?

A.    Yes, sir.

Q.    Did you have a partner, meaning somebody that you were assigned to work with regularly?

A.    Yes, that would be Reginald Minor.

Q.    Okay.  And that is a formal designation, meaning that you would say, "Detective Minor is my partner"?

A.    Yes.

Q.    In the Tomika Means homicide, was there a lead detective?

PIROZZI & HILLMAN
212-213-5858

A-196

Bohen                          70

A.    No, not really.  We all kind of shared information and, you know, there wasn't a so-called lead detective.

Q.    Was there one person who was directing how the homicide was investigated or what your next steps were, something like that?

A.    I would say Lieutenant Conwall or Captain Riga.

Q.    Okay.  So would it be correct to say that it's a small department and therefore the supervisors were hands on in the homicide investigations?

A.    Yes.

MS. HUGGINS:  Are you saying it was all one case?

Q.    Yeah, I mean, I think the answer is no, right, it belonged to everyone, is that fair to say?

A.    Well, let me specify.

Q.    Okay.

A.    If we got called out to a scene, homicide scene, you had one officer who would record the scene itself and the other

A-197

Bohen                          71

detectives that were there, they would talk to witnesses or canvass the area.

Q.   Now, the detective that took information about the scene itself, would they have any particular role going forward in the investigation?

A.   Not really.  You know, just whatever information you as the scene officer or -- received, you know, you would always put that down on a P-73.

MS. HUGGINS:  I think there's just a confusion in terminology.  You were asked earlier about catching a case.  What did that phrase mean to detectives at that time?

THE WITNESS:  We didn't use that at that time.  That was NYPD I think.

Q.   Yes, that would be correct.

So maybe I shouldn't have been confused, but we discussed earlier that you were assigned to work on this case by one of your superior officers, is that right?

A.   Yes, sir.

Q.   But there wasn't any --

A-198

Bohen                               72

withdrawn.

Besides your superior officers, there wasn't one person whose case this was who was the lead or the primary detective on it, is that correct?

A.    Yes, sir.

Q.    Going back to Exhibit 8, now, looking at the second entry, it says 1920 hours.

Do you see that?

A.    Yes.

Q.    Is that for a different case or is that part of the Tomika Means homicide?

A.    I believe that was a different case.

Q.    So going one entry up, there's a notation about getting a phone call from the aunt of the victim, Linda Means, is that correct?

A.    Yes, sir.

Q.    And over the phone she stated that she thought that the suspect looked like Cory Epps?

A.    Yes, sir.

A-199

```
                    Bohen                        73
        Q.    Did you ever interview Linda
Means?
        A.    Not that I can remember.
        Q.    Did you ever find out how she
knew Cory Epps?
        A.    Not that I can remember, no.
              MS. HUGGINS:  Form.  For
        clarification, just the use of the word
        interview.
              MR. RICKNER:  Yes.
              MS. HUGGINS:  I have an
        objection.
        Q.    What is an interview?
        A.    What is an interview?
        Q.    Yeah.
        A.    It's when you talk to somebody,
talk to a witness or the victim themselves.
        Q.    Now, we've discussed two phone
calls that you had with Linda Means, is
that fair to say?
        A.    Yes.
        Q.    Did you ever sit down with Linda
Means in person and have a discussion about
Cory Epps?
```

A-200

Bohen                        74

A.    I don't recall that.

Q.    And did you ever investigate how she may have known Cory Epps?

A.    I don't recall that.

Q.    What is a frap, F-R-A-P?

A.    I don't know.

Q.    Okay.  And just to be clear, I'm taking this from the entry on Exhibit 8.

A.    Yes.

Q.    Does that refresh your recollection?

A.    No, I just don't recall what it stands for.

Q.    Do you remember whether you or Detective Callari spoke with Linda Means?

A.    No, I don't.

Q.    Now, let's skip ahead a little bit.

MR. RICKNER:  Let's mark the other blue ID sheet, the one that has Cory Epps's photo, as Exhibit 9.

MS. HUGGINS:  951?

MR. RICKNER:  948.  COB 948.

(Photo Spread Information, Bates

A-201

Bohen                    75

No. COB 948 marked Exhibit 9 for identification)

Q.    Detective, going back to Exhibit 3 and looking at Exhibit 9, is it correct to say that you created the photo array with Cory Epps in it?

A.    Well, what I'm looking at, Exhibit 9, it doesn't have my name on the cover sheet, it has another detective's name.

As far as Exhibit 3, it looks like I requested the photos and they were requested by me but, like I say, Exhibit 9, on the actual array, that shows a different officer and my name is nowhere on it.

Q.    Okay.  So let's step back for a second.  Looking at Exhibit 3, it's fair to say that this has your name and signature on it?

A.    Yes.

Q.    And it's dated July 3, 1997?

A.    Yes, sir.

Q.    And as we discussed before, the BPD mug number in the top paragraph

PIROZZI & HILLMAN
212-213-5858

A-202

Bohen                    76

corresponds to the mug shot of the person who might or might not be identified in the array?

A.   Yes.

Q.   The the bottom has the fillers, right?

A.   Yes.

Q.   Now, when you went to the cabinet of photographs to pick out the fillers, would you actually take the individual photos as you found ones that you thought were suitable?

A.   Yes.

Q.   And then you would write down on a document like Exhibit 3 which numbers corresponded to those fillers?

A.   Yes.

Q.   So when you were asking to create the photo array, would you come by with the actual photos and this document and say, I need this put together into a photo array?

A.   Well, actually, I would put the photos in the array.

Q.   Okay.  Well, looking at

A-203

Bohen                          77

Exhibit 9, I think we've discussed that the front page does not have your name on it?

A.    No.

Q.    It has an Officer Morales?

A.    Yes.

Q.    Do you remember Officer Morales's first name?

A.    Juan.

Q.    But just to be clear, if you compare Exhibit 9 and Exhibit 4, it contains the same CD number, meaning 100-714?

A.    Let me look.  Yes.

Q.    And based on that plus the other documents, we know that Exhibit 9 was also created with respect to the Tomika Means homicide, right?

A.    I'm assuming, yes.

Q.    Well --

MS. HUGGINS:  We don't want you to assume.

THE WITNESS:  Okay.

MS. HUGGINS:  Could you repeat the question for him?

A-204

Bohen                        78

Q.    Was Exhibit 9 created with respect to the Tomika Means homicide?

A.    Yes.

Q.    Now, do you know why Officer Morales's name is on the photo array?

A.    Well, he was part of the unit and he might have picked the pictures to do this array and he might have set this array up.  I would say he probably did set it up.

Q.    Okay.  Well, looking at Exhibit 3, it's fair to say this is a request for a photo array that contains a photograph of Cory Epps, right?

A.    Yes, sir.

Q.    And you picked out the fillers for this photo array, right?

A.    Yes, sir.

Q.    But ultimately it appears that you didn't actually put them into the slots?

A.    Well, not this particular array that I'm looking at.

Q.    Well, based on Exhibit 3 and Exhibit 9, is it possible that there was

Bohen                         79

more than one photo array created with Cory Epps in it?

A.    There's possible, but not that I was ever made aware of.

Q.    Okay.  Well, I'd like you to look at Exhibit 9.

A.    Okay.

Q.    And would it be fair to say that there is a list of mug numbers?

A.    Yes, sir.

Q.    Now, the first mug number is 212522?

A.    Yes.

Q.    I'd like you to look at Exhibit 3.

Does that mug number appear on Exhibit 3?

A.    No, it doesn't.

Q.    And I'd like you to look at number 2, it's 188001.

Do you see that?

A.    Yes.

Q.    And I'd like you to look at Exhibit 3.  Do you see that mug number?

A-206

                        Bohen                    80

A.    No, sir.

Q.    Now, again, on Exhibit 9, there's mug number 187356.

Do you see that?

A.    Yes.

Q.    And does that appear on Exhibit 3?

A.    187356.  No.

Q.    Based on these discrepancies, is it correct to say that there were two photo arrays containing Cory Epps that were created?

MS. HUGGINS:  Form.  You can answer.

A.    Yes.

Q.    Now, on Exhibit 4 there was a date as to when the photo array was created, is that correct?

A.    Yes.

Q.    Is there another location on the photo array where a date is typically recorded?  And I mean a date that the photo array was created, not the date that the mug shots were taken.

Bohen                    81

A.    No, not actually, no, just under remarks.

Q.    And this isn't a trick question, I'm actually wondering if there's something I'm not seeing that elsewhere in this document there's a date that corresponds to when the photo array was created.

A.    Excuse me?

Q.    I said, this isn't a trick question.

I'm actually honestly curious, is there someplace else on Exhibit 9 where maybe you're seeing a date or indication as to when the photo array was taken that I may not see?

A.    No.

Q.    Now -- sorry.  One second.

MR. RICKNER:  Now, I'd like to mark the, let's see, it's a P-73 with the date 7/7/97, Bates number on the bottom right is COB 123.

MS. HUGGINS:  And that will be Exhibit 10?

MR. RICKNER:  Yes.

PIROZZI & HILLMAN
212-213-5858

A-208

Bohen                          82

(Buffalo Police Department Intra-Departmental Correspondence dated July 7, 1997 marked Exhibit 10 for identification)

Q.    Now, Exhibit 10 is a P-73 that was created by you?

A.    Yes, sir.

Q.    You typed this up yourself?

A.    Yes, sir.

Q.    Going back to July 6th of 1997, do you actually have a recollection independent of anything you've read in these documents of the interview with Jackie Bradley on that date?

A.    No, not really.

MS. HUGGINS:  And when you said these documents, are you referring to all of the exhibits or just the exhibit in front of him?

MR. RICKNER:  All of the exhibits.  Or any other document for that matter.

MS. HUGGINS:  So answer that question based on all the exhibits in

Bohen                        83

front of you, do you have an independent recollection of these events?

A.    Yes, yes.

Q.    Okay.  No.  So is it fair to say that some of the documents that you've reviewed have refreshed your recollection?

A.    Yes.

Q.    So with that refreshed recollection, without reading or reiterating what you see in a specific document, what do you remember about the July 6, 1997 interview with Jacqueline Bradley?

        MS. HUGGINS:  Independent of the documents, he's asking.

A.    Going to her house along with Detective Minor and showing her a photo array.

Q.    Besides that, do you remember anything else about that day?

A.    No.

Q.    Do you remember who was with Jacqueline Bradley, if anyone, when you got

Bohen                          84

to the house?

A.    No.

Q.    Would it be your practice to do a photo array without family members around?

A.    Yes.

Q.    Besides Detective Minor, did anyone else go with you?

A.    No.

MS. HUGGINS:  Are you asking independent of his independent recollection?

MR. RICKNER:  Period.  Full stop. Any source of information.

Q.    Besides Detective Minor, did anybody else from Buffalo PD go with you to see Jacqueline Bradley on July 6, 1997?

A.    No.

Q.    Is it correct to say that you showed a photo array to Jacqueline Bradley?

A.    Yes.

Q.    Looking at Exhibit 9, do you know whether or not this specific photo array is the one that you showed to Jacqueline Bradley?

A-211

Bohen                    85

A.    I would say it was the one I showed her because of the mug numbers.

Q.    Well --

A.    Well, I should say his mug number appears on Exhibit 9.

Q.    Right.  Well, would it be correct to say that any photo array that contains Cory Epps would also have his mug number listed?

A.    It should.

Q.    Right.  But with regard to the fillers, do you know if the fillers in Exhibit 9 are the same fillers that were in the photo array that was shown to Jacqueline Bradley?

A.    I'm not sure on that.

MR. RICKNER:  Now, I'd like to mark a handwritten, it's a handwritten one page, mark this as Exhibit 11.  And it's got the Bates stamp COB 958.

(Handwritten notes dated July 6, 1997 marked Exhibit 11 for identification)

Q.    Is Exhibit 11 a document with

PIROZZI & HILLMAN
212-213-5858

Bohen                                86

your handwriting?

A.    It's my printing, yes.

Q.    You're differentiating between cursive and printed?

A.    Correct.

Q.    But you wrote this?

A.    But I wrote it, yes.

Q.    Did you take this contemporaneously with your interview of Jacqueline Bradley?

A.    Yeah, yes.

Q.    Roughly the same time, maybe not identical, but similar?

A.    Correct, yes.

Q.    Now, is this a page from your memo book?

A.    No, I wouldn't think so.  I would believe it was just a piece of paper, you know, like a three-ring piece of paper that I carried.

Q.    So your memo books were a bit smaller?

A.    Yes.

Q.    Now, following Ms. Bradley's

A-213

Bohen                                     87

identification of Cory Epps in position number five --

A.    Yes.

Q.    -- did you tell Jacqueline Bradley the name of who she identified?

MS. HUGGINS:  Can you read the question back.

(Question read)

MS. HUGGINS:  I just want to make sure I understand your question.

MR. RICKNER:  My question isn't good.  I'm going to redo it.

MS. HUGGINS:  Yeah, that's fine.

Q.    After Jacqueline Bradley made the identification, did you tell her that she had identified Cory Epps?

A.    I believe I did.

Q.    And prior to you telling her the name Cory Epps, had you ever heard her say that name?

A.    No.

Q.    Prior to her identifying Cory Epps, did you ever ask her if she knew Cory Epps, prior to?

A-214

```
                    Bohen                    88

        A.    No.

        Q.    Did Detective Minor ever ask her
if she knew Cory Epps prior to the
identification procedure?

        A.    I don't know.

        Q.    Fair to say that you don't
remember it happening in your presence?

        A.    Yes.

              MR. RICKNER:  There's one more in
        this sequence that I'd like to mark.
        There's an affidavit, it's got COB 4,
        and let's just mark this as Exhibit 12.

              (Photo-Array Identification

        Affidavit dated July 6, 1997 marked

        Exhibit 12 for identification)

        Q.    Can you identify Exhibit 12 for
us, please, detective?

        A.    Yes, it's a Department of Police,
City of Buffalo, it's a Photo-Array
Identification Affidavit.

        Q.    Is it fair to say that the
sections above the signature block were
filled out by you?

        A.    Yes.
```

A-215

Bohen                89

Q.    That's your handwriting?

A.    Yes.

Q.    Now, in section A, it says the photo number that was picked and, you know, the significance of the criminal act, is that correct?

A.    Yes.

Q.    Okay.  Now, in the bottom line it says, "I was told by the above police officer that the name of the person in the photograph is" and then handwritten in is "Cory Epps"?

A.    Yes.

Q.    Was it standard procedure to tell witnesses the name of the person that they had identified?

A.    I don't know if it was procedure, but it was kind of, if you wanted to, I think.

Q.    Okay.  Were there some instances where the name of the person who was identified was left out of one of these affidavits, you'd leave it blank?

MS. HUGGINS:  Form of the

```
                     Bohen                    90
        question.  You may answer.
        A.    Possible.
             MR. RICKNER:  All right.  You
        want to go off the record for a few
        minutes?  I'm actually getting pretty
        close to being finished.
             MS. HUGGINS:  Let's go off the
        record and talk about timing for the
        day.
             (Discussion off the record)
             (Recess)
EXAMINATION CONTINUED
BY MR. RICKNER:
        Q.    Detective, in 1997, was there an
establishment in Buffalo called
Birchfield's?
        A.    Yes.
        Q.    What was Birchfield's?
        A.    That was a tavern.
        Q.    When you say tavern, do you mean
that it's a place that you could drink,
right?
        A.    Yes, a bar.
        Q.    A bar?
```

Bohen                        91

A.   Yes.

Q.   Could you also get food there?

A.   Yes, I believe you could.

Q.   Was there dancing, and by that, I mean a dance floor?

A.   That I'm not sure.  I know people probably danced there.  But I was never personally there.

Q.   Okay.  Did Birchfield's have any particular reputation at the Buffalo Police Department in 1997?

A.   Not that I'm aware of.

Q.   Did you ever arrest anybody outside of Birchfield's?

A.   No.

Q.   Were you aware of the fact that Cory Epps had an alibi with respect to where he was during the Tomika Means murder?

A.   No, I'm not.

Q.   Okay.  Did you do anything to investigate any alibis that Cory Epps had?

A.   No, I didn't.

Q.   Cory Epps was placed in a lineup,

A-218

Bohen                      92

is that correct?

