# 26-263-cv

# United States Court of Appeals

*for the*

## Second Circuit

———— •• ————

CORY EPPS,

*Plaintiff-Appellee,*

v.

CITY OF BUFFALO, DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA, MARK R. COSTANTINO,
Executor of the Estate of Anthony Costantino,

*Defendants-Appellants,*

DETECTIVE JOHN BOHEN, DETECTIVE REGINALD MINOR, DETECTIVE
ROBERT CHELLA, DETECTIVE RANIERO MASECCHIA, DETECTIVE
CHARLES ARONICA, CHIEF JOSEPH RIGA,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANTS-APPELLANTS

HUGH M. RUSS III
CHEYENNE N. FREELY
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

DAVID J. PANZARELLA
HODGSON RUSS LLP
1800 Bausch & Lomb Place
Rochester, New York 14604
(585) 454-0700

*Attorneys for Defendants-Appellants*

CP COUNSEL PRESS    (800) 4-APPEAL • (390342)

# **TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ...................................................................1

JURISDICTIONAL STATEMENT ...............................................................3

STATEMENT OF THE ISSUES...................................................................4

STATEMENT OF THE CASE .....................................................................5

    The Tomika Means Homicide .................................................................5

    The Defendant Detectives ......................................................................6

        1. Detective John Bohen ....................................................................7

        2. Detective Reginald Minor ..............................................................8

        3. Detective Mark Stambach ..............................................................8

        4. Detective James Giardina ............................................................10

        5. Detective Sergeant Anthony Costantino ........................................10

    Epps's Conviction ..............................................................................11

    Plaintiff's Pre-Sentencing Motion to Vacate His Conviction ....................12

    Post-Conviction Proceedings in 2000 ....................................................13

    Newly Discovered Evidence Leads to the Reversal of
Plaintiff's Conviction .........................................................................14

    Procedural History .............................................................................16

    The Amended Report and Recommendation .............................................16

**TABLE OF CONTENTS - cont'd**

<u>PAGE</u>

The District Court's Decision ...................................................................17

SUMMARY OF THE ARGUMENT ......................................................19

STANDARD OF REVIEW ....................................................................20

ARGUMENT .........................................................................................20

POINT I.   AS A MATTER OF LAW, PLAINTIFF CANNOT
ESTABLISH A *BRADY* VIOLATION .............................................22

    A.   The Defendant Detectives Did Not Intentionally
Withhold Anderson's Alleged Statement. .................................23

    B.   Anderson's Alleged Statement Is Not Material. ........................24

POINT II.   THE DEFENDANT DETECTIVES ARE ENTITLED TO
QUALIFIED IMMUNITY .................................................................30

    A.   The Defendant Detectives Did Not Violate Any Clearly
Established Rights. .....................................................................31

        1.   There was no clearly established right to the
disclosure of inadmissible evidence in 1998. ..................31

        2.   The *Walker* case is insufficient to clearly establish
a right to disclosure of Anderson's Alleged
Statement. ........................................................................34

    B.   The Defendant Detectives' Conduct Was Objectively
Reasonable. ...............................................................................40

CONCLUSION.......................................................................................43

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................3

*Brady v. Maryland,*
373 U.S. 83 (1963)........................................................... 17, 22

*City & Cnty. of San Francisco, Calif. v. Sheehan,*
575 U.S. 600 (2015)..........................................................39

*Clark v. Valletta,*
157 F.4th 201 (2d Cir. 2025) ...................................... passim

*Coggins v. Buonora,*
776 F.3d 108 (2d Cir. 2013) ...........................................43

*Cowan ex rel. Est. of Cooper v. Breen,*
352 F.3d 756 (2d Cir. 2003) .............................................4

*Cuoco v. Moritsugu,*
222 F.3d 99 (2d Cir. 2000) ...............................................3

*D.C. v. Wesby,*
583 U.S. 48 (2018)...........................................................35

*Downs v. Hoyt,*
232 F.3d 1031 (9th Cir. 2000) ........................................27

*Fappiano v. City of New York,*
640 F. App'x 115 (2d Cir. 2016) ....................................23

*Horn v. Stephenson,*
11 F.4th 163 (2d Cir. 2021) ............................................36

*Jin v. City of New York,*
169 F.4th 373 (2d Cir. 2026) ............................................4

*Kinzer v. Jackson,*
316 F.3d 139 (2d Cir. 2003) ...........................................20

# TABLE OF AUTHORITIES - cont'd

PAGE

*Kisela v. Hughes*,
584 U.S. 100 (2018)................................................................. 33, 35

*Kyles v. Whitely*,
514 U.S. 419 (1995).................................................................. 25, 26

*Luna v. Pico*,
356 F.3d 481 (2d Cir. 2004) ..................................................... 31, 42

*Malley v. Briggs*,
475 U.S. 335 (1986).........................................................................40

*Matusak v. Daminski*,
165 F.4th 702 (2d Cir. 2026) ....................................... 34, 37, 39, 41

*McGhee v. Annucci*,
2024 WL 36998 (S.D.N.Y. Jan. 3, 2024) ......................................27

*Montgomery v. Wood*,
727 F. Supp. 2d 171 (W.D.N.Y. 2010)...........................................28

*Montgomery v. Woods*,
2007 WL 9200020 (W.D.N.Y. Oct. 19, 2007) ......................... 28, 32

*Mullenix v. Luna*,
577 U.S. 7 (2015)............................................................................35

*Nat'l Rifle Ass'n of Am. v. Vullo*,
144 F.4th 376 (2d Cir. 2025) ................................................... passim

*Nnodimele v. Derienzo*,
2016 WL 3561708 (E.D.N.Y. June 27, 2016)................................23

*Proventud v. City of New York*,
750 F.3d 121 (2d Cir. 2014) ..........................................................29

*Reid v. Simmons*,
163 F. Supp. 2d 81 (D.N.H 2001)............................................ 24, 40

*Salim v. Proulx*,
93 F.3d 86 (2d Cir. 1996) ................................................................4

## TABLE OF AUTHORITIES - cont'd

PAGE

*Saucier v. Katz*,
533 U.S. 194 (2001)..................................................................40

*Savino v. City of N.Y.*,
331 F.3d 63 (2d Cir. 2003) .......................................................20

*Strickler v. Greene*,
527 U.S. 263 (1999)............................................................ passim

*U.S. v. Arillotta*,
529 F. App'x 81 (2d Cir. 2013) ................................................29

*U.S. v. Coppa*,
267 F.3d 132 (2d Cir. 2001) .....................................................29

*U.S. v. Murphy*,
2024 WL 3264127 (2d Cir. July 2, 2024)..................................26

*U.S. v. Gil*,
297 F.3d 93 (2d Cir. 2002) ........................................ 18, 26, 27, 33

*U.S. v. Polisi*,
416 F.2d 573 (2d Cir. 1969) .....................................................19

*U.S. v. Santos*,
2010 WL 2985913 (E.D.N.Y. July 27, 2010)............................27

*U.S. v. Wilson*,
2017 WL 1456984 (W.D.N.Y. Apr. 25, 2017)............................27

*Valentin v. City of Rochester*,
2018 WL 5281799 (W.D.N.Y. Oct. 24, 2018) ...................... 20, 23

*Walker v. City of New York*,
974 F.2d 293 (2d Cir. 1992) ...................................... 34, 35, 36, 41

*Wood v. Bartholomew*,
516 U.S. 1 (1995)........................................................... 27, 32

*Wood v. Clemons*,
89 F.3d 922 (1st Cir. 1996)......................................................40

## TABLE OF AUTHORITIES - cont'd

PAGE

**Statutes**

28 U.S.C. § 636(b)(1)(B) ...............................................................16

28 U.S.C. § 636(b)(1)(C) ...............................................................16

28 U.S.C. § 1291 ............................................................................3

28 U.S.C. § 1292(b) ........................................................................3

28 U.S.C. § 1331 ............................................................................3

42 U.S.C. § 1983................................................................ 6, 16, 17, 23

**Rules & Regulations**

Fed. R. Civ. P. 56 ...........................................................................3

Fed. R. Evid. 801 ..........................................................................21

## PRELIMINARY STATEMENT

Qualified immunity is no immunity at all where, as here, law enforcement officers are held to standards that were not clearly established at the time of the challenged conduct. In his Amended Report and Recommendation, Magistrate Judge Foschio recognized this reality. Judge Foschio was correct in recommending that the Defendants be entitled to qualified immunity, but the District Court erred when it disagreed with him. The District Court denied qualified immunity for the Defendant Detectives based on generalized proclamations of not closely related law that would have failed to put officers on notice of their *Brady* obligations in 1998. Put simply, the District Court's holding deprives the Defendant Detectives of the immunity which they are entitled to receive. The Defendants respectfully request that this Court remedy this deprivation, reverse the District Court's qualified immunity decision, and hold that the Defendant Detectives are entitled to qualified immunity for Plaintiff's pre-trial due process claim.

In April of 1998, Plaintiff Cory Epps was tried and convicted of the 1997 murder of Tomika Means. The "*Brady* evidence" upon which Epps relies is not *Brady* evidence at all. As recognized by Judge Foschio, the written statement, signed by Wymiko Anderson and gathered in the context of a separate murder

1

investigation, does not mention Epps or Means.  Moreover, the allegedly exculpatory comments implicating an alternate suspect in the Means murder were not recorded in Anderson's Signed Statement or in the Defendant Detectives' notes.  And, there is no showing that Defendants intentionally withheld or failed to preserve *Brady* evidence.

Even if this Court were to determine that Defendants violated their *Brady* obligations, they would still be entitled to qualified immunity.  This Court must recognize, the "clearly established right" the District Court referenced in withholding qualified immunity was merely the general proposition that police officers should turn over *Brady* materials to satisfy their obligations.  This general rule hardly put officers in 1998 on fair notice of their obligations under the unique facts of this case.  Under the circumstances the Defendant Detectives faced, in 1998, there was no clearly established right that mandated there be a violation of *Brady* where officers inadvertently fail to turn over inadmissible "evidence" learned in the context of a separate investigation.  With this greater understanding of the context, the District Court's determination regarding the existence of a *Brady* violation and the inapplicability of qualified immunity must be reversed.

## JURISDICTIONAL STATEMENT

The complaint in this action asserts several claims under federal law, including violations of the Fourth, Fifth, and Fourteenth Amendments. *See* A-17-43. As such, the District Court for the Western District of New York and the United States Court of Appeals Second Circuit have federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

In this appeal, the City challenges a final Decision and Order issued by the Honorable Lawrence J. Vilardo. Judge Vilardo's Decision and Order granted in part and denied in part the City's motion for summary judgment brought pursuant to Fed. R. Civ. P. 56, and thereby reinstated a cause of action based on *Brady*. *See generally* SPA 1-26. Because the City appeals from a decision denying the application of qualified immunity, and since the City's appeal turns on an issue of law, this Court has jurisdiction over this matter under 28 U.S.C. §§ 1291 and 1292(b). *See Cuoco v. Moritsugu*, 222 F.3d 99, 105-106 (2d Cir. 2000); *Ashcroft v. Iqbal*, 556 U.S. 662, 672-673 (2009).

Moreover, "under the 'collateral order doctrine,' [the Court] may review on an interlocutory basis a denial of summary judgment based on qualified immunity if it may be resolved 'on stipulated facts, or on the facts that the plaintiff

alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find.'" *Jin v. City of New York*, 169 F.4th 373, 379 (2d Cir. 2026) (quoting *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996)). "[E]ven where the district court rules that material disputes of fact preclude summary judgment on qualified immunity, [the Court] may still exercise interlocutory jurisdiction if the defendant contests the existence of a dispute or the materiality thereof, or contends that he is entitled to qualified immunity even under plaintiff's version of the facts." *Id.* (quoting *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003)).

