# 26-263-cv

*United States Court of Appeals*
*for the*
*Second Circuit*

CORY EPPS,

*Plaintiff - Appellee,*

v.

CITY OF BUFFALO, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, MARK R. COSTANTINO, Executor of the Estate of Anthony Costantino,

*Defendants - Appellants,*

DETECTIVE JOHN BOHEN, DETECTIVE REGINALD MINOR, DETECTIVE ROBERT CHELLA, DETECTIVE RANIERO MASECCHIA, DETECTIVE CHARLES ARONICA, CHIEF JOSEPH RIGA,

*Defendants,*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

# BRIEF OF PLAINTIFF-APPELLEE

Glenn A. Garber
GLENN A. GARBER, P.C.
The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
(212) 965-9370

Rob Rickner
RICKNER MOSKOVITZ LLP
14 Wall Street, Suite 4C
New York, New York 10005
(212) 300-6506

*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iv

PRELIMINARY STATEMENT ..... 1

JURISDICTIONAL STATEMENT ..... 2

STATEMENT OF THE ISSUES ..... 3

STATEMENT OF THE CASE ..... 3

I. Factual Background ..... 3

a. Russell Montgomery Kills Tomika Means, and the Initial Investigation ..... 3

b. Cory Epps is Falsely Identified. ..... 5

c. Detective Bohen Falsifies the Identification Procedure ..... 6

d. Shortly Before Trial Wymiko "Pumkin" Anderson Tells Police That Russell Montgomery, Not Cory Epps, Shot and Killed Tomeka Means. ..... 8

e. How Anderson's Statement Could Have Been Used by Epps to Defend Himself. ..... 11

f. Epps's Trial and Sentencing ..... 12

g. Post-Conviction Revelations and Epps's Post-Trial Motions ..... 14

h. Epps's Exoneration. ..... 16

II. Procedural History ..... 17

SUMMARY OF THE ARGUMENT ..... 18

ARGUMENT ..... 21

I. QUALIFIED IMMUNITY DOES NOT APPLY BECAUSE NO REASONABLE DETECTIVE IN 1998 WOULD HAVE WITHHELD ANDERSON'S STATEMENT FROM THE PROSECUTION. ..................21

a. The Obligation to Turn Over Favorable Material to the Prosecution was Clearly Established by 1998....................................................................23

b. Other Precedent also Clearly Established the Law. ...................................31

c. The Impact of Montgomery's Confession ...............................................35

d. The Law Was Clearly Established, So Failing to Give the Anderson Statement to the Prosecution Was Inherently Unreasonable. ....................40

e. Conclusion..........................................................................................43

II. This Court Lacks Jurisdiction to Consider Appellants' Arguments Beyond Qualified Immunity—And Those Arguments Lack Merit............................44

a. The Detectives Fail to Meet Their Burden of Demonstrating Jurisdiction Over Half the Arguments in Their Brief...................................................44

b. Detectives' *Mens Rea* Arguments Have No Merit. ...................................46

c. The Detectives' Materiality Arguments—Which Cannot Be Re-Litigated Here—Also Have No Merit. ..........................................................49

CONCLUSION...............................................................................................54

CERTIFICATE OF COMPLIANCE...................................................................55

## TABLE OF AUTHORITIES

### Cases

*Arizona v. Youngblood*, 488 U.S. 51 (1988) .................... 21, 46

*Baxter v. Bracey*, 140 S. Ct. 1862 (2020) .................... 42

*Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019) .................... 47

*Blockbuster, Inc. v. Galeno*, 472 F.3d 53 (2d Cir. 2006) .................... 46

*Catone v. Spielmann*, 149 F.3d 156 (2d Cir. 1998) .................... 45

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .................... 38

*Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) .................... 42

*Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000) .................... 2

*Daniels v. Williams*, 474 U.S. 327 (1986) .................... 47

*Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994) .................... 45

*Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) .................... 24

*Giglio v. United States*, 405 U.S. 150 (1972) .................... 31, 37

*Gould v. Davis*, 165 F.3d 265 (4th Cir. 1998) .................... 41

*Grant v. Alldredge*, 498 F.2d 376 (2d Cir. 1974) .................... 32

*Green v. Thomas*, 734 F. Supp. 3d 532 (S.D. Miss. 2024) .................... 42

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) .................... 22

*Hope v. Pelzer*, 536 U.S. 730 (2002) .................... 24

*Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021) .................... passim

*Jok v. City of Burlington, Vermont*, 96 F.4th 291 (2d Cir. 2024) ............................46

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ............................................................42

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................... passim

*Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, 533 F.3d 98 (2d Cir. 2008) .....49

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) ..............................48

*McColley v. Cnty. of Rensselaer*, 740 F.3d 817 (2d Cir. 2014) ..............................49

*McKinney v. City of Middletown*, 49 F.4th 730 (2d Cir. 2022) ..............................42

*Miller v. Angliker*, 848 F.2d 1312 (2d Cir. 1988) ...................................................33

*Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376 (2d Cir. 2025),
*cert. denied*, 146 S. Ct. 1628 (2026) ...................................................................40

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) .....................................................22

*People v. DePasquale*, 54 N.Y.2d 693 (N.Y. 1981) ................................................36

*People v. Esteves*, 152 A.D.2d 406 (2d Dept 1989) ...............................................39

*People v. James*, 242 A.D.2d 389 (2d Dept 1997) .................................................39

*People v. Lumpkins*, 141 Misc. 2d 581 (Sup. Ct. Kings Co. 1988) .........................12

*People v. Robinson*, 89 N.Y.2d 648 (N.Y. 1997) ...................................................38

*People v. Smith*, 127 A.d.2d 864 (2d Dept. 1987) ...................................................12

*People v. Sorge*, 301 N.Y. 189 (N.Y. 1950) ...........................................................36

*Rohman v. New York City Transit Auth.*, 215 F.3d 208 (2d Cir. 2000) ...................45

*Russell v. Scott*, 170 F.4th 83 (2d Cir. 2026) ................................................. passim

*Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022)........................................................24

*Sacaza v. City of New York*, 169 F.4th 363 (2d Cir. 2026)............................ 2, 3, 45

*Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012 (9th Cir. 2020)...........................42

*Strickler v. Greene*, 527 U.S. 263 (1999) ..............................................................50

*Taravella v. Town of Wolcott*, 599 F.3d 129 (2d Cir. 2010)...................................22

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ..................................................24

*Tolan v. Cotton*, 572 U.S. 650 (2014).....................................................................48

*U.S. v. Santos*, 486 F. App'x 133 (2d Cir. 2012)....................................................52

*United State v. Gleason*, 265 F.Supp. 880 (S.D.N.Y. 1967) ..................................29

*United States v. Bagley*, 473 U.S. 667 (1985) .......................................................32

*United States v. Bonanno*, 430 F.2d 1060 (2d Cir. 1970).......................... 18, 22, 26

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) ............................................ 24, 25

*United States v. Katsourgrakis*, 715 F.2d 769 (2d Cir. 1983) ................................36

*United States v. Miller*, 411 F.2d 825 (2d Cir. 1969) .............................................32

*United States v. Polisi*, 416 F.2d 573 (2d Cir. 1969)...................................... passim

*United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004).......................................30

*United States.v. Payne*, 63 F.3d 1200 (2d Cir. 1995) ...................................... 51, 53

*Vega v. Semple*, 963 F.3d 259, 272 (2d Cir. 2020).......................................... 21, 24

*Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992).............................. passim

*Washington v. Napolitano*, 29 F.4th 93 (2d Cir. 2022) ......................................2, 45

*Wood v. Bartholomew*, 516 U.S. 1 (1995) .......... 20, 52

**Statutes**

28 U.S.C. § 1291 .......... 44

C.P.L. § 330 .......... 14

C.P.L. § 330.30 .......... 14, 44

C.P.L. § 440 .......... 15, 52

Fed. R. App. P. 28(a)(4)(B) .......... 46

**Other Authorities**

Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018) .......... 43

The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136 (1964) .......... 27

William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45 (2018) .......... 43

## PRELIMINARY STATEMENT

This is an interlocutory appeal in a wrongful conviction civil rights case brought by Defendant-Appellant Detectives ("Detectives") and the City of Buffalo challenging the District Court's denial of summary judgment. Epps spent over 20 years in jail for a Buffalo homicide he did not commit. The cause was Buffalo Detectives' pre-trial suppression of *Brady* material (named after the seminal case *Brady v. Maryland*, 373 U.S. 83 (1963)).

The appeal should only address qualified immunity, the only cognizable issue. But it strays to other issues and contested facts in an effort to improperly relitigate the entire summary judgment decision. This aspect of the appeal should be quickly rejected. Qualified immunity is equally straightforward. In this case, just days before Epps's murder trial began, the police received evidence that someone else confessed to committing the murder. As opposed to sharing that evidence with the prosecution, the police intentionally buried it. It goes without saying that the police cannot withhold alternative perpetrator evidence from the prosecution, whether the police think it is hearsay or not. The law was clearly established on this point well before 1998 when the suppression occurred, and the District Court thoroughly and effectively explains it in its well-reasoned summary judgment decision.