    A.    Yes.

    Q.    Were you there when he was placed in a lineup?

    A.    No.

        MR. RICKNER:  I'd like to mark as, I guess we're up to Exhibit 13, the testimony, I think it's Epps 1022 through 1038.

        (Trial testimony of Detective Bohen, Bates Nos. Epps 1022-1039 marked Exhibit 13 for identification)

    Q.    Do you see that?

    A.    Yes.

    Q.    Prior to the deposition, did you review your testimony in Exhibit 13?

    A.    I'm not sure if I did.

        MS. HUGGINS:  Well, did you look at it today before you started testifying?

        THE WITNESS:  Oh, yes, I thought you meant originally.  I did, yeah.

    Q.    Looking at your testimony in Exhibit 13, did you see anything that was

A-219

Bohen                              93

inaccurate?

MS. HUGGINS:  If you want to take a moment to look through it again before you answer, you can.

THE WITNESS:  Sure.

(Pause)

A.    On the first page on the backside of it, there was a mistake on the question number 21, it says, "On June 6th of this year did you have occasion to show that photo array," and my answer which is 24, it says, "I thought it was July 6th that I showed this."

And 25 says, "I believe that's what I stated."

And the next page, the court said, "No.  Excuse me.  You said June 6th." And Ms. Carrington, "I'm sorry.  Yes, July 6th."

So that's one.

Q.    Okay.  Now, is it correct to say that there was some confusion at that time as to whether or not somebody said June or July?

Bohen                         94

A.   I don't know.  I don't know why she would have said that.

Q.   Put it this way, is the transcript to your knowledge inaccurate in that respect?

A.   Well, this transcript is -- and with that part is inaccurate but then it was clarified.

Q.   Okay.  So is it correct to say that the transcript accurately describes the back and forth that ultimately led to the clarification?

A.   Yes.

Q.   Besides that, do you see any other instances where there's -- withdrawn.

Besides what we just discussed --

A.   Let me look for a minute.

(Pause)

A.   Are you talking about what we just discussed about the date-wise?

Q.   Let me just finish my question.

Besides the date section that you just identified for the record, do you see anything else in Exhibit 13 where your

A-221

Bohen                    95

testimony was inaccurate?

A.    Okay, let me look.

(Pause)

MS. HUGGINS:  If you don't mind just reading the last question back to the detective.

MR. RICKNER:  Actually, I'd like to do it slightly different.

Q.    Is it fair to say you spent about 15 minutes reviewing your prior testimony?

A.    Yes.

Q.    Now, besides the incident that we discussed earlier where there was confusion between June and July, did you see anything else inaccurate in your testimony in Exhibit 13?

A.    No, I didn't.

Q.    Do you stand by that testimony today?

A.    Yes.

Q.    Do you -- well, do you still live in Buffalo?

A.    I live outside of Buffalo.

Q.    In the general area?

A-222

Bohen                                96

A.   Yes.

Q.   Do you subscribe to any Buffalo newspapers?

A.   No, I don't.

Q.   Do you watch the local news?

A.   Yes.

Q.   Did you see newspaper or -- withdrawn.  I'll ask it more broadly.

Did you see on the news that Cory Epps had been released from prison?

A.   No, I didn't.

Q.   Did anybody call you to say Cory Epps had been released from prison?

A.   No.

Q.   Would it be correct to say that the first time that you learned that Cory Epps had been exonerated was when you heard about this lawsuit?

A.   Yes.

Q.   Now, there's a district attorney in this case in 1997, right?

A.   Yes.

Q.   Okay.  Now, would you talk to the district attorney with respect to what you

Bohen                          97

discovered in a homicide?

A.    Yes.

Q.    Would that be a continuous process throughout an investigation?

A.    Yes.

Q.    Did you understand that you had an obligation to -- withdrawn.

Would you tell the district attorney everything that you had learned during your investigation?

A.    Yes.

Q.    And the district attorney would also be provided with documents relating to the investigation, right?

A.    Yes.

Q.    Do you know who handled that?

A.    Who was the district attorney?

Q.    No, who gave documents to the district attorney?

A.    Oh, I would say she was -- he or she would come to the office and they wore given the documents that were in the file. So it would probably be Marilyn Lanc.

Q.    Okay.  Where was the homicide

Bohen                          98

unit physically located?

A.    At 74 Franklin Street in the City of Buffalo on the second floor.

Q.    Okay.  Where was the district attorney's office in 1997?

A.    That was at the county office building on Delaware Avenue.  I believe it's -- oh, I don't know the address number-wise.

Q.    How far away was the district attorney's office?

A.    About three blocks.

Q.    Now, I'd like to go back to your memo book, and we discussed that you would carry around loose sheets of paper but also that you had an eight-by-three, approximately, notebook, right?

A.    Yes, sir.

Q.    What did you call that notebook?

A.    Notebook.

Q.    Okay.  When you would take notes regarding a particular homicide, would you keep them all in the same spot in the notebook?

A-225

Bohen                    99

A.    No.

Q.    Would you keep information about more than one case on the same page in a notebook?

A.    Possibly, yes.

Q.    You mentioned that sometimes you would tear sheets out of the notebook?

A.    Yes.

Q.    Would you also leave some sheets in the notebook?

A.    Yes.

Q.    So earlier on we discussed sort of when a notebook would get full.

Would there come a time when you ran out of blank notebook pages?

A.    I personally didn't, but I'm sure there would be.

Q.    Okay.  Well, so let's put it differently.

Would it be correct to say that you weren't in the detectives unit to actually fill or completely use up a single notebook?

A.    That's possible, yes.

```
                        Bohen                100
        Q.    Did you see other detectives run
out of pages in their notebook?
        A.    No.
        Q.    Okay.  We'll have other
detectives to talk to to clarify the rest
of that.
              Have you ever heard the name
Wymiko Anderson?
        A.    No.
              MR. RICKNER:  First, I guess I
        would ask opposing counsel, do you have
        any questions that you would like to
        ask?
              MS. HUGGINS:  I don't believe so
        but give me one moment to look at my
        notes.
              MR. RICKNER:  Sure.
EXAMINATION
BY MS. HUGGINS:
        Q.    Detective, do you presently have
an independent recollection of why
Detective Morales's name appears on
Exhibit 9?
        A.    No, I don't.
```

Bohen                    101

MS. HUGGINS:  I don't have
anything further.

RE-EXAMINATION

BY MR. RICKNER:

Q.    Detective, you've been testifying
off and on for approximately three hours,
is that fair to say?

A.    Yes.

Q.    Thinking back to your testimony
that you've given today, is there anything
that you'd want to correct?

A.    Not that I can think of.

Q.    It is fair to say that you've
told the truth, the whole truth, and
nothing but the truth today?

A.    Yes, sir.

MR. RICKNER:  Then I have no
further questions.

You know what, before I say that,
Glenn, do you have anything else you
want to talk offline for a second or
are we good?

MR. GARBER:  We're good.  Thank
you, Rob.

A-228

Bohen                    102

MR. RICKNER:  Okay.

MR. GARBER:  Hello, everybody, by the way.  I remain as a dark screen for now.

(Discussion off the record)

(Time noted:  2:07 p.m.)

PIROZZI & HILLMAN
212-213-5858

Bohen                                103

January 19, 2021


ERRATA


PAGE/LINE        CHANGE/REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Bohen                                    104

_____

JOHN BOHEN

Subscribed and sworn to

before me this        day

of            2021

_____

105

CERTIFICATE

STATE OF NEW YORK )

                  ) ss.

COUNTY OF NEW YORK)


        I, Joseph B. Pirozzi, a Registered
Professional Reporter and Notary Public
within and for the State of New York, do
hereby certify:

        That JOHN BOHEN, the witness whose
deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is
a true record of the testimony given by such
witness.

        I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.




                        _____

                        JOSEPH B. PIROZZI, RPR

106

January 19, 2021

                          INDEX

WITNESS                   EXAMINATION BY        PAGE

John Bohen                Mr. Rickner              6
                          Ms. Huggins            100
                          Mr. Rickner            101


EXHIBIT         PAGE

Exhibit 1       48      Log dated July 7, 1997

Exhibit 2       53      Buffalo Police
                        Department Intra-
                        Departmental
                        Correspondence dated
                        June 9, 1997

Exhibit 3       59      Buffalo Police
                        Department Intra-
                        Departmental
                        Correspondence dated
                        July 3, 1997

Exhibit 4       59      Photo Spread
                        Information, Bates No.
                        COB 986

Exhibit 5       59      Buffalo Police
                        Department Intra-
                        Departmental
                        Correspondence dated
                        June 24, 1997

Exhibit 6       64      Buffalo Police
                        Department Intra-
                        Departmental
                        Correspondence dated
                        June 25, 1997

107

January 19, 2021

INDEX (continued)

EXHIBIT          PAGE

Exhibit 7     67      Buffalo Police
                      Department Intra-
                      Departmental
                      Correspondence, Bates
                      No. COB 90

Exhibit 8     68      Buffalo Police
                      Department Activity
                      Report dated June 26,
                      1997

Exhibit 9     74      Photo Spread
                      Information, Bates No.
                      COB 948

Exhibit 10    82      Buffalo Police
                      Department Intra-
                      Departmental
                      Correspondence dated
                      July 7, 1997

Exhibit 11    85      Handwritten notes dated
                      July 6, 1997

Exhibit 12    88      Photo-Array
                      Identification
                      Affidavit dated July 6,
                      1997

Exhibit 13    92      Trial testimony of
                      Detective Bohen, Bates
                      Nos. Epps 1022-1039

A-234

108

## #

**#2370** [1] - 2:14

## '

**'68** [1] - 14:10

## 0

**0200** [2] - 30:24, 30:25
**0900** [2] - 30:23, 30:25

## 1

**1** [8] - 46:14, 46:22, 47:25, 48:3, 48:9, 48:15, 52:3, 106:10
**1/2** [1] - 40:2
**10** [4] - 81:24, 82:4, 82:6, 107:13
**100** [2] - 51:7, 106:6
**100-714** [1] - 77:13
**10005** [1] - 2:8
**101** [1] - 106:7
**1022** [1] - 92:9
**1022-1039** [2] - 92:12, 107:21
**10279** [1] - 2:15
**1038** [1] - 92:10
**11** [5] - 40:2, 85:20, 85:23, 85:25, 107:16
**1112** [1] - 3:8
**119** [1] - 63:24
**11:22** [1] - 1:14
**12** [5] - 58:3, 88:13, 88:16, 88:17, 107:18
**123** [1] - 81:22
**13** [7] - 92:8, 92:13, 92:17, 92:25, 94:25, 95:17, 107:20
**14** [1] - 2:6
**14202-3313** [1] - 3:9
**15** [6] - 16:25, 17:6, 17:12, 17:22, 47:22, 95:11
**1600** [2] - 30:24
**1603** [1] - 2:7
**17** [1] - 57:24
**18** [1] - 18:9
**187356** [2] - 80:4, 80:9
**188001** [1] - 79:21
**19** [5] - 1:13, 5:13, 103:2, 106:2, 107:2
**1920** [1] - 72:9
**1950** [1] - 13:16
**1962** [3] - 13:16, 14:8, 14:10
**1967** [2] - 14:18, 14:19
**1968** [5] - 14:7, 14:8, 14:18,

14:23, 17:3
**1970** [2] - 9:4, 9:5
**1983** [5] - 17:3, 18:13, 18:24, 27:15, 27:20
**1996** [3] - 32:22, 33:4, 33:11
**1997** [45] - 18:9, 18:10, 18:13, 26:3, 26:16, 27:15, 28:20, 31:16, 31:20, 32:18, 33:9, 33:16, 34:13, 41:14, 48:8, 52:15, 52:16, 53:4, 59:8, 59:15, 63:25, 64:6, 64:15, 68:19, 68:21, 75:22, 82:4, 82:11, 83:14, 84:17, 85:23, 88:15, 90:15, 91:12, 96:22, 98:6, 106:10, 106:13, 106:16, 106:21, 106:24, 107:10, 107:15, 107:17, 107:19
**1:19-cv-00281-LJV** [1] - 1:6

## 2

**2** [9] - 52:13, 53:4, 53:9, 54:25, 61:7, 61:8, 62:15, 79:21, 106:11
**2019** [1] - 11:3
**202.7** [1] - 5:12
**2020** [1] - 5:13
**2021** [5] - 1:13, 103:2, 104:15, 106:2, 107:2
**21** [1] - 93:10
**212522** [1] - 79:13
**215197** [1] - 60:4
**233** [1] - 2:13
**23:30** [1] - 50:14
**24** [11] - 11:13, 11:21, 12:3, 12:10, 12:16, 12:22, 13:4, 13:9, 59:15, 93:12, 106:21
**25** [6] - 52:16, 63:25, 64:6, 64:15, 93:15, 106:24
**26** [3] - 68:18, 68:21, 107:10
**27th** [1] - 41:18
**2:07** [1] - 102:7

## 3

**3** [20] - 58:2, 58:12, 58:18, 58:20, 59:3, 59:8, 75:5, 75:12, 75:18, 75:22, 76:16, 78:12, 78:24, 79:16, 79:18, 79:25, 80:8, 106:14, 106:16
**30th** [1] - 11:3

## 4

**4** [19] - 58:5, 58:12, 58:13, 58:21, 58:23, 59:11, 60:19,

61:8, 62:24, 63:5, 64:24, 66:3, 66:17, 66:25, 67:4, 77:11, 80:17, 88:12, 106:17
**48** [1] - 106:10

## 5

**5** [10] - 58:8, 58:21, 59:15, 59:17, 63:5, 63:6, 66:9, 66:18, 66:20, 106:19
**53** [1] - 106:11
**59** [3] - 106:14, 106:17, 106:19

## 6

**6** [13] - 63:24, 64:2, 64:6, 64:8, 65:25, 83:14, 84:17, 85:22, 88:15, 106:6, 106:22, 107:17, 107:19
**6-24-97** [1] - 67:3
**6/24** [1] - 67:9
**64** [2] - 32:20, 106:22
**65** [1] - 3:7
**67** [1] - 107:6
**68** [1] - 107:9
**6th** [5] - 82:11, 93:10, 93:13, 93:18, 93:20

## 7

**7** [9] - 48:8, 67:15, 67:18, 67:23, 68:2, 82:4, 106:10, 107:6, 107:15
**7/7/1997** [1] - 46:14
**7/7/97** [4] - 45:11, 45:15, 45:23, 81:21
**74** [2] - 98:3, 107:11

## 8

**8** [8] - 27:21, 27:22, 40:2, 68:17, 68:22, 72:8, 74:9, 107:9
**82** [1] - 107:13
**85** [1] - 107:16
**88** [1] - 107:18

## 9

**9** [22] - 45:6, 52:15, 53:4, 74:22, 75:2, 75:5, 75:9, 75:14, 77:2, 77:11, 77:16, 78:2, 78:25, 79:7, 80:3, 81:13, 84:22, 85:6, 85:14, 100:24, 106:13, 107:11
**90** [4] - 67:16, 67:18, 67:23, 107:8

**911** [1] - 62:11
**92** [1] - 107:20
**948** [4] - 74:24, 75:2, 107:12
**951** [1] - 74:23
**953** [3] - 57:23, 58:20, 59:4
**958** [1] - 85:21
**97-083** [1] - 62:18
**981** [2] - 58:9, 58:21
**986** [7] - 58:4, 58:14, 58:19, 58:24, 59:11, 106:18
**9th** [2] - 52:17, 52:18