Judge Vilardo's Decision and Order was entered on January 16, 2026. *See* SPA 1-26. The City timely filed a Notice of Interlocutory Appeal of Judge Vilardo's Decision and Order on February 5, 2026, under Rule 4 of the Federal Rules of Appellate Procedure, as it was filed within thirty days of Judge Vilardo's Decision and Order. *See* A-3279.

**STATEMENT OF THE ISSUES**

I.   Given the *Brady* standard applicable in 1998, and since Anderson's alleged exculpatory statement could neither be confirmed nor used to aid Epps's defense, did the District Court err in holding that the Defendant Detectives

4

committed a *Brady* violation when they inadvertently failed to preserve and turn over the alleged exculpatory statement?

II.    Law enforcement officers are entitled to qualified immunity if they did not violate clearly established law or it was objectively reasonable for them to believe that they were not violating clearly established law.  For a right to be clearly established under the qualified immunity analysis, it must be sufficiently particularized and firmly settled.  Under these circumstances and because no reasonable person would have believed that Anderson's alleged exculpatory statement had to be disclosed, did the District Court err when it held that the Defendant Detectives are not entitled to qualified immunity on Epps's pre-trial due process claim?

## STATEMENT OF THE CASE

### The Tomika Means Homicide

In the early morning hours of May 26, 1997, a then-unidentified perpetrator murdered Tomika Means in a road rage incident in the City of Buffalo.  A-801-812.  Jaqueline Bradley was in the passenger seat of the car with Means when she was shot.  *See id.*  Bradley was the only eyewitness to the murder.  *See id.*

The next day, Bradley worked with the Buffalo Police Homicide Squad and the Town of Tonawanda Police Department to create a sketch of the suspect using an "identikit." *See* A-1681. Bradley agreed that the sketch they created (the "composite sketch") looked like the suspect. A-815-816.

**The Defendant Detectives**[1]

The limited investigative activities of each Defendant Detective are detailed below:

---

[1] In the Complaint, Epps asserted three causes of action against City of Buffalo Detectives John Bohen, Reginald Minor, Mark Stambach, James Giardina, Anthony Costantino, Robert Chella, Raniero Masecchia, Charles Aronica, and City of Buffalo Police Chief Joseph Riga (the "Individual Defendants") (first, second, and fourth causes of action) and two causes of action against the Individual Defendants and the City of Buffalo (third and fifth causes of action). *See* A-37-42. At oral argument on April 28, 2025, Epps agreed to voluntarily dismiss his claims against Detectives Chella, Masecchia, Aronica, and Riga. *See* A-3262. The District Court granted summary judgment for the remaining Defendants as to Epps's third and fourth causes of action for malicious prosecution under New York State law and 42 U.S.C. § 1983, respectively. *See* A-3276-3277. The District Court further entered summary judgment in favor Bohen, Minor, Stambach, Giardina, and Costantino as to Epps's second cause of action regarding post-trial due process. *See* A-3272-3273.

Accordingly, Epps's first cause of action against Defendants Bohen, Minor, Stambach, Giardina and Costantino (the "Defendant Detectives") and Epps's Fifth Cause of Action alleging a violation of the New York State Constitution against the City of Buffalo have been reinstated, and these Defendants remain and serve as Defendants-Appellants in the instant appeal.

6

### 1. Detective John Bohen

Detective Bohen used the composite sketch to create a six-person photo array. *See* A-1092. This first photo array contained a mug shot of Donald Faison—whom the BPD had some suspicion of—but not Epps. *See* A-185-186, 189-190. On June 25, 1997, Detectives Bohen and Minor went to Bradley's home to show her the first photo array. *See* A-185, 190-193. Bradley did not identify any of the photos as the suspect. *See* A-1114.

The following day, Detective Bohen received a call from the victim's aunt, Linda Means, who stated that she saw the composite sketch on the local news and that it resembled Epps. *See* A-198-200, 1115. Based on this, on July 3, 1997, Detectives Bohen and Juan Morales created a second photo array containing Epps's mug shot and those of five non-suspects who fit the suspect's description. *See* A-1095, 2544-2552. On July 6, 1997, Detectives Bohen and Minor showed Bradley the second photo array. *See* A-209-210, 986-987, 1098-1099, 2553. Bradley identified Epps's photo as the suspect in the second photo array. *See id.* Bradley identified Epps as the shooter confidently and without qualification. *See* A-21, 1095, 1097, 1118. Bohen did not suggest to Bradley that she should pick Epps's photo. *See* A-1118. Nor did Bohen tell Bradley that the perpetrator's photo would be in the array. *See* A-988-989. Bohen simply asked Bradley to look at the array, to take her

time, and to let him know if she recognized any of the photographs shown in the photo array. *See* A-988-989. Bradley signed the back of the second photo array and an affidavit indicating that she had identified Epps as the suspect. *See* A-211, 2544-2552, 2022-2024. Bradley also signed a Buffalo Police Photo Array Identification Affidavit, which stated that on July 6, 1997 she selected Epps's photo in the second photo array and "positively identif[ied] the person in the photograph as being the one that [she] saw shoot Tomika Means on 5/26/1997." *See* A-1097, 2555.

### 2. Detective Reginald Minor

Detective Minor's only pertinent investigative activities involved his presence with Bohen when Bradley was shown the first and second photo arrays. *See* A-988, 2555. Minor was not involved in any other investigative activity that led to Epps's arrest and prosecution.

### 3. Detective Mark Stambach

Detective Stambach did not investigate the Means homicide. *See* A-352. He played no role in gathering any evidence which was the basis for Epps's arrest or prosecution. *See* A-352. The only arguably relevant involvement Stambach has in this case stems from his interview of Wymiko "Pumpkin" Anderson on April 17, 1998 as part of his investigation into the murder of Paul Pope. *See* A-352, 357-

8

367. The interview occurred almost a year after the Means homicide, many months after Epps was indicted, and only days before Epps's trial was scheduled to begin. *See* A-358, A-801-812. Detectives Stambach and Giardina interviewed Anderson, because she was Pope's girlfriend and the mother of his children. *See* A-359. They believed Anderson had pertinent information regarding Pope's murder. *See* A-685.

During this interview, Anderson informed Stambach that she suspected Russell Montgomery murdered Pope. *See* A-699-702. Stambach prepared a statement from Anderson's interview, which provides that it was made in connection with the Pope murder. *See* A-1107-1108. Anderson signed the Statement ("Anderson's Signed Statement"). *See id.*

Two years later, in an affidavit dated April 29, 2000, Anderson claimed that, during that 1998 interview, she told Stambach that Montgomery resembled the composite sketch created in connection with the Means investigation, which had been broadcast on the news and featured in local newspapers. *See* A-700-701. Anderson also claimed that she told Stambach that the morning of the Means murder, Montgomery, who was a drug dealing associate of Pope's, came to get Pope from the home where he was staying with Anderson. *See* A-701, 894-897. Anderson claims that when Pope returned, he told her that Montgomery had confessed to Pope

9

that he had killed Means (collectively referred to herein as "Anderson's Alleged Statement"). *See* A-894-897. Anderson's Signed Statement does not mention the Means murder whatsoever. *See* A-1107-1108. Anderson alleges that Stambach did not write down this part of her statement, and that this information was omitted from her Signed Statement given in connection with the Pope homicide. *See* A-702, 901-903. Detective Stambach denies Anderson's allegations. A-935:4-13.

**4.     Detective James Giardina**

Detective Giardina did not investigate the Means murder, either. *See* A-441-442. He did not gather any evidence that served as the basis for Epps's arrest or prosecution. *See id.* Detective Giardina's only involvement in this action is that he was present with Detective Stambach during Anderson's April 1, 1998 interview. *See* A-440. Detective Giardina also denies Anderson's account. A-1071.

**5.     Detective Sergeant Anthony Costantino**

Detective Costantino played an active role in the Means murder investigation. Though Costantino was not present during the photo arrays, he was present when Bradley worked with detectives to create the composite sketch. *See* A-568, 587, 597, 649. He was also present during the in-person lineup where

Bradley identified Epps. A-600:14-601:9. During this lineup, seeing Epps in person caused such an emotional response from Bradley that she began to sob. A-1013:3-13. The ADA present at the lineup described Bradley's identification as the most "sure and chilling" identification she had ever seen a witness make. A-1061.

After Epps was convicted, Costantino participated in interviews with Anderson. *See* A-639-642. During Epps's post-conviction proceedings, Costantino testified that he was not present when Anderson allegedly told detectives that Montgomery admitted to the Means murder. A-965:15-23. In testimony given in connection with this action, Costantino subsequently testified that he was present during Anderson's April 17 interview. A-638:23-639:7.

**Epps's Conviction**

Epps's trial began on April 20, 1998, a few days after Anderson's Alleged Statement. *See* A-85. At trial, Bradley identified Epps as the man who shot Means. *See* A-822. Bradley relayed the facts of the murder and her identification of Epps during the in-person line up. *See generally* A-792-846. No testimony or other evidence was elicited regarding any photo identification procedures employed by detectives or officers prior to the in-person lineup. *See generally id.*

11

Epps introduced evidence that, on the morning of Mean's murder, he went to a Perkins restaurant on Maple Road to eat breakfast with his girlfriend, Jerriah Johnson. *See* A-27-28. Johnson testified that she paged Epps between 4:00 and 4:30 a.m., he called her back from a pay phone shortly thereafter, and he arrived at her home approximately 5 minutes later. *See* A- 1523-1525, 1545-1555. She and Epps then traveled to the Perkins restaurant, arrived at approximately 4:45 a.m., and placed an order at approximately 5:01 a.m. *See* A-1550-1553. Johson specifically recalled that Epps wanted to order the brownie at the Perkins restaurant, which he had seen in the restaurant's display case earlier that week. *See* A-1524. The receipt from Johnson and Epps's visit to Perkins was admitted into evidence, which showed that that an order for a "Mega Omelet" meal and a brownie were paid for at 5:30 A.M. on May 26, 1997. A-1517:8-268:8. Epps introduced the receipt from their Perkins visit as alibi evidence at trial. A-266:8-268:8. Despite this, and based in part on Bradley's testimony, a jury convicted Epps of Means's murder on April 24, 1998. A-86.

**Plaintiff's Pre-Sentencing Motion to Vacate His Conviction**

After Epps was convicted but before he was sentenced, Anderson wrote an anonymous letter to Epps's trial counsel, Andrew Lotempio, Esq. *See* A-1109-1110. The letter mentioned that she suspected that Montgomery was the true

12

perpetrator of the Means homicide, but she did not mention Pope or her Alleged Statement to the Buffalo Police Department. *See id.*

Based on the anonymous letter, Lotempio moved to vacate Epps's conviction pursuant to New York Criminal Procedure Law 330. *See* A-1079. Acting New York Supreme Court Justice Joseph McCarthy denied the motion, in part, because the letter contained no admissible evidence. *See* A-1088. The assistant district attorney who served as first chair in Epps's criminal trial, Lawrence Schwegler, later became aware that Anderson may have been the author of the anonymous letter. *See* A-967-968. There is no evidence that any Defendant-Appellant knew that Anderson was the author of the letter at that time or actively tried to keep this information hidden from ADA Schwegler. *See id.*

**Post-Conviction Proceedings in 2000**

In 2000, Epps's new counsel, David Cotter, Esq., learned Anderson's identity and what Anderson claimed she had told detectives days before Epps's trial—namely that Pope had told her that Montgomery admitted to killing Means. *See* A-1063-1065. Based on Anderson's Alleged Statement, Cotter filed another motion under New York Criminal Procedure Law 440 to vacate Epps's conviction. Cotter alleged that detectives withheld *Brady* material—Anderson's Alleged

13

Statement—which demonstrated his innocence. *See* A-1078-1090. Justice McCarthy denied the motion, in part, because the purported new evidence was inadmissible, double hearsay. *See* A-1086-1090.