## JURISDICTIONAL STATEMENT

This Court lacks jurisdiction to decide the primary point in this interlocutory appeal. The Detectives are attempting to relitigate issues they lost on summary judgment that have no bearing on the qualified immunity defense. This Court cannot "exercise pendent jurisdiction over issues that are not ordinarily subject to interlocutory review," unless "(1) they are inextricably intertwined with the determination of qualified immunity or (2) their resolution is necessary to ensure meaningful review of the district court's ruling on qualified immunity." *Russell v. Scott*, 170 F.4th 83, 92 (2d Cir. 2026) (quotation omitted). Consequently, this Court has no jurisdiction to consider whether the evidence the Detectives withheld was material, or whether they acted with bad faith intent.

The Detectives' second point, whether the rights at issue were clearly established, is within this Court's interlocutory jurisdiction, as long as the Detectives limit their arguments to pure issues of law. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). This Court lacks jurisdiction to consider arguments that require it to comb through the record and delve into contested facts. "Appellate jurisdiction generally does not exist 'if resolution of the immunity defense depends upon disputed factual issues.'" *Sacaza v. City of New York*, 169 F.4th 363, 369 (2d Cir. 2026) (quoting *Washington v. Napolitano*, 29 F.4th 93, 103 (2d Cir. 2022)). The factual record must be limited to three categories of facts: "[1]

stipulated facts, or [2] on the facts that the plaintiff alleges are true, or [3] on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Sacaza*, 169 F.4th at 369 (2d Cir. 2026). To the extent the Detectives' arguments go beyond this limited set of facts, this Court lacks jurisdiction to consider them.

## STATEMENT OF THE ISSUES

1. Does this Court have jurisdiction to consider the aspects of a summary judgment ruling that have no bearing on a qualified immunity defense?

2. Would a reasonable officer in 1998 have withheld from the prosecution evidence that an alternate murder suspect confessed to the crime and was identified and described as looking like the defendant who was about to go to trial?

## STATEMENT OF THE CASE[1]

### I. Factual Background

#### a. Russell Montgomery Kills Tomika Means, and the Initial Investigation.

On Monday, May 26, 1997, shortly after four o'clock in the morning, Tomika Nicole Means was murdered while driving home from Birchfield's, a popular Buffalo nightclub. A801-A812. It occurred in a "road rage" incident.

---

[1] The Appendix is cited herein as "A___" and the Confidential Appendix is cited herein as "CA-___".

A802-A805. She was with her friend, Jacqueline Bradley, who was in the passenger seat, when another car cut them off, nearly causing an accident. A802. Means honked the car horn and continued driving. A802.

When Means and Bradley reached the intersection of East Delevan and Chelsea Streets, the same car cut in front of them again and stopped. A806-A808. Montgomery exited the passenger side of the vehicle, a gray or light blue Oldsmobile Delta 88 or Pontiac 6000, and approached the passenger side window of Means' car. A808; A1389. The woman who was driving stayed in the car. A780-A781. He leaned in, drew a gun, and pointed it at Means. Bradley said, "It ain't worth it," but he replied, "fuck that, bitch," and shot Means once in the head before returning to his car and fleeing the scene. A808-A809.

Bradley described the shooter as a black male, five feet eight inches or five feet nine inches tall, and weighing approximately 250 pounds, with noticeable pockmarks on his face, and a light goatee or beard. The pockmarks—scarring from acne—were visible because Montgomery was leaning into the passenger side, just inches away from Bradley. A1404-A1407; A2693-A2694. He was also wearing a baseball cap. A2693. She saw the shooter when it was dark, after she had four drinks. It happened very quickly, Bradely was scared, and the gun was right in front of her face. A839-A842; A2693-A2694.

The next day, Bradley helped police create a composite identikit sketch of the male shooter and the female driver. A745-A746; A1680-A1683; A1986. The composite sketch of the shooter (now known to be Montgomery) did not include the pockmarks which Bradley had initially described. A1986. The sketch also had the shooter wearing a hat. A1986. Bradley also said that she knew the shooter from Birchfield's. A1403-A1404.

**b. Cory Epps is Falsely Identified.**

At her deposition, Bradley explained the identification procedure the police used. A few weeks after Means was killed, officers came with, "these big books with a lot of pictures and stuff in them." A740-A745. The books were large binders with plastic over the photos to hold them in. A740-A745. There were probably over a hundred photos in the books, with about ten photos per page. A740-A745. And she would just, "keep flipping," through them. A740-A745. The first time officers brought her one of these books, she did not recognize anyone. A744. A few weeks later, the second time, she recognized Epps in the book and testified that, "I just zoned right in, heart start beating, crying. And I'm like that's him." A746. She testified that she did not remember ever seeing a photo array with six photos in it. A748. She did not remember seeing a photo array, or making an identification from one and signing it, as the detective who conducted the photo identification procedure claimed. A751-A572. She said she signed documents

related to an identification, "nine or ten times." A766. Finally, Bradley said she did not learn Epps's name until after a subsequent lineup, although she admitted that she did recognize him from Birchfield's. A754.

It should have been apparent that Bradley's mug book identification was problematic because Epps did not match the description Bradley gave to the police earlier. *First*, he is six foot two inches tall—at least four inches taller than Montgomery and six inches taller than the description provided by Bradley. A1402-A1405. *Second*, Epps has smooth skin, unlike Montgomery, who has acne scars, scars that Bradley saw first-hand when he leaned into the car to shoot Means. A1406-A1407. *And third*, there was no other evidence whatsoever to connect Epps to the Means murder. A260-A261; A1613-A1620; A1687; A1828-A1829; A1903-A1910, A2045-A2046. There were no leads suggesting he was involved. *Id*. No witnesses said he was in the area. *Id*.

Unfortunately, Epps, believing he would be exonerated, cooperated with the police and on July 30, 1997, he agreed to be placed in a lineup. A1005-A1007. He was, in fact, placed in a lineup twice, back-to-back. A1005-A1007. And Bradley identified him in both. 32.D.

**c. Detective Bohen Falsifies the Identification Procedure.**

Detective John Bohen had little experience in working a homicide case, and was assigned to homicides at the very end of his career so he could get more

overtime, leading to a higher pension. A151-A155. Bohen admitted, in the suppression hearing, that he knew little about Epps, and had not reviewed any documents related to the case, before approaching Bradley to make an identification, he just heard, "people talking in the office." A2570-A2571.

According to Bohen, on June 26, 1997, he got a call from the victim's aunt, Linda Means, saying the composite Bradley made looked like Epps, but he never actually interviewed her. A176-A177; A198-A200; A1114-A1115. He only recorded this alleged conversation in a very short note on a P-73 police form. A1114-A1115. He also stated that he created a photo array that included Epps on July 3, 1997, showed it to her on July 6, 1997, and that after about two minutes she, "in a very exited voice states, that's him, that's the guy who shot Tomika. I swear to god that's him." A987-A988; A1895-A1896; A2020. And then, he claims, she signed the back of the array, and signed an affidavit with Epps's name on it, saying that is who she identified. A1095-A1096; A1118.

There are also substantial questions about the photo arrays the police provided to the prosecution. There were two photo arrays created for Epps, with two different pictures of Epps taken on two different dates (March 22, 1994 and May 18, 1997). A205-A206; A1095-A1103. One photo array was created by Bohen. A201A213; A1095-A1103. The second photo array states that it was created by a Detective Juan Morales, but it also repeats a mug shot from another

array Bohen created for suspect Donald Faison (mug number 210027). A201-A213; A1095-A1103. Bohen could not explain why there were two photo arrays created using two different photos of Epps. A201-A213. At his deposition, he testified that he thought the photo array created by Morales was the one he showed to Bradley, based on the mug shot numbers, but that is not the one that Bradley allegedly signed. A201-A213; A1101. The copy of the photo array she did sign, that was produced in discovery in this action, does not have Epps's photo in it. A1095-A1096. And all three photo arrays have the target in spot 5. A1095-A1103.

#### d. Shortly Before Trial Wymiko "Pumkin" Anderson Tells Police That Russell Montgomery, Not Cory Epps, Shot and Killed Tomeka Means.

Russell Montgomery murdered Paul Pope on April 16, 1998, only a few days before Epps's trial. A692-A693. Pope's body was found stuffed in the trunk of his white 1992 Grand Am. A2641. Montgomery and Pope had dealt drugs together for several years, but Pope had been telling people about how Montgomery killed Means, so Montgomery shot Pope to silence him and to intimidate anyone else who knew the truth. CA-1; A1064-A1065.

This information came from Wymiko "Pumkin" Anderson, one of Pope's girlfriends. Investigating Pope's murder, Detectives Mark Stamback and James Giardina first talked to Anderson at her home on April 17, 1998, and then brought her to the homicide unit, where they were joined by Detective Mark Constantino.