## A

**a.m** [1] - 1:14
**able** [1] - 29:18
**about** [28] - 8:8, 12:3, 12:10, 15:2, 16:14, 16:25, 20:25, 25:8, 34:5, 43:12, 45:14, 47:24, 50:5, 54:9, 55:22, 71:5, 71:14, 72:18, 73:24, 83:13, 83:22, 90:9, 94:20, 94:21, 95:10, 96:19, 98:13, 99:3
**above** [2] - 88:23, 89:10
**absolutely** [1] - 8:10
**academy** [2] - 16:2, 18:25
**acceptable** [1] - 47:15
**access** [2] - 37:4, 54:5
**accuracy** [1] - 30:11
**accurate** [1] - 9:20
**accurately** [1] - 94:11
**acknowledge** [2] - 5:4, 5:8
**act** [1] - 89:6
**action** [1] - 105:17
**activities** [2] - 49:13, 49:23
**activity** [2] - 68:18, 68:23
**Activity** [2] - 68:21, 107:9
**actual** [4] - 47:3, 62:3, 75:15, 76:21
**actually** [25] - 7:11, 7:18, 15:9, 16:7, 24:4, 26:19, 30:14, 40:15, 40:23, 44:18, 47:6, 48:21, 51:19, 65:9, 66:22, 67:7, 76:11, 76:23, 78:20, 81:2, 81:5, 81:12, 82:12, 90:6, 99:23
**Actually** [2] - 52:23, 95:8
**additional** [2] - 17:8, 18:25
**address** [1] - 98:9
**administer** [2] - 4:12, 5:10
**administered** [1] - 5:9
**advice** [1] - 26:17
**affidavit** [1] - 88:12
**Affidavit** [3] - 88:15, 88:21, 107:19
**affidavits** [1] - 89:24
**after** [11] - 14:22, 17:5, 17:25, 38:20, 39:21, 41:2,

109

63:10, 63:12, 63:13, 67:10, 87:15

**afternoon** [2] - 30:17
**again** [5] - 18:19, 47:25, 59:3, 80:3, 93:4
**against** [1] - 10:11
**ago** [8] - 11:13, 11:21, 12:4, 12:10, 12:16, 12:22, 13:4, 13:9
**agree** [1] - 5:22
**AGREED** [3] - 4:4, 4:9, 4:13
**agreement** [2] - 5:18, 5:19
**agrees** [1] - 5:21
**ahead** [1] - 74:18
**alibi** [1] - 91:18
**alibis** [1] - 91:23
**alive** [1] - 50:7
**all** [21] - 4:6, 8:6, 20:7, 25:15, 30:7, 37:15, 38:7, 39:7, 45:19, 47:8, 49:4, 49:22, 52:10, 56:20, 70:2, 70:17, 82:19, 82:21, 82:25, 90:4, 98:24
**All** [2] - 7:23, 48:10
**ALL** [1] - 2:2
**along** [1] - 83:18
**also** [13] - 6:14, 7:17, 25:19, 47:7, 52:4, 56:25, 60:10, 77:16, 85:9, 91:3, 97:14, 98:16, 99:10
**alternate** [1] - 30:8
**Although** [1] - 7:24
**always** [4] - 8:2, 26:21, 36:11, 71:11
**am** [3] - 5:4, 105:16, 105:18
**AND** [4] - 1:11, 4:4, 4:9, 4:13
**Anderson** [1] - 100:9
**Andy** [1] - 26:10
**another** [4] - 19:20, 55:4, 75:10, 80:21
**answer** [12] - 6:18, 8:18, 33:23, 50:4, 56:3, 65:12, 70:18, 80:15, 82:24, 90:2, 93:5, 93:12
**answers** [1] - 9:20
**Anthony** [1] - 12:5
**ANTHONY** [1] - 1:9
**any** [50] - 4:11, 5:16, 8:21, 10:2, 14:2, 14:9, 14:20, 15:6, 15:11, 15:16, 15:18, 17:7, 17:13, 17:17, 17:20, 18:25, 19:3, 20:13, 20:14, 20:16, 20:19, 20:22, 21:4, 21:7, 22:5, 22:22, 24:11, 24:25, 27:23, 31:16, 32:15, 34:13, 34:20, 38:2, 39:20, 43:19, 44:5, 51:4, 52:6, 71:6, 71:25, 82:22, 84:14, 85:8, 91:10, 91:23, 94:15, 96:3, 100:13, 105:17

**anybody** [3] - 84:16, 91:14, 96:13
**anyone** [4] - 11:6, 33:15, 83:25, 84:8
**anything** [14] - 9:23, 10:7, 42:2, 44:12, 50:2, 82:13, 83:22, 91:22, 92:25, 94:25, 95:15, 101:3, 101:11, 101:21
**anyway** [2] - 8:11, 16:9
**apologies** [1] - 58:7
**appear** [2] - 79:17, 80:7
**APPEARANCES** [2] - 2:2, 3:2
**APPEARING** [1] - 2:2
**appears** [3] - 78:19, 85:6, 100:23
**approximately** [2] - 98:18, 101:7
**area** [2] - 71:3, 95:25
**Aronica** [3] - 12:24, 13:3, 26:12
**ARONICA** [1] - 1:11
**arrangement** [1] - 5:15
**array** [47] - 23:10, 24:4, 41:8, 59:20, 59:25, 60:16, 60:23, 62:3, 64:12, 64:16, 64:19, 64:22, 65:3, 65:7, 65:17, 66:7, 66:14, 66:19, 66:23, 67:2, 67:8, 67:11, 75:7, 75:15, 76:4, 76:20, 76:22, 76:24, 78:6, 78:9, 78:13, 78:17, 78:22, 79:2, 80:18, 80:22, 80:24, 81:8, 81:15, 83:20, 84:5, 84:20, 84:23, 85:8, 85:15, 93:12
**Array** [3] - 88:14, 88:20, 107:18
**arrays** [4] - 23:4, 23:7, 23:25, 80:12
**arrest** [2] - 60:8, 91:14
**arrested** [1] - 25:14
**assailant** [2] - 56:13, 57:11
**assaults** [1] - 28:4
**assigned** [14] - 19:25, 27:9, 27:11, 27:20, 28:15, 28:22, 29:4, 30:6, 35:23, 36:14, 38:17, 38:25, 69:16, 71:22
**assignment** [2] - 27:17, 36:3
**assistant** [2] - 22:16, 22:18
**assume** [1] - 77:22
**assuming** [1] - 77:19
**attached** [2] - 62:4, 62:6
**attention** [4] - 55:3, 55:8, 55:21, 57:9
**attorney** [9] - 6:13, 22:13, 40:13, 96:21, 96:25, 97:10, 97:13, 97:18, 97:20
**Attorney** [1] - 2:12
**attorney's** [2] - 98:6, 98:12
**Attorneys** [2] - 2:5, 3:6

**attorneys** [3] - 5:2, 22:17, 22:19
**August** [2] - 14:7, 14:23
**aunt** [7] - 42:12, 42:15, 42:18, 43:3, 43:6, 43:7, 72:19
**authorized** [1] - 4:11
**Avenue** [1] - 98:8
**avoid** [1] - 58:7
**aware** [7] - 19:2, 26:24, 39:3, 39:23, 79:5, 91:13, 91:17

## B

**backside** [1] - 93:8
**bad** [1] - 33:16
**bar** [2] - 90:24, 90:25
**based** [7] - 29:10, 64:15, 65:25, 77:15, 78:24, 80:10, 82:25
**basic** [2] - 14:24, 16:2
**basically** [4] - 19:18, 24:23, 29:8, 61:22
**basis** [1] - 19:19
**Bates** [15] - 45:8, 57:23, 58:4, 59:10, 67:15, 67:17, 67:23, 74:25, 81:21, 85:21, 92:12, 106:17, 107:7, 107:12, 107:21
**because** [4] - 10:21, 20:8, 56:8, 85:3
**become** [2] - 56:6, 63:21
**been** [20] - 6:3, 25:7, 28:19, 32:5, 36:4, 38:19, 39:7, 43:11, 47:6, 47:11, 48:23, 51:6, 57:13, 57:17, 63:6, 71:20, 96:11, 96:14, 96:18, 101:6
**before** [12] - 1:18, 4:11, 6:10, 8:17, 9:2, 16:8, 33:7, 75:24, 92:20, 93:5, 101:20, 104:14
**beforehand** [1] - 68:24
**beginning** [2] - 27:19, 41:3
**behalf** [1] - 5:22
**being** [9] - 6:20, 7:6, 7:11, 17:25, 20:25, 35:8, 58:8, 64:12, 90:7
**believe** [19] - 6:11, 9:7, 15:3, 25:4, 32:20, 41:18, 42:11, 42:12, 49:16, 50:8, 55:24, 67:13, 72:15, 86:19, 87:18, 91:4, 93:15, 98:8, 100:15
**belonged** [1] - 70:19
**below** [1] - 32:6
**benefit** [2] - 21:22, 69:2
**besides** [16] - 10:6, 11:5, 20:11, 22:22, 44:5, 52:5, 57:4, 68:5, 72:3, 83:21, 84:7,

84:15, 94:15, 94:17, 94:23, 95:13
**better** [2] - 29:19, 69:5
**between** [8] - 4:5, 14:8, 30:21, 41:21, 41:25, 42:23, 86:4, 95:15
**biggest** [1] - 41:9
**Birchfield's** [4] - 90:17, 90:19, 91:10, 91:15
**bit** [3] - 52:11, 74:19, 86:22
**blank** [4] - 51:16, 51:18, 89:24, 99:16
**blanks** [1] - 60:24
**block** [1] - 88:23
**blocks** [1] - 98:13
**blood** [1] - 105:18
**blue** [6] - 58:22, 60:22, 61:11, 61:17, 67:5, 74:21
**board** [2] - 56:20, 56:24
**BOHAN** [1] - 1:7
**Bohen** [8] - 6:7, 8:12, 48:14, 50:21, 69:8, 92:12, 106:6, 107:21
**BOHEN** [4] - 1:17, 6:2, 104:9, 105:11
**book** [7] - 38:23, 39:6, 40:12, 51:9, 51:13, 86:17, 98:15
**books** [6] - 38:25, 39:11, 39:18, 39:21, 39:25, 86:22
**bore** [1] - 48:10
**bottom** [8] - 45:8, 49:12, 50:9, 50:17, 59:21, 76:6, 81:22, 89:9
**BPD** [1] - 75:25
**Bradley** [14] - 64:17, 65:3, 66:2, 67:11, 82:15, 83:15, 83:25, 84:17, 84:20, 84:25, 85:16, 86:11, 87:6, 87:15
**Bradley's** [1] - 86:25
**Brady** [7] - 15:19, 16:8, 17:21, 20:20, 21:8, 21:11, 21:15
**Bratos** [2] - 48:13, 50:20
**bringing** [1] - 10:11
**broadly** [1] - 96:9
**Broadway** [1] - 2:13
**brought** [3] - 55:3, 55:8, 57:8
**BUFFALO** [2] - 1:7, 3:4
**Buffalo** [38] - 3:9, 14:2, 14:5, 18:8, 27:6, 28:18, 29:24, 32:19, 33:5, 33:21, 34:16, 34:25, 36:7, 43:13, 52:13, 53:2, 59:6, 59:13, 64:4, 64:10, 67:21, 68:20, 82:2, 84:16, 88:20, 90:16, 91:11, 95:23, 95:24, 96:3, 98:4, 106:11, 106:14, 106:19, 106:22, 107:6, 107:9, 107:13

110

**buffalo.com** [1] - 3:11
**building** [1] - 98:8
**bureau** [5] - 23:19, 23:23, 24:9, 24:15, 25:17
**burglaries** [2] - 28:3, 28:4
**business** [1] - 28:4
**buy** [1] - 39:4
**BY** [8] - 2:9, 2:16, 3:10, 6:6, 90:14, 100:20, 101:5, 106:5

## C

**cabinet** [5] - 24:17, 24:19, 24:21, 25:9, 76:9
**calculated** [1] - 29:10
**call** [8] - 23:21, 26:16, 31:4, 57:14, 62:11, 72:18, 96:13, 98:20
**Callari** [3] - 69:8, 69:12, 74:16
**called** [7] - 6:3, 31:7, 43:15, 50:14, 70:4, 70:23, 90:16
**calls** [2] - 62:11, 73:20
**camera** [1] - 6:19
**Can** [1] - 52:20
**can** [37] - 8:8, 8:19, 9:2, 10:3, 10:14, 10:18, 17:24, 18:18, 20:21, 22:4, 22:19, 22:25, 25:9, 33:22, 42:9, 43:7, 45:3, 45:12, 46:13, 50:3, 50:23, 55:6, 55:14, 55:22, 56:2, 59:17, 60:19, 64:8, 65:11, 65:25, 73:4, 73:7, 80:14, 87:7, 88:17, 93:5, 101:13
**can't** [4] - 6:21, 8:22, 26:14, 46:12
**canvass** [1] - 71:3
**Captain** [5] - 32:5, 36:5, 36:12, 43:23, 70:10
**car** [3] - 56:9, 57:16, 57:17
**cardboard** [1] - 60:22
**care** [1] - 47:10
**career** [1] - 16:17
**careful** [1] - 9:19
**carefully** [1] - 65:18
**carried** [3] - 51:15, 51:16, 86:21
**Carrington** [1] - 93:19
**carry** [1] - 98:16
**case** [14] - 15:22, 36:7, 36:10, 36:15, 37:15, 37:19, 70:17, 71:15, 71:22, 72:4, 72:13, 72:16, 96:22, 99:4
**cases** [4] - 19:20, 26:24, 49:14, 56:21
**catch** [2] - 36:7, 36:10
**catching** [1] - 71:14
**caught** [1] - 56:11
**caused** [1] - 65:19

**CD** [3] - 61:22, 62:9, 77:12
**certain** [4] - 20:25, 25:24, 28:8, 65:22
**CERTIFICATE** [1] - 105:2
**certify** [2] - 105:10, 105:16
**CHANGE/REASON** [1] - 103:6
**charged** [1] - 25:15
**CHARLES** [1] - 1:10
**Charles** [2] - 12:23, 26:12
**CHELLA** [1] - 1:10
**Chella** [2] - 12:12, 12:15
**CHIEF** [1] - 1:11
**Chief** [2] - 13:5, 13:8
**choice** [1] - 24:5
**circulate** [2] - 47:2, 47:13
**circulated** [1] - 56:17
**circumstances** [1] - 36:21
**CITY** [2] - 1:7, 3:4
**City** [2] - 88:20, 98:3
**claims** [1] - 10:11
**clarification** [3] - 7:4, 73:9, 94:13
**clarified** [1] - 94:9
**clarify** [2] - 16:12, 100:6
**class** [1] - 20:24
**classes** [4] - 19:3, 20:13, 20:16, 20:19
**clear** [6] - 6:15, 16:6, 27:2, 51:3, 74:8, 77:10
**clip** [1] - 60:25
**close** [1] - 90:7
**COB** [16] - 58:4, 58:9, 58:13, 59:11, 63:24, 67:16, 67:18, 67:23, 74:24, 75:2, 81:22, 85:21, 88:12, 106:18, 107:8, 107:12
**collect** [1] - 49:4
**collected** [2] - 36:25, 49:23
**collection** [1] - 23:23
**college** [1] - 13:17
**colored** [1] - 52:21
**come** [6] - 25:13, 35:2, 36:11, 76:20, 97:22, 99:15
**comes** [1] - 66:17
**coming** [1] - 62:11
**command** [1] - 32:7
**communication** [2] - 10:17, 10:21
**compare** [1] - 77:11
**comparing** [1] - 63:5
**complaint** [4] - 61:23, 62:10, 62:12, 62:22
**completely** [1] - 99:23
**composite** [1] - 56:13
**composites** [2] - 56:16, 56:21
**concern** [1] - 20:19
**concurrently** [1] - 47:10
**confused** [1] - 71:21
**confusion** [3] - 71:13,