To consider the claim that *Brady* evidence had been withheld, Justice McCarthy ordered a hearing. *See id.* After hearing testimony from Anderson and Detectives Costantino, Stambach, Giardina, and Masecchia, Justice McCarthy found no *Brady* violation. *See id.* Justice McCarthy found the testimony of the detectives was consistent and credible. *See* A-1089-1090. These detectives testified consistently that Anderson had never relayed the double hearsay evidence to them prior to Epps's trial. *See id.* On the contrary, Justice McCarthy found that Anderson's testimony, taken together with the claims she presented in her anonymous letter, were neither consistent nor credible. *See* A-1087-1089. Making these findings, Justice McCarthy denied the motion to vacate Epps's conviction. *See* A-1087-1088.

**Newly Discovered Evidence Leads to the Reversal of Plaintiff's Conviction**

Over a decade after Epps was convicted, a new witness, never previously known to the BPD, contacted one of Epps's relatives. To protect their identity, this witness has been referred to as "Witness 1" throughout these

14

proceedings. Eventually, based on an affidavit submitted by Witness 1 in 2014 and testimony given in 2017, Epps succeeded in having his conviction overturned with the discovery of previously unavailable evidence. *See* A-1119.

Based on information given by Witness 1, Joseph Riga, who was acting in his capacity as an investigator for the Erie County District Attorney's Office, concluded that Russell Montgomery may have been responsible for the Means homicide as opposed to Epps. *See* A-1182-1190. Investigator Riga based his determination on his finding that Witness 1 was credible. *See* A-1188. In fact, in conducting a re-investigation on behalf of the District Attorney's Office, Investigator Riga found that Witness 1 was far more credible than Anderson, and that the two accounts given by these witnesses were not consistent with each other. *See* A-1182-1190. The District Attorney's Office did not oppose a subsequent New York Criminal Procedure Law 440 motion brought by Epps in 2017. *See* A-1216-1217. This motion was based on the sworn affidavit and testimony of Witness 1, and not on the account Anderson gave years prior. *See id.* Epps's unopposed motion was granted, and his conviction was overturned. *See id.* In his Decision and Order, Judge Vilardo focused on this new evidence, even though it was not available in 1998.

15

**Procedural History**

On March 1, 2019, Epps initiated this action alleging pre-trial due process and *Brady* claims, post-trial due process claims, a malicious prosecution claim under 42 U.S.C. § 1983, state law malicious prosecution claims, and due process claims under the New York State Constitution. *See* A-17-43.

On May 2, 2019, United States District Judge Lawrence J. Vilardo referred all pretrial matters to United States Magistrate Judge Leslie G. Foschio. *See* A-6. On August 18, 2021, Judge Vilardo ordered, in relevant part, that Judge Foschio shall "hear and report upon dispositive motions for the consideration of the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C)." A-8. On October 7, 2022, Defendants moved for summary judgment. A-66-1271. Epps filed his opposition on December 22, 2022. A-1272-2949.

**The Amended Report and Recommendation**

On May 11, 2023, Magistrate Judge Foschio issued a report and recommendation on Defendants' Motion for Summary Judgment and Epps's Cross-Motion for Summary Judgment, A-2978-3040, and later an amended report and recommendation (the "R&R") on May 23, 2022, A-3041-3103. Judge Foschio granted virtually all of Defendants' Motion in all respects. *See id.* In relevant part,

16

Judge Foschio found that the Detectives Stambach, Giardina, and Costantino were qualifiedly immune from liability for Epps's pre-trial due process claims brought under § 1983. *See* A-3072-3082.[2]

In rendering his decision, Judge Foschio found that Anderson's Alleged Statement was not subject to the government's obligations to furnish material in keeping with *Brady v. Maryland*, 373 U.S. 83 (1963), because Anderson's Signed Statement did not mention Epps or Means and was not likely to lead to the discovery of admissible evidence. *See* A-3082-3083. Judge Foschio recommended that the District Court enter summary judgment in favor of the Defendant Detectives on Epps's second cause of action for post-trial due process violation pursuant to § 1983. *See* A-3099. Epps and Defendants filed objections to the R&R. *See* A-13-14.

## The District Court's Decision

The District Court held oral argument on the Parties' objections to the R&R on April 28, 2025. *See* A-14-15. On January 16, 2026, the District Court issued a Decision and Order ("D&O") adopting the R&R in part and rejecting it in

---

[2] Judge Foschio also recommended that summary judgment be granted in favor of the Defendant Detectives on Epps's third and fourth state law malicious prosecution causes of action, *see* A-3093, and fifth cause of action for violations of the New York State Constitution, *see* A-3099-3101.

part. *See* A-3253-3278. As a preliminary matter, the District Court noted that the Parties agreed on the record that Epps voluntarily dismissed his claims against Detectives Chella, Masecchia, Aronica, and Riga. *See* A-3262. For this reason, all claims against these Defendants were dismissed.

As relevant to this appeal, the District Court stated that Detectives Stambach, Giardina and Costantino were not entitled to qualified immunity on the pre-trial due process cause of action. *See* A-3270-3271. The District Court stated that Anderson's Alleged Statement to Stambach, Giardina and Costantino was *Brady* material, finding Epps's "trial counsel certainly could have used the information about Montgomery to develop an alternative perpetrator defense, and challenge Bradley's identification of [Epps] on cross-examination." A-3265 (citation omitted).

The District Court further determined that the law regarding the government's *Brady* obligations was clearly established in 1998. *See* A-3269-3271. In the R&R, Magistrate Judge Foschio had noted that when Anderson was interviewed, "the need to turn over [inadmissible material . . . as evidence which could nevertheless lead to admissible evidence . . . [was] not established within the Second Circuit until [*U.S. v. Gil*, 297 F.3d 93 (2d Cir. 2002)] was decided . . . well

18

after the conclusion of [Epps's] criminal trial." A-3082-3083. In response, the District Court reported a line of cases including *U.S. v. Polisi* 416 F.2d 573 (2d Cir. 1969) which recognized *Brady* violations where the government did not furnish material that was "material and of some substantial use to the defendant." A-3268 (quoting *Polisi*, 416 F.2d at 578). However, the District Court did not analyze whether such a duty was clearly established as to police investigators as compared to prosecutors. *See* A-3266-3267. Despite this, the Court denied the aspect of the Defendants' Motion seeking qualified immunity for the Defendant Detectives.

## SUMMARY OF THE ARGUMENT

I. The District Court erred when it held that the Defendant Detectives committed a *Brady* violation based on Anderson's Alleged Statement, since there is no evidence that the Defendant Detectives intentionally withheld Anderson's Alleged Statement and it could not be verified or used to aid in Epps's defense.

II. The District Court erred in denying the Defendant Detectives the protections of qualified immunity, because, in 1998, Epps did not have a clearly

established right to the disclosure of Anderson's Alleged Statement, and no reasonable officer would have believed that they had to be produced.

## STANDARD OF REVIEW

This Court reviews a "district court's denial of summary judgment on qualified immunity grounds" *de novo*. *See Savino v. City of N.Y.*, 331 F.3d 63, 71 (2d Cir. 2003) (citing *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)). Under this authority, Defendants are entitled to summary judgment on qualified immunity grounds unless, in response to Defendants' Motion for Summary Judgment, Epps "submitted evidence sufficient to establish that objectively reasonable persons in [Defendants'] position[s] would have known that their conduct violated [Epps's] rights." *See id.*

## ARGUMENT

Evaluating a *Brady* claim requires a nuanced approach. The character of the withheld evidence and the circumstances of the alleged suppression, together, dictate whether the alleged violation is actionable. *Valentin v. City of Rochester*, 2018 WL 5281799, at *12-13 (W.D.N.Y. Oct. 24, 2018) (citing *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)). In his R&R, the Magistrate Judge reached the correct result. In rejecting the relevant portion of the R&R, the District Court did not.

20

Judge Vilardo found that Epps's criminal trial counsel could have utilized Anderson's Alleged Statement about Russell Montgomery "to develop an alternative-perpetrator defense, conduct further investigation, and challenge Bradley's identification of Epps on cross-examination." SPA-13. This view regarding the potential helpfulness of the Alleged Statement, however, was speculative and unrealistic. At the time, Epps was just days away from trial. A-875:14-23, A-85.[3] The Alleged Statement itself would never have been admitted into evidence. *See* Fed. R. Evid. 801. Paul Pope was dead; he could not be questioned. *See* A-1107-1108. Russell Montgomery was close to indictment for a different murder; there is no evidence that he would have cooperated. *See* A-1064. Nor is there evidence that any other witness was present when Montgomery and Pope spoke. *See id.* No other witness was present when Pope told Anderson. *See id.*

Anderson acknowledged that Epps and Montgomery look remarkably alike. *See* A-713:10-12, A-714:18-20. Any new photos of Montgomery were unlikely to change the proceedings. Jacqueline Bradley had identified Epps two different times. A-209-210, 600:14-601:9, 986-987. Even after Epps's conviction,

---

[3] The Complaint contains a typo given that it alleges the trial began on April 20, 1997. There is no real dispute that Epps's trial did not begin until April of 1998.

21

when officers showed Bradley a picture of Montgomery, Bradley told them she had never seen him before. A-756:9-757:11. Epps presented his full alibi defense, complete with testimony and the receipt from his Perkins meal with his girlfriend. a-1517:8-268:8. Despite that, a jury still convicted him. A-86. Judge Vilardo's vision of how the Epps trial would have proceeded differently does not fairly evaluate the character of the double hearsay. Nor does the District Court's vision accurately treat the circumstances of the trial or the state of the law at the time.

But even if the challenged information should have been considered *Brady* material, the Defendant Detectives would be entitled to qualified immunity. Their failure to produce Anderson's Alleged Statement was not intentional. They "reasonably believed" that double hearsay account would never be admitted into evidence in any trial, let alone the one involving Epps. No "reasonably well-trained officer" would have believed otherwise. They did not disregard an established legal standard. They were just doing their jobs: investigating a separate crime over a year after Means's murder.

## POINT I.  <u>AS A MATTER OF LAW, PLAINTIFF CANNOT ESTABLISH A <u>*BRADY*</u> VIOLATION</u>

*Brady* set the stage for constitutional litigation addressing the claimed withholding of evidence favorable to the accused. Under *Brady* and its progeny,

22

prosecutors must disclose exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment. *Strickler*, 527 U.S. at 280. Establishing liability for a *Brady* claim under 42 U.S.C. 1983 requires a plaintiff to prove three elements: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that the evidence was intentionally suppressed; and (3) that prejudice ensued because of the material nature of the evidence. *Valentin*, 2018 WL 5281799 at *12-13 (citing *Strickler*, 527 U.S. at 281-82). No one contests the first factor—that the Alleged Statement would have been favorable to Epps. However, Epps has not established the remaining factors.

## A. The Defendant Detectives Did Not Intentionally Withhold Anderson's Alleged Statement.

"To establish liability against a police officer for a *Brady* due process violation, the plaintiff must show that the officer intentionally withheld information from prosecutors." *Valentin*, 2018 WL 5281799 at *13. This Court has "never held anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages" and it should decline to do so here. *See Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016); *see also Nnodimele v. Derienzo*, 2016 WL 3561708, at *5 (E.D.N.Y. June 27, 2016). The Defendant Detectives contend, in part, that they did not intentionally withhold

23

Anderson's Alleged Statement, because they were not investigating Epps, whose trial was only days away. Epps has not presented any evidence to the contrary. To establish liability against the Defendant Detectives, Epps must show that the officers intentionally withheld Anderson's Alleged Statement. He has not and cannot make this showing.