A485-A487; A688-A689; A2387-A2391. During the precinct interview, before Epps's trial, they asked her what Montgomery looked like, and she said that he looked just like the sketch of the guy who killed Means, the sketch that had been on the news. A699-A701; A1064-A1065. Anderson was friends with Means' boyfriend, so she had a particular interest in the case. A693-A694.

After hearing that Montgomery looked just like the composite sketch Bradley generated during the Means investigation, Stambach and Giardina left the interview room. A699-A701; A1064-A1065. When they returned, Stambach said they were pretty sure that they had the right guy for the Means murder, because all the evidence pointed to Epps. A699-A701; A1064-A1065. Anderson responded that they (Epps and Montgomery) look alike. A699-A701; A1064-A1065.

Anderson also told Stambach and Giardina that at 9:00 AM on May 26, 1997—the day Means was murdered—Montgomery came to where she was asleep with her boyfriend, Pope. A1064-A1065. Montgomery and Pope left for a while, and when Pope came back, Pope told Anderson that Montgomery had confessed to killing Means earlier that morning. A1064-A1065.

At this point, there were many additional reasons to believe that Montgomery killed Means:

- Montgomery fit the description in the composite sketch (A700-A701; A718);

- Montgomery was five foot ten inches tall, much closer to Bradley's initial description than Epps (A2649);
- Montgomery, unlike Epps, had acne scars, just like the ones described by Bradley when she saw the shooter from only inches away (CA-26);
- Montgomery lived at 1118 East Delevan Avenue, less than a mile from where Means was killed (A584-A585; A2696);
- Montgomery had a Buick Park Avenue, possibly tan, which is similar to the car Bradley described on the night of the shooting (A2650);
- Montgomery was engaged in criminal activity, including dealing large quantities of illegal drugs (A1064-A1065);
- Montgomery regularly carried a gun (A2651);
- Montgomery murdered Pope in an awful act of cold-blooded violence, much like the Means murder, and stuffed him into the trunk of a car (A692-A693; A2641);
- Montgomery's motive for killing Pope was that Pope was gossiping about the Means murder (CA-1);

Detectives Stambach and Giardino prepared a statement about the Pope murder that did not include these details about Montgomery and Anderson signed it. A1107-A1108. They did not disclose the Anderson statement to the prosecution, even though they knew Epps was going to trial. A157; A160; A196-A197; A2346-

A2347. There were only about ten detectives in the City's homicide unit, and when a homicide case went to trial, everyone would know about it. A157; A160; A196-A197. There was also a common file with all the documents related to homicide investigations maintained in the homicide unit. A1663-A1665. And the composite sketch Bradley helped police make of the shooter was widely distributed in the homicide unit. In fact, there was a board at the homicide unit that had all the composites up on it. A182.

#### e. How Anderson's Statement Could Have Been Used by Epps to Defend Himself.

One of Epps's criminal defense counsel at trial, David Cotter, was explicit in how he could have used Anderson's statement to defend Epps:

- Requesting a trial continuance to investigate Anderson's information.
- Investigating Montgomery, obtaining a picture of him, and comparing it to Epps.
- Urging the prosecution to investigate Montgomery and advocating for dismissal in light of Epps's alibi and the weakness of the case.
- Conducting a background search of Montgomery and speaking to other witnesses who he may have also confessed to.
- Showing the sole eyewitness, Jackie Bradley, Montgomery's photograph before she testified, and if she refused to cooperate showing his photo to her on cross-examination.

A2346-A2347.

Notably, when Anderson's identity came to light in 2000 and her revelation became the subject of a motion to vacate Epps's conviction in 2000, both sides litigated with the understanding that Anderson's statement, if made prior to Epps's trial, was *Brady* material and could not have been withheld. Indeed, when issuing the order granting an evidentiary hearing, the court stated:

> [T]hat this information could have been used on cross-examination of the People's eyewitness had it been timely divulged; and that the failure to disclose deprived [Epps]of the opportunity to show a photograph of Montgomery to the eyewitness, and to make an informed decision concerning the trial strategy most beneficial to his interests.

March 2, 2001, Memorandum and Order, McCarthy, J.; A2957-A2958. The decision then cited *People v. Smith*, 127 A.d.2d 864 (2d Dept 1987) and *People v. Lumpkins*, 141 Misc. 2d 581 (Sup. Ct. Kings Co. 1988), two state law decisions following the federal *Brady* rule regarding the breadth of exculpatory material that needed to be turned over to the defense. A2958.

**f. Epps's Trial and Sentencing.**

Epps's trial started on April 20, 1998. A2346. At trial, Bradley identified Epps as the person she observed shoot and kill Means. A819; A826. She claimed to be certain that Epps was the shooter even though she had been drinking that night and only saw the shooter very briefly in the dark under terribly stressful

circumstances when he exited his vehicle and approached Means's car with a gun in his hand. A838-A843.

Epps's trial counsel was focused on alternate perpetrators. A830-A837. They made a specific pretrial discovery request for *Brady* material. A1969. Andrew LoTempio used the disclosures to cross-examine Bradley with photos of the other suspects that had emerged. A830-A837. He also addressed how Epps did not have acne and was much taller than the shooter Bradely described. A825-A835. Because Epps's attorney did not know about Montgomery, he could not confront Bradley with his photo or otherwise try to prove that Montgomery was a viable alternate perpetrator. A2346-A2347; A1969-A1983.

When Epps was eventually exonerated, Erie County District Attorney John Flynn emphasized that Epps and Montgomery look "eerily similar" and referenced photographs that could have been used by Epps's criminal attorney to demonstrate this obvious fact. A1880.

In addition, Epps had an alibi—he was on his way to Perkins, a restaurant across town, to eat breakfast with his girlfriend Jerriah Johnson, when Means was killed. A1490-A1590. Johnson testified that Epps drove her to Perkins at around 4:30 AM in his car, a "four-door hunter green Chevy Malibu" (a different car than the one the killer was described as driving). A1494; A1518. She recalled where they sat in the restaurant, what their server looked like, and what they ordered.

A1519; A1551. Joseph Murphy, a manager at Perkins, testified that he examined the schedule and learned that Mike Strasser, who was still new at the restaurant, was on duty that night, and confirmed that Strasser matched the description of the waiter Johnson provided. A1569-A1573. Murphy also located a receipt in Perkins' computer system which corroborated Johnson's testimony, including the food Epps ate and the location of their table in the restaurant. A1572-A1573.

Nevertheless, on April 24, 1998, Epps was convicted of murder. A2019; A2996.

**g. Post-Conviction Revelations and Epps's Post-Trial Motions.**

Three days after the verdict, and after seeing it on the news, Anderson wrote an anonymous letter to Epps's attorney, telling him that Montgomery killed Means. A1109-A1110. She also pointed out the resemblance between Epps and Montgomery. A1109-A1110. After Epps's counsel received the anonymous letter it became the subject of a motion to set aside the verdict under C.P.L. § 330.30, which was argued at Epps's sentencing on June 10, 1998. A1987-A1994. But without a witness to swear to the allegations in the anonymous letter, the court denied the motion. A2003-A2005.

The court sentenced Epps to twenty-five years to life in prison. A2019. But it directed that, "in light of the defendant's protestations of innocence and at least this suggestion that there may be someone else responsible, and based upon a

general premise that eyewitness testimony in and of itself, without corroboration, is not the most satisfying of evidence that can be received in a courtroom ... the district attorney has an ongoing obligation to continue to make sure that justice has been done in this case." A2019.

Two years later in 2000, when Montgomery's murder trial involving Pope was underway, Epps's attorneys finally learned that Wymiko Anderson wrote the anonymous letter, and filed a C.P.L. § 440 motion. A2953. Detectives Stambach, Giardina, and Minor undermined this motion by providing the prosecution with false affidavits that stated that Anderson did not tell them about Montgomery on April 17, 1998—which would have made the statement *Brady* material, as it was before trial—instead claiming this information surfaced afterwards. A2524-A2538. The evidentiary hearing on the motion centered on this very fact—whether Anderson's statement was provided on April 17, 1998, making it *Brady* material that was suppressed, requiring a new trial—or whether it was disclosed afterwards, at which point it was not *Brady*, and not the basis for granting a new trial. A2349-A2523.

Anderson testified at the hearing in 2001. First, she detailed how, before Epps's trial started, she told Detectives Stambach and Giardina that Montgomery looked just like the composite sketch from the Means murder. A2423-A2425. She explained that they left the room right after, came back, and said she was wrong.

A2379-A2380. She argued with them, and then told them about how Montgomery had confessed to Pope only hours after the Means murder. A2381. The prosecution called Giardina, Stamback, and Constantino, who falsely testified that Anderson had not told them about Montgomery's link to the Means murder before Epps's trial. A2463-A2510.

On September 13, 2001, the court found that the officers were credible, that Anderson was not, and denied Epps's motion. A1086-A1090.