93:23, 95:14
**connected** [1] - 51:22
**consecutive** [1] - 47:19
**consent** [1] - 5:15
**Constantino** [2] - 12:6, 12:9
**CONSTANTINO** [1] - 1:9
**contact** [1] - 13:11
**containing** [1] - 80:12
**contains** [4] - 64:19, 77:12, 78:13, 85:8
**contemporaneously** [1] - 86:10
**content** [1] - 10:3
**contents** [1] - 10:20
**CONTINUED** [1] - 90:13
**continued** [2] - 5:24, 107:3
**Continued** [1] - 3:2
**continuous** [1] - 97:4
**continuously** [1] - 18:12
**conversation** [4] - 6:23, 44:24, 51:6, 51:12
**conversations** [3] - 10:3, 34:5, 52:7
**Conwall** [5] - 32:7, 32:10, 48:19, 48:22, 70:9
**copies** [2] - 47:8, 47:14
**copy** [3] - 38:14, 46:10, 60:21
**corner** [2] - 48:15, 66:11
**CORPORATION** [1] - 3:5
**correct** [35] - 29:16, 35:22, 38:5, 41:23, 48:16, 49:2, 49:11, 50:10, 50:17, 55:4, 56:12, 61:9, 62:19, 63:18, 64:14, 67:20, 68:2, 70:11, 71:19, 72:6, 72:20, 75:6, 80:11, 80:19, 84:19, 85:7, 86:6, 86:15, 89:7, 92:2, 93:22, 94:10, 96:16, 99:21, 101:12
**correctly** [1] - 55:2
**correspond** [3] - 50:20, 60:14, 62:25
**corresponded** [2] - 43:22, 76:17
**Correspondence** [14] - 52:14, 53:3, 59:7, 59:14, 64:5, 64:12, 67:22, 82:3, 106:12, 106:15, 106:20, 106:23, 107:7, 107:15
**correspondence** [3] - 43:19, 43:24, 44:14
**corresponding** [1] - 43:23
**corresponds** [2] - 76:2, 81:7
**Cory** [28] - 10:11, 35:3, 35:9, 35:11, 41:12, 72:24, 73:6, 73:25, 74:4, 74:22, 75:7, 78:14, 79:2, 80:12, 85:9, 87:2, 87:17, 87:20,

87:23, 87:24, 88:4, 89:13, 91:18, 91:23, 91:25, 96:10, 96:13, 96:17
**CORY** [1] - 1:4
**could** [14] - 19:16, 25:7, 37:9, 40:7, 45:23, 47:22, 49:6, 52:24, 55:10, 61:4, 77:24, 90:22, 91:3, 91:4
**couldn't** [1] - 33:14
**counsel** [4] - 4:5, 5:14, 10:17, 100:12
**COUNSEL'S** [1] - 3:5
**COUNTY** [1] - 105:5
**county** [1] - 98:7
**County** [1] - 14:13
**couple** [2] - 10:5, 10:6
**COURT** [1] - 1:2
**court** [5] - 9:9, 9:14, 47:7, 69:3, 93:17
**cover** [1] - 75:10
**create** [1] - 76:19
**created** [13] - 37:12, 38:14, 59:25, 66:18, 75:6, 77:17, 78:2, 79:2, 80:13, 80:19, 80:24, 81:8, 82:7
**creating** [1] - 63:8
**crime** [2] - 25:15, 40:24
**crimes** [2] - 28:6, 28:11
**criminal** [4] - 15:21, 21:22, 22:12, 89:6
**cross** [1] - 9:15
**cross-examined** [1] - 9:15
**Cuomo** [1] - 5:12
**curiosity** [1] - 50:6
**curious** [1] - 81:12
**current** [1] - 56:21
**currently** [1] - 64:23
**cursive** [1] - 86:5
**cut** [1] - 46:10

## D

**DA's** [1] - 45:10
**daily** [1] - 19:19
**dance** [1] - 91:6
**danced** [1] - 91:8
**dancing** [1] - 91:5
**dark** [1] - 102:4
**date** [19] - 10:15, 10:18, 10:22, 10:25, 25:2, 41:16, 66:10, 66:13, 67:8, 80:18, 80:22, 80:23, 80:24, 81:7, 81:14, 81:21, 82:15, 94:21, 94:23
**date-wise** [1] - 94:21
**dated** [23] - 45:23, 48:8, 52:14, 53:3, 59:7, 59:14, 63:24, 64:5, 68:18, 68:21, 75:22, 82:3, 85:22, 88:15, 106:10, 106:12, 106:15,

106:20, 106:23, 107:10, 107:15, 107:16, 107:19

**dates** [1] - 15:17

**day** [12] - 30:2, 30:15, 30:16, 30:21, 30:23, 38:20, 49:5, 49:22, 69:13, 83:22, 90:10, 104:14

**days** [1] - 49:7

**death** [1] - 42:23

**December** [1] - 18:9

**deem** [1] - 46:22

**defendant** [3] - 5:23, 15:22, 21:22

**defendants** [1] - 3:6

**Defendants** [1] - 1:12

**defense** [1] - 22:13

**degree** [1] - 13:23

**Delaware** [1] - 98:8

**demarcated** [1] - 30:21

**DEPARTMENT** [1] - 3:4

**department** [6] - 14:2, 14:23, 29:12, 35:13, 39:2, 70:12

**Department** [25] - 14:6, 14:13, 18:8, 27:7, 34:17, 35:2, 43:14, 52:13, 53:2, 59:6, 59:13, 64:4, 64:11, 67:21, 68:20, 82:2, 88:19, 91:12, 106:11, 106:14, 106:19, 106:22, 107:6, 107:9, 107:14

**Departmental** [14] - 52:14, 53:3, 59:7, 59:14, 64:5, 64:11, 67:22, 82:3, 106:12, 106:15, 106:20, 106:23, 107:7, 107:14

**departmental** [1] - 43:18

**departments** [1] - 14:3

**depending** [1] - 49:25

**deposition** [20] - 1:16, 4:10, 4:15, 5:3, 5:5, 5:6, 6:10, 8:25, 9:6, 9:24, 10:8, 46:20, 46:25, 47:20, 47:21, 47:22, 48:2, 92:16, 105:12, 105:13

**depositions** [1] - 47:12

**describe** [1] - 19:16

**describes** [1] - 94:11

**designation** [1] - 69:21

**desk** [3] - 62:10, 62:13, 62:22

**DETECTIVE** [6] - 1:7, 1:7, 1:8, 1:8, 1:9, 1:10

**Detective** [34] - 11:8, 11:12, 11:16, 11:20, 11:22, 12:2, 12:5, 12:9, 12:11, 12:15, 12:17, 12:21, 12:23, 13:3, 26:9, 26:10, 26:11, 26:12, 48:14, 69:7, 69:8, 69:12, 69:22, 74:16, 83:19, 84:7, 84:15, 88:3, 92:11, 100:23, 101:6, 107:21

**detective** [41] - 18:6, 18:12, 18:15, 18:24, 19:4, 19:13, 19:20, 19:24, 20:7, 20:12, 20:14, 20:23, 21:2, 22:3, 22:7, 23:3, 27:6, 27:17, 27:23, 28:12, 30:13, 31:12, 31:17, 32:9, 35:19, 37:18, 38:23, 43:19, 46:4, 48:11, 53:9, 67:25, 69:25, 70:4, 71:4, 72:5, 75:4, 88:18, 90:15, 95:7, 100:21

**detective's** [1] - 75:10

**detectives** [16] - 23:8, 25:25, 26:3, 28:10, 29:23, 31:20, 31:25, 32:12, 53:21, 57:3, 57:5, 71:2, 71:16, 99:22, 100:2, 100:6

**did** [116] - 7:5, 8:3, 9:23, 10:7, 10:10, 13:14, 13:17, 13:24, 14:2, 14:5, 14:8, 14:10, 14:15, 14:19, 14:23, 15:2, 15:5, 15:11, 15:16, 15:18, 16:22, 17:7, 17:13, 17:17, 17:20, 18:7, 18:16, 18:24, 19:3, 19:6, 20:3, 20:13, 20:16, 20:19, 20:22, 21:4, 21:25, 22:9, 22:15, 22:22, 23:6, 24:25, 25:12, 27:4, 27:16, 27:22, 28:17, 29:5, 35:2, 35:9, 35:12, 35:15, 35:18, 35:19, 36:2, 37:13, 37:18, 38:10, 38:12, 38:23, 39:4, 39:10, 39:13, 39:18, 40:23, 42:2, 43:2, 43:4, 46:3, 46:4, 46:15, 49:5, 53:13, 53:14, 53:22, 54:5, 56:6, 56:23, 56:24, 58:11, 65:8, 67:11, 67:13, 68:5, 69:15, 71:15, 73:2, 73:5, 73:23, 74:3, 78:10, 84:7, 84:15, 86:9, 87:5, 87:16, 87:18, 87:24, 88:3, 91:10, 91:14, 91:22, 92:16, 92:18, 92:19, 92:23, 92:25, 93:11, 95:15, 96:8, 96:10, 96:13, 97:7, 98:20, 100:2

**didn't** [9] - 13:22, 40:25, 44:22, 71:17, 78:20, 91:24, 95:18, 96:12, 99:17

**different** [15] - 20:9, 23:24, 28:5, 44:16, 47:25, 49:2, 49:14, 49:24, 52:21, 62:21, 63:2, 72:13, 72:15, 75:15, 95:9

**differentiating** [1] - 86:4

**differently** [1] - 99:20

**difficult** [1] - 69:4

**directing** [1] - 70:6

**discipline** [1] - 34:20

**disciplined** [1] - 34:18

**disclose** [1] - 10:18

**disclosed** [1] - 45:18

**discovered** [1] - 97:2

**discovery** [1] - 45:19

**discrepancies** [1] - 80:10

**discussed** [13] - 11:6, 51:9, 51:25, 68:24, 71:21, 73:19, 75:24, 77:2, 94:17, 94:21, 95:14, 98:15, 99:13

**discussion** [6] - 18:20, 50:11, 58:10, 73:24, 90:11, 102:6

**Discussion** [2] - 58:17, 59:5

**district** [11] - 22:16, 22:18, 40:13, 96:21, 96:25, 97:9, 97:13, 97:18, 97:20, 98:5, 98:11

**DISTRICT** [2] - 1:2, 1:2

**divided** [1] - 30:3

**do** [87] - 6:25, 7:24, 8:2, 8:13, 8:19, 9:23, 10:7, 11:4, 11:8, 11:10, 11:16, 11:22, 11:24, 12:5, 12:7, 12:11, 12:13, 12:17, 12:19, 12:23, 12:25, 13:5, 13:6, 21:12, 21:15, 21:19, 24:15, 25:19, 25:22, 26:15, 26:18, 33:15, 36:7, 38:13, 39:16, 39:17, 41:16, 41:25, 42:17, 45:12, 46:17, 47:9, 47:19, 48:5, 50:6, 51:3, 51:19, 51:21, 53:18, 58:9, 60:12, 63:9, 63:14, 65:2, 69:9, 72:11, 74:15, 77:7, 78:5, 78:8, 79:22, 79:25, 80:5, 82:12, 83:2, 83:13, 83:21, 83:24, 84:4, 84:22, 85:13, 90:21, 91:22, 92:14, 94:15, 94:24, 95:9, 95:19, 95:22, 96:3, 96:6, 97:17, 100:12, 100:21, 101:21, 105:9

**Do** [2] - 8:21, 32:24

**document** [17] - 43:15, 45:6, 46:11, 47:21, 48:21, 49:12, 53:13, 55:7, 64:15, 68:3, 68:5, 76:16, 76:21, 81:7, 82:22, 83:13, 85:25

**documents** [21] - 36:24, 37:5, 37:9, 37:13, 38:7, 44:6, 47:8, 49:9, 49:20, 49:22, 52:6, 57:22, 57:23, 77:16, 82:14, 82:18, 83:7, 83:17, 97:14, 97:19, 97:23

**does** [13] - 7:10, 42:21, 45:7, 49:4, 59:24, 60:6, 60:14, 66:13, 67:7, 74:11, 77:3, 79:17, 80:7

**doesn't** [4] - 45:9, 50:25, 75:9, 79:19

**doing** [6] - 19:23, 41:4, 41:8, 43:20, 47:6, 65:20

**don't** [43] - 7:9, 7:15, 7:16, 7:17, 7:21, 9:7, 10:14, 10:20,

17:10, 21:17, 32:11, 32:23, 36:6, 36:19, 39:9, 39:19, 47:9, 47:10, 47:17, 51:2, 55:9, 57:14, 65:4, 67:13, 68:7, 74:2, 74:5, 74:7, 74:13, 74:17, 77:21, 88:6, 88:7, 89:18, 94:2, 95:5, 96:5, 98:9, 100:15, 100:25, 101:2

**Donald** [11] - 55:13, 55:15, 55:24, 56:6, 57:9, 60:3, 60:7, 63:4, 64:19, 67:12, 68:3

**done** [1] - 63:8

**down** [9] - 36:18, 37:14, 42:6, 46:7, 55:19, 61:4, 71:11, 73:23, 76:15

**draft** [1] - 54:8

**drafted** [1] - 53:12

**dressed** [1] - 8:11

**drink** [1] - 90:22

**driving** [1] - 56:10

**duly** [2] - 6:3, 105:13

**during** [11] - 15:5, 17:6, 17:12, 20:12, 34:16, 34:25, 35:18, 46:4, 63:20, 91:19, 97:11

**duties** [1] - 27:23

**duty** [1] - 46:4

---

**E**

---

**early** [2] - 28:19, 31:6

**earn** [1] - 13:23

**easier** [1] - 32:17

**edge** [1] - 51:23

**efficient** [1] - 47:4

**eight** [2] - 40:5, 98:17

**eight-by-three** [1] - 98:17

**either** [2] - 17:14, 51:14

**else** [11] - 10:8, 11:6, 20:5, 50:2, 81:13, 83:22, 84:8, 84:16, 94:25, 95:16, 101:21

**elsewhere** [1] - 81:6

**email** [1] - 45:17

**enacted** [1] - 16:8

**end** [2] - 46:24, 47:9

**enforcement** [3] - 14:9, 14:20, 34:14

**enough** [5] - 6:24, 11:15, 17:11, 53:23, 53:24

**entries** [1] - 49:17

**entry** [5] - 50:10, 50:23, 72:9, 72:17, 74:9

**EPPS** [1] - 1:4

**Epps** [34] - 10:11, 35:3, 35:6, 35:7, 35:9, 35:12, 41:12, 41:23, 42:25, 72:24, 73:6, 73:25, 74:4, 75:7, 78:14, 79:3, 80:12, 85:9, 87:2, 87:17, 87:20, 87:24, 87:25, 88:4, 89:13, 91:18,

91:23, 91:25, 92:9, 92:12, 96:11, 96:14, 96:18, 107:21
**Epps's** [1] - 74:22
**Erie** [1] - 14:13
**ERRATA** [1] - 103:4
**establishment** [1] - 90:16
**estimate** [1] - 25:10
**even** [2] - 6:19, 8:14
**evening** [1] - 30:18
**events** [1] - 83:4
**eventually** [1] - 63:20
**ever** [17] - 6:9, 9:5, 9:15, 20:13, 34:17, 35:2, 47:24, 73:2, 73:5, 73:23, 74:3, 79:5, 87:20, 87:24, 88:3, 91:14, 100:8
**every** [3] - 6:18, 49:21, 63:19
**everybody** [1] - 102:3
**everyone** [2] - 18:18, 70:19
**everything** [1] - 97:10
**evidence** [8] - 17:22, 20:20, 21:20, 22:2, 22:6, 22:11, 22:20, 22:24
**exactly** [3] - 8:15, 10:15, 39:17
**EXAMINATION** [5] - 6:5, 90:13, 100:19, 101:4, 106:5
**examined** [1] - 9:15
**example** [5] - 25:5, 31:6, 37:7, 53:10, 56:22
**except** [1] - 4:6
**exculpatory** [9] - 15:20, 17:22, 20:20, 21:21, 22:2, 22:6, 22:10, 22:20, 22:24
**excuse** [1] - 93:18
**Excuse** [1] - 81:9
**Executive** [1] - 5:11
**Exhibit** [109] - 46:14, 46:22, 47:25, 48:3, 48:9, 48:15, 52:3, 52:13, 53:4, 53:9, 54:25, 58:2, 58:5, 58:8, 58:12, 58:13, 58:21, 58:23, 59:3, 59:8, 59:11, 59:15, 59:17, 60:19, 61:7, 61:8, 62:15, 62:24, 63:5, 63:24, 64:2, 64:6, 64:8, 64:24, 65:25, 66:3, 66:9, 66:17, 66:18, 66:20, 66:25, 67:4, 67:15, 67:18, 67:23, 68:2, 68:17, 68:22, 72:8, 74:9, 74:22, 75:2, 75:5, 75:9, 75:12, 75:14, 75:18, 76:16, 77:2, 77:11, 77:16, 78:2, 78:12, 78:24, 78:25, 79:7, 79:16, 79:18, 79:25, 80:3, 80:8, 80:17, 81:13, 81:24, 82:4, 82:6, 84:22, 85:6, 85:14, 85:20, 85:23, 85:25, 88:13, 88:16, 88:17, 92:8, 92:13, 92:17, 92:25, 94:25,