Explaining the intent requirement for a *Brady* violation in *Reid v. Simmons*, 163 F. Supp. 2d 81, 87 (D.N.H 2001), where a police officer failed to disclose exculpatory impeachment evidence, the District of New Hampshire emphasized:

> [A constitutional violation] requires that the officer have intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial. This is what is meant by "bad faith."

To succeed in his case, Epps must prove that the Defendant Detectives acted in bad faith. His claim must fail. There is no evidence that any of the Defendant Detectives acted with bad faith or with the intent to withhold Anderson's Alleged Statement.

## B.    Anderson's Alleged Statement Is Not Material.

While all three factors are critical, often the discussion focuses on the third, as is the case here. "It is the third component—whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry—that is the

24

most difficult element of the claimed *Brady* violation in this case." *Strickler*, 527

U.S. at 282. This consideration is the critical one the District Court missed.

*Strickler* provides guidance regarding the third factor, the issue of

materiality, or prejudice:

> He must convince us that "there is a reasonable probability" that the result of the trial would have been different if the suppressed documents had been disclosed to the defense. As we stressed in *Kyles* [*v. Whitely*, 514 U.S. 419, 434 (1995)]: "The adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

*Strickler*, 527 U.S. at 289. Epps must prove that there is a "reasonable probability"

that the result of the trial would have been different had he received Anderson's

Alleged Statement, that without the evidence the verdict was not worthy of

confidence. He failed to meet this exacting standard.

The Supreme Court also explained an additional perspective on the

necessary analysis:

> Rather, the question is whether "The favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

25

*Strickler*, 527 U.S. at 290. It does not appear that the District Court undertook either version of the required review. If it had, the District Court would have recognized that the dubious admissibility of Anderson's Alleged Statement undermines their materiality for *Brady* purposes. *See U.S. v. Murphy*, 2024 WL 3264127, at *3 (2d Cir. July 2, 2024) (citing *Gil*, 297 F.3d at 104)).

In *Kyles*, the Supreme Court presented three different approached to evaluate "materiality" under this difficult last factor:

- Is there a reasonable probability that its disclosure would have provided a different result?

- Could favorable evidence reasonably be introduced to put the whole case in such a different light as to undermine confidence in the verdict?

- Would disclosure of the suppressed evidence to competent counsel have made a different result reasonably possible?

514 U.S. at 434. Each of these inquiries as applied to the Anderson Alleged Statement should be answered "no."

The District Court's speculation that the Alleged Statement could have led to the discovery of admissible evidence is insufficient to establish materiality. Since 2002, the clearly established law in this Circuit provides that

26

inadmissible exculpatory evidence must be produced under *Brady* if its disclosure could lead to the discovery of admissible evidence. *Gil*, 297 F.3d at 104; *U.S. v. Wilson*, 2017 WL 1456984, at \*4 (W.D.N.Y. Apr. 25, 2017). However, an inadmissible statement given by a witness without the witness's personal knowledge is not *Brady* evidence, unless the witness is able to provide a viable source to confirm the information related. *U.S. v. Santos*, 2010 WL 2985913 at \*8 (E.D.N.Y. July 27, 2010) (holding that government did not violate *Brady* where it failed to disclose informant's inadmissible allegations of the murders which were "unsupported by personal knowledge and consist[ed] of nothing but rumor."). Applying this standard, Anderson's Alleged Statement relaying what a recently murdered person said to her eleven months earlier is not *Brady* evidence. Anderson's Alleged Statement was not based on her own personal knowledge, and there was no viable source that the detectives, prosecution, or defense counsel might have contacted in order to confirm the information she provided.

Moreover, "mere speculation about the effects of undisclosed evidence does not provide a basis for materiality." *See McGhee v. Annucci*, 2024 WL 36998, at \*6 (S.D.N.Y. Jan. 3, 2024) (citing *Wood v. Bartholomew*, 516 U.S. 1, 7-8 (1995)); *see also Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (upholding denial of *Brady* claim where petitioner resorted to speculation

27

regarding what admissible evidence might have been discovered). The District Court speculated that "Epps potentially could have called other witnesses and certainly could have developed an alternative-perpetrator theory that might have undermined Bradley's identification." SPA-18. Not only is that speculation insufficient, it is also highly unlikely.

Paul Pope—the individual who allegedly told Anderson about Montgomery's confession—of course, was not an option, as he had been murdered before the BPD interview. *See* A-352, 357-367. Russell Montgomery likely would have been reluctant to cooperate in any investigation by law enforcement or defense counsel, since he was the alleged murderer, and since he was the subject of a different active murder investigation. Even if Montgomery had cooperated, the only way Montgomery's testimony could have undermined the verdict was by his own confession. And, based on his claim that he had nothing to do with the Pope murder and his subsequent attacks on his conviction, an admission of guilt for the Means murder was highly remote. *See, e.g.*, *Montgomery v. Woods*, 2007 WL 9200020, at *1 (W.D.N.Y. Oct. 19, 2007); *Montgomery v. Wood*, 727 F. Supp. 2d 171, 178 (W.D.N.Y. 2010) (summarizing state court proceedings and noting his denial of responsibility for the Pope murder). The belief that disclosure of Anderson's Alleged Statement would have led to admissible evidence capable of

28

undermining Epps's conviction is speculative at best and, in all likelihood, completely unrealistic. *See also Proventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (noting that the materiality question is whether the accused received a fair trial resulting in a verdict worthy of confidence absent the subject evidence). No readily available additional source would have been available to defense counsel in 1998 to confirm Anderson's Alleged Statement, let alone confirm it in a manner that would have been admissible at the trial of Epps.

Given this reality, Anderson's Alleged Statement, although exculpatory, is not *Brady* evidence, because there is no way to determine how its disclosure could have led to admissible evidence. *See U.S. v. Arillotta*, 529 F. App'x 81, 82 (2d Cir. 2013) (citing *U.S. v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001)). In other words, it is not material. Arguments to the contrary, and the District Court's rationale, amount only to speculation. Like the petitioner in *Strickland*, Epps "has not shown that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed. He therefore cannot show materiality under *Brady* or prejudice from his failure to raise the claim earlier." 27 U.S. at 296. Magistrate Judge Foschio reached this conclusion. Judge Vilardo should not have disturbed that conclusion.

29

This Court should reverse Judge Vilardo's determination regarding Epps's *Brady* claim and dismiss it.

Not every statement merits disclosure under *Brady*. An inadmissible statement is not automatically *Brady* material merely because it is favorable to the accused. Could the discovery of Montgomery's picture have aided Epps's defense? Since, even by Anderson's account, Montgomery and Epps looked remarkably alike, that advantage is doubtful. Anderson had no knowledge of Montgomery's admission—Pope was dead; she was not present when Montgomery allegedly made the admission; nor was any other witness. *See* A-1107-1108, 1064. No one else was present when Pope allegedly shared Montgomery's admission with Anderson. *See id.* No ability to confirm the admission existed. The District Court's discussion regarding how Epps could have used the information is nothing more than pure speculation. In 1998, Anderson's Alleged Statement simply was not *Brady* material.

## POINT II.  <u>THE DEFENDANT DETECTIVES ARE ENTITLED TO QUALIFIED IMMUNITY</u>

Even if this Court were to find that Anderson's Alleged Statement constituted *Brady* material, the Defendant Detectives would be entitled to qualified immunity. The qualified immunity doctrine has evolved over the years, but its

mandate is clear: qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known. *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). Said more directly, "a defendant is not liable if he did not violate clearly established law or it was objectively reasonable for him to believe that he was not violating clearly established law." *Id.* at 490 (citations omitted).

The District Court recognized (and even quoted) the appropriate standard. SPA-11. Perhaps out of empathy for Epps's plight, however, Judge Vilardo misapplied the doctrine, finding, "[t]here is a reasonable probability that the outcome would have been different had Epps been given Anderson's statements about Montgomery." SPA-14. In short, the District Court found that the Anderson Alleged Statement was material. This finding was erroneous and insufficient to deprive the Defendant Detectives of qualified immunity.

## A. The Defendant Detectives Did Not Violate Any Clearly Established Rights.

### 1. There was no clearly established right to the disclosure of inadmissible evidence in 1998.

In 1998, when the events and circumstances underlying this case occurred, no definitive Supreme Court precedent existed on the issue of whether inadmissible hearsay evidence could nonetheless constitute *Brady* material despite

31

its inadmissibility. On the contrary, in *Wood*, the Court held that testimony concerning inadmissible polygraph results was not *Brady* material, because the test results were definitely inadmissible, and disclosure of the evidence would have had no direct effect on the outcome of the trial. 516 U.S. at 6. At the time, *Wood* was the closest decision to the issue faced in Epps's trial. The Court held:

> But as we reiterated just last Term, evidence is "material" under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a "reasonable" probability that had the evidence been disclosed the result at trial would have been different.

*Id.* at 5. Reviewing the evidence admitted at trial in *Wood*, the Court determined that the claimed *Brady* material would not have resulted in a different outcome. *Id.* at 8. So reasoning, the Court wrote, "In short, it is not 'reasonably likely' that disclosure of the polygraph results—inadmissible under state law—would have resulted in a different outcome at trial." *Id.* In the same vein, since the claimed *Brady* evidence here would not, in all likelihood, have changed the outcome of the trial or undermined the verdict, the evidence was not material and did not need to be disclosed.

The issue was not settled by 1998, and the Defendant Detectives cannot be held responsible for failing to anticipate development of the law. As the Supreme Court stated in a different 1983 action "a reasonable officer is not

32

required to foresee judicial decisions that do not yet exist in instances" where their obligations are "far from obvious." *Kisela v. Hughes*, 584 U.S. 100, 107 (2018). In fact, the Second Circuit had not considered the explicit issue of whether inadmissible evidence could be *Brady* material until 2002. In *Gil*, this Court defined materiality for the first time in this context:

> One consideration that bears on *Brady* materiality is admissibility. The Bradford memo clearly contains hearsay, and the admissibility of the document, in whole or in part, remains to be decided on remand by the district judge, whose evidentiary ruling on that question is entitled to the usual deference. For our current purposes, we need only satisfy ourselves that: [1] either all or part of the Bradford memo is admissible; [2] the memo could lead to admissible evidence; or [3] the memo would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise.

297 F.3d at 104. Before this guidance, reasonable police officers would not have known that double hearsay statements could possibly be *Brady* material. Even with this guidance, the answer concerning Anderson's Alleged Statement would not have appeared clear—the officers would not have ignored a definitive rule of the law. Their failure to provide the evidence would not have been intentional withholding of *Brady* documents.

The Defendant Detectives argued to the District Court that the law in 1998 was not clear in that the officers had no fair warning that failing to produce

33

Anderson's Alleged Statement to Epps was unconstitutional. But their dilemma was further complicated in that they were not working on the Epps investigation at the time. They were investigating the (then unrelated) Paul Pope murder. *See* A-352, 357-367. Epps made no showing that the Defendant Detectives even knew of his impending trial.

2. The *Walker* case is insufficient to clearly establish a right to disclosure of Anderson's Alleged Statement.

For a right to be "clearly established" the constitutional question must be firmly settled in that it is beyond debate and particularized to the facts of the case. *Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir. 2025); *see also Matusak v. Daminski*, 165 F.4th 702, 712 (2d Cir. 2026). The District Court's reliance on *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) does not satisfy either facet of the "clearly established" inquiry.