**h. Epps's Exoneration.**

Almost two decades after he was first arrested, the Exoneration Initiative, Epps's most recent post-conviction attorneys, received new information proving that Montgomery killed Means. CA-1-CA-2. A new witness, referred to as Witness 1 to protect her identity, overheard Montgomery's confession to Pope. CA-1-CA-2. She was in her bedroom when Montgomery and Pope came to her apartment shortly after Means's murder and she heard Montgomery tell Pope, "I fucked up. I killed Keyon baby mother," whom she knew to be Tomika Means. CA-9-CA-10. This evidence, against the backdrop of an already weak case, including Anderson learning about Montgomery's confession to Pope, secured Epps's release. In fact, mid-hearing, the Erie County District Attorney conceded: "After reviewing this case, it has become clear to me that Mr. Epps should not spend one more night in

prison … This Office is committed to not only convicting the guilty, but protecting the innocent."[2]

Epps was released from custody on December 1, 2017, finally a free man after over two decades of wrongful incarceration.

## II. Procedural History

After his exoneration, on March 1, 2019, Epps filed this action against the Detectives who investigated him, as well as the City of Buffalo. A6. The Complaint included 42 U.S.C. § 1983 federal claims against the Detectives, as well as respondeat superior claims against Buffalo. A17-A43.

After two years of litigation, discovery concluded and the Detectives moved for summary judgment. It was referred to a magistrate judge, who on May 23, 2022, issued a report and recommendation effectively dismissing Plaintiff's entire case, including, relevant here, the *Brady* claim by finding that Detectives Stambach, Giardina, and Constantino were entitled to qualified immunity. A3253-A3278.

Plaintiff filed an objection, and after briefing, the District Court held oral argument on April 28, 2025. A3206. On January 16, 2026, the District Court

---

[2] Press Release, Erie County District Attorney's Office, DA Flynn Consents To Vacate Buffalo Man's Murder Conviction (modified Dec. 6, 2017), https://www4.erie.gov/da/sites/www4.erie.gov.da/files/archive/index.php-1809.html?q=press/da-flynn-consents-vacate-buffalo-mans-murder-conviction

issued a Decision and Order rejecting the Detectives' qualified immunity defense, and ruling that the *Brady* claim and the related claim against the City of Buffalo for violating the New York State Constitution could go forward to trial. A3253-A3278.

The Detectives filed this interlocutory appeal on February 5, 2026. A3279.

## SUMMARY OF THE ARGUMENT

The Detectives advance two sets of arguments. We address them in reverse order. *First*, the Detectives claim, they should be granted qualified immunity because in 1998 it was not clearly established that inadmissible evidence could be *Brady* material, and that it was not clearly established that the Detectives had an obligation under *Brady* to turn exculpatory evidence over to the prosecution. Not so.

Decades earlier, in *United States v. Polisi*, 416 F.2d 573 (2d Cir. 1969), and *United States v. Bonanno*, 430 F.2d 1060 (2d Cir. 1970), this Court held that favorable evidence that could be useful to the defense for *trial preparation* must be disclosed, and in context it was obvious that admissibility did not matter. And six years before Epps's trial, in *Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), this Court ruled that the police had to turn over favorable material to the prosecution so the prosecution, not the police, can assess its value. This Court reasoned that decisions on admissibility should be left to prosecutors and

ultimately to judges, and that it is not up to police, who are not lawyers, to make such assessments prior to turning over material that can help the defense. And this Court recently held that *Walker* "clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused," *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021), making the qualified immunity issue here essentially *res judicata*.

The Montgomery confession was unquestionably favorable to Epps's defense. Epps's trial counsel could have used it to cross-examine the only eyewitness to the crime, to investigate new leads, and could have moved to admit it into evidence. Without question, the District Court was correct to deny the Detectives qualified immunity.

The Detectives take these same arguments and claim that even if the law was clearly established, some imagined ambiguities in the law made suppression reasonable. But that is not how qualified immunity works when the right is clearly defined. In some cases, like an arrest without probable cause, the right has been defined generally, and qualified immunity can still apply if an officer can reasonably believe there was probable cause on the specific facts of the case. Such decisions are made by police officers every day, often in the spur of the moment, and reasonable mistakes can be made. But when, as here, Detectives come by information that is obviously favorable to the defense, like Montgomery's

confession, how it can be used by the defense is outside their purview, and there can be no question of what to do. They simply must turn it over to the prosecution; and failing to do so was undoubtedly unreasonable. The District Court was correct on this score too.

The one case Detectives cite about whether inadmissible evidence could be *Brady* material, *Wood v. Bartholomew*, 516 U.S. 1 (1995), offers them no help. There, while it is true the suppressed polygraph was inadmissible under state law, the Court also ruled that it was not *Brady* because it had no value even as an investigatory lead or for impeachment and the record contained defense counsel's "candid acknowledgment that disclosure would not have affected the scope of his cross-examination." *Id*. at 7.

*Second*, the Detectives try to relitigate parts of their summary judgment motion wholly unrelated to qualified immunity. This appears in the first and primary section of their Brief. But this Court lacks jurisdiction to hear these arguments because they have no connection to the qualified immunity analysis. *Russell v. Scott*, 170 F.4th 83, 92 (2d Cir. 2026). Worse, the Detectives do not even argue there is jurisdiction, which in itself is "fatal" to their appeal. *Id*. at 91–92.

These arguments also lack merit. They hinge on Detectives' claim that they did not act in bad faith; but that is inconsequential. *Brady* has no *mens rea* requirement; "good or bad faith" is "irrelevant." *Arizona v. Youngblood*, 488 U.S.

51, 57 (1988). And there is evidence the Detectives acted in bad faith. They withheld Anderson's identity even after the "anonymous" letter surfaced to undermine Epps's post-verdict motion and then lied about when Anderson told them about Montgomery's confession to undermine Epps's post-conviction motion. A636-A637; A705-A707; A2524-A2538. The Detectives are also wrong to claim that the Montgomery confession was not material. The question is whether the criminal defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). There can be no confidence in Epps's undisputed wrongful conviction in light of the withholding of Montgomery's confession, especially given all the ways the defense could have used it at trial and how it could have impacted the outcome.

Defendant Detectives' jurisdictionally defective, meritless arguments should be disregarded, the qualified immunity defense should be rejected, and Epps's wrongful conviction should finally advance to trial.

## ARGUMENT

### I. QUALIFIED IMMUNITY DOES NOT APPLY BECAUSE NO REASONABLE DETECTIVE IN 1998 WOULD HAVE WITHHELD ANDERSON'S STATEMENT FROM THE PROSECUTION.

Qualified immunity is only available to public officials who "'perform their duties reasonably.'" *Russell v. Scott*, 170 F.4th 83, 93 (2d Cir. 2026) (quoting *Vega v. Semple*, 963 F.3d 259, 272 (2d Cir. 2020)). Its limited purpose is to "protect[]

government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal cites and quotes omitted). In certain cases, even if the law is clearly established and violated, qualified immunity can still shield an official from liability, but only "if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (quoting *Higazy v. Templeton*, 505 F.3d 161, 169–70 (2d Cir. 2007)).

In appropriately denying the Detectives' qualified immunity defense, the District Court drew from a trilogy of Second Circuit cases. First, *United States v. Polisi*, 416 F.2d 573 (2d Cir. 1969), and *United States v. Bonanno*, 430 F.2d 1060 (2d Cir. 1970) solidified what *Brady* meant: that evidence favorable to the defense had to be turned over if it could impact a ***defendant's trial preparation***. Disclosure was not limited to material that was technically admissible as direct evidence that would be physically put before a trial jury. Any information that is useful to the defense needed to be turned over.

If this was not clear enough (six years before the Detectives suppressed Montgomery's confession) *Walker v. City of New York* held that as early as 1971 exculpatory information—including *inadmissible hearsay*—had to be disclosed by

police and it was not their province to make admissibility determinations. 974 F.2d 293 (2d Cir. 1992). While the Detectives try to re-interpret *Walker* to avoid its central holding, they cannot. This Court, in *Horn v. Stephenson*, ruled that *Walker* "clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused." 11 F.4th 163, 171 (2d Cir. 2021). As such, this Court already decided the core immunity issue presented in this interlocutory appeal.

Given this clearly established law, the question of whether the Detectives' conduct was reasonable effectively disappears. Any reasonable detective would have known to turn over to the prosecution a confession to a murder by an identified alternate perpetrator who looked remarkably like the defendant about to go to trial for the same crime. There can be no mistake about it. And the failure to do so was unreasonable by any metric.

**a. The Obligation to Turn Over Favorable Material to the Prosecution was Clearly Established by 1998.**

The Detectives employ a common qualified immunity strategy. They define the right that is violated as narrowly as possible and claim that prior cases did not put the Detectives on notice of the violation when it occurred. For them, unless an appellate court previously ruled in a case that is impossibly identical to the facts here, the Detectives could not have known what to do. The Detectives imagine a reasonable detective that is so incapable of reasoning and deduction that the only

way he would know what to do is if an appellate court holds his hand and gently guides him to the correct answer. Anything less, they claim, warrants immunity.