95:17, 100:24, 106:10, 106:11, 106:14, 106:17, 106:19, 106:22, 107:6, 107:9, 107:11, 107:13, 107:16, 107:18, 107:20
**EXHIBIT** [2] - 106:9, 107:5
**exhibit** [3] - 46:21, 47:3, 82:19
**exhibits** [3] - 82:19, 82:22, 82:25
**exonerated** [1] - 96:18
**eye** [1] - 56:11

## F

**fact** [4] - 10:14, 49:16, 64:22, 91:17
**fair** [33] - 9:8, 9:18, 11:15, 13:10, 13:22, 16:18, 17:2, 17:11, 23:22, 25:18, 28:8, 28:21, 29:14, 30:2, 33:19, 33:25, 34:8, 35:11, 40:20, 41:13, 50:19, 54:2, 70:20, 73:21, 75:18, 78:12, 79:9, 83:6, 88:7, 88:22, 95:10, 101:8, 101:14
**fairly** [1] - 56:17
**Faison** [10] - 55:13, 55:15, 55:24, 56:6, 57:9, 60:7, 63:4, 64:20, 67:12, 68:3
**Faison's** [1] - 60:3
**false** [1] - 34:21
**family** [1] - 84:5
**far** [4] - 38:15, 43:7, 75:12, 98:11
**fashion** [1] - 24:22
**felonies** [1] - 28:9
**felt** [1] - 46:17
**few** [1] - 90:5
**field** [2] - 54:5, 54:12
**file** [10] - 37:22, 38:8, 38:14, 45:10, 57:25, 62:16, 62:18, 63:17, 63:21, 97:23
**files** [3] - 38:10, 49:24, 49:25
**filing** [1] - 4:14
**fill** [3] - 60:25, 66:22, 99:23
**filled** [1] - 88:24
**filler** [2] - 24:14, 60:16
**fillers** [8] - 24:6, 76:6, 76:10, 76:17, 78:16, 85:13, 85:14
**final** [1] - 29:11
**find** [3] - 16:10, 24:13, 73:5
**fine** [5] - 7:13, 7:21, 8:6, 46:25, 87:14
**finish** [1] - 94:22
**finished** [4] - 8:17, 37:16, 63:13, 90:7
**first** [12] - 10:10, 41:4,

47:21, 55:15, 58:16, 66:17, 66:19, 77:8, 79:12, 93:8, 96:17, 100:11
**fit** [1] - 40:7
**five** [4] - 26:17, 49:17, 60:11, 87:3
**floor** [4] - 23:20, 24:9, 91:6, 98:4
**focused** [1] - 28:12
**folded** [1] - 61:19
**folders** [1] - 61:17
**follow** [2] - 19:21, 19:25
**following** [3] - 19:12, 40:10, 86:25
**follows** [1] - 6:4
**food** [1] - 91:3
**form** [18] - 4:7, 7:25, 19:14, 21:10, 27:12, 29:20, 30:10, 31:14, 33:22, 36:17, 44:11, 50:3, 56:2, 57:19, 65:11, 73:8, 80:14, 89:25
**formal** [3] - 20:23, 36:15, 69:20
**formally** [1] - 46:24
**forms** [2] - 45:17, 52:2
**forth** [2] - 94:12, 105:12
**forward** [1] - 71:6
**forwarded** [1] - 55:20
**found** [1] - 76:12
**four** [5] - 15:3, 16:5, 16:14, 50:16, 52:5
**fourth** [2] - 23:20, 24:9
**frame** [1] - 16:12
**Franklin** [1] - 98:3
**frap** [1] - 74:6
**FRAP** [1] - 74:6
**friend** [4] - 42:13, 42:14, 42:15, 42:16
**from** [27] - 10:17, 17:3, 18:7, 18:13, 20:11, 21:23, 25:13, 25:14, 27:15, 30:25, 36:11, 41:3, 43:19, 43:21, 48:25, 50:23, 55:6, 60:7, 60:9, 62:21, 69:7, 72:18, 74:9, 84:16, 86:16, 96:11, 96:14
**front** [5] - 45:20, 61:21, 77:3, 82:20, 83:2
**full** [6] - 8:22, 39:6, 39:21, 40:2, 84:13, 99:14
**full-size** [1] - 40:2
**further** [4] - 5:8, 101:3, 101:19, 105:16
**FURTHER** [2] - 4:9, 4:13

## G

**GARBER** [4] - 2:11, 2:16, 101:24, 102:3
**gathered** [1] - 46:6

**gave** [2] - 39:15, 97:19
**general** [2] - 65:6, 95:25
**generally** [1] - 16:3
**generated** [2] - 44:7, 56:14
**gestures** [1] - 6:22
**get** [18] - 6:15, 15:17, 17:7, 17:13, 17:17, 17:20, 18:16, 29:5, 31:7, 36:16, 36:17, 44:18, 44:22, 52:21, 61:15, 91:3, 99:14
**getting** [3] - 21:23, 72:18, 90:6
**Giardina** [2] - 11:23, 12:2
**GIARDINA** [1] - 1:9
**give** [7] - 8:22, 9:20, 22:11, 22:19, 47:14, 52:20, 100:16
**given** [6] - 7:10, 32:15, 62:12, 97:23, 101:11, 105:14
**giving** [1] - 46:18
**glasses** [2] - 65:14
**Glenn** [1] - 101:21
**GLENN** [2] - 2:11, 2:16
**glue** [1] - 61:14
**go** [29] - 6:12, 6:21, 13:17, 14:12, 14:23, 18:24, 19:19, 20:22, 20:24, 23:18, 24:16, 27:19, 34:2, 35:5, 37:9, 37:15, 40:23, 45:4, 47:12, 52:10, 52:24, 53:23, 53:24, 54:9, 84:8, 84:16, 90:5, 90:8, 98:14
**going** [30] - 7:14, 7:20, 8:16, 10:2, 16:15, 26:24, 34:4, 34:10, 38:16, 39:24, 47:19, 47:23, 48:2, 48:18, 51:8, 52:10, 52:21, 54:25, 58:2, 58:18, 62:14, 62:24, 66:9, 71:6, 72:8, 72:17, 75:4, 82:11, 83:18, 87:13
**gone** [1] - 16:7
**good** [3] - 87:13, 101:23, 101:24
**got** [19] - 14:12, 17:9, 24:18, 25:14, 29:7, 31:22, 44:15, 46:8, 46:10, 54:13, 61:6, 61:16, 62:8, 68:3, 68:12, 70:23, 83:25, 85:21, 88:12
**gotcha** [1] - 68:15
**Governor** [1] - 5:12
**graduate** [1] - 13:14
**grand** [3] - 9:11, 9:15, 28:6
**Great** [1] - 48:7
**ground** [1] - 6:13
**guard** [1] - 14:14
**guess** [3] - 57:7, 92:8, 100:11
**guy** [1] - 68:10

113

## H

**had** [31] - 6:9, 8:25, 9:5, 19:20, 20:6, 22:9, 23:23, 34:13, 37:19, 39:7, 44:13, 50:11, 52:7, 53:24, 53:25, 54:4, 60:6, 63:10, 70:24, 73:20, 87:17, 87:20, 89:17, 91:18, 91:23, 96:11, 96:14, 96:18, 97:7, 97:10, 98:17
**half** [2] - 49:12, 61:19
**hand** [2] - 48:15, 66:10
**handed** [2] - 48:22, 49:24
**handle** [1] - 26:25
**handled** [1] - 97:17
**hands** [1] - 70:13
**handwriting** [2] - 86:2, 89:2
**handwritten** [6] - 52:2, 67:15, 85:19, 85:22, 89:12
**Handwritten** [1] - 107:16
**Hang** [2] - 7:3, 52:18
**happened** [1] - 57:16
**happening** [1] - 88:8
**has** [9] - 47:7, 57:23, 58:3, 59:22, 74:21, 75:10, 75:19, 76:6, 77:5
**head** [1] - 31:22
**headquarters** [1] - 23:20
**hear** [3] - 18:19, 20:25, 33:14
**heard** [4] - 21:17, 87:20, 96:18, 100:8
**hello** [1] - 102:3
**HEREBY** [1] - 4:4
**hereby** [1] - 105:10
**hereinbefore** [1] - 105:12
**hereto** [1] - 4:6
**herself** [1] - 42:16
**high** [2] - 13:14, 13:16
**highway** [1] - 40:21
**hold** [1] - 54:16
**home** [1] - 66:5
**homicide** [44] - 26:23, 27:11, 28:15, 28:18, 28:22, 28:25, 29:5, 29:17, 29:23, 30:12, 31:5, 31:10, 31:12, 31:17, 31:18, 31:20, 32:2, 34:4, 34:6, 34:9, 35:24, 36:23, 36:24, 36:25, 38:8, 38:21, 40:10, 42:7, 44:2, 44:7, 53:16, 53:17, 55:20, 56:18, 69:24, 70:6, 70:14, 70:24, 72:14, 77:18, 78:3, 97:2, 97:25, 98:23
**Homicide** [1] - 43:14
**homicides** [7] - 32:16, 32:18, 32:22, 33:4, 33:17, 33:21, 34:2
**honestly** [1] - 81:12
**hopefully** [2] - 16:17, 18:22

**hours** [5] - 10:5, 10:6, 30:23, 72:10, 101:7
**house** [3] - 28:3, 83:18, 84:2
**how** [33] - 10:4, 15:2, 16:24, 19:4, 20:3, 22:15, 23:3, 23:6, 25:8, 25:19, 26:18, 30:11, 31:20, 32:15, 32:18, 32:21, 33:4, 33:8, 33:11, 36:2, 42:25, 43:4, 48:5, 53:18, 54:9, 56:6, 57:9, 61:17, 70:6, 73:5, 74:3, 98:11
**HUGGINS** [67] - 3:10, 5:22, 7:3, 7:9, 7:16, 7:23, 8:4, 8:7, 10:16, 10:23, 15:25, 16:11, 19:14, 21:10, 27:12, 29:20, 30:10, 31:14, 32:25, 33:6, 33:10, 33:13, 33:22, 39:17, 45:7, 45:16, 46:19, 47:15, 48:5, 50:3, 52:16, 52:18, 56:2, 57:19, 58:11, 58:15, 58:18, 58:23, 59:2, 64:2, 65:11, 67:17, 69:2, 70:16, 71:12, 73:8, 73:12, 74:23, 77:21, 77:24, 80:14, 81:23, 82:17, 82:24, 83:16, 84:10, 87:7, 87:10, 87:14, 89:25, 90:8, 92:19, 93:3, 95:5, 100:15, 100:20, 101:2
**Huggins** [2] - 11:5, 106:6
**hums** [1] - 69:3
**hundreds** [1] - 25:11
**hung** [1] - 56:22

## I

**ID** [2] - 23:19, 74:21
**idea** [1] - 56:4
**identical** [3] - 45:14, 47:7, 86:14
**Identification** [3] - 88:14, 88:21, 107:18
**identification** [24] - 23:19, 23:23, 24:9, 24:15, 25:17, 35:7, 41:22, 42:24, 48:9, 53:5, 59:9, 59:12, 59:16, 64:7, 67:24, 68:22, 75:3, 82:5, 85:24, 87:2, 87:16, 88:5, 88:16, 92:13
**identified** [6] - 76:3, 87:6, 87:17, 89:17, 89:23, 94:24
**identify** [4] - 45:24, 60:19, 64:8, 88:17
**identifying** [1] - 87:23
**immediate** [1] - 31:25
**implicated** [1] - 35:8
**in-person** [1] - 25:19
**inaccurate** [6] - 34:21, 93:2, 94:5, 94:8, 95:2, 95:16
**inches** [2] - 40:5
**incident** [1] - 95:13

**include** [1] - 20:17
**including** [1] - 32:9
**increase** [1] - 29:5
**independent** [6] - 82:13, 83:3, 83:16, 84:11, 100:22
**INDEX** [2] - 106:3, 107:3
**index** [1] - 37:12
**indicate** [5] - 5:18, 59:24, 60:6, 66:13, 69:11
**indication** [1] - 81:14
**individual** [2] - 57:17, 76:11
**individually** [1] - 49:8
**individuals** [2] - 25:24, 49:2
**info** [1] - 68:9
**Information** [4] - 59:10, 74:25, 106:17, 107:12
**information** [13] - 25:2, 25:16, 42:6, 43:25, 44:13, 46:5, 54:10, 55:19, 70:3, 71:5, 71:9, 84:14, 99:3
**informed** [1] - 36:20
**initials** [2] - 50:16, 50:20
**inside** [3] - 10:24, 36:25, 56:17
**insist** [1] - 7:14
**instances** [3] - 44:21, 89:21, 94:16
**instructing** [1] - 19:12
**instruction** [3] - 15:6, 20:17, 22:23
**intend** [1] - 46:16
**interest** [4] - 23:17, 55:12, 56:5, 56:7
**interested** [1] - 105:19
**interrogation** [1] - 17:18
**interview** [7] - 73:2, 73:10, 73:14, 73:15, 82:14, 83:14, 86:10
**Intra** [14] - 52:14, 53:3, 59:7, 59:14, 64:5, 64:11, 67:22, 82:3, 106:11, 106:14, 106:19, 106:22, 107:6, 107:14
**Intra-Departmental** [8] - 52:14, 53:3, 59:7, 59:14, 64:5, 64:11, 67:22, 82:3
**investigate** [2] - 74:3, 91:23
**investigated** [3] - 28:3, 28:10, 70:6
**investigating** [1] - 36:23
**investigation** [14] - 38:18, 40:11, 40:13, 41:6, 42:3, 43:20, 44:2, 44:8, 55:16, 63:20, 71:7, 97:5, 97:11, 97:15
**investigations** [1] - 70:14
**involve** [3] - 21:4, 21:7, 49:17
**involved** [1] - 55:25
**involving** [2] - 41:22, 42:25
**IS** [3] - 4:4, 4:9, 4:13

**issued** [1] - 5:12
**issues** [1] - 20:25
**IT** [3] - 4:4, 4:9, 4:13
**itself** [3] - 66:23, 70:25, 71:5

## J

**Jackie** [1] - 82:15
**Jacqueline** [13] - 64:16, 65:3, 66:2, 67:10, 83:14, 83:25, 84:17, 84:20, 84:24, 85:16, 86:11, 87:5, 87:15
**jail** [1] - 14:13
**James** [1] - 11:22
**JAMES** [1] - 1:9
**January** [4] - 1:13, 103:2, 106:2, 107:2
**job** [3] - 19:6, 19:9, 20:3
**jobs** [3] - 14:9, 14:20, 34:13
**JOHN** [5] - 1:7, 1:16, 6:2, 104:9, 105:11
**John** [2] - 68:9, 106:6
**join** [1] - 14:5
**joined** [1] - 14:22
**joining** [1] - 13:25
**JOSEPH** [2] - 1:11, 105:23
**Joseph** [7] - 1:18, 13:5, 32:6, 32:10, 36:5, 43:23, 105:7
**jostled** [1] - 61:15
**Juan** [2] - 26:10, 77:9
**July** [19] - 41:14, 48:8, 59:8, 75:22, 82:4, 82:11, 83:14, 84:17, 85:22, 88:15, 93:13, 93:19, 93:25, 95:15, 106:10, 106:16, 107:15, 107:17, 107:19
**jump** [1] - 8:18
**June** [17] - 52:15, 52:16, 53:4, 59:15, 63:25, 64:6, 64:15, 68:18, 68:21, 93:10, 93:18, 93:24, 95:15, 106:13, 106:21, 106:24, 107:10
**jury** [2] - 9:11, 9:15