The District Court cited *Walker* for the proposition that since 1992 "law enforcement officers have an obligation under *Brady* to turn over to the prosecution team *any* favorable evidence regardless of materiality." SPA-18. But that is not the language *Walker* uses. Rather, this Court held that "police satisfy their obligations under *Brady* when they turn exculpatory [or impeachment] evidence over to the prosecutors." *Walker*, 974 F.2d at 299. It did *not* hold that

34

police *must* turn over all exculpatory evidence to satisfy their *Brady* obligations. As this Court has made clear, "[i]t is not enough that the rule is suggested by then-existing precedent." *Clark*, 157 F.4th at 209 (citing *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)).

This Court's general pronouncement of law—that police satisfy their *Brady* obligations when they turn over exculpatory evidence to prosecutors—is not enough to clearly establish a right. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 393-394 (2d Cir. 2025). At most, the *Walker* Court's general pronouncement *suggests* that a failure to turn over material evidence gathered in the course of a separate investigation *may* amount to a *Brady* violation. *See* 974 F.2d at 299. This mere suggestion is insufficient to firmly settle the issue. *Nat'l Rifle*, 144 F.4th at 393-394.

The "right" the District Court relied upon also lacked particularity. In addition to being firmly settled, the right has to be "sufficiently particularized" because "qualified immunity focuses on whether the officer had fair notice that her conduct was unlawful." *Clark*, 157 F.4th at 209-210 (citing *Kisela*, 584 U.S. at 104); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established. This

35

inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal citations omitted)). In analyzing whether officers had the requisite fair notice, this Court looks to factors including but not limited to: (i) whether the constitutional question is "beyond debate"; (ii) whether it is sufficiently clear to every reasonable official that the challenged conduct "in the specific context of the case" violates that right; and (iii) whether, at the time, there was a "robust consensus" of cases of persuasive authority supports the right. *Nat'l Rifle*, 144 F.4th at 389-390; *Clark*, 157 F.4th at 209-210.

*Walker* did not foreclose debate on the constitutional question here. Indicative of this is *Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021), a decision the District Court embraced. In *Horn*, this Court clarified *Walker*'s "teachings":

> Applying the teachings of *Brady*, in 1992, we recognized in *Walker v. City of New York* that the government's disclosure obligation applied to the police when we held that "the police satisfied their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors."

*Id.* at 171 (citing *Walker*, 974 F.2d at 299). Certainly, the Defendant Detectives cannot be said to be on fair notice of a holding that this Court clarified almost three decades later.

36

In 1998, it was also unclear how *Walker* would apply in the specific context of this case. In *Clark*, this Court held that the district court erred by analyzing the qualified immunity question at too high a level of generality. *See* 157 F.4th at 210. There, the district court defined the right as "the right to be free from deliberate indifference to serious medical needs." *Id.* This Court held that the proposition was too general to clearly establish that the defendants' treatment of the plaintiff's gender dysphoria amounted to deliberate indifference. Similarly, in *Matusak*, this Court held that "officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." 165 F.4th at 713 (citation omitted). *Walker* did not squarely govern the specific facts at issue here—it was a general pronouncement of circumstances under which officers can satisfy *Brady*. The District Court's reliance on this pronouncement is too general; it does not provide the requisite guidance to the Defendant Detectives in 1998.

*Walker* is the only case relied upon by the District Court. No robust consensus existed in 1998 on the issue. The general pronouncement regarding officers' obligations to turn over *Brady* materials did not put officers on fair notice that their failure to disclose Anderson's Alleged Statement to prosecutors (on a different case) would amount to a *Brady* violation.

37

One of this Court's most recent pronouncements on qualified immunity comes in *Nat'l Rifle*. Defining the "applicable law," this Court reaffirmed its understanding of qualified immunity:

> Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," and it generally attaches to conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Nat'l Rifle*, 144 F.4th at 389 (citations omitted). Thus, qualified immunity is the default position. After it supplied the general law, this Court provided additional factors to be considered in the analysis.

- An official is entitled to qualified immunity only if the rights at issue were not "clearly established"

- The constitutional question is "beyond debate"

- The rules declare with a "high degree of specificity" which conduct is permitted and which is not

- The right is violated only if it is sufficiently clear to every reasonable official that the challenged conduct "in the specific context of the case" violates that right

- A right is clearly established if (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the right, (3) a reasonable defendant would have understood his conduct is unlawful

38

- A "robust consensus" of cases of persuasive authority supports the right.

*Id.* at 389-390. Each of the factors weighs in favor of finding qualified immunity for the Defendant Detectives, since the principle Epps seeks to advance was not clearly established, beyond debate, or highly specific.

It cannot be genuinely said that Epps's right to disclosure of Anderson's Alleged Statement, made during the investigation of a different murder, was "clearly established," or that the issue was "beyond debate." The rules as conveyed through controlling precedent did not provide a "high degree of specificity" as to permitted conduct. In the specific context of Epps's case, the right violated would not have been clear to every reasonable police officer. In 1998, no "robust consensus" of cases or persuasive authority supported Epps's claimed right to receive Anderson's Alleged Statement. In fact, in 1998, no existing precedent squarely governed the specific facts at issue. *See Matusak*, 165 F.4th at 713.

Under the factors recently highlighted by this Court, therefore, the Defendant Detectives are entitled to qualified immunity. To hold otherwise would be to nullify qualified immunity. "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from a given

39

constitutional injury." *Clark*, 157 F.4th at 210 (citing *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015) (cleaned up)). Using these guideposts, the Court should hold that Epps did not have a clearly established right.

**B.    The Defendant Detectives' Conduct Was Objectively Reasonable.**

Absent a clearly established right, the Defendant Detectives' conduct was objectively reasonable, because "an objectively reasonable official, situated similarly to the defendant, [could] have believed that his conduct did not violate the plaintiff['s] constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the alleged wrongful conduct[.]" *Reid*, 163 F. Supp. 2d at 94 (citing *Wood v. Clemons*, 89 F.3d 922, 927 (1st Cir. 1996)); *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001). Qualified immunity is the default position. "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law[.]'" *Nat'l Rifle*, 144 F.4th at 389 (citations omitted); *see also Malley v. Briggs*, 475 U.S. 335, 335 (1986) (holding that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). The Defendant Detectives were neither incompetent nor knowingly violating the law, particularly because the law was not clearly established.

40

Under these circumstances, as the Defendant Detectives perceived them, their actions were reasonable, they did not violate a clearly established right of Epps, and they are entitled to qualified immunity. Here, the Magistrate reached the same, appropriate conclusion. The District Court did not.

Even if this Court decides that the Defendant Detectives were mistaken on the state of the law in 1998, they would still be entitled to qualified immunity. Qualified immunity applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Matusak*, 165 F.4th at 711. *Walker* was not clear on how it applied to the circumstances of this case. In *Walker*, this Court addressed the deliberate suppression of obviously exculpatory and admissible evidence. 974 F.2d at 298-299. The decision has assumed outsized importance. The real issue in *Walker* involved determining whether the plaintiff could maintain a *Monell* claim against a municipality for the failure to properly train and supervise police officers. *Id.* at 296. In this context, the Second Circuit found that police officers satisfy their *Brady* obligations by turning potentially exculpatory evidence over to prosecutors. *Id.* at 299. This Court also reasoned that prosecutors are in a better position to evaluate whether complicated evidence is governed by *Brady*. *Id.*

41

Epps's entire argument is that the Defendant Detectives should have disclosed Anderson's Alleged Statement to defense counsel. *Walker* does not address this issue. Here, there is no evidence of deliberate suppression, and the claimed *Brady* material is inadmissible. As a result, even if the Court finds that the right was "clearly established" in 1998, the Defendant Detectives are still entitled to qualified immunity. Their actions were objectively reasonable. *See Luna*, 356 F.3d at 490. For all the reasons discussed in Section II.A. above, it was objectively reasonable for the Defendant Detectives to recognize that Anderson's inadmissible Alleged Statement would neither undermine Epps's eventual conviction nor lead to the discovery of any admissible evidence that would have that effect. The Defendant Detectives did what they were obligated to do. They prepared a standard P-73 form detailing the Anderson interview for the murder they were investigating, that of Paul Pope. *See* A-1067-1072. They also wrote up Anderson's Signed Statement, which was devoid of any mention of Epps or Means. A-3082-3083. Anderson reviewed and signed it. *See id.* Their conduct was objectively reasonable, and the District Court simply failed to evaluate or recognize this.

The Defendant Detectives are entitled to qualified immunity because (A) Epps did not have a clearly established right to disclosure of Anderson's

42

Alleged Statement and (B) regardless of if he did, a reasonable officer would not have known of the right. *See Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2013) (Qualified immunity protects public officials from civil liability only if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. (internal quotation and citation omitted)).

## **CONCLUSION**

For these compelling reasons, the Court should reverse the District Court's decision insofar as it erroneously held that Anderson's Alleged Statement was *Brady* material that Defendants Detectives failed to disclose and further held that the Defendant Detectives were not entitled to qualified immunity.

Dated:    May 19, 2026

**HODGSON RUSS LLP**
*Attorneys for Defendants-Appellants*
*City of Buffalo, Detective Mark Stambach,*
*Detective James Giardina, Mark R.*
*Costantino, as Executor of the Estate of*
*Anthony Costantino*

By:    */s/ Hugh M. Russ III*

Hugh M. Russ III, Esq.
David Panzarella, Esq.
Cheyenne N. Freely, Esq.
The Guaranty Building

43

140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000
*hruss@hodgsonruss.com*
*dpanzarella@hodgsonruss.com*
*cfreely@hodgsonruss.com*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(B, I certify that the City's Appeal Brief contains 8,916 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(5).

I further certify that the City's Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

By: _____*/s/ Hugh M. Russ III*_____

Hugh M. Russ

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Decision and Order of the Honorable Lawrence J.
Vilardo, dated January 16, 2026 ............................  SPA-1

SPA-1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CORY EPPS,

      Plaintiff,

      v.

CITY OF BUFFALO, et al.,

      Defendants.

19-CV-281-LJV-LGF
DECISION & ORDER

On March 1, 2019, the plaintiff, Cory Epps, commenced this action under 42 U.S.C. § 1983 against the City of Buffalo; Buffalo Police Detectives John Bohen, Reginald Minor, Mark Stambach, James Giardina, Anthony Costantino, Robert Chella, Raniero Masecchia, and Charles Aronica; and Buffalo Police Chief Joseph Riga.[1] Docket Item 1. Epps alleges that the defendants violated his federal and state constitutional rights during his prosecution for the 1997 murder of Tomika Means. *See id.*

On August 18, 2021, this Court referred the case to United States Magistrate Judge Leslie G. Foschio for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 41. On October 7, 2022, the defendants moved for summary judgment. Docket Item 77. Epps then responded, Docket Item 89, and the defendants replied, Docket Item 94.

---

[1] Bohen's, Costantino's, and Masecchia's names are incorrectly spelled in the case caption and complaint as "Bohan," "Constantino," and "Massechia." *See* Docket Item 1; Docket Item 99 at 2 n.2, 3 n.3; Docket Item 103-3 at 4.

SPA-2

On May 21, 2023, Judge Foschio issued a Report and Recommendation ("R&R") finding that the defendants' motion for summary judgment should be granted.  Docket Item 97; *see* Docket Item 99 (amended R&R).[2]  More specifically, Judge Foschio determined that Bohen, Minor, Stambach, Giardina, and Costantino were entitled to summary judgment on Epps's malicious prosecution, pre-trial due process, and post-trial due process claims and that any remaining state law claims should be dismissed.  Docket Item 99at 32-61.[3]  Chella, Masecchia, Aronica, and Riga did not move for summary judgment, but Epps had agreed not to pursue any claims against those defendants.  *See id.* at 61.  Nevertheless, because the parties had not yet filed a stipulation of dismissal, Judge Foschio found that the action should continue against those defendants.  *See id.* at 61-62.