But this is not the law. This Court has repeatedly rejected this "common refrain in qualified immunity cases," where defendants point to "the absence of prior case law" with impossibly identical facts to the case at bar. *Edrei v. Maguire*, 892 F.3d 525, 542 (2d Cir. 2018) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 237 n20 (2d Cir. 2014)); *see also Vega*, 963 F.3d at 277 (noting that this Court has "repeatedly rejected this type of argument"). Officials can even be "on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Sabir v. Williams*, 52 F.4th 51, 63 (2d Cir. 2022).

The District Court's opinion methodically goes through prior cases that, in 1998, informed the Detectives of what the law required: Turn over the Montgomery confession to the prosecution because it is favorable to Epps's defense. The Detectives claim that "the Second Circuit had not considered the explicit issue of whether inadmissible evidence could be *Brady* material until *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002), is simply not true. Nor, is "*Walker* [] the only case relied upon by the District Court" to support its qualified immunity determination, as Detectives also argue. Br. 33, 37. Indeed, these contentions are quite surprising given the  District Court's opinion.

It begins by reviewing *Polisi* and *Bonnano,* which clearly established the right to favorable material, regardless of admissibility, decades before *Gil* (and *Walker*). But the Detectives do not even address *Polisi* beyond a brief mention in their Statement of the Case. And they do not mention *Bonnano* at all. They essentially pretend this key precedent does not exist.

But it does, and with force on the matter at hand as the District Court explains: "The Second Circuit held long before *Gil* that the relevant inquiry under *Brady* is not admissibility but rather the effect of the suppressed evidence 'upon [the defendant's] *preparation* for trial.' *United States v. Polisi*, 416 F.2d 573, 578 (2d Cir. 1969) (emphasis added)." A3267-A3268.[3] In *Polisi*, "the Second Circuit said that '[t]he importance of *Brady* . . . is its holding that the concept out of which the constitutional dimension arises in these cases[] is prejudice to the defendant measured by the effect of the suppression upon [the] defendant's preparation for trial, rather than its effect upon the jury's verdict." *Id.* at 16 (quoting *Polisi*, 416 F.2d at 577).

---

[3] *Gil* did not outline a new legal standard at all as Detectives contend. Rather, the Court simply went through a straightforward analysis under another key precedent, *Kyles v. Whitley*, 514 U.S. 419 (1995), and found that a hearsay memo "had the potential to subvert [the prosecution's] background assumption radically," and thus could have potentially resulted in a different trial outcome. *Gil*, 297 F.3d at 102. *Kyles*, decided three years before Epps's trial and resting on the logic of *Brady* and its progeny, stresses the importance of turning over information that can be used to undermine the quality of the police investigation.

*Polisi*'s broad description of *Brady* material not only encompasses favorable evidence, regardless of its admissibility at trial, but the facts and holding of *Polisi* clearly demonstrate what a reasonable detective must do when presented with a murder confession from an alternate suspect. In *Polisi,* two accomplices testified and described the defendant as the mastermind of a robbery. 416 F.2d at 575. The withheld *Brady* material was a third accomplice's conflicting version of the crime where the defendant played a less serious role. *Id*. This Court held that "[a] new trial [was] required even though [the withheld accomplice's] testimony probably would not have produced a different verdict, even though the testimony is perhaps more relevant to punishment than guilt, and even though the testimony's primary effect would only be to impeach the credibility of the accomplices." *Polisi*, 416 F.2d at 578. (internal cites and quotes omitted). *Polisi* thus makes clear that if the evidence can lead to any positive for the defense, it must be disclosed. It is thus impossible to fathom how, after *Polisi,* Montgomery's confession, even if Detectives had the wherewithal to conjure an argument that it was inadmissible hearsay, could be withheld.

*Polisi's* holding and rationale is then echoed a year later in *United States v. Bonanno*, 430 F.2d 1060 (2d Cir. 1970), also relied upon by the District Court (and completely ignored by Appellants). There, the Court cites to and follows *Polisi*'s holding and explicitly applies it to inadmissible evidence: "Nondisclosure by a

government prosecutor of a known indictment by his office against an important government witness cannot be justified … ***by self-serving judgments as to the admissibility of the indictment*** or its utility to the defense." *Bonanno*, 430 F.2d at 1063 (emphasis added). As the District Court explained, the question is whether the material would help the defense investigate and prepare for trial. Quoting *Bonnano*, the District Court says: "[e]ven if the indictment were inadmissible at trial, this would not diminish it's obvious value to the defense in preparing for trial and in giving it a lead to investigate." 430 F.2d at 1062; A3269. The District Court draws further from *Bonnano*: "failing to disclose evidence valuable to the defense, ***even on the good faith belief by the prosecutor that it would be inadmissible at trial***, deprives the defense of the opportunity to argue its admissibility and the court of its function of deciding the question." *Id.* (emphasis added).[4] *Bonnano* actually says that even a prosecutor cannot make admissibility decisions to avoid disclosure. How anyone could think that a police officer can nevertheless make

---

[4] *Bonnano* cites "The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant," 74 Yale L.J. 136, 147-48 (1964). In that passage, the article reasons:

> Neither can the evidence's admissibility circumscribe the duty. Certainly inadmissible evidence can help the defendant prepare his case as much as admissible evidence. Also, any judgment concerning admissibility made before the trial cannot be tested effectively unless the defense lawyer is given the opportunity to argue the issue. If the prosecutor makes the decision he will have performed his adversary's job.

such an admissibility decision to withhold evidence, after *Bonnano,* is far beyond unreasonable.

Relying on *Polisi* and *Bonnano,* the District Court concludes: "There is little question that the information about Montgomery would have been of 'some substantial use to [Epps]' in preparing his defense, *see Polisi*, 416 F.2d at 578; among other things, it at least would have given Epps's counsel 'a lead to investigate,' *see Bonnano*, 430 F.2d at 1062." A3269. It is thus astounding that the Detectives minimize *Polisi* and ignore *Bonnano* altogether. Perhaps marginalizing *Polisi* and *Bonnano* is the best tack for the Detectives because there is no way around them. But even if these cases did not exist as the Detectives feign, the District Court cites *Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), yet another case that clearly established the law and the underlying violation; also, well before 1998.

The District Court correctly applied *Walker* to conclude that Montgomery's confession clearly had to be disclosed to prosecutors, and its admissibility was not for the Detectives to decide.[5] *Walker* was a 1992 civil rights case decided six years

---

[5] The Detectives claim that "Epps's entire argument is that the Detectives should have disclosed Anderson's alleged statement to defense counsel." Br. 42. This is wrong. The claim is that Anderson's statement needed to be turned over to the prosecution, as is and was the standard practice.

before Epps's trial.[6] The central claim was that "police officers and prosecutors covered up exculpatory evidence and committed perjury in order to insure Walker's conviction despite their knowledge of Walker's probable innocence." *Walker*, 974 F.2d at 294. This Court held that police officers *are required to* disclose favorable material to the prosecution, and then it is the prosecution's job to do a more nuanced *Brady* analysis, if necessary:

> It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense. A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion. It also would ignore the fact that the defendant's appropriate point of contact with the government during litigation is the prosecutor and not those who will be witnesses against him.

*Walker*, 974 F.2d at 299. *Walker's* ruling makes "good sense," as the District Court noted, lifting the assessment verbatim from *Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021), which reaffirms and ratifies *Walker*. Of course, it would be illogical and misguided to place complicated decisions on

---

[6] The District Court also cited *United State v. Gleason*, 265 F.Supp. 880 (S.D.N.Y. 1967), as an example of how broad the *Brady* disclosure requirement was understood to be shortly after *Brady* was decided. (Dist. Ct. Dec. 17). *Gleason* held that the "prosecution's duty of disclosure as affirmed in *Brady*, cannot be limited to materials or information demonstrated in advance to be 'competent evidence.'" 265 F.Supp. at 886 (internal cite omitted).

admissibility to the police, and at the risk of violating a criminal defendant's constitutional right to due process of law and to a fair trial.[7] A3270.

The Detectives argue that because *Walker* only says that "police satisfy their obligation under *Brady* when they turn exculpatory [or impeachment] evidence over to prosecutors," but does not say "must" turn it over, *Walker* merely offers a "suggest[ion]" not a "hold[ing]." Br. at 34-35. This is silly. The actual language of *Walker* is this:

> Subsequent cases [to *Brady*], however, have suggested that the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors. We agree.

*Walker*, 974 F.2d at 299 (citations omitted). *Walker* cannot be clearer. It confirms—"***we agree***"—that police have an obligation to turn over exculpatory information to prosecutors. *Id*.

Thus, it was clearly established over five years before the Detectives withheld Montgomery's murder confession that it was the prosecutor's judgment call, not the polices', to assess *Brady* disclosures. And this is based on *Walker* alone. Combined with *Polisi* and *Bonnano,* (with *Bonnano's* admonishment that

---

[7] Indeed, the District Court was duty bound to acknowledge the import of *Walker* and apply it to this case. This Court in *Horn* said without qualification that *Walker* "clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused."11 F.4th at 171. This makes *Walker* binding law absent a contrary ruling from an "en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004).

even a prosecutor should not "deprive" a defendant of the right to argue admissibility) these three cases cited by the District Court form an insurmountable hurdle for the Detectives.