## K

**keep** [3] - 54:23, 98:24, 99:3
**keeping** [1] - 38:7
**kept** [5] - 13:11, 24:17, 24:20, 44:2, 51:25
**kind** [7] - 19:21, 20:14, 24:25, 44:6, 56:11, 70:2, 89:19
**knew** [5] - 33:5, 67:12, 73:6, 87:24, 88:4
**know** [73] - 8:15, 10:14, 10:20, 11:4, 11:8, 11:16,

114

11:22, 12:5, 12:11, 12:17, 12:23, 13:5, 17:10, 19:18, 19:22, 20:8, 21:12, 21:15, 25:23, 26:20, 32:21, 34:9, 35:3, 35:5, 35:9, 35:15, 35:18, 35:20, 36:6, 36:8, 36:20, 38:13, 38:15, 39:16, 39:17, 41:7, 45:11, 46:5, 47:9, 47:17, 49:21, 50:7, 51:2, 51:15, 54:12, 54:14, 55:9, 57:2, 57:14, 57:15, 58:6, 61:4, 61:22, 66:15, 68:7, 70:3, 71:8, 71:10, 74:7, 77:16, 78:5, 84:22, 85:13, 86:20, 88:6, 89:5, 89:18, 91:7, 94:2, 97:17, 98:9, 101:20

**knowledge** [4] - 33:20, 35:13, 35:14, 94:5

**known** [2] - 57:10, 74:4

## L

**Lanc** [6] - 37:25, 38:6, 39:15, 50:7, 54:24, 97:24

**larcenies** [4] - 28:5, 28:6

**large** [2] - 40:7, 63:17

**last** [11] - 11:11, 11:19, 11:25, 12:8, 12:14, 12:20, 13:2, 13:7, 33:2, 57:19, 95:6

**later** [2] - 16:10, 35:6

**LAW** [1] - 3:4

**law** [3] - 14:9, 14:20, 34:13

**lawsuit** [2] - 11:6, 96:19

**lead** [4] - 19:21, 69:25, 70:4, 72:5

**leaf** [1] - 51:22

**learn** [2] - 22:15, 23:6

**learned** [5] - 19:4, 23:3, 25:19, 96:17, 97:10

**learning** [2] - 20:8, 20:11

**least** [2] - 8:7, 13:21

**leave** [3] - 39:13, 89:24, 99:10

**led** [1] - 94:12

**left** [3] - 39:14, 48:15, 89:23

**left-hand** [1] - 48:15

**less** [3] - 13:20, 26:25, 28:22

**letter** [2] - 10:24, 11:2

**letting** [1] - 65:10

**level** [2] - 16:2, 16:20

**lieu** [1] - 5:9

**Lieutenant** [4] - 32:7, 48:18, 48:22, 70:9

**lighting** [1] - 65:15

**Linda** [9] - 42:20, 50:12, 50:24, 51:4, 72:19, 73:2, 73:20, 73:23, 74:16

**line** [2] - 16:20, 89:9

**line-level** [1] - 16:20

**lineup** [14] - 15:6, 15:8, 17:14, 20:17, 21:5, 26:5, 26:15, 26:20, 27:3, 44:10, 63:9, 63:19, 91:25, 92:5

**lineups** [3] - 15:12, 25:19, 26:25

**list** [3] - 60:10, 61:25, 79:10

**listed** [3] - 26:17, 32:8, 85:10

**listen** [1] - 19:22

**lists** [1] - 50:16

**little** [6] - 25:20, 25:21, 43:12, 61:10, 74:18

**live** [2] - 95:22, 95:24

**local** [1] - 96:6

**located** [2] - 53:16, 98:2

**location** [1] - 80:21

**Log** [1] - 106:10

**log** [4] - 45:22, 45:25, 46:14, 48:8

**long** [6] - 8:14, 10:4, 15:2, 16:24, 20:3, 40:5

**look** [24] - 7:11, 10:14, 10:24, 37:8, 37:10, 45:13, 58:15, 59:17, 60:18, 61:7, 61:8, 62:15, 65:18, 65:23, 77:14, 79:6, 79:15, 79:20, 79:24, 92:19, 93:4, 94:18, 95:3, 100:16

**looked** [2] - 57:10, 72:23

**looking** [16] - 24:13, 49:11, 50:9, 55:6, 57:2, 57:11, 66:25, 72:9, 75:5, 75:8, 75:18, 76:25, 78:11, 78:23, 84:22, 92:24

**looks** [3] - 11:3, 60:21, 75:12

**loose** [6] - 24:20, 24:24, 51:22, 61:10, 61:12, 98:16

## M

**m.huggins@city** [1] - 3:11

**m.huggins@city-buffalo. com** [1] - 3:11

**made** [5] - 24:5, 55:23, 66:14, 79:5, 87:15

**Maeve** [4] - 9:25, 10:7, 11:5, 45:6

**MAEVE** [1] - 3:10

**mail** [1] - 10:13

**make** [13] - 6:15, 8:13, 16:17, 23:3, 23:6, 23:10, 24:3, 32:16, 40:16, 51:12, 57:24, 65:15, 87:10

**makeup** [1] - 56:9

**making** [2] - 34:21, 66:21

**manner** [1] - 5:16

**many** [14] - 25:8, 30:11,

31:20, 32:15, 32:18, 32:21, 33:4, 33:8, 33:11, 42:25, 43:4, 53:18, 53:20, 61:17

**March** [1] - 5:13

**march** [1] - 16:16

**Marilyn** [6] - 37:25, 38:6, 39:15, 50:7, 54:24, 97:24

**mark** [16] - 46:13, 46:23, 47:11, 52:12, 57:21, 58:5, 63:23, 67:14, 68:16, 74:20, 81:20, 85:19, 85:20, 88:11, 88:13, 92:7

**MARK** [1] - 1:8

**Mark** [2] - 11:16, 26:11

**marked** [17] - 45:5, 48:9, 53:4, 57:25, 58:6, 59:8, 59:11, 59:15, 64:6, 64:23, 67:23, 68:22, 75:2, 82:4, 85:23, 88:15, 92:12

**marking** [2] - 47:23, 48:3

**marriage** [1] - 105:18

**Marty** [3] - 68:11, 68:12, 68:13

**Mary** [1] - 68:10

**MASSECHIA** [1] - 1:10

**Massechia** [3] - 12:18, 12:21, 26:13

**material** [4] - 15:19, 15:20, 21:8, 21:15

**materials** [1] - 20:20

**matter** [2] - 82:23, 105:19

**matters** [1] - 16:10

**may** [10] - 4:10, 8:15, 16:7, 21:21, 21:22, 28:11, 61:12, 74:4, 81:16, 90:2

**May** [3] - 11:3, 41:18

**maybe** [12] - 6:13, 15:3, 20:23, 26:11, 31:23, 38:20, 40:5, 46:24, 56:9, 71:20, 81:14, 86:13

**me** [34] - 8:19, 9:2, 10:4, 10:18, 10:19, 14:17, 15:17, 18:18, 18:19, 21:14, 22:19, 42:9, 43:19, 44:15, 50:23, 52:20, 55:6, 55:14, 55:22, 58:15, 59:18, 66:2, 66:15, 70:21, 75:14, 77:14, 81:9, 93:18, 94:18, 94:22, 95:3, 100:16, 104:14, 105:13

**mean** [17] - 15:7, 25:22, 25:23, 26:7, 36:8, 49:21, 51:5, 51:19, 51:21, 57:4, 63:10, 67:7, 70:18, 71:15, 80:23, 90:21, 91:6

**meaning** [12] - 15:12, 15:19, 19:11, 21:21, 37:13, 39:7, 47:20, 65:8, 66:18, 69:15, 69:21, 77:12

**Means** [28] - 35:9, 35:24, 38:17, 40:19, 41:5, 41:17, 41:21, 42:3, 42:14, 42:16,

42:24, 43:5, 49:17, 50:12, 50:24, 51:4, 56:14, 57:12, 69:24, 72:14, 72:19, 73:3, 73:20, 73:24, 74:16, 77:17, 78:3, 91:19

**means** [1] - 21:12

**Means's** [4] - 42:12, 42:15, 42:18, 43:2

**meant** [1] - 92:23

**medical** [1] - 8:21

**members** [1] - 84:5

**memo** [13] - 38:23, 38:25, 39:6, 39:11, 39:18, 39:21, 39:25, 40:12, 51:9, 51:13, 86:17, 86:22, 98:15

**memorandum** [1] - 44:6

**memory** [2] - 16:6, 41:8

**memos** [1] - 43:24

**mention** [1] - 7:20

**mentioned** [1] - 99:7

**met** [3] - 9:25, 10:4, 10:7

**might** [13] - 20:6, 26:13, 43:11, 47:4, 51:5, 54:19, 55:24, 57:13, 57:17, 76:3, 78:8, 78:9

**mind** [2] - 7:15, 95:5

**MINOR** [1] - 1:8

**Minor** [10] - 11:9, 11:12, 48:14, 50:21, 69:19, 69:22, 83:19, 84:7, 84:15, 88:3

**minute** [1] - 94:18

**minutes** [3] - 52:25, 90:6, 95:11

**missed** [1] - 32:25

**mistake** [1] - 93:9

**moment** [5] - 7:4, 52:20, 62:15, 93:4, 100:16

**Montgomery** [1] - 35:16

**months** [4] - 15:4, 16:5, 16:14, 20:5

**Morales** [2] - 26:10, 77:5

**Morales's** [3] - 77:7, 78:6, 100:23

**morning** [1] - 31:6

**most** [3] - 26:22, 41:7, 47:4

**move** [1] - 16:15

**moved** [1] - 61:15

**MR** [56] - 5:21, 6:6, 7:7, 7:13, 7:19, 7:24, 8:5, 8:10, 16:4, 16:13, 18:18, 18:21, 33:3, 33:8, 33:12, 45:5, 45:9, 46:13, 47:5, 47:16, 48:7, 52:12, 52:17, 52:23, 53:7, 57:21, 58:13, 58:20, 58:25, 59:4, 63:23, 64:3, 67:14, 67:19, 68:16, 73:11, 74:20, 74:24, 81:19, 81:25, 82:21, 84:13, 85:18, 87:12, 88:10, 90:4, 90:14, 92:7, 95:8, 100:11, 100:18, 101:5, 101:18, 101:24, 102:2, 102:3

115

**MS** [64] - 5:22, 7:3, 7:9, 7:16, 7:23, 8:4, 8:7, 10:16, 10:23, 15:25, 16:11, 19:14, 21:10, 27:12, 29:20, 30:10, 31:14, 32:25, 33:6, 33:10, 33:13, 33:22, 39:17, 45:7, 45:16, 46:19, 47:15, 48:5, 50:3, 52:16, 52:18, 56:2, 57:19, 58:11, 58:15, 59:2, 64:2, 65:11, 67:17, 69:2, 70:16, 71:12, 73:8, 73:12, 74:23, 77:21, 77:24, 80:14, 81:23, 82:17, 82:24, 83:16, 84:10, 87:7, 87:10, 87:14, 89:25, 90:8, 92:19, 93:3, 95:5, 100:15, 100:20, 101:2

**mug** [16] - 60:4, 60:7, 60:11, 61:25, 62:25, 75:25, 76:2, 79:10, 79:12, 79:17, 79:25, 80:4, 80:25, 85:3, 85:5, 85:9

**multiple** [1] - 49:13

**murder** [9] - 35:8, 38:16, 40:19, 41:21, 49:18, 55:25, 56:14, 57:12, 91:20

**murdered** [1] - 41:17

**myself** [1] - 61:13

### N

**name** [28] - 5:19, 21:25, 26:6, 31:11, 31:16, 37:23, 42:18, 42:20, 46:10, 55:12, 55:15, 59:22, 60:4, 75:9, 75:11, 75:16, 75:19, 77:3, 77:8, 78:6, 87:6, 87:20, 87:21, 89:11, 89:16, 89:22, 100:8, 100:23

**name-wise** [1] - 26:6

**named** [3] - 35:3, 35:15, 35:20

**names** [1] - 46:18

**nearly** [1] - 45:13

**necessarily** [1] - 42:5

**need** [5] - 7:22, 8:13, 9:19, 10:20, 76:22

**needed** [1] - 54:8

**needs** [1] - 15:20

**never** [4] - 26:19, 27:2, 54:20, 91:8

**new** [1] - 18:2

**NEW** [3] - 1:2, 105:3, 105:5

**New** [4] - 1:20, 2:8, 2:15, 105:9

**news** [2] - 96:6, 96:10

**newspaper** [1] - 96:8

**newspapers** [1] - 96:4

**next** [7] - 5:24, 27:14, 33:10, 46:2, 47:21, 70:7, 93:17

**Niagara** [1] - 3:7

**nice** [1] - 6:15

**night** [1] - 30:22

**no** [97] - 6:22, 8:6, 8:24, 9:7, 10:9, 11:7, 13:16, 13:24, 14:4, 14:21, 15:10, 15:15, 15:23, 17:16, 19:5, 20:2, 20:18, 21:6, 21:9, 21:13, 21:17, 22:4, 22:8, 22:25, 24:12, 27:4, 29:3, 31:13, 32:11, 32:23, 33:18, 34:15, 34:22, 35:10, 35:17, 35:21, 37:17, 38:4, 39:5, 39:12, 39:19, 40:25, 42:4, 42:19, 43:11, 48:23, 50:8, 50:25, 52:9, 54:7, 54:20, 57:6, 58:20, 61:20, 62:6, 63:12, 65:4, 67:13, 69:4, 70:2, 70:19, 73:7, 74:13, 74:17, 77:4, 79:19, 80:2, 80:9, 81:2, 81:17, 82:16, 83:6, 83:23, 84:3, 84:9, 84:18, 86:18, 87:22, 88:2, 91:16, 91:21, 91:24, 92:6, 95:18, 96:5, 96:12, 96:15, 97:19, 99:2, 100:4, 100:10, 100:25, 101:18, 105:18

**No** [10] - 24:23, 48:12, 52:17, 59:11, 67:23, 75:2, 93:18, 106:17, 107:8, 107:12

**nobody** [2] - 31:2, 31:3

**nonparties** [1] - 7:14

**normal** [3] - 33:20, 47:18

**Nos** [2] - 92:12, 107:15

**Notary** [2] - 1:19, 105:8

**notation** [2] - 68:8, 72:18

**note** [1] - 51:15

**notebook** [15] - 43:21, 51:16, 51:20, 51:21, 98:18, 98:20, 98:21, 98:25, 99:5, 99:8, 99:11, 99:14, 99:16, 99:24, 100:3

**noted** [1] - 102:7

**notes** [9] - 43:20, 51:13, 52:2, 54:12, 54:17, 85:22, 98:22, 100:17, 107:16

**nothing** [1] - 101:16

**notice** [3] - 1:18, 7:10, 10:10

**noticed** [2] - 7:17, 7:25

**notices** [1] - 8:2

**nowhere** [1] - 75:16

**Number** [1] - 5:12

**number** [39] - 27:21, 27:22, 33:20, 37:14, 45:6, 45:8, 46:15, 46:21, 47:3, 47:22, 57:24, 58:3, 58:18, 58:20, 60:4, 61:23, 62:9, 62:10, 62:12, 62:13, 62:16, 62:18, 62:22, 63:6, 75:25, 77:12, 79:12, 79:17, 79:21, 79:25, 80:4, 81:21, 85:5, 85:9, 87:3,