The defendants objected to the portion of the R&R recommending that summary judgment not be entered in favor of Chella, Masecchia, Aronica, and Riga.  Docket Item 103.  Epps objected to the portions of the R&R recommending that summary judgment be entered in favor Bohen, Minor, Stambach, Giardina, and Costantino on his due process claims and that his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution be dismissed.  Docket Item 109.  Both sides also filed responses.  Docket Items 116 and 124.  This Court heard oral argument and reserved decision.  *See* Docket Item 131.

---

[2] The amended R&R "replace[d] an incorrect date on page 16, and clarifie[d] the status of the non-moving Defendants and the conclusion, but [made] no substantive changes."  Docket Item 99.

[3] Page numbers in docket citations refer to ECF pagination.

SPA-3

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The district court must review de novo those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R as well as the parties' objections and responses; it also has thoroughly reviewed the record in this case, including the materials submitted to Judge Foschio.  Based on that de novo review, this Court adopts in part and modifies in part Judge Foschio's R&R.  More specifically, the Court accepts and adopts Judge Foschio's recommendation to enter summary judgment in favor of Bohen, Minor, Stambach, Giardina, and Costantino on Epps's malicious prosecution claims and to dismiss Epps's state law claims against the individual defendants.  The Court, however, respectfully disagrees with Judge Foschio regarding Epps's pre-trial due process claims and Epps's claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution.  The Court therefore modifies the R&R to allow those claims to proceed to trial.

### BACKGROUND[4]

#### I.    INVESTIGATION OF TOMIKA MEANS'S MURDER

In May 1997, an unidentified individual shot and killed Tomika Means while she was sitting in her car near the corner of Chelsea Place and East Delvan Avenue in

---

[4] On summary judgment, the facts are construed in the light most favorable to the non-moving party—in this case, Epps.  *See Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024).  The following background is drawn from the parties' statements of fact, *see* Docket Items 79 and 91, as well as the exhibits submitted in support of and opposition

Buffalo, New York.  Docket Item 79 at ¶¶ 1-2; Docket Item 91 at ¶¶ 1.D-2.D.  Means's friend, Jacqueline Bradley, witnessed the shooting from the passenger seat of Means's car.  Docket Item 79 at ¶ 2; Docket Item 91 at ¶ 2.D.  The next day, Bradley worked with law enforcement—specifically, the Buffalo Police—to create an "identikit" composite sketch of Means's killer.[5]  Docket Item 79 at ¶ 6; Docket Item 91 at ¶ 6.D; see Docket Item 89-8 (identikit composite sketch created on May 27, 1997).

Several weeks later, on June 26, Detective Bohen noted in a P-73 report that Linda Means—the victim's aunt—had called the station and said that the identikit composite of her niece's killer looked like Cory Epps.  Docket Item 79 at ¶¶ 6-7; Docket Item 91 at ¶¶ 6.D-7.D; see also Docket Item 89-7 at 2 (copy of P-73 report created by Bohen on June 26, 1997).  On July 6, Bohen, along with fellow Detective Minor, showed Bradley a photo array[6] that included Epps's picture.  See Docket Item 79 at ¶¶ 5-12; Docket Item 91 at ¶¶ 5.D-12.D; see also Docket Item 78-27 at 1-2 (copy of photo array shown to and signed by Bradley on July 6, 1997).  Bradley identified Epps as the person

---

to the defendants' motion for summary judgment and are undisputed unless otherwise noted.

[5] The "identikit" is a "commonly employed composite technique."  James Lang, Note, *Hearsay and Relevancy Obstacles to the Admission of Composite Sketches in Criminal Trials*, 64 B.U. L. REV. 1101, 1104 (1984).  "It consists of over 500 transparent plastic overlays each bearing an individual facial characteristic—eyes, noses, chins, hairlines, etc.," as well as "transparencies of other identifying characteristics, such as age lines and scars."  *Id.*  "A trained . . . operator selects those overlays he deems most similar to the witness' description of the offender," and "[a]s each successive overlay is added a complete face begins to develop," allowing the "composite [to] be produced in just a few minutes."  *Id.*

[6] Epps asserts that Bohen and Minor presented Bradley with a mug book containing his photograph, not a photo array.  *See* Docket Item 91 at ¶ 8.D; *see also* Docket Item 78-9 at 6-12 (excerpt from Bradley's deposition taken on October 29, 2021).

SPA-5

who had killed Means.  Docket Item 79 at ¶¶ 11-13; Docket Item 91 at ¶¶ 11.D-13.D;

*see also* Docket Item 78-27 at 3 (copy of affidavit signed by Bradley on July 6, 1997,

acknowledging her identification of Epps).

After Bradley identified Epps, Assistant Erie County District Attorney Patricia

Carrington applied for an order requiring Epps to participate in an in-person lineup, and

Erie County Court Judge Timothy Drury granted Carrington's application.  Docket Item

79 at ¶¶ 25-26; Docket Item 91 at ¶¶ 25.D-26.D; *see* Docket Item 78-22 (copy of

Carrington's application); Docket Item 78-23 (copy of Judge Drury's order granting

Carrington's application).  On July 30, Epps participated in two in-person lineups at

which both ADA Carrington and Epps's counsel were present, and Bradley identified

Epps in both lineups.  *See* Docket Item 79 at ¶¶ 27-35; Docket Item 91 at ¶¶ 27.D-35.D.

And on August 7, a grand jury indicted Epps for Means's murder.  *See* Docket Item 79

at ¶¶ 36-39; Docket Item 91 at ¶¶ 36.D-39.D.

## II.    INVESTIGATION OF PAUL POPE'S MURDER

On April 17, 1998, while investigating the murder of Paul Pope, Buffalo Police

Detectives Stambach and Giardina interviewed Pope's girlfriend, Wymiko ("Pumpkin")

Anderson.  *See* Docket Item 79 at ¶¶ 41, 50; Docket Item 91 at ¶¶ 41.D, 50.D; *see also*

Docket Item 78-31 (copy of Anderson's statement recorded April 17, 1998).  Detective

Costantino also was present at some point during Anderson's interview.[7]  *See* Docket

---

[7] The defendants assert that Costantino "only spoke with Anderson after Epps had been convicted."  Docket Item 79 at ¶ 52; *see* Docket Item 78-15 at 2 (excerpt from hearing testimony given by Costantino in 2001).  But Costantino testified most recently that he remembered Anderson saying, on the day she was interviewed by Stambach and Giardina, that "she was the girlfriend of Montgomery at one time, Pope, or one of them, and that she was told by someone that Montgomery did the shooting of Tomika

Item 79 at ¶ 52; Docket Item 91 at ¶ 52.D; *see also* Docket Item 78-7 at 105 (excerpt from Costantino's deposition taken on February 12, 2021).  Anderson told the detectives that she believed a man named Russell Montgomery had killed Pope.  *See* Docket Item 79 at ¶ 43; Docket Item 91 at ¶ 43.D.

The parties disagree about the other details of the interview.  According to Epps, Anderson also told the detectives that Montgomery looked like the individual depicted in the identikit composite of Means's killer and that Pope had told her that Montgomery admitted to killing Means.  *See* Docket Item 79 at ¶¶ 44-46; Docket Item 91 at ¶¶ 44.D-46.D; *see also* Docket Item 78-8 at 24-27 (excerpt from Anderson's deposition taken on August 11, 2021).  But according to the defendants, Anderson did not tell the detectives that Pope had told her that Montgomery had admitted to killing Means.  *See* Docket Item 79 at ¶¶ 47, 51; *see also* Docket Items 78-19, 78-20 and 78-21 (copies of affidavits signed by Constantino, Stambach, and Giardina, respectively, on August 30, 2000).

## III.    EPPS'S CRIMINAL PROCEEDINGS

On April 24, 1998, a jury found Epps guilty of Means's murder.  *See* Docket Item 79 at ¶¶ 54, 58; Docket Item 91 at ¶ 54.D, 58.D.  The jury convicted Epps based solely on Bradley's identification of Epps as the killer.  *See* Docket Item 79 at ¶¶ 55-57; Docket Item 91 at ¶¶ 55.D-57.D; *see also* Docket Item 78-11 (copy of Bradley's trial testimony).

A few days later, Epps's trial counsel received an anonymous letter stating that the wrong man had been convicted for Means's murder and that Montgomery was the real killer.  *See* Docket Item 79 at ¶¶ 59-61; Docket Item 91 at ¶¶ 59.D-61.D; *see also*

---

[Means] and [Pope] knew about it, or [Montgomery] told [Pope]."  *See* Docket Item 78-7 at 105.

Docket Item 78-32 (copy of Anderson's letter to Epps's trial counsel dated April 27, 1998).  After identifying Anderson as the author of the anonymous letter, Epps sought relief under section 440 of New York's Criminal Procedure Law.[8]  *See* Docket Item 79 at ¶¶ 62-63; Docket Item 91 at ¶¶ 62.D-63.D.  More specifically, Epps sought to vacate the judgment entered against him based on: (1) newly discovered, previously unavailable evidence demonstrating his innocence and (2) the prosecution's failure to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Docket Item 79 at ¶ 64; Docket Item 91 at ¶ 64.D.

Acting New York State Supreme Court Justice Joseph McCarthy denied Epps's motion to the extent it was based on newly available evidence but determined that an evidentiary hearing was necessary regarding the *Brady* issue.  *See* Docket Item 79 at ¶¶ 65, 69; Docket Item 91 at ¶¶ 65.D; 69.D; *see also* Docket Item 78-24 (copy of Justice McCarthy's order dated March 2, 2001).  Following the evidentiary hearing, Justice McCarthy denied the remainder of Epps's section 440 motion.  Docket Item 79 at ¶¶ 66-68; Docket Item 91 at ¶¶ 66.D-68.D; *see* Docket Items 78-12, 78-13, 78-14, and 78-15 (copies of witnesses' testimonies from section 440 evidentiary hearing); Docket Item 78-25 (copy of Justice McCarthy's order dated September 13, 2001).

---

[8] Section 440 allows a court, upon motion by a defendant, to vacate a judgment in several different instances, including where: (1) "improper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom"; or (2) "new evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant."  N.Y. Crim. Proc. Law § 440.10(1)(f)-(g) (McKinney 1998) (citation modified).

7

## IV.    EPPS'S EXONERATION

In 2014, a new witness ("Witness 1") came forward with evidence that Montgomery had indeed killed Means.  Docket Item 79 at ¶¶ 70-71; Docket Item 91 at ¶¶ 70.D-71.D; *see* Docket Item 84 (copy of Witness 1's unredacted affidavit dated November 11, 2014).  Former Buffalo Police Department Homicide Chief Riga, acting in his capacity as an investigator for the Erie County District Attorney's Office, interviewed Witness 1 on approximately three occasions in either 2016 or 2017 and found Witness 1 credible.  *See* Docket Item 79 at ¶¶ 72-73; Docket Item 91 at ¶¶ 72.D-74.D; *see also* Docket Item 78-37 (copy of Riga's deposition taken on May 5, 2021).

Based on the statements made by Witness 1, Epps filed another section 440 motion in 2017.  *See* Docket Item 79 at ¶ 74; Docket Item 91 at ¶ 75.D.  The Erie County District Attorney's Office did not oppose that motion, and on December 1, 2017, Erie County Court Judge James F. Bargnesi granted the motion and vacated the judgment against Epps.  Docket Item 79 at ¶ 76; Docket Item 91 at ¶ 77.D; *see* Docket Item 78-38 (copy of Judge Bargnesi's order dated December 1, 2017).  Epps then filed the case at bar on March 1, 2019.  *See* Docket Item 1.