**b. Other Precedent also Clearly Established the Law.**

*Polisi, Bonnano* and *Walker* are not the only cases that clearly establish the law and govern the qualified immunity issue on this appeal. The Supreme Court methodically reiterated *Brady's* expansive disclosure requirements through several subsequent decisions. *Brady* itself, decided in 1963, speaks of "favorable" evidence, and does not draw a line between admissible and inadmissible evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Giglio v. United States*, decided more than twenty-five years before the relevant point in Epps's case, confirmed that *Brady* required disclosure of impeachment evidence, which, by its nature, is not directly admissible evidence. It is common practice to confront a witness with a document or out-of-court statement, including hearsay and without the underlying material being accepted into evidence and physically shown to the jury. 405 U.S. 150 (1972).[8]

[8] *Polisi*, decided in 1969, states that impeachment evidence needed to be disclosed. Three years later, the Supreme Court in *Giglio* reiterated the Second Circuit's interpretation of *Brady* and decades before Epps's trial.

*United States v. Bagley*, decided twelve years before Epps's trial, made crystal clear that the touchstone for *Brady* purposes is whether the "evidence [is] favorable to an accused" and could have been "***used effectively***" to defend the criminal case. 473 U.S. 667, 676-77 (1985) (emphasis added). The focus on ***use*** is obviously much wider than mere admissibility. Later, in *Kyles v. Whitley*, decided three years before Epps's trial, the Supreme Court reiterated that it is how *Brady* material might be used, creatively, by the defense, not necessarily the nature of the evidence, that is important. 514 U.S. 419, 447 (1995) (explaining that statements were *Brady* material because they "throw the reliability of the investigation into doubt" and can "sully the credibility" of the police). Indeed, the Second Circuit caselaw cited by the District Court was merely tracking the Supreme Court.

Moreover, the thread in *Polisi, Bonnano* and *Walker* about disclosure of favorable evidence, despite arguments over its value to the defense, ran through this Court's other cases, long before Epps's trial. In *United States v. Miller*, Judge Friendly emphasized that the question is what "skilled counsel" could develop with the exculpatory material. 411 F.2d 825, 832 (2d Cir. 1969). And in *Grant v. Alldredge*, a case with strikingly similar facts to Epps's, this Circuit expanded on Judge Friendly's insight. 498 F.2d 376 (2d Cir. 1974). A photograph of an alternate suspect who was identified by a witness was exculpatory merely because it would have led to "further inquiries" by defense counsel. *Id*. at 381-82. Selection of

"another man […] might have been significant enough for counsel to investigate further" because "pictures of those appearing in photographic spreads are often those of people who have had previous contacts with the authorities." *Id*. The fact it could have been used by a "skilled" defense attorney to prepare for trial was, alone, enough to make it exculpatory. *Id*.; *see also Miller v. Angliker*, 848 F.2d 1312, 1321 (2d Cir. 1988) (concluding that information from an investigation "suggest[ing] that the murders might have been committed" by an alternate suspect was clearly and obviously exculpatory).

The one case the Detectives argue helps them, *Wood v. Bartholomew*, does not. 516 U.S. 1 (1995). It is entirely consistent with this precedent and further demonstrates that the law was clearly established in 1998. In *Wood,* polygraph results were suppressed that showed two witnesses exhibited deception. Polygraph evidence was also "inadmissible under state law." *Id.* at 8. Detectives seize on this language as if "inadmissible" is a shiny object that can save the day. But it's fool's gold. The Supreme Court never held that admissibility was the key to whether the material needed to be disclosed. The suppression was not a *Brady* violation in *Wood* because the failed polygraph was not admissible ***and*** could not be ***used*** in any way by the defendant; either as impeach or an investigatory lead. *Wood* even delved into an analysis of whether this inadmissible evidence would have aided

defense counsel's trial preparation and decided it would not. *Id.* at 5. The Court reasoned:

> It is difficult to see, then, on what basis the Ninth Circuit concluded that respondent's counsel would have prepared in a different manner, or (more important) would have discovered some unspecified additional evidence, merely by disclosure of polygraph results that, as to two questions, were consistent with respondent's preestablished defense.

*Id.* at 5. Thus, directly contrary to the Detective's argument, use in the defense's trial preparation was an essential component of the Court's *Brady* analysis in *Wood.* Any suggestion that it was not is false and misleading. At bottom, all this case stands for the logical corollary of the other cases: useless evidence is not *Brady*, only useful material needs to be disclosed.

On a basic level, Detectives had a clearly established obligation to turn over any material that was useful to Epps's defense in any way. The case law by 1998 also covered a variety of scenarios—from trial strategy, to cross-examination, to an alternate suspect defense, to demonstrating that the police conducted a shoddy investigation. Montgomery's confession covered all of these bases, and the claim that it was hearsay offers no defense.

We are only now taken down a rabbit hole because the Detectives look to exploit qualified immunity to the extreme. But even indulging the folly, in a Lewis Carroll world where believing the impossible is possible,[9] the immunity claim still falls apart.

---

[9] *See* Lewis Carroll, *Through the Looking-Glass* (1871) ("Alice laughed. 'There's no use trying,' she said: 'one can't believe impossible things.' 'I daresay you haven't had much practice,' said the Queen. 'When I was your age, I always did it

### c. The Impact of Montgomery's Confession

Because the only evidence against Epps was a one-witness identification, made after a fleeting and incredibly stressful event, Epps looked remarkably like Montgomery, and Epps had a strong alibi, it is evident that Montgomery's confession was important and useful. Not much was needed to tilt the scales to acquittal in this case and the withheld evidence was a bombshell.

The Montgomery confession was favorable, useful, and may have even been admissible. In the first post-conviction C.P.L. § 440 proceeding, the state court trial judge immediately understood that this was a *Brady* violation that would require a new trial because the confession was so valuable: "this information could have been used on cross-examination of the People's eyewitness had it been timely divulged; and that the failure to disclose deprived [Epps] of the opportunity to show a photograph of Montgomery to the eyewitness, and to make an informed decision concerning the trial strategy most beneficial to his interests." A1080.

The Detectives' affidavits opposing Epps's § 440 motion all focused on the timing of Anderson's statement. The prosecutor never argued that if Anderson's revelation came before trial it was not *Brady* and did not have to be disclosed because it was inadmissible hearsay.  It is thus perplexing that Defendants the

---

for half-an-hour a day. Why, sometimes I've believed as many as six impossible things before breakfast.'").

Detectives now claim they Detectives thought the law in 1998 allowed them to withhold Montgomery's confession, despite never making this argument in the criminal case.

In opposition to the summary judgment motion, Epps provided an affidavit from David Cotter, one of his trial lawyers, explaining numerous ways he and co-counsel would have actually ***used*** Anderson's information to change the trajectory of the case. A2346-A2347. They would have, among other things, acquired Montgomery's photograph, recognized his resemblance to Epps, and if the prosecution could not be persuaded to dismiss the case, confronted Bradley with the photograph on cross-examination, among other things.

Not only was Epps's counsel allowed to show Bradley pictures of suspects other than Epps at trial, he had a good faith basis to show Montgomery's photo to Bradley, which the law clearly permitted the inquiry. *See United States v. Katsourgrakis*, 715 F.2d 769 (2d Cir. 1983); *accord People v. DePasquale*, 54 N.Y.2d 693 (N.Y. 1981) *and People v. Sorge*, 301 N.Y. 189 (N.Y. 1950). The argument Detectives make that a court would not permit the photographic confrontation is just incorrect, both legally, and as a practical matter since the trial court in real life did not curtail such confrontations. And if counsel had the photo and confronted Bradley with it, there is every reason to believe that it would have bared fruit. Both Montgomery and Epps's photographs were shown to Bradley in

2002, three years after Epps's trial and she said: "I see a definite similarity between Russell Montgomery and Cory Epps." A2348. Hence, the record hear demonstrates the usefulness of Montgomery's confession and the prejudice that ensued from the suppression of it.

Moreover, Epps's trial counsel made a pretrial demand for *Brady* and *Giglio* material and asked for "material that provides the defense the opportunity to make informed decisions regarding the trial strategy," noting that a prosecutor is "require[d] to turn over materials specifically requested by the defendant which will help in cross-examination" and with trial and defense strategies. A2346-A2347; A1969-A1983. In addition, he specifically asked the prosecutor to "[s]tate whether anyone other than the defendant was… [q]uestioned or considered a suspect; and [i]f so, state the name of, when, where and by whom questioned or considered and the crimes for which questioned or considered." A1978.Trial counsel was very interested in the type of information Anderson provided, and it is apparent that he would have utilized it effectively had it been turned over.