89:5, 93:10, 98:10

**number-wise** [1] - 98:10

**numbers** [8] - 38:10, 46:16, 47:20, 60:11, 62:25, 76:16, 79:10, 85:3

**NY** [3] - 2:8, 2:15, 3:9

**NYPD** [1] - 71:18

### O

**oath** [3] - 4:12, 5:9, 5:10

**objection** [2] - 29:20, 73:13

**objections** [2] - 4:6, 5:16

**obligation** [4] - 17:21, 21:20, 22:10, 97:8

**occasion** [1] - 93:11

**OF** [5] - 1:2, 1:7, 3:4, 105:3, 105:5

**off** [12] - 18:20, 31:22, 46:10, 52:24, 58:10, 58:17, 59:5, 90:5, 90:8, 90:11, 101:7, 102:6

**offhand** [1] - 42:19

**office** [10] - 37:21, 39:14, 45:17, 53:17, 54:14, 55:20, 97:22, 98:6, 98:7, 98:12

**OFFICE** [1] - 3:5

**Officer** [4] - 8:12, 77:5, 77:7, 78:5

**officer** [13] - 4:11, 6:7, 16:19, 16:20, 35:19, 36:12, 39:22, 55:4, 61:24, 70:24, 71:10, 75:16, 89:11

**officer's** [1] - 56:11

**officers** [14] - 7:15, 8:6, 20:12, 26:17, 32:13, 34:9, 55:17, 55:23, 56:25, 57:5, 57:8, 68:6, 71:23, 72:3

**offline** [1] - 101:22

**old** [1] - 13:11

**on-the-job** [3] - 19:6, 19:9, 20:3

**once** [3] - 43:8, 63:8, 65:16

**one** [40] - 7:3, 8:8, 24:4, 26:16, 27:5, 27:16, 29:22, 37:14, 38:8, 38:13, 45:9, 45:15, 47:16, 49:8, 49:23, 51:22, 57:22, 58:7, 58:22, 60:14, 61:18, 61:21, 67:5, 70:5, 70:17, 70:24, 71:22, 72:4, 72:17, 74:21, 79:2, 81:18, 84:24, 85:2, 85:20, 88:10, 89:23, 93:21, 99:4, 100:16

**ones** [1] - 76:12

**only** [4] - 8:2, 10:25, 30:15, 49:16

**open** [1] - 65:17

**opposing** [1] - 100:12

**Order** [1] - 5:11

**ordinary** [1] - 57:5

**organized** [2] - 24:10, 24:21

**original** [1] - 54:17

**originally** [1] - 92:23

**originated** [1] - 55:15

**Ortiz** [1] - 26:10

**outcome** [1] - 105:19

**outside** [2] - 91:15, 95:24

**overtime** [3] - 29:7, 29:11, 29:17

**own** [3] - 39:4, 53:22, 53:25

### P

**P-73** [11] - 43:15, 43:17, 44:5, 44:24, 53:10, 54:9, 63:24, 67:15, 71:11, 81:20, 82:6

**P-73s** [1] - 52:3

**P.C** [1] - 2:11

**p.m** [1] - 102:7

**packet** [1] - 36:16

**pads** [1] - 40:2

**PAGE** [3] - 106:5, 106:9, 107:5

**page** [11] - 5:24, 61:5, 61:8, 61:21, 62:2, 77:3, 85:20, 86:16, 93:8, 93:17, 99:4

**PAGE/LINE** [1] - 103:6

**pages** [6] - 39:7, 40:12, 61:18, 62:4, 99:16, 100:3

**PANOUSIERIS** [1] - 3:14

**paper** [10] - 46:7, 51:15, 51:17, 51:19, 51:20, 51:21, 54:13, 86:19, 86:20, 98:16

**papers** [1] - 60:22

**paperwork** [1] - 44:11

**paragraph** [1] - 75:25

**part** [7] - 28:20, 45:10, 57:17, 63:21, 72:14, 78:7, 94:8

**participating** [1] - 5:3

**particular** [12] - 19:10, 19:24, 23:11, 24:11, 27:23, 30:5, 37:19, 46:11, 71:6, 78:22, 91:11, 98:23

**particularly** [1] - 33:16

**parties** [3] - 4:6, 5:14, 105:17

**partner** [2] - 69:15, 69:22

**parts** [1] - 30:3

**party** [1] - 65:19

**passed** [1] - 50:8

**patrol** [3] - 16:19, 55:17, 57:8

**patrolman** [6] - 16:23, 16:24, 17:3, 17:7, 17:13, 18:2

**Paul** [1] - 35:20

**pause** [4] - 53:6, 93:7,

116

94:19, 95:4
**Pause** [1] - 18:17
**paused** [1] - 7:19
**pay** [1] - 29:7
**PD** [2] - 29:24, 84:16
**PDF** [1] - 45:17
**PDFs** [1] - 47:2
**pen** [1] - 52:22
**pension** [2] - 29:10, 29:19
**people** [9] - 15:8, 19:11, 23:24, 26:22, 32:8, 42:5, 42:6, 42:9, 91:7
**percent** [1] - 51:7
**perfect** [1] - 16:6
**performed** [1] - 63:19
**period** [2] - 65:22, 84:13
**person** [19] - 5:10, 17:15, 23:17, 23:18, 25:14, 25:19, 43:9, 43:12, 55:12, 56:5, 56:7, 65:21, 70:5, 72:4, 73:24, 76:2, 89:11, 89:16, 89:22
**person's** [1] - 23:16
**personally** [5] - 37:17, 37:18, 61:13, 91:9, 99:17
**petit** [1] - 28:6
**phone** [4] - 43:10, 72:18, 72:22, 73:19
**photo** [50] - 23:4, 23:7, 23:10, 23:16, 23:25, 24:3, 41:8, 59:20, 59:25, 60:16, 60:23, 61:4, 63:9, 63:19, 64:12, 64:16, 64:19, 64:22, 65:3, 65:7, 65:17, 66:7, 66:14, 66:19, 66:23, 67:8, 67:11, 74:22, 75:6, 76:20, 76:22, 78:6, 78:13, 78:17, 79:2, 80:11, 80:18, 80:22, 80:23, 81:8, 81:15, 83:19, 84:5, 84:20, 84:23, 85:8, 85:15, 88:14, 89:5, 93:12
**Photo** [7] - 59:10, 67:2, 74:25, 88:20, 106:17, 107:11, 107:18
**photo-Array** [1] - 88:14
**Photo-Array** [2] - 88:20, 107:18
**photocopy** [1] - 40:16
**photograph** [5] - 15:12, 17:15, 60:15, 78:14, 89:12
**photographs** [9] - 15:13, 23:24, 24:5, 24:10, 24:14, 25:8, 25:12, 63:2, 76:10
**photos** [13] - 24:17, 24:20, 24:21, 24:25, 44:10, 59:19, 61:2, 61:10, 62:3, 75:13, 76:12, 76:21, 76:24
**phrase** [1] - 71:15
**physical** [3] - 15:7, 26:25, 56:9
**physically** [2] - 5:4, 98:2

**pick** [1] - 76:10
**picked** [3] - 78:8, 78:16, 89:5
**picture** [1] - 23:18
**pictures** [1] - 78:8
**piece** [3] - 51:14, 86:19, 86:20
**pieces** [3] - 51:16, 51:18, 61:20
**Pirozzi** [2] - 1:18, 105:7
**PIROZZI** [1] - 105:23
**place** [6] - 20:4, 20:24, 36:25, 40:20, 49:23, 90:22
**placed** [5] - 35:6, 59:20, 60:15, 91:25, 92:4
**places** [1] - 52:6
**Plaintiff** [1] - 1:5
**plaintiff** [4] - 1:17, 2:5, 2:12, 5:21
**plan** [1] - 19:13
**PLLC** [1] - 2:4
**plus** [1] - 77:15
**pocket** [1] - 40:8
**pockets** [1] - 61:11
**point** [9] - 7:4, 23:2, 28:14, 35:23, 44:20, 46:23, 51:4, 56:14, 65:21
**police** [10] - 13:25, 14:3, 14:22, 23:20, 29:12, 35:13, 35:19, 57:5, 68:6, 89:10
**Police** [24] - 14:6, 18:8, 27:6, 34:17, 35:2, 43:14, 52:13, 53:2, 59:6, 59:13, 64:4, 64:10, 67:21, 68:20, 82:2, 88:19, 91:11, 106:11, 106:14, 106:19, 106:22, 107:6, 107:9, 107:13
**policy** [1] - 22:5
**Pope** [1] - 35:20
**portion** [1] - 7:5
**position** [4] - 14:16, 18:3, 18:5, 87:2
**possible** [7] - 17:19, 55:11, 61:13, 78:25, 79:4, 90:3, 99:25
**possibly** [1] - 99:6
**practice** [3] - 47:18, 47:19, 84:4
**precinct** [6] - 23:9, 27:21, 27:22, 28:7, 28:9, 28:10
**prepare** [2] - 9:23, 10:8
**presence** [1] - 88:8
**PRESENT** [1] - 3:13
**present** [1] - 5:5
**presenting** [1] - 65:9
**presently** [1] - 100:21
**pretty** [2] - 8:3, 90:6
**previous** [1] - 33:7
**primary** [1] - 72:5
**printed** [2] - 45:19, 86:5
**printing** [1] - 86:3

**prison** [2] - 96:11, 96:14
**privileged** [1] - 10:22
**probably** [24] - 7:14, 11:13, 11:21, 12:3, 13:20, 14:17, 14:18, 17:9, 23:8, 26:9, 28:19, 36:4, 38:19, 39:14, 40:4, 40:17, 54:18, 56:8, 57:13, 78:10, 91:8, 97:24
**problem** [3] - 8:6, 48:12, 65:19
**procedure** [11] - 23:11, 23:14, 35:7, 36:16, 39:20, 41:22, 42:25, 65:7, 88:5, 89:15, 89:18
**procedures** [6] - 15:7, 15:8, 17:14, 20:17, 21:5, 26:5
**proceedings** [2] - 9:12, 9:16
**process** [4] - 19:17, 24:14, 66:19, 97:5
**Professional** [2] - 1:19, 105:8
**promoted** [1] - 18:2
**promotion** [1] - 29:2
**prosecutor** [2] - 21:21, 22:11
**provided** [1] - 97:14
**Public** [2] - 1:20, 105:8
**pull** [1] - 45:3
**purpose** [1] - 6:20
**purposes** [1] - 46:19
**purse** [1] - 28:4
**pursuant** [2] - 1:17, 5:11
**put** [15] - 15:13, 26:19, 27:3, 37:22, 46:7, 54:14, 54:21, 63:16, 67:8, 71:11, 76:22, 76:23, 78:20, 94:4, 99:19

**Q**

**question** [23] - 6:18, 8:17, 16:9, 27:14, 33:2, 33:7, 33:11, 44:15, 46:2, 57:20, 66:16, 77:25, 81:4, 81:11, 82:25, 87:8, 87:9, 87:11, 87:12, 90:2, 93:9, 94:22, 95:6
**questions** [3] - 8:15, 100:13, 101:19
**quick** [1] - 16:17

**R**

**radio** [1] - 57:13
**rambling** [1] - 8:14
**ran** [1] - 99:16
**RANIERO** [1] - 1:10
**Raniero** [2] - 12:17, 26:12
**rather** [2] - 48:3, 61:8

**RE** [1] - 101:4
**re** [2] - 47:23, 48:3
**RE-EXAMINATION** [1] - 101:4
**re-marking** [2] - 47:23, 48:3
**read** [3] - 82:13, 87:7, 87:9
**reading** [3] - 55:2, 83:11, 95:6
**really** [10] - 6:14, 13:11, 20:18, 21:13, 29:3, 33:18, 47:10, 70:2, 71:8, 82:16
**reason** [1] - 8:21
**recall** [10] - 17:24, 26:14, 36:19, 43:8, 46:12, 65:4, 68:7, 74:2, 74:5, 74:13
**receive** [6] - 15:6, 15:11, 15:16, 15:18, 19:6, 36:2
**received** [2] - 19:9, 71:10
**recess** [1] - 90:12
**recollection** [8] - 42:21, 74:12, 82:12, 83:3, 83:8, 83:11, 84:12, 100:22
**record** [28] - 5:20, 9:21, 10:16, 18:20, 18:22, 22:10, 34:12, 37:20, 44:23, 45:16, 45:24, 46:25, 52:7, 52:24, 58:8, 58:10, 58:17, 59:5, 60:20, 64:9, 66:6, 70:25, 90:5, 90:9, 90:11, 94:24, 102:6, 105:14
**recorded** [4] - 6:20, 7:6, 7:12, 80:23
**recording** [2] - 7:18, 54:9
**records** [1] - 49:13
**redo** [1] - 87:13
**referring** [4] - 27:13, 31:15, 45:22, 82:18
**refresh** [2] - 42:21, 74:11
**refreshed** [2] - 83:8, 83:10
**regard** [2] - 44:7, 85:12
**regarding** [15] - 15:6, 15:12, 15:19, 17:14, 17:18, 17:21, 20:13, 22:5, 22:23, 26:4, 37:19, 43:25, 49:13, 68:3, 98:23
**regards** [1] - 41:5
**REGINALD** [1] - 1:8
**Reginald** [2] - 11:8, 69:18
**Registered** [2] - 1:19, 105:7
**regularly** [1] - 69:17
**reiterating** [1] - 83:12
**related** [1] - 105:17
**relating** [5] - 36:24, 38:8, 40:12, 49:22, 97:14
**released** [2] - 96:11, 96:14
**remain** [1] - 102:4
**remark** [1] - 67:2
**remarks** [1] - 81:3
**remember** [23] - 22:4, 22:25, 24:12, 24:24, 32:24, 33:15, 39:9, 41:4, 41:10,

A-243

117

41:16, 42:2, 42:17, 51:3, 53:18, 65:2, 73:4, 73:7, 74:15, 77:7, 83:13, 83:21, 83:24, 88:8

**remotely** [2] - 5:7, 5:11
**REMOTELY** [1] - 2:2
**repeat** [2] - 59:2, 77:24
**report** [7] - 37:14, 37:21, 37:23, 38:2, 48:24, 63:16, 69:4
**Report** [2] - 68:21, 107:10
**REPORTER** [1] - 5:2
**Reporter** [2] - 1:19, 105:8
**reporter** [2] - 47:7, 69:3
**reporting** [2] - 5:6, 5:17
**reports** [4] - 38:7, 50:11, 68:18, 68:24
**reputation** [2] - 35:12, 91:11
**request** [5] - 44:14, 59:19, 66:14, 66:22, 78:13
**requested** [4] - 44:10, 61:24, 75:13, 75:14
**required** [1] - 23:12
**reserved** [1] - 4:7
**respect** [6] - 42:2, 77:17, 78:3, 91:18, 94:6, 96:25
**respective** [1] - 4:5
**responsible** [1] - 38:6
**rest** [2] - 8:9, 100:6
**retire** [1] - 18:7
**retired** [5] - 11:14, 13:12, 27:16, 39:10, 39:22
**retirement** [1] - 18:13
**review** [2] - 65:10, 92:17
**reviewed** [2] - 66:3, 83:8
**reviewing** [1] - 95:11
**Rickner** [2] - 106:6, 106:7
**RICKNER** [56] - 2:4, 2:9, 5:21, 6:6, 7:7, 7:13, 7:19, 7:24, 8:5, 8:10, 16:4, 16:13, 18:18, 18:21, 33:3, 33:8, 33:12, 45:5, 45:9, 46:13, 47:5, 47:16, 48:7, 52:12, 52:17, 52:23, 53:7, 57:21, 58:13, 58:20, 58:25, 59:4, 63:23, 64:3, 67:14, 67:19, 68:16, 73:11, 74:20, 74:24, 81:19, 81:25, 82:21, 84:13, 85:18, 87:12, 88:10, 90:4, 90:14, 92:7, 95:8, 100:11, 100:18, 101:5, 101:18, 102:2
**riding** [1] - 56:10
**RIGA** [1] - 1:11
**Riga** [8] - 13:5, 13:8, 32:6, 32:10, 36:5, 36:12, 43:23, 70:10
**right** [27] - 7:23, 15:17, 24:24, 26:14, 33:12, 44:19, 48:10, 48:19, 52:10, 60:10, 66:10, 68:9, 68:14, 70:19,

71:23, 76:7, 77:18, 78:14, 78:17, 81:22, 85:7, 85:12, 90:4, 90:23, 96:22, 97:15, 98:18

**right-hand** [1] - 66:10
**ring** [1] - 86:20
**rip** [1] - 40:15
**ripped** [1] - 40:18
**ROB** [1] - 2:9
**Rob** [1] - 101:25
**Robert** [1] - 12:11
**ROBERT** [1] - 1:10
**role** [1] - 71:6
**room** [2] - 5:5, 65:15
**Room** [1] - 3:8
**roughly** [3] - 28:2, 33:20, 86:13
**RPR** [1] - 105:23
**rules** [1] - 6:13
**run** [1] - 100:2
**Russell** [1] - 35:16