## LEGAL PRINCIPLES

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  Conversely, "summary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues

8

in favor of that party." *Id.* (citation modified). "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence." *Id.*

"If the evidence submitted in support of [a] summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation modified). "An unopposed summary judgment motion may also fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *Id.* (citation modified).

## DISCUSSION[9]

### I.    THE DEFENDANTS' OBJECTION

The defendants object to Judge Foschio's recommendation that Epps's claims against Chella, Masecchia, Aronica, and Riga proceed until the parties file a stipulation of dismissal. *See* Docket Item 103-3 at 4-7. They argue that Judge Foschio's recommendation is incorrect because Epps failed to "contest [their] assertion on summary judgment that he was no longer pursuing his claims against those individuals." *See id.* at 4.

In his own objections, Epps acknowledges that he agreed not to proceed against Masecchia, Aronica, and Riga. *See* Docket Item 109 at 27 n.6. He also acknowledges that he agreed to the dismissal of his claims against Chella for lack of personal involvement. *See id.* But according to Epps, Judge Foschio "appear[ed] to believe that

---

[9] The Court assumes familiarity with the analysis in Judge Foschio's R&R, Docket Item 99.

Chella was personally involved . . . so [he] did not feel as though he could stipulate to simply dismiss [Chella]." *Id.* (citation modified).

It is true that "when a counseled party moves for summary judgment, a partial response by the non-movant arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (citation modified); *see L.W. Matteson, Inc. v. Sevenson Env't Servs., Inc.*, 831 F. Supp. 2d 608, 618 (W.D.N.Y. 2011) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citation modified)).  As Judge Foschio observed, however, the defendants did not raise any arguments as to why they were entitled to summary judgment on Epps's claims against Chella, Masecchia, Aronica, and Riga; rather, they simply noted that Epps had agreed not to proceed against those defendants.  *See* Docket Item 80 at 10 n.4.

Nevertheless, at oral argument on April 28, 2025, both sides agreed on the record to the dismissal of Epps's claims against Chella, Masecchia, Aronica, and Riga. *See* Docket Item 135 at 6-7.  This Court is entitled to rely on that agreement.  *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 118 (S.D.N.Y. 2018) ("[F]or the Court to conduct proceedings properly, it must be able to rely upon representations made on the record by attorneys licensed to practice before it.").  Epps's claims against Chella, Masecchia, Aronica, and Riga therefore are dismissed.

10

## II.    EPPS'S OBJECTIONS

### A.    Pre-Trial Due Process Claims

Epps first objects to Judge Foschio's recommendation that the defendants' motion for summary judgment be granted on his pre-trial due process claims. *See* Docket Item 109 at 17-27. Those claims are based on Stambach's, Giardina's, and Costantino's alleged intentional failure to provide Epps with statements made by Anderson during her police interview on April 17, 1998, which Epps says is a *Brady* violation. *See id.* The three detectives argued to Judge Foschio that they are protected by qualified immunity. *See* Docket Item 80 at 33-36.

"Qualified immunity is an affirmative defense available to a person defending a suit brought under [section] 1983, which shields public officials, including law enforcement officers, 'from liability for civil damages [under that statute] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (second alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Because qualified immunity is an affirmative defense . . . , it is incumbent upon the defendant to plead and adequately develop a qualified immunity defense." *Id.* at 30-31 (citation modified).

"In deciding whether an official is entitled to qualified immunity, [courts] conduct[] a two-pronged inquiry, asking whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024) (citation modified). "The Supreme Court has left it up to courts to decide the order in which to approach those questions." *Id.* (citing *Pearson v. Callahan*, 555

11

U.S. 223, 236 (2009)).  But ultimately, "the party seeking summary judgment on the basis of qualified immunity bears the burden of proof for both queries."  *Id.* (citation modified).

For the reasons discussed below, Stambach, Giardina, and Costantino have not met their burden under either prong of the qualified immunity analysis.

### 1.　　Violation of Constitutional Right

"Due process requires disclosure of evidence that is 'favorable to [the] accused' and 'material either to guilt or to punishment.'"  *McCray v. Capra*, 45 F.4th 634, 641 (2d Cir. 2022) (alteration in original) (quoting *Brady*, 373 U.S. at 87).  "So-called *Brady* material includes both evidence that is exculpatory and evidence that can be used to impeach a prosecution witness whose credibility may be 'determinative of guilt or innocence.'"  *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *see United States v. Bagley*, 473 U.S. 667, 676 (1985) (indicating that there is no distinction between exculpatory and impeachment evidence under *Brady* because both are favorable to the accused).  But "[o]nly evidence that is *material* raises due process concerns."  *McCray*, 45 F.4th at 641.

"The 'touchstone of materiality' is whether there is a 'reasonable probability' that the result of the trial would have been different had the relevant evidence been disclosed to the defendant."  *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  "A reasonable probability is 'the likelihood of a different result [that] is great enough to undermine confidence in the outcome of the trial.'"  *Id.* (alteration in original) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (explaining that "a [criminal] defendant's right to pre-trial

SPA-13

disclosure under *Brady* is not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed, much less that he is in fact innocent." (citation and internal quotation marks omitted)).  So "[t]he materiality of the undisclosed evidence [must be] evaluated 'in the context of the entire record.'" *McCray*, 45 F.4th at 641 (quoting *Turner v. United States*, 582 U.S. 313, 325 (2017)).

Here, viewing the facts in the light most favorable to Epps—as this Court must on the defendants' motion for summary judgment—there is evidence that on April 17, 1998, Anderson told Stambach, Giardina, and Costantino (1) that Montgomery looked like the identikit composite of Means's killer and (2) that Pope had told Anderson that Montgomery admitted to killing Means.[10]  *See* Docket Item 78-7 at 105; Docket Item 78-8 at 24-27.  Without question, those statements were favorable to Epps:  His trial counsel certainly could have used the information about Montgomery to develop an alternative-perpetrator defense, conduct further investigation, and challenge Bradley's identification of Epps on cross-examination.  *See, e.g.*, *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (concluding that certain pieces of evidence were favorable "because they could have helped the defense suggest an alternative perpetrator or impeach [the prosecution's witnesses]").

In fact, after another witness later came forward with credible information that Montgomery had indeed killed Means, Epps was exonerated.  *See* Docket Item 79 at ¶¶ 70-76; Docket Item 91 at ¶¶ 70.D-77.D.  If Epps had Anderson's statements prior to

---

[10] As noted above, the defendants dispute that these statements were made to them.  But that is a question for trial:  The Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

13

trial, his counsel may well have been able to find that witness—or perhaps other witnesses—to support an alternative-perpetrator defense and undermine Bradley's testimony. And especially because the only evidence at trial connecting Epps to Means's murder came from Bradley, that may well have resulted in a different outcome. *See, e.g.*, *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) ("In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant(s) to the crime." (citation and internal quotation marks omitted)).

For all those reasons, viewing the evidence and drawing all inferences in Epps's favor, the Court finds that there is a reasonable probability that the outcome would have been different had Epps been given Anderson's statements about Montgomery. Anderson's statements therefore were *Brady* material not disclosed to Epps before or during his criminal trial. And for that reason, Stambach, Giardina, and Costantino are not entitled to summary judgment under the first prong of the qualified immunity analysis. *See Soukaneh*, 112 F.4th at 116.

### 2. Clearly Established Law

"To determine whether the relevant law [at issue] was clearly established, [courts] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Sabir v. Williams*, 52 F.4th 51, 63 (2d Cir. 2022) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)). "Precedent directly on point is not required for law to be clearly established, and it is not necessary, of course, that the very action in question has previously been held unlawful." *Id.*

14

(alteration, citations, and internal quotation marks omitted). "Thus, the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (citation and internal quotation marks omitted); *see Terebesi*, 764 F.3d at 230 ("[A] plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).

In their motion for summary judgment, Stambach, Giardina, and Costantino argued that "it was not clearly established in 1998, when Anderson's interview took place, that inadmissible double hearsay evidence constituted *Brady* material." Docket Item 80 at 8-9. Judge Foschio agreed, concluding that "the need to turn over [inadmissible] material . . . as evidence which could nevertheless lead to admissible evidence . . . [was] not established within the Second Circuit until [*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002)] was decided . . . well after the conclusion of [Epps's] criminal trial." Docket Item 99 at 42-43.

In *Gil*, the Second Circuit explained that to find *Brady* information to be material, a court "need only satisfy [itself] that: [1] either all or part of [evidence] is admissible; [2] the [evidence] could lead to admissible evidence; or [3] the [evidence] would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." 297 F.3d at 104. That observation, however, was nothing new: The Second Circuit held long before *Gil* that the relevant inquiry under *Brady* is not admissibility but rather the effect of the suppressed evidence "upon [the

15

defendant's] *preparation* for trial." *United States v. Polisi*, 416 F.2d 573, 578 (2d Cir. 1969) (emphasis added).

In *Polisi*—decided nearly three decades before Epps's trial—the Second Circuit said that "[t]he importance of *Brady* . . . is its holding that the concept out of which the constitutional dimension arises in these cases[] is prejudice to the defendant measured by the effect of the suppression upon [the] defendant's preparation for trial, rather than its effect upon the jury's verdict." *Id.* at 577. "In order to violate the defendant's constitutional right to evidence necessary to the preparation of his defense," the Second Circuit continued, "'the evidence must also be shown to be material and of some substantial use to the defendant.'" *Id.* at 578 (quoting *United States v. Tomaiolo*, 378 F.2d 26, 28 (2d Cir. 1967)). In other words, if evidence would have substantially helped the defense prepare for trial—even if the jury ultimately would never have seen that evidence—it was potential *Brady* material.

Thus, in *Polisi*, the court found that the prosecution's failure to turn over inconsistent testimony given by coconspirators at a later trial while the defendant's conviction was still on appeal was a *Brady* violation. "At the [first] trial, Anthony Polisi was made to appear the mastermind of the series of robberies" by his accomplices, the court explained. *Id.* But at the later trial of John Franzese—who "was not mentioned by the accomplices" at Polisi's trial—"the same accomplices testified that Franzese was the mastermind of the bank-robbery operations." *Id.*; *see United States v. Franzese*, 392 F.2d 954 (2d Cir. 1968), *cert. granted in part, judgment vacated in part sub nom. Giordano v. United States*, 394 U.S. 310 (1969). Because the government failed to disclose that information—which it must have known before Polisi's trial—"Polisi never

16

had the opportunity to use the differing version . . . to raise the issue of the credibility of the accomplices, nor to question the whole fabric of the change of leadership story." *Polisi*, 416 F.2d at 578. The court did not discuss the admissibility of this other testimony; rather, the inquiry was how it might have assisted the defense in preparing for trial. *See id.* at 577-78.

A year later, in *United States v. Bonnano*, 430 F.2d 1060 (2d Cir. 1970), the Second Circuit found a *Brady* violation when the government failed to disclose evidence that "a major prosecution witness[] was awaiting trial on an indictment in the same district on a securities fraud charge." *Id.* at 1061. Although the prosecution ultimately conceded on appeal that the evidence would be admissible, the Second Circuit explained that "[e]ven if the indictment were inadmissible at trial, this would not diminish its obvious value to the defense in preparing for trial and in giving it a lead to investigate." *Id.* at 1062. "Moreover," the court explained, "failing to disclose evidence valuable to the defense, even on the good faith belief by the prosecutor that it would be inadmissible at trial, deprives the defense of the opportunity to argue its admissibility and the court of its function of deciding the question." *Id.; see also United States v. Gleason*, 265 F. Supp. 880, 886 (S.D.N.Y. 1967) (acknowledging that "the prosecution's duty of disclosure as affirmed in *Brady*[] cannot be limited to materials or information demonstrated in advance to be competent evidence." (citation modified)).

So too here. There is little question that the information about Montgomery would have been of "some substantial use to [Epps]" in preparing his defense, *see Polisi*, 416 F.2d at 578; among other things, it at least would have given Epps's counsel "a lead to investigate," *see Bonnano*, 430 F.2d at 1062. As noted above, Epps

17

potentially could have called other witnesses and certainly could have developed an alternative-perpetrator theory that might have undermined Bradley's identification.  So clearly established law made that evidence material.

What is more, law enforcement officers have an obligation under *Brady* to turn over to the prosecution team *any* favorable evidence regardless of materiality.  *See Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (holding that "police satisfy their obligations under *Brady* when they turn exculpatory [or impeachment] evidence over to the prosecutors").  That rule was clearly established long before the start of Epps's criminal trial, *see id.*, and "makes good sense . . . because the police may lack 'the requisite legal acumen' to determine whether materials constitute *Brady* evidence . . . [and] should not be charged with 'mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions,'" *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021) (second alteration in original) (quoting *Walker*, 974 F.2d at 299).  So to the extent that the defendants suggest that reasonable law enforcement officers would not have understood the nuances of the materiality question, that argument lacks merit.

In sum, the Court finds that no reasonable law enforcement officer in 1998 would have concluded that he or she did not need to disclose Anderson's statements to the prosecution under *Brady* simply because those statements themselves might have been inadmissible.  *See Nat'l Rifle Assoc. of Am. v. Vullo*, 144 F.4th 376, 390 (2d Cir. 2025) (explaining that "an official is . . . qualifiedly immune from liability unless, under the particular circumstances the official faced, any reasonable official would have known for certain that the conduct was unlawful under then-existing precedent." (citation modified)).  And had the defendants disclosed the information to the prosecutors,  the

18

prosecution team should have determined under clearly established law that those statements were *Brady* material that could have assisted Epps in his trial preparation.

For all those reasons, Stambach, Giardina, and Costantino are not entitled to summary judgment on Epps's *Brady* claim.

### B.    Post-Trial Due Process Claims

Epps also objects to Judge Foschio's recommendation that summary judgment be entered on his post-trial due process claims.  *See* Docket Item 109 at 27-32.  More specifically, he argues that Judge Foschio failed to address either of his two post-trial due process claims for fabrication of evidence.  *See id.*  As discussed further below, neither of those claims may proceed to trial.

"The Due Process Clause [of the Fourteenth Amendment] promises a right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity."  *Ortiz v. Stambach*, 137 F.4th 48, 66 (2d Cir. 2025) (citation modified).  "More specifically, when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under [section] 1983."  *Id.* at 66-67 (citation modified).  "To prevail on a [s]ection 1983 fabrication of evidence claim, a plaintiff must demonstrate that (1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result."  *Id.* at 67 (citation modified).

### 1.     Bohen and Minor

Epps says that his first post-trial claim for fabrication of evidence involves Bohen's and Minor's lying about how Bradley initially identified Epps as Means's killer. *See* Docket Item 109 at 27.  According to Epps, Bohen and Minor fabricated the tip from Means's aunt to cover up the fact that Bradley first identified him by looking at a mug book rather than a photo array.  *See id.* at 30-31.

As an initial matter, to the extent Epps asserts that Judge Foschio failed to address a *pre-trial* due process claim against Bohen and Minor for fabrication of evidence, that argument lacks merit because that claim was never raised in the complaint.  Epps's pre-trial due process claims are based solely on the purported *Brady* violation, *see* Docket Item 1 at ¶¶ 109-17, and *Brady* claims are distinct from claims based on fabrication of evidence, *see Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 367 (W.D.N.Y. 2021) (acknowledging that "fabrication of evidence is not redressable as a *Brady* violation"); *Li v. City of New York*, 246 F. Supp. 3d 578, 626 (E.D.N.Y. 2017) ("A defendant's right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs . . . , and also when an officer forwards fabricated evidence to prosecutors." (citation modified)).

In fact, Epps did not assert a pre-trial fabrication-of-evidence claim against Bohen and Minor until his response to the motion for summary judgment.  *See* Docket Item 90 at 24.  And it is well settled that "a party may not use his or her opposition to a dispositive motion as a means to amend the complaint." *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 365 (2d Cir. 2007) (summary order) (citation modified); *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  So Epps cannot maintain a pre-trial fabrication of evidence claim now.

20

SPA-21

Nor can Epps defeat summary judgment on a post-trial fabrication claim. Epps did not challenge the identification procedures employed by Bohen and Minor *post-trial* in his initial section 440 motion, and there is no evidence that the two detectives participated in the hearing in any way. *See generally* Docket Items 78-24 and 78-25. So Epps cannot establish that Bohen and Minor caused him to suffer a post-trial deprivation of liberty. *See Collins v. City of New York*, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2021) (explaining that, in the context of a fabrication of evidence claim, a plaintiff must "prove that she suffered a deprivation of liberty that is not too remote of a consequence of the act of creating the false information" (citation modified)). Bohen and Minor therefore are entitled to summary judgment on Epps's post-trial due process claim against them.

### 2.    Stambach, Giardina, and Costantino

Epps says that his second post-trial claim for fabrication of evidence is against Stambach, Giardina, and Costantino for lying to the prosecutors who prepared the detectives' affidavits submitted in opposition to Epps's initial section 440 motion. *See* Docket Item 109 at 27-28. That claim fails because Stambach, Giardina, and Costantino are entitled to absolute immunity in connection with it.

Law enforcement officers are entitled to absolute immunity for their testimony in judicial proceedings. *See Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983); *see also Rolon v. Henneman*, 517 F.3d 140, 145 (2d Cir. 2008) ("The Supreme Court has extended absolute immunity to police officers testifying at judicial proceedings on the ground that this type of immunity existed at common law for citizen-witnesses."). But that immunity also extends to "preparatory activity, such as a preliminary discussion in

21

SPA-22

which the witness relates the substance of his intended testimony." *See Rehberg v. Paulk*, 566 U.S. 356, 370 (2012). "Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Id.* at 369 (citation modified).

Here, Epps attempts to do exactly that. He says that he "is not claiming that [the] [d]efendants are liable for their post-trial hearing testimony[;] [r]ather, they are liable for what they told the prosecutors, memorialized in their affidavits, months before they ever testified." Docket Item 124 at 17. The affidavits, he says, "were the reason that these same [d]efendants were called to the stand, by the prosecution, to testify to the same fabrications." *Id.* at 18. Had the defendants "told the truth [to the prosecutors]," Epps posits, "the [section] 440 hearing would have been entirely different, and a jury here could find that [he] would have been released years earlier." *Id.*

In other words, Epps says that had the defendants not lied to prosecutors when preparing for the hearing, the prosecutors never would have called them to testify. That may be true, but it does not change the fact that the real harm came from the false testimony. Put another way, absent the protected testimony, Epps cannot meet the elements of his post-trial due process claim. *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) ("When a police officer claims absolute immunity for his . . . testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his [section] 1983 claim without resorting to the . . . testimony."). Accordingly, Epps's post-trial due process claim against Stambach, Giardina, and Costantino is dismissed.

22

### C.     Article I, Section 6, Claim

Finally, Epps objects to Judge Foschio's recommendation that his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution[11] be dismissed. *See* Docket Item 109 at 32-33. In Epps's view, that claim should proceed to trial because respondeat superior liability is not cognizable under section 1983, and his only viable claim against the city therefore is under the state constitution. *See id.* This Court agrees with Epps.

"Courts in this Circuit have uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under [section] 1983 for violations of parallel provisions of the U.S. Constitution." *Buari v. City of New York*, 530 F. Supp. 3d 356, 408 (S.D.N.Y. 2021) (citation modified). "These courts rely on the premise that [section] 1983 provides an 'adequate' alternative remedy for violations of the New York State Constitution." *Id.* at 409 (citation modified). "Thus, where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Id.* (citation modified).

Respondeat superior liability is not cognizable under section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). But it is cognizable under the provisions of the New York State Constitution. *See Brown v. New York*, 674 N.E.2d 1129, 1142 (N.Y. 1996). So to the extent Epps seeks to hold the City of Buffalo vicariously liable for the failure of Stambach, Giardina, and Costantino to disclose

---

[11] Article I, Section 6 of the New York State Constitution states, in relevant part, that "no person shall be deprived of life, liberty[,] or property without due process of law." N.Y. Const. art. I, § 6 (citation modified).

SPA-24

Anderson's statements under *Brady*, that claim does not fall within the scope of section 1983. *See, e.g., Buari*, 530 F. Supp. 3d at 409-10 (allowing state constitutional due process claim against municipality to proceed because section 1983 does not provide an adequate alternative remedy for respondeat superior claims); *see also Brown*, 89 N.Y.2d at 194 ("A plaintiff seeking to recover on the basis of respondeat superior simply does not come within the terms of section 1983."). Epps's claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution therefore may proceed to trial.

## III.    REMAINING CLAIMS

Judge Foschio also recommended that summary judgment be entered in favor of Bohen, Minor, Stambach, Giardina, and Costantino on Epps's malicious prosecution claims and that Epps's remaining state law claims against the individual defendants be dismissed. *See* Docket Item 99 at 43-53, 59-61. Epps does not object to those recommendations, and neither 28 U.S.C. § 636 nor Federal Rule of Civil Procedure 72 requires a district court to review the recommendations of a magistrate judge to which no objections are raised. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985).

Nevertheless, the Court has reviewed those portions of the R&R and agrees with Judge Foschio. More specifically, Epps's malicious prosecution claims fail because the detectives had probable cause to prosecute him for Means's murder based on Bradley's photographic and in-person identifications. *See, e.g., Thompson v. City of New York*, 603 F. Supp. 2d 650, 657-58 (S.D.N.Y. 2009) (concluding that a witness's identification of the plaintiff in both a photo array and an in-person lineup established probable cause sufficient to defeat malicious prosecution claim); *see also Savino v. City of New York*,

24

331 F.3d 63, 72 (2d Cir. 2003) (acknowledging that "the existence of probable cause is a complete defense to a claim of malicious prosecution").

Further, without a viable malicious prosecution claim against any of the individual defendants, Epps cannot pursue a parallel claim against the City of Buffalo under Article I, Section 12, of the New York State Constitution.[12]  *See, e.g.*, *Morales v. City of New York*, 59 F. Supp. 3d 573, 583 (S.D.N.Y. 2014) ("Because Plaintiff has not demonstrated any basis for liability on the part of any of the City's agents or employees, her respondeat superior claim also fails." (citation modified)).  And Epps cannot pursue any state law claims against the individual defendants because section 1983 provides an adequate alternative remedy for those claims.  *See Buari*, 530 F. Supp. 3d at 409-10.

The Court therefore accepts Judge Foschio's recommendation to enter summary judgment in favor of Bohen, Minor, Stambach, Giardina, and Costantino on Epps's malicious prosecution claims and to dismiss Epps's remaining state law claims against the individual defendants.

---

[12] Article I, Section 12 of the New York State Constitution provides that "the right of the people to be secure in their persons, houses, papers[,] and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  N.Y. Const. art. I, § 12 (citation modified).

SPA-26

### CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment, Docket Item 77, is GRANTED in part and DENIED in part.  Epps's pre-trial due process claims against Stambach, Giardina, and Costantino, as well as his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution, may proceed to trial.  But Epps's remaining claims are dismissed.  The Court will schedule a status conference to set a trial date.


SO ORDERED.

Dated:   January 16, 2026
         Buffalo, New York


                              /s/ Lawrence J. Vilardo
                              LAWRENCE J. VILARDO
                              UNITED STATES DISTRICT JUDGE