Finally, this case starkly shows why it is inappropriate to tether *Brady* disclosure obligations to admissibility determinations, the evil *Polisi, Bonnano* and *Walker* tried to avert. There was a strong argument that Anderson's statement recounting Montgomery's confession would have been admitted as direct evidence

at Epps's trial despite it being hearsay. At a minimum, there was a viable argument for it that his trial attorney should have been allowed to make.

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court reversed a conviction for the failure to admit an exculpatory declaration against penal interest, despite a state law that precluded such evidence. It held that the right to present a defense in accordance with due process of law required admission of hearsay that carries "persuasive assurances of trustworthiness and.. also was critical to Chambers' defense. In these circumstances where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302; *see also* Fed. R. Evid. 807 (the residual hearsay exception is functionally equivalent to a due process exception to the hearsay rule).

The New York State Court of Appeals applied this reasoning in *People v. Robinson*, 89 N.Y.2d 648 (N.Y. 1997), under New York State's constitution. There, the Court held that grand jury testimony of an unavailable witness, "vital to the defense" and that bore "indicia of reliability" should have been admitted, even though it did not fall within a recognized hearsay exception. *Id.* at 654-55; *see also*

*People v. James*, 242 A.D.2d 389 (2d Dept 1997) (same).[10] *Robinson* was decided over a year before Epps's trial. Thus, under the law at the time, trial counsel could have made a compelling argument that Montgomery's confession was admissible.

Montgomery's confession to killing Means was central to Epps's misidentification claim. It carried strong indicia of reliability as a declaration against penal interest despite the extra layer of hearsay. Montgomery looks like Epps ("eerily similar"), and with the pock marks on his face Montgomery actually meets the description of the killer better than Epps; Montgomery lived in the area of the murder; and, his motive for killing Pope to silence him from spreading news of Montgomery confession further links him to Means's murder.

So, in addition to all the ways Epps's trial counsel could have used the withheld evidence, they also could have offered it directly to the jury or at least argued for such admission. That Montgomery's confession was unquestionably useful to the defense.

[10] The "constitutional exception to the hearsay rule" raised in *Robinson* was also recognized in *People v. Est*eves, 152 A.D.2d 406 (2d Dept 1989), decided nine years before Epps's trial.

### d. The Law Was Clearly Established, So Failing to Give the Anderson Statement to the Prosecution Was Inherently Unreasonable.

The reasonableness prong of the qualified immunity analysis is straightforward. The law was clearly established. The Detectives had an obligation to turn over all material that is favorable to the defense to the prosecution, who then has a separate obligation to turn it over to the criminal defendant. Montgomery's confession was unquestionably favorable to Epps. Anderson also identified the true murderer, who better matched the description the sole witness provided. Any reasonable homicide detective, indeed any reasonable person, would recognize that an alternate suspect who looks like the defendant about to go on trial may help a skilled criminal defense lawyer. What the Detectives needed to do was obvious: turn over the evidence to the prosecution. The law "clearly bar[red] the challenged conduct"—suppressing the Anderson statement, which was favorable to Epps's defense. *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 390 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1628 (2026).

The Detectives' reasonableness argument is essentially a recasting of their argument that the law was not clearly established, claiming that as a result it was reasonable for them to think their actions were lawful, mixing the clearly established law and reasonableness prongs of the qualified immunity analysis to

make the same points twice. But that is not how the reasonableness prong of the qualified immunity analysis operates.

It is true that sometimes courts will define the right broadly under the second prong, "and consider the specific factual circumstances under the [reasonableness] prong." *Gould v. Davis*, 165 F.3d 265, 273 (4th Cir. 1998). For example, the right not to be arrested without probable cause is clearly established, but what might amount to probable cause in a specific case may be unclear. "In such cases, the [clearly established law] prong of the qualified immunity analysis becomes a *pro forma* recitation of a general constitutional right, and the real 'work' (that is, the consideration of the specific facts of the case) is done under the [reasonableness] prong." *Id*. But when, as here, the right is clearly defined, this prong is "easy to resolve." *Id*.

Given the clearly established law, it was inherently unreasonable for the Detectives to suppress Montgomery's confession because anyone would have known it was favorable to Epps.

In essence, the Detectives urge this Court to overturn the District Court and functionally expand qualified immunity far beyond its current boundaries. Of course, this Court cannot abolish qualified immunity in this case. But it is interesting to note the ground swell of well-founded criticisms of the doctrine by jurists and academics from across the ideological spectrum in considering this

appeal. *See Baxter v. Bracey*, 140 S. Ct. 1862, 1865 (2020) (Thomas, J., dissenting from the denial of certiorari) ("I continue to have strong doubts about our § 1983 qualified immunity doctrine."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (the current "one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers," telling them that "they can shoot first and think later"); *McKinney v. City of Middletown*, 49 F.4th 730, 756-58 (2d Cir. 2022) (Calabresi, J., dissenting appendix) (noting "more and more judges have come to recognize[] qualified immunity cannot withstand scrutiny," and that broad readings of the doctrine do not "strike[] the right balance"); *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1025 (9th Cir. 2020) (Hurwitz, J., concurring in part and dissenting in part) (noting "struggle" to apply the "ill-conceived" and "judge-made doctrine of qualified immunity, which is found nowhere in the text of § 1983"); *Cole v. Carson*, 935 F.3d 444, 471 (5th Cir. 2019) (en banc) (Willett, J., dissenting) ("The real-world functioning of modern immunity practice—essentially 'heads government wins, tails plaintiff loses'—leaves many victims violated but not vindicated."); *Green v. Thomas*, 734 F. Supp. 3d 532, 544 (S.D. Miss. 2024), (District Judge Carlton Reeves, sitting in the Southern District of Mississippi, outlining the historical, and logical, infirmities in the doctrine of qualified immunity, as well as the way it perpetuates racial inequality); William Baude, *Is Qualified Immunity Unlawful?*,

106 CAL. L. REV. 45 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018).

The qualified immunity defense can be argued to unfair extremes, as the Detectives do in this case. And those arguments should be rejected.

**e. Conclusion.**

In sum, there was a well-developed body of clearly established law prior to 1998 that covered the Detectives' actions in general, in principle, and in factually similar situations. Far beyond "undermining confidence in the verdict," the withheld evidence was a game-changer in this one-witness identification case with a strong alibi. The Detectives were not permitted to withhold Montgomery's confession from the prosecutor on the made-up, after-the-fact idea that inadmissible hearsay is not *Brady* material. This defies common sense and the clear law at the time that instructed them in unequivocal terms to turn over the evidence. There is no reasonable excuse that can effectively diminish the constitutional violation, even in the fairy tale land of qualified immunity Detectives try to create.

The District Court's rejection of a qualified immunity defense should be sustained.

## II. This Court Lacks Jurisdiction to Consider Appellants' Arguments Beyond Qualified Immunity—And Those Arguments Lack Merit.

This Court lacks jurisdiction to consider any of the arguments in the first point of the Detectives' Brief. These arguments are merely an attempt to relitigate other *Brady* issues Detectives lost on summary judgment, unconnected to the qualified immunity arguments that give this Court jurisdiction to consider this interlocutory appeal. Worse, Detectives have not even tried to meet their burden of establishing jurisdiction to consider these collateral arguments; the jurisdictional statement is limited to justifying the qualified immunity interlocutory appeal. This failure alone is fatal to jurisdiction. These arguments should be ignored.

They are also meritless. There is no bad faith *mens rea* requirement to prove a *Brady* violation, and even if there was, Epps could easily meet such a burden. Accepting Epps's version of the facts as true, which this Court must do, the Detectives lied about when they learned about the Montgomery confession at the 2001 C.P.L. § 440 hearing. They also withheld Anderson's identity after the verdict and before sentencing subverting Epps 1998 C.P.L. § 330.30 motion. And the Montgomery confession is clearly material.

### a. The Detectives Fail to Meet Their Burden of Demonstrating Jurisdiction Over Half the Arguments in Their Brief.

The District Court's denial of summary judgment is not a final order and could not ordinarily be appealed under 28 U.S.C. § 1291. *Rohman v. New York*

*City Transit Auth.*, 215 F.3d 208, 214 (2d Cir. 2000). Interlocutory appeals are only allowed in limited instances where an immediate appeal is in "the interest of achieving a healthy legal system." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (quotation omitted). "Appellate jurisdiction generally does not exist 'if resolution of the immunity defense depends upon disputed factual issues.'" *Sacaza v. City of New York*, 169 F.4th 363, 369 (2d Cir. 2026) (quoting *Washington v. Napolitano*, 29 F.4th 93, 103 (2d Cir. 2022)). A denial of qualified immunity can only be appealed when the denial presents "a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Catone v. Spielmann*, 149 F.3d 156, 159 (2d Cir. 1998) (internal quotations omitted). Consequently, the factual record on appeal is limited to three categories of facts: "[1] stipulated facts, or [2] on the facts that the plaintiff alleges are true, or [3] on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Sacaza*, 169 F.4th at 369.

The only exception is that this Court can consider collateral issues presented beyond qualified immunity if "(1) they are inextricably intertwined with the determination of qualified immunity or (2) their resolution is necessary to ensure meaningful review of the district court's ruling on qualified immunity." *Russell v. Scott*, 170 F.4th 83, 92 (2d Cir. 2026) (quotations omitted). But we do not even reach this exception here.

"It is beyond dispute that a party seeking to invoke the jurisdiction of a federal court bears the burden of establishing it." *Jok v. City of Burlington, Vermont*, 96 F.4th 291, 293 (2d Cir. 2024) (citing *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006) ("The line of cases confirming the rule that the party invoking jurisdiction bears the burden is a venerable one.")). "[T]he Federal Rules of Appellate Procedure make it clear that an appellant must demonstrate that the Court has appellate jurisdiction over the matter" in the jurisdictional statement in the brief." *Id*. at 293–94 (citing Fed. R. App. P. 28(a)(4)(B)). So, when the appellant "has made no attempt to establish [this Court's] jurisdiction," that defect is "fatal." *Russell*, 170 F.4th at 91–92.

The Detectives' Jurisdictional Statement says nothing about jurisdiction to consider any of the arguments in the first section of their Brief. This Court need not consider them at all.

**b. Detectives' *Mens Rea* Arguments Have No Merit.**

Beyond the jurisdictional failures, the Detectives' *mens rea* arguments are wrong on the law and wrong on the facts. *First*, bad faith is not the correct standard: "The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988); *see also Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995)

(finding that "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). This Court has "suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional." *Bellamy v. City of New York*, 914 F.3d 727, 751 n.23 (2d Cir. 2019). And certainly, an accidental failure to disclose may not be actionable, given that a civil rights violation requires proof of more than negligence. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986). But a high standard, closer to malice, is not the law. Nor could it be, because Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right," *Daniels*, 474 U.S. at 330, and the *Brady* right can be violated whether the material was withheld intentionally or not, *Arizona*, 488 U.S. at 57.

*Second*, the Detectives claim that "they did not intentionally withhold Anderson's Alleged Statement, because they were not investigating Epps, whose trial was only days away" is squarely contradicted by the officers' own testimony. Stambach insists that Andrson never mentioned that Pope told her about Montgomery's confession. A2524. Constantino says the same. A2533-A2534. Giardina also denies it. A2537.

Consequently, the Detectives cannot establish as an uncontested fact that they lacked intent to suppress while simultaneously claiming Anderson never made

the *Brady* statement at all. Indeed, the District Court ruled that "defendants dispute that these statements were made to them. But that is a question for trial: The Court 'may not resolve genuine disputes of fact in favor of the party seeking summary judgment.'" A3265 (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

Further, if the Detectives were correct about the *mens rea* standard, which they are not, those denials would allow a jury to find that Giardina and Stambach intentionally withheld this *Brady* material in bad faith. Anderson testified that she made her statement linking Montgomery to the Means murder before Epps went to trial. A jury could readily infer that the officers withheld this statement deliberately because if it was truly suppressed by accident, they would have no reason to lie about when Anderson made it. *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (finding that lies can allow a jury to find the officers acted in bad faith).

The Detectives also claim that they did not know about the Epps trial because they were investigating the Pope murder instead. Anderson's account in the record belies this contention. It is also factually inaccurate and untenable based on Detectives' deposition testimony alone. A157; A160; A196-A197. In any event, they cannot raise this argument for the first time here because they did not argue it below. "It is a well-established general rule that an appellate court will not

consider an issue raised for the first time on appeal." *Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, 533 F.3d 98, 99 (2d Cir. 2008) (quotation omitted).

### c. The Detectives' Materiality Arguments—Which Cannot Be Re-Litigated Here—Also Have No Merit.

The District Court ruled that the defendant officers knew from Anderson that "(1) that Montgomery looked like the identikit composite of Means's killer and (2) that Pope had told Anderson that Montgomery admitted to killing Means." A3265. And then ruled that "[w]ithout question, those statements were favorable to Epps: His trial counsel certainly could have used the information about Montgomery to develop an alternative-perpetrator defense, conduct further investigation, and challenge Bradley's identification of Epps on cross-examination"—the Montgomery confession. A3265.

This ruling is entirely correct. Anderson's statement could have changed the outcome of the trial, and due process required Epps to have the chance to use it to defend himself. That ruling, grounded in findings of law and fact, cannot be re-litigated in this interlocutory appeal. *See McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 826 (2d Cir. 2014) (finding that "issues of fact underlie" the impact omissions in a warrant may have had in the criminal case, so "this case lies outside of the jurisdiction of this Court to perform interlocutory review of the denial of summary judgment.").

But beyond this insurmountable jurisdictional defect, there are three major errors in the Detectives' argument against the District Court's well-reasoned opinion. *First*, the Detectives ignore the clear holding of the *Walker* case (and *Polisi* and *Bonnano* which pre-dated *Walker* and share the same rationale) . The Detectives did not have to consider and should not have considered thorny materiality questions because "*Walker* clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused" and despite admissibility. *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021). Given how obviously favorable the Montgomery confession is, there was no reason for any further analysis by the Detectives. It was up to a prosecutor, a trained attorney to handle it, and ultimately up to the court to decide, and with defense counsel's input.

*Second*, citing *Strickler v. Greene*, 527 U.S. 263 (1999), they claim "Epps must prove that there is a "reasonable probability" that the result of the trial would have been different had he received Anderson's Alleged Statement … ." Br. at 25. But that is the exact opposite of what *Strickler* held: "The question ***is not*** whether the defendant would more likely than not have received a different verdict with the evidence." *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (emphasis added). The question, clearly established in 1995, was whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v.*

*Whitley*, 514 U.S. 419, 434 (1995). An unfair trial caused by suppressed evidence, with at least a "reasonable probability of a different result" itself "undermines confidence" in the conviction. *Id.* He only has to prove that it is reasonable to find that a fair trial ***could*** have had a different outcome. This is a relatively lax standard, not the "exacting" one the Detectives claim. Br. at 25. But of course, even with a higher standard Epps easily meets it on this record.

*United States.v. Payne*, cited by the District Court, readily demonstrates how the correct standard applies in a single-witness identification case, with no corroborating testimony, like this one. 63 F.3d 1200 (2d Cir. 1995). In *Payne,* this Court was openly skeptical about the chances of the suppressed evidence changing the outcome at trial because it was "improbable that the jury would have believed" it. *Id.* at 1210. But this Court still found that it was material merely because it was "useful impeachment evidence." *Id*. Montgomery's confession was more than useful; it ultimately led to Epps's exoneration, and may have even been admissible, as argued above.

*And third*, the "speculation" that the Detectives claim is required to find materiality ignores, again, both the facts and the law. When the police suppress evidence, the materiality prong requires the court to consider what might have happened if the evidence had been turned over. The the court must look at the

record and consider whether the suppressed material would have somehow been useful to the criminal defense.

Here, the answer is readily available in the record. The criminal defense attorney described how he would have investigated and used Montgomery's confession. And the Montgomery confession may have been admissible outright. After the verdict, the trial judge was immediately concerned by Anderson's then-anonymous revelation and ordered the prosecution to investigate. The trial judge granted the defense's request for a C.P.L. § 440 hearing in 2000 to determine if Anderson's statement was *Brady* material—a step he did not need to take if Anderson's statement was, on its face, not *Brady* material because it was hearsay. The officers lied about when the statement was made to undermine Epps's attempts to reverse the conviction, which would have been pointless if the statement was not material. And most importantly, Montgomery's confession ultimately led to Epps's exoneration. Materiality is so clear in this case, that it will likely not be a seriously contested issue at Epps's civil rights trial.

The cases cited by the Detectives simply stand for the obvious corollary: completely useless evidence is not material. In *Wood v. Bartholomew*, as explained above, the suppresses material was useless to the defense 516 U.S. 1, 7-8 (1995). And *U.S. v. Santos* comes to essentially the same conclusion; the suppressed material had no value "given that the impeachment evidence against the

government's main witness was already overwhelming.” 486 F. App'x 133, 135 (2d Cir. 2012). A little bit more impeachment evidence was of no use. Taken together, *Payne*, *Wood*, and *Santos* outline a straightforward rule. When the evidence could have been useful to the defense, it is material. When it is useless, it is by nature immaterial. The Montgomery confession is so obviously useful, materiality is beyond question.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's Order.

Dated: New York, New York
August 17, 2026

GLENN A. GARBER, P.C.

By: /s/

Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
Phone: (212) 965-9370

RICKNER MOSKOVITZ LLP

By: /s/

Rob Rickner

14 Wall Street, Suite 4C
New York, New York 10005
Phone: (212) 300-6506

*Attorneys for Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C)(i)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,011** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a **proportionally spaced typeface** using **Microsoft Word** in **Times New Roman 14-point font**.

Dated: New York, New York
August 17, 2026

Respectfully submitted,

______/s/_________
Rob Rickner
Rickner Moskovitz LLP

*Attorneys for Plaintiff-Appellee*