## S

**said** [9] - 8:25, 18:10, 42:8, 81:10, 82:17, 93:18, 93:24, 94:3
**salary** [2] - 29:6, 29:8
**salary-wise** [1] - 29:8
**same** [9] - 11:21, 12:3, 29:9, 48:3, 77:12, 85:14, 86:13, 98:24, 99:4
**say** [84] - 6:22, 7:5, 9:8, 9:18, 13:10, 13:22, 16:18, 17:2, 20:6, 20:21, 23:22, 24:8, 24:19, 25:9, 25:18, 25:21, 26:6, 26:9, 26:16, 28:8, 28:21, 29:14, 29:16, 30:2, 31:23, 33:19, 33:25, 34:8, 35:11, 35:22, 36:8, 38:5, 40:20, 41:13, 49:11, 50:10, 50:19, 50:25, 51:18, 52:9, 54:2, 55:10, 56:12, 58:11, 61:9, 63:18, 64:14, 65:5, 65:19, 66:4, 66:20, 68:2, 69:21, 70:9, 70:12, 70:20, 73:21, 75:6, 75:14, 75:19, 76:21, 78:10, 78:12, 79:9, 80:11, 83:6, 84:19, 85:2, 85:5, 85:8, 87:20, 88:7, 88:22, 90:21, 93:22, 94:10, 95:10, 96:13, 96:16, 97:21, 99:21, 101:8, 101:14, 101:20
**saying** [2] - 33:15, 70:16
**scene** [6] - 40:23, 70:23, 70:24, 70:25, 71:5, 71:9
**school** [2] - 13:15, 13:16
**screen** [2] - 45:12, 102:4
**sealing** [1] - 4:14
**second** [8] - 32:6, 62:2, 68:17, 72:9, 75:18, 81:18,

98:4, 101:22

**section** [2] - 89:4, 94:23
**sections** [1] - 88:23
**secure** [1] - 29:18
**see** [23] - 7:17, 18:18, 42:11, 45:2, 60:12, 65:18, 69:9, 72:11, 79:22, 79:25, 80:5, 81:16, 81:20, 83:12, 84:17, 92:14, 92:25, 94:15, 94:24, 95:15, 96:8, 96:10, 100:2
**seeing** [2] - 81:6, 81:14
**seminars** [3] - 20:22, 21:4, 21:7
**sent** [5] - 10:13, 10:24, 11:2, 25:16, 42:6
**Sentiff** [2] - 68:13, 68:14
**separate** [1] - 61:20
**sequence** [1] - 88:11
**Sergeant** [1] - 48:13
**set** [4] - 67:3, 78:9, 78:10, 105:12
**sets** [1] - 52:5
**several** [3] - 41:20, 42:4, 42:9
**share** [1] - 45:12
**shared** [2] - 45:17, 70:3
**she** [19] - 37:22, 50:8, 50:14, 63:16, 65:14, 66:2, 66:4, 67:12, 72:22, 72:23, 73:5, 74:4, 87:6, 87:16, 87:24, 88:4, 94:3, 97:21, 97:22
**sheet** [5] - 15:13, 61:11, 61:18, 74:21, 75:10
**sheets** [3] - 98:16, 99:8, 99:10
**Sheriff's** [1] - 14:13
**shift** [9] - 29:23, 30:5, 30:16, 30:17, 30:21, 30:22, 30:23
**shifts** [1] - 30:12
**shooting** [2] - 57:15, 57:18
**short** [1] - 13:18
**shortly** [1] - 38:20
**shot** [2] - 60:7, 76:2
**shots** [2] - 61:25, 80:25
**should** [2] - 85:5, 85:11
**shouldn't** [1] - 71:20
**show** [3] - 15:14, 60:23, 93:11
**showed** [9] - 63:10, 64:16, 64:23, 65:7, 67:10, 84:20, 84:24, 85:3, 93:14
**showing** [2] - 65:2, 83:19
**shown** [4] - 63:13, 64:13, 66:7, 85:15
**shows** [2] - 61:22, 75:15
**signature** [2] - 75:19, 88:23
**signed** [1] - 4:10
**significance** [1] - 89:6

**similar** [2] - 68:23, 86:14
**since** [3] - 9:5, 13:12, 34:12
**single** [1] - 99:23
**sit** [2] - 39:16, 73:23
**sitting** [1] - 61:10
**six** [2] - 15:13, 20:4
**size** [2] - 39:25, 40:2
**skip** [1] - 74:18
**slices** [1] - 61:3
**slightly** [3] - 42:22, 61:14, 95:9
**slip** [1] - 61:4
**slot** [1] - 63:6
**slots** [1] - 78:21
**small** [1] - 70:12
**smaller** [3] - 40:3, 40:4, 86:23
**smarter** [1] - 46:17
**snatchings** [1] - 28:5
**so-called** [1] - 70:4
**some** [23] - 6:13, 14:24, 16:19, 19:12, 23:2, 24:22, 28:14, 33:25, 35:22, 36:15, 36:25, 44:20, 45:18, 46:23, 49:7, 56:14, 60:7, 62:5, 62:6, 83:7, 89:21, 93:23, 99:10
**somebody** [12] - 23:21, 31:6, 31:24, 35:3, 35:15, 35:20, 36:22, 37:13, 62:11, 69:16, 73:17, 93:24
**somehow** [1] - 46:23
**someone** [1] - 50:11
**someplace** [2] - 39:8, 81:13
**something** [6] - 20:5, 36:17, 41:19, 65:20, 70:7, 81:5
**sometime** [1] - 9:4
**sometimes** [3] - 44:17, 54:3, 99:7
**somewhere** [2] - 17:4, 39:13
**sorry** [7] - 18:16, 32:25, 33:13, 48:10, 69:6, 81:18, 93:19
**sort** [7] - 14:24, 16:16, 16:19, 19:12, 36:15, 60:24, 99:13
**sound** [1] - 39:24
**source** [1] - 84:14
**speaking** [1] - 51:4
**specific** [4] - 27:9, 31:11, 83:12, 84:23
**specifically** [4] - 16:5, 16:13, 50:25, 51:2
**specify** [1] - 70:21
**spent** [1] - 95:10
**spot** [1] - 98:24
**Spread** [4] - 59:10, 74:25, 106:17, 107:11
**squad** [7] - 13:11, 26:22, 26:23, 27:6, 27:10, 27:17,

118

30:13
**Square** [1] - 3:7
**ss** [1] - 105:4
**STAMBACH** [1] - 1:8
**Stambach** [3] - 11:17, 11:20, 26:11
**stamp** [4] - 57:23, 58:4, 67:17, 85:21
**stamped** [1] - 67:16
**stand** [1] - 95:19
**standard** [1] - 89:15
**stands** [1] - 74:14
**staple** [1] - 62:7
**start** [3] - 28:17, 37:13, 66:21
**started** [4] - 16:19, 18:15, 18:23, 92:20
**starting** [1] - 41:3
**STATE** [1] - 105:3
**State** [2] - 1:20, 105:9
**statement** [4] - 34:21, 37:8, 44:19, 44:23
**statements** [2] - 6:23, 52:4
**STATES** [1] - 1:2
**stating** [2] - 5:19, 57:15
**step** [1] - 75:17
**STEPHANIE** [1] - 3:14
**steps** [2] - 65:8, 70:7
**still** [3] - 8:16, 50:7, 95:22
**STIPULATED** [3] - 4:4, 4:9, 4:13
**STIPULATIONS** [1] - 4:2
**stop** [3] - 55:18, 55:23, 84:13
**stopped** [3] - 17:25, 55:18, 68:10
**store** [1] - 39:8
**stored** [3] - 37:10, 44:2, 49:20
**storing** [1] - 39:21
**street** [1] - 40:20
**Street** [2] - 2:6, 98:3
**structure** [1] - 19:10
**stupid** [1] - 39:24
**submit** [4] - 23:17, 44:11, 44:13, 49:8
**submitted** [3] - 23:15, 23:16, 44:12
**subscribe** [1] - 96:3
**Subscribed** [1] - 104:13
**substance** [1] - 44:24
**sufficient** [1] - 65:16
**suitable** [1] - 76:13
**Suite** [1] - 2:7
**sum** [1] - 44:24
**superior** [5] - 31:25, 32:13, 36:11, 71:23, 72:3
**supervisors** [1] - 70:13
**suspect** [5] - 23:16, 41:9, 41:11, 55:11, 72:23
**sworn** [4] - 4:10, 6:4,

104:13, 105:13

### T

**tavern** [2] - 90:20, 90:21
**tear** [1] - 99:8
**technician** [4] - 37:21, 37:24, 48:24, 63:16
**technicians** [1] - 38:3
**techniques** [1] - 17:18
**ten** [3] - 31:23, 32:8, 32:12
**term** [2] - 21:11, 36:7
**terminology** [1] - 71:13
**terms** [1] - 16:2
**testified** [4] - 6:4, 9:9, 9:11, 9:14
**testifying** [2] - 92:21, 101:6
**testimony** [12] - 8:23, 92:9, 92:11, 92:17, 92:24, 95:2, 95:11, 95:16, 95:19, 101:10, 105:14, 107:20
**THE** [9] - 1:7, 5:2, 21:13, 30:14, 39:19, 71:17, 77:23, 92:22, 93:6
**themselves** [1] - 73:18
**therefore** [1] - 70:13
**thinking** [1] - 101:10
**three** [9] - 30:3, 30:7, 40:5, 48:25, 49:5, 86:20, 98:13, 98:17, 101:7
**three-ring** [1] - 86:20
**throughout** [1] - 97:5
**throw** [1] - 54:19
**timing** [1] - 90:9
**title** [2] - 16:22, 46:9
**today** [6] - 8:23, 9:24, 92:20, 95:20, 101:11, 101:16
**together** [6] - 26:20, 27:3, 49:21, 67:8, 69:12, 76:22
**Tomika** [24] - 35:8, 35:24, 38:17, 40:19, 41:5, 41:17, 41:21, 42:3, 42:12, 42:14, 42:15, 42:16, 42:18, 42:24, 43:2, 43:5, 49:17, 56:13, 57:12, 69:24, 72:14, 77:17, 78:3, 91:19
**took** [4] - 40:20, 43:21, 54:12, 71:4
**top** [5] - 31:22, 59:21, 62:16, 66:10, 75:25
**total** [1] - 31:21
**tour** [1] - 46:4
**track** [1] - 44:3
**traffic** [2] - 55:18, 55:23
**trained** [2] - 25:25, 26:4
**training** [17] - 14:24, 15:5, 15:11, 15:18, 16:3, 16:7, 16:16, 17:8, 17:13, 17:17, 17:20, 18:25, 19:7, 19:10, 19:13, 20:4, 22:23

**transcript** [5] - 6:16, 6:21, 94:5, 94:7, 94:11
**transcripts** [1] - 47:13
**trial** [5] - 4:8, 34:2, 34:5, 34:9, 92:11
**Trial** [1] - 107:20
**trick** [2] - 81:4, 81:10
**true** [1] - 105:14
**truth** [3] - 101:15, 101:16
**truthful** [1] - 8:22
**try** [1] - 15:17
**trying** [1] - 57:7
**turn** [5] - 17:21, 21:20, 40:11, 54:24, 63:15
**turned** [4] - 15:21, 22:12, 37:20, 48:23
**two** [15] - 13:19, 30:15, 30:19, 32:13, 38:20, 41:25, 45:13, 49:16, 52:24, 55:17, 57:22, 61:20, 62:4, 73:19, 80:11
**type** [2] - 19:19, 54:14
**typed** [1] - 82:9
**typewriter** [2] - 53:13, 54:6
**typewriters** [2] - 53:15, 53:19
**typically** [2] - 66:6, 80:22

### U

**ultimately** [6] - 15:21, 22:12, 29:18, 35:6, 78:19, 94:12
**um** [1] - 69:3
**um-hums** [1] - 69:3
**unclear** [1] - 58:8
**undated** [2] - 67:17, 67:20
**under** [1] - 81:2
**understand** [6] - 6:25, 9:19, 21:19, 22:9, 87:11, 97:7
**understanding** [1] - 7:8
**unfortunately** [1] - 33:21
**unit** [22] - 26:23, 27:11, 28:12, 28:15, 28:18, 28:22, 28:25, 29:5, 29:18, 29:23, 31:12, 31:17, 32:2, 32:9, 34:6, 37:2, 53:16, 56:18, 61:24, 78:7, 98:2, 99:22
**Unit** [1] - 43:14
**UNITED** [1] - 1:2
**unpause** [1] - 7:21
**up** [14] - 8:11, 25:16, 37:8, 37:10, 54:15, 56:22, 65:17, 67:3, 72:17, 78:10, 82:9, 92:8, 99:23
**upper** [1] - 48:15

### V

**vague** [2] - 6:22, 43:12

**vaguely** [1] - 51:5
**verbally** [1] - 6:19
**via** [1] - 45:17
**victim** [2] - 72:19, 73:18
**video** [1] - 7:5
**Videoconference** [1] - 1:16
**vivid** [1] - 41:7

### W

**wait** [1] - 8:16
**waive** [1] - 5:15
**waived** [1] - 4:15
**Wall** [1] - 2:6
**watch** [3] - 19:22, 96:6
**weed** [1] - 24:18
**weeks** [1] - 41:20
**WESTERN** [1] - 1:2
**what's** [1] - 43:17
**whatever** [4] - 37:17, 37:18, 46:5, 71:9
**where** [29] - 8:15, 15:8, 15:12, 19:3, 19:19, 20:24, 24:17, 24:19, 25:12, 27:20, 37:9, 44:22, 49:7, 53:15, 54:21, 55:14, 56:20, 61:3, 66:2, 66:6, 80:22, 81:13, 89:22, 91:19, 94:16, 94:25, 95:14, 97:25, 98:5
**whole** [1] - 101:15
**wide** [1] - 40:6
**widely** [1] - 56:17
**William** [1] - 32:7
**wise** [4] - 26:6, 29:8, 94:21, 98:10
**withdraw** [1] - 66:15
**withdrawn** [12] - 11:4, 17:5, 29:15, 31:10, 32:16, 34:24, 41:2, 54:3, 72:2, 94:16, 96:9, 97:8
**witness** [22] - 6:3, 15:14, 37:8, 44:18, 44:19, 44:22, 45:21, 46:21, 51:12, 52:4, 55:3, 55:7, 55:10, 63:11, 63:14, 64:13, 65:8, 65:13, 66:7, 73:18, 105:11, 105:15
**WITNESS** [8] - 21:13, 30:14, 39:19, 71:17, 77:23, 92:22, 93:6, 106:5
**witnessed** [1] - 65:20
**witnesses** [4] - 42:5, 52:8, 71:3, 89:16
**wondering** [2] - 33:3, 81:5
**word** [1] - 73:9
**wore** [3] - 65:14, 97:22
**work** [8] - 14:2, 18:23, 19:21, 20:14, 35:23, 38:18, 69:16, 71:22
**worked** [10] - 22:17, 23:9, 26:21, 30:7, 31:9, 37:21,

119

38:22, 43:13, 49:25
  **working** [10] - 22:2, 22:6,
28:25, 29:14, 29:17, 31:2,
31:3, 31:19, 34:23, 69:12
  **write** [2] - 37:14, 76:15
  **written** [6] - 25:5, 36:18,
39:8, 44:19, 44:22, 46:20
  **wrote** [3] - 55:19, 86:7, 86:8
  **Wymiko** [1] - 100:9

### Y

  **year** [9] - 13:19, 13:21,
20:4, 27:12, 28:23, 29:11,
32:15, 33:16, 93:11
  **years** [14] - 11:13, 11:21,
12:3, 12:10, 12:16, 12:22,
13:4, 13:9, 14:15, 16:25,
17:6, 17:12, 17:23, 20:7
  **YORK** [3] - 1:2, 105:3,
105:5
  **York** [4] - 1:20, 2:8, 2:15,
105:9
  **yourself** [2] - 27:3, 82